**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>GREEN SAPPHIRE HOLDINGS, INC.,<br><br>Putative Debtor. | Case Number 26-33254-mvl7<br><br>Chapter No.: 7 (Involuntary) |

**GLOBAL CAPITAL PARTNERS, LLC'S RESPONSE**
**<u>TO PETITIONERS' OBJECTION TO ITS NOTICE OF WITHDRAWAL</u>**

Global Capital Partners, LLC ("Global Capital"), by and through undersigned counsel, respectfully submits the following response to Petitioners' objection to Global Capital's notice of withdrawal of its motion to dismiss (ECF 58) (the "Motion").

## INTRODUCTION

1. On July 31, 2026, Global Capital moved to dismiss Petitioners' involuntary petition against putative debtor Green Sapphire Holdings, Inc. ("Green Sapphire"). The Court ordered discovery responses due September 4, depositions to be taken the week of September 7, and a hearing on September 14, 2026. Petitioners served untimely and woefully incomplete discovery responses on September 5. Petitioners and Green Sapphire then refused to make their witnesses available for depositions, even by Zoom, during the week of September 7. Given the discovery disputes, Global Capital asked Petitioners to continue the hearing. Petitioners refused. Global Capital therefore withdrew its motion, without prejudice to refiling. Petitioners have now objected and requested a "with-prejudice" disposition barring Global Capital from renewing its motion to dismiss. Petitioners' request should be denied.

2. Basic due process protects all parties to a case. Petitioners are entitled to a hearing at the appropriate time on Global Capital's motion to dismiss their petition as filed in bad faith. By the same token, Global Capital is entitled to take discovery in advance of that hearing so that it may properly present its motion. However, as discussed below, Petitioners denied Global Capital critical discovery and sought to force through an evidentiary hearing on a one-sided record. Global Capital should be permitted to refile its motion to dismiss and reset it for a hearing once Petitioners fairly respond to its focused discovery requests and allow depositions of their witnesses.

## FACTUAL BACKGROUND

### A. The Court Ruled Any Depositions Would Be Had the Week of September 7.

3. On July 17, 2026, the U.S. Bankruptcy Court for the Northern District of Illinois dismissed Green Sapphire's voluntary petition for bankruptcy and barred Green Sapphire from refiling for one year. On July 21, 2026, two business days later, an involuntary petition against Green Sapphire was filed in this Court. On July 31, 2026, Global Capital filed its motion to dismiss the involuntary petition as filed in bad faith and in collusion with Green Sapphire and its controller A.R. Thane Ritchie.

4. On August 18, 2026, the Court held a status hearing. The Court ordered that the motion to dismiss would be heard during week of September 14, and directed the parties to confer and agree on an exact date.

5. During the August 18 hearing, counsel for Petitioners stated: "We probably – we will likely have at least four witnesses that will testify." Ex. 1 at 6:12-13. Counsel for Green Sapphire also stated that it would call "Certainly one, if not two" witnesses. *Id.* at 33:6-9. In

response, counsel for Global Capital unequivocally stated: "we need to depose these witnesses ahead of the hearing." *Id.* at 36:15-16.

6. The Court then ruled: "any depositions that need to be had can be had the week of the 7th, in preparation for a hearing on the week of the 14th." *Id.* at 39:3-5. The Court reiterated: "any depositions can be had the week of September 7th, and we'll have that hearing the week of the 14th." *Id.* at 39:14-16.

**B. Petitioners Served Untimely and Incomplete Discovery Responses.**

7. On September 4, Petitioners asked Global Capital for an extension of time to respond to its interrogatories, until September 5 at 3:00 p.m. central time. Ex. 2. Global Capital agreed to the extension on reciprocal terms. *Id.* The parties did not extend the September 4 deadline for responding to other discovery requests.

8. Later on September 4, Global Capital served Petitioners with its written responses to their document requests and requests for admission as well as its production of documents. Ex. 3. Petitioners, however, did not serve their responses to Global Capital's document requests or their document production by the September 4 deadline.

9. On September 5, at 2:01 pm central time, Global Capital served its answers and objections to Petitioners' interrogatories. Ex. 4.[1] At 3:00 pm—the extended deadline for interrogatory answers—Petitioners did not serve their answers to Global Capital's interrogatories. Nor did Petitioners serve written responses to Global Capital's document requests or their document production.

10. Later on September 5, at 6:32 pm, Petitioners finally served their interrogatory answers, written responses to document requests, and document production. *See* Ex. 5 (email

[1] The email in Exhibit 4 and all other emails attached hereto bear eastern standard time.

serving discovery responses); Ex. 6 (document request responses of lecocqassociate, Legamaro Banipal LLP, and Charles-Hubert Vanoverberghe); Ex. 7 (interrogatory answers of lecocqassociate, Legamaro Banipal LLP, and Charles-Hubert Vanoverberghe); Ex. 8 (document request responses of Lazareff Le Bars Legal Advisory Limited (ADGM) and Lazareff Le Bars SARL); and Ex. 9 (interrogatory answers of Lazareff Le Bars Legal Advisory Limited (ADGM) and Lazareff Le Bars SARL).

11. Petitioners' discovery responses exhibited significant deficiencies. Among other improper objections to production, Petitioners interposed a general objection and specific objections to seven discovery requests concerning connections between Petitioners and A.R. Thane Ritchie.[2] Petitioners objected to such discovery concerning Ritchie "insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative," on grounds that he "is not a party to this proceeding" and "cannot control" Green Sapphire. In addition, several of Petitioners' answers to critical interrogatories were woefully incomplete, as discussed below. Petitioners' document production contained only 132 documents.

**C. Substantial Discovery Disputes Emerged Days Before the Hearing.**

12. On September 7, Global Capital emailed Petitioners and Green Sapphire to schedule depositions. Ex. 10. Global Capital asked that Petitioners and Green Sapphire "identify the witnesses you intend to call at the hearing and provide their availability for depositions later this week," and "provide Michael Legamaro's availability for a deposition this week." *Id.*

13. On September 8, Petitioners emailed Global Capital that its "request to depose witnesses attending hearing, Monday, 14 September is opposed." Ex. 11. Petitioners did not identify their witnesses. Later that day, Green Sapphire responded that the request for depositions

[2] *See* Requests for Production 2, 3, 7, 16, 17, 19 (Exs. 6, 8) and Interrogatories 7, 8, 11 (Exs. 7, 9).

"was a complete surprise." Ex. 12. Green Sapphire stated that "My client is also unavailable this week." Green Sapphire did not identify its witnesses.

14. That evening, Global Capital offered to "take the depositions by Zoom for the convenience of the witnesses, and also to take depositions this Saturday if need be." Ex. 13. Global Capital again asked that Petitioners and Green Sapphire "Please identify your witnesses and provide their availability for Zoom depositions." Neither party responded.

15. Late on September 8, Petitioners emailed Global Capital asserting that its discovery responses were deficient. Ex. 14. Petitioners sought a meet and confer the next day at 1 pm. The next morning, Global Capital sent Petitioners notice of the deficiencies in their discovery responses. Ex. 15. Global Capital offered to meet at any time on September 10. Petitioners did not respond.

**D. Petitioners Refused to Continue the Hearing, So Global Capital Withdrew its Motion.**

16. Later on September 9, Global Capital telephoned Petitioners to request a continuance of the hearing in view of the many discovery disputes outstanding between the parties. A continuance would allow time for the Court to rule on the disputes and discovery to be completed. Petitioners rejected the request out of hand. Instead, Petitioners immediately emailed chambers and stated that they would be moving forward with the hearing on Monday. Ex. 16.

17. In response, Global Capital advised chambers: "Global Capital is withdrawing its motion to dismiss the involuntary petition, without prejudice to refiling at a later date after adequate discovery can be carried out. The hearing set for Monday, September 14, can therefore be cancelled." Ex. 17. Global Capital then filed its Notice of Withdrawal. ECF 57. The notice withdrew its Motion to Dismiss (ECF 11), "without prejudice to refiling at a later date."

18. Later that evening, Petitioners filed their *Emergency Objection to Global's Notice of Withdrawal; Emergency Request for With-Prejudice Disposition; and Alternative Emergency Motion to Preserve the September 14 Evidentiary Hearing*. ECF 58.

## ARGUMENT

### A. Global Capital's Notice of Withdrawal Was Necessary and Proper.

19. Global Capital's Notice of Withdrawal was proper and timely. Days before the September 14 hearing date, substantial discovery disputes emerged between the parties. Global Capital requested a continuance to provide time to resolve the disputes and seek relief from the Court if needed. When Petitioners refused to continue the hearing, Global Capital immediately withdrew its motion without prejudice to refiling. Global Capital had little choice but to file its notice of withdrawal because Petitioners denied it discovery critical to presenting its motion.

20. Petitioners blocked Global Capital from deposing their witnesses ahead of the hearing. The Court ordered that any depositions that need to be had could be had the week of September 7. But when Global Capital requested that Petitioners and Green Sapphire provide their witnesses' availability that week, they flatly refused to allow any depositions or even identify their witnesses. Global Capital cannot reasonably be expected to proceed to a hearing without the identities of the witnesses to be called or the chance to probe their testimony in advance.

21. There is no valid excuse for denying Global Capital depositions before the hearing. Contrary to Green Sapphire's response, Global Capital's request of September 7 could not have come as a "complete surprise." Petitioners and Green Sapphire were on notice as of August 18 that they were to prepare their witnesses for depositions the week of September 7. At the status hearing, Global Capital unequivocally stated that it would need to depose any witnesses the other parties intended to call, and the Court ordered twice that such depositions would occur the week

of September 7. Nor could Petitioners or Green Sapphire object out of inconvenience. Global Capital offered to waive in-person depositions and take them remotely, via Zoom.

22. Petitioners also denied Global Capital key written discovery and documents it requested before the hearing. First, Petitioners refused to produce documents related to Thane Ritchie and his family office. Global Capital requested "All Communications between You and … Thane Ritchie…during the Relevant Period" (Request No. 3),[3] and "Documents sufficient to show all monies You received, directly or indirectly, from … Thane Ritchie, or Alpha Carta Ltd. … during the Relevant Period" (Request No. 7).[4] Ex. 6 at 7, 10; Ex. 8 at 8, 11. Petitioners responded to both requests by improperly objecting and stating: "Mr. Ritchie is excluded from the scope." Ex. 6 at 7, 10; Ex. 8 at 8, 12.

23. However, Global Capital's motion to dismiss claims that Petitioners filed in bad faith and in collusion with Green Sapphire and Thane Ritchie. ECF 11 at 11-19. Global Capital is entitled to develop its claim and discover connections between Petitioners and Ritchie and his family office—including any communications or payments between them in the last 18 months. Petitioners' objection that Ritchie "cannot control" Green Sapphire is improper and contrary to established fact. The Delaware Court of Chancery in its post-trial opinion expressly found that "Ritchie controls Defendant Green Sapphire Holdings, Inc." Ex. 18 at 1, 4, 9.

24. Second, Petitioners refused to provide complete answers to key interrogatories. Global Capital requested that Petitioners describe "the circumstances leading to the filing of the Petition." Yet they have not disclosed the circumstances that led to their first contact with Tittle

[3] The "Relevant Period" was defined to mean January 1, 2025 to the present.

[4] Alpha Carta Ltd. is another entity within Thane Ritchie's family office. The Delaware Court of Chancery in its post-trial opinion found, "Ritchie controls both Alpha Carta and the Borrower [Green Sapphire]." Ex. 18 at 4.

Santiago. For example, Petitioners state that "Mr. Tittle initiated contact" with lecocqassociate and Charles-Hubert Vanoverberghe about a possible involuntary bankruptcy case on June 29, 2026—three weeks before Green Sapphire's voluntary bankruptcy case was dismissed in Illinois. But Petitioners do not disclose the circumstances prior to June 29, 2026 that led Texas-based Tittle Santiago to contact creditors in a then-pending Illinois case about filing a new case in Texas—including how Tittle Santiago knew Green Sapphire had a virtual office in Dallas to support a new case in Texas, when the sole office address listed in the Illinois bankruptcy was a virtual office in Chicago.

25. Global Capital also requested that Petitioners disclose whether they "had knowledge of the July 21, 2026 hearing in the Delaware Action prior to filing the Petition, ***and the source of such knowledge***." Ex. 7 at 13 (emphasis added). The petition was filed on July 21, 2026, barely one hour before a hearing in the Delaware Court of Chancery on a motion to appoint a receiver over Green Sapphire. Petitioners state that "each considered that the pending receiver request was a material timing factor." But they do not disclose how they came to learn about the pending receiver request, which was made less than 24 hours before they filed their petition.

26. The discovery deficiencies are most acute in Legamaro Banipal's responses. Legamaro Banipal states only that "Michael Legamaro … contacted Mr. Tittle by telephone on July 21, 2026," implying they had not previously spoken. Ex. 7 at 6. But the day that Mr. Legamaro and Mr. Tittle first spoke also happened to be the same day that Tittle Santiago filed the involuntary petition, and the same day that the Chancery Court heard the pending receiver request. Legamaro Banipal does not disclose any of the circumstances that led Mr. Legamaro to contact Mr. Tittle on the day of the Chancery Court hearing, to immediately engage his firm, and to sign

and file the petition all within a few hours. How did Legamaro learn of Tittle Santiago?[5] And how did Legamaro know to call Tittle Santiago that day? Global Capital's interrogatories sought these answers and Petitions have not asserted any valid objection to providing them.

27. Petitioners' incomplete discovery responses and refusal to produce their witnesses for depositions denied Global Capital the discovery it sought for its motion to dismiss. Global Capital was therefore forced to withdraw its motion rather than proceed blindly into the hearing on an incomplete record. Global Capital should be permitted to refile its motion once Petitioners supplement their discovery responses and produce their witnesses for depositions.

**B. Petitioners' Request for a "With-Prejudice" Disposition Should be Denied.**

28. Petitioners have requested that Global Capital's motion to dismiss the involuntary petition be "withdrawn or dismissed only with prejudice to renewal." Motion ¶ 4. Petitioners' request to condition Global Capital's withdrawal of its motion is unsupported by relevant law or facts.

29. Petitioners insist the withdrawal could deemed with prejudice pursuant to Federal Rule of Civil Procedure 41, which permits courts to so condition a dismissal of claims for relief. Motion ¶¶ 32-37. Federal Rule of Bankruptcy Procedure 7041 makes Civil Rule 41 applicable to certain bankruptcy proceedings. But by its terms, Bankruptcy Rule 7041 provides that Civil Rule 41 only "applies in an adversary proceeding." Global Capital has not withdrawn an adversary complaint. It has withdrawn a motion to dismiss. Thus, Civil Rule 41 has no application here.

[5] Likewise, Joining Petitioner Lazareff Le Bars Legal Advisory Limited stated only that "On August 11, 2026, Mr. McNutt … independently called Tittle Santiago" about joining the petition. Ex. 9 at 6. The joining petitioner does not disclose the circumstances that led Mr. McNutt to call Tittle Santiago or how he learned about the involuntary bankruptcy in the first instance.

30. Petitioners' invocation of Bankruptcy Rules 9014 and 1018 does not change the analysis. Motion ¶¶ 32-33. Bankruptcy Rule 9014 makes Rule 7041 generally applicable to contested matters. But Rule 9014 does not specifically govern motions to dismiss an involuntary petition. Rather, Bankruptcy Rule 1018 governs a "proceeding that contests … an involuntary petition." And under Bankruptcy Rule 1018, Rule 7041 is *not* among the default rules of Part VII made applicable to a motion to dismiss an involuntary petition.[6]

31. Even if Civil Rule 41 did apply, treating Global Capital's withdrawal of its motion to dismiss as a "dismissal" and conditioning it as a dismissal with prejudice is unwarranted. Under Civil Rule 41(a)(2), a voluntary dismissal is without prejudice, unless the court orders otherwise. The traditional principle is that dismissal without prejudice should be allowed unless the party opposing dismissal demonstrates "plain legal prejudice." *Manshack v. Sw. Elec. Power Co.*, 915 F.2d 172, 174 (5th Cir. 1990) (plaintiff moved to voluntarily dismiss without prejudice, and court granted motion same day) (citing 9 C. Wright & A. Miller, Federal Practice and Procedure § 2364, at 165 (1971)). Here, Petitioners have not shown any prejudice, much less plain legal prejudice.

32. Petitioners suggest they face "indefinite postponement" of a renewed motion to dismiss. Motion ¶ 4. But Global Capital does not propose an indefinite postponement. It intends to renew its motion and proceed to a hearing once Petitioners fairly answer its discovery requests.

33. Petitioners also argue they have "incurred hearing-specific expense and arranged overseas travel." Motion ¶ 35. Global Capital withdrew its motion five days before the hearing. Any overseas travel arrangements could easily have been rearranged. Any hearing-specific work

---

[6] Petitioners' reliance on *In re Alfahel*, 651 B.R. 381 (B.A.P. 9th Cir. 2023) is misplaced. There, the court applied Civil Rule 41 to the withdrawal of successive motions to avoid a lien, because such motions are contested matters subject to Rule 9014. Here, Global Capital has withdrawn a motion to dismiss an involuntary petition, which is subject to Rule 1018 instead.

can be reused when the motion is renewed and the hearing rescheduled. As *Manshack* held, "the mere prospect of a second lawsuit" does not constitute plain legal prejudice. 915 F.2d at 174.

34. The cases Petitioners cite are inapposite. In *Elbaor v. Tripath Imaging, Inc.*, the court held that voluntary dismissal without prejudice would cause defendant plain legal prejudice because plaintiff could refile in another jurisdiction with a longer statute of limitations, depriving defendant of its key defense. 279 F.3d 314, 319 (5th Cir. 2002). Global Capital's refiling of its motion to dismiss will not cause Petitioners to lose any legal defense. *In re FEMA Trailer Formaldahyde Prods. Liab. Litig.*, the court held that a bellwether plaintiff in a multi-district litigation could not voluntarily dismiss without prejudice because he moved shortly before trial and the "size and scope of this multiparty litigation" would have complicated efforts to set the case back on track. 628 F.3d 157, 163 (5th Cir. 2010). That is not this case.

35. Ultimately, conditioning Global Capital's notice of withdrawal and prohibiting it from renewing its motion to dismiss would reward Petitioners' non-cooperation and set a troubling precedent. A party opposing a motion set for an evidentiary hearing could improperly defeat it by frustrating discovery at the eleventh hour. The movant would face an impossible choice: proceed on an incomplete record, or withdraw the motion and lose the ability to refile for the requested relief on a more complete record.

## CONCLUSION

36. For these reasons, Global Capital respectfully requests the Court to overrule Petitioners' Objection to Global Capital's Notice of Withdrawal and deny the request to condition the Notice of Withdrawal as a dismissal with prejudice.

Dated September 18, 2026

**DENTONS US LLP**

/s/ *Spencer D. Hamilton*
Spencer D. Hamilton
Texas Bar No. 24087656
DENTONS US LLP
100 Crescent Court, Suite 900
Dallas, Texas 75201
Tel: (214) 259-0900
Email: spencer.hamilton@dentons.com

Kenneth J. Pfaehler (*pro hac vice*)
Nicholas W. Petts (*pro hac vice* )
DENTONS US LLP
1900 K Street N.W.
Washington, D.C. 20006
Tel: (202) 408-6468
Email: kenneth.pfaehler@dentons.com
nicholas.petts@dentons.com

Robert E. Richards (*pro hac vice*)
233 S. Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel: (312) 876-7396
Email: robert.richards@dentons.com

Kevin McCullough
ROCHELLE MCCULLOUGH PLLC
Texas Bar No. 00788005
901 Main St #3200
Dallas, TX 75202
Tel: (214) 953-0182
Email: kdm@romclawyers.com

*Counsel to Global Capital Partners, LLC*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that he served a copy of the foregoing on all counsel of record via the Court's CM/ECF System on September 18, 2026.

By: */s/ Spencer D. Hamilton*
Spencer D. Hamilton

# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>GREEN SAPPHIRE HOLDINGS, INC.,<br><br>Alleged Debtor.<br><br>. | **Case No. 26-33254-mvl-7**<br><br>Dallas, Texas<br>August 18, 2026<br>9:30 a.m. Docket<br><br>STATUS CONFERENCE RE:<br>INVOLUNTARY CHAPTER 11<br>PETITION (1) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Alleged Debtor: | R. Adam Swick<br>AKERMAN, LLP<br>500 W. 5th Street, Suite 1210<br>Austin, TX 78701<br>(737) 999-7103 |
| For the Alleged Debtor: | Andrew Dupre<br>AKERMAN, LLP<br>222 Delaware Avenue,<br>Suite 1710<br>Wilmington, DE 19801<br>(302) 596-9201 |
| For Legamaro Banipal, LLP, et al, Petitioning Creditors: | Brandon J. Tittle<br>TITTLE SANTIAGO, PLLC<br>1125 Legacy Drive, Suite 230<br>Frisco, TX 75034<br>(972) 213-2316 |
| For Global Capital Partners, LLC: | Kenneth J. Pfaehler<br>Nicholas W. Petts<br>DENTONS US, LLP<br>1900 K Street, NW, Suite 800<br>Washington, D.C. 20006-1102<br>(202) 408-6468 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the United States Trustee: | Meredyth Kippes<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242<br>(214) 767-8967 |
| Recorded by: | Bryon A. Robinson<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street<br>Dallas, TX 75242<br>(214) 753-2011 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

DALLAS, TEXAS - AUGUST 18, 2026 - 10:02 A.M.

THE COURT: With that, the next matter on the docket is Case No. 26-33254, Green Sapphire Holdings, Inc. I'll take appearances for the record, and I'll start with those folks in the courtroom.

MS. KIPPES: Good morning again, Your Honor. Meredyth Kippes on behalf of the United States Trustee.

I will note for the record that since this is currently an involuntary without an order for relief, the U.S. Trustee doesn't really have much jurisdiction, but we are here to monitor.

THE COURT: Thank you very much. Appreciate that.

All right. So I'll now hear from -- I'll start with you, Mr. Tittle.

MR. TITTLE: Good morning, Your Honor. Brandon Tittle for the Petitioning Creditors and the two Joining Creditors. I appear for lecocqassociate, Legamaro Banipal, LLP, Charles-Hubert Vanoverberghe, Lazareff Le Bars Legal Advisory, Limited, and Lazareff Le Bars SARL.

THE COURT: All right. Anyone else wish to make an appearance?

MR. PFAEHLER: Yes, Your Honor. Ken Pfaehler, and with me is Nick Petts, from Dentons US, LLC. We represent -- we represent Creditor Global Capital Partners, LLC. Global Capital won a final judgment after trial in the Delaware

Court of Chancery. Global Capital secured a dismissal of a Chapter 11 case on July 17th by Judge Cox, Northern District of Illinois, who found that the case had been filed in bad faith, for the purpose --

THE COURT: Okay. We're making appearances.

MR. PFAEHLER: Yes.

THE COURT: Okay.

MR. PFAEHLER: Thank you, Your Honor.

THE COURT: All right. Thank you.

Anyone else wish to make an appearance?

MR. SWICK: Your Honor, you have Adam Swick and Andrew Dupre with Akerman on behalf of the Debtor, Global Sapphire -- Green Sapphire Holdings, Inc.

THE COURT: Okay. Thank you.

Anyone else wish to make an appearance?

(No response.)

THE COURT: All right. So, again, Mr. Tittle, obviously, I've seen that there has been a flurry of filings relative to this matter. So why don't you bring me up to speed, tell me who your creditors are, the nature of their debt against Green Sapphire Holdings, and then where we are relative to -- I know at one point you had filed a motion to withdraw, and I think I hear from the papers that you have withdrawn the motion to withdraw. So, why don't you tell me where we are.

MR. TITTLE: Well, so the original claims arise from professional services performed over several years. Legamaro's two invoices from March and April 2024 total about $8,060. Charles invoices dated April 2023rd [sic] concerns work related to Global loan and security agreement. Lecocq's records document extensive Green Sapphire, corporate, French, Delaware, and St. Barts work.

The original Petitioning Creditors assert aggregate claims of $174,000. The two filed joinders bring the present asserted total to $968,000. Each Joining Creditor filed a verified declaration asserting a prepetition claim, independent business judgment, no debtor control, no reimbursement, indemnification, or preferential consideration.

The common representation was funded by an unpaid creditor, lecocqassociate, not by Green Sapphire. The creditors are faced -- faced a concrete enforcement threat. Global sought a receiver empowered to act in Green Sapphire's name to dismiss litigation claims, marshal and sell Green Sapphire's noncash investments, and apply those proceeds to Global's judgment. That gave the creditors an independent economic reason to seek a collective process.

If the Court requires proof under Section 303(b) and Section 303(h), we are prepared to present the engagements, invoices, accounts records, creditor declarations, payment

history, petition date creditor matrix, bank records, and witness testimony. We do not ask the Court to resolve those disputed facts without that record.

For today's purposes, since this is merely a status conference, I would like to address four matters. First, the intended Chapter 11 designation and the two filed joinders. Second, the Petitioning Creditors' compliance with the standing scheduling order. Third, the narrow procedural relief that we're actually requesting today. And then, four, setting a hearing on the dismissal motion with a scheduling order as to discovery.

We probably -- we will likely have at least four witnesses that will testify. The only party that we're trying to figure out if they will testify is Charles-Hubert Vanoverberghe. He's currently in St. Barts on holiday, so it's been difficult to get ahold of him this last week. But if we -- if he agrees to be -- to serve as a witness, then that means all five Petitioners are willing to serve as a witness at the hearing on the motion to dismiss.

The immediate procedural issue today is straightforward. The Petitioning Creditors intended from the outset to commence an involuntary case under Chapter 11. The selection of a Chapter 7 on Official Form 205 was an inadvertent checkbox error that I made myself. I was moving too quickly to try to get it filed the morning before the receivership,

and that should not be an error that should penalize my clients. It did not reflect the chapter the Petitioning Creditors intended to select, and it did not reflect the relief they intended to request from this Court.

Green Sapphire does not oppose Chapter 11 relief. In the Joint Pretrial Statement, Green Sapphire represents that it has no evidence in opposition to the entry of an order for relief under Chapter 11.

Two additional creditors have now filed joinders pursuant to Section 303(c) at Docket Numbers 25 and 26. Both Joining Creditors expressly request relief under Chapter 11, not Chapter 7, and have submitted declarations supporting their joinders.

Taken together, these three Original Petitioning Creditors and the two Joining Creditors assert prepetition unsecured claims totaling $968,644.66. Those claims arise from legal services rendered to Green Sapphire, and they remain unpaid.

We understand that Global disputes the eligibility, independence, and motivation of these creditors, and we are prepared to prove those matters with the engagement documents, invoices, declarations, and testimony, if the Court determines that an evidentiary hearing is necessary.

But the Court does not need to adjudicate all of those factual disputes at the status conference. The immediate

question is how to place the case procedurally in the chapter the creditors intended without altering the original filing date or impairing the two joinders that have already been filed.

We therefore ask the Court to establish a clean procedure to correct the Chapter 11 designation, or the chapter designation, preserve the original July 21st petition date, preserve the joinders at Docket Numbers 25 and 26, and then either enter an order for relief under Chapter 11 or set a prompt and focused evidentiary hearing on the threshold disputes raised by Global.

I want to be clear about what the Petitioning Creditors are not asking the Court to do today. We are not asking the Court to retry the Delaware action. We are not asking the Court to determine that the allegations in the RICO action are true. We are not asking the Court to disregard the findings entered by the Delaware Court of Chancery. And we are not asking the Court to decide sanctions at a status conference without the procedural and evidentiary record necessary to address those issues.

What we are requesting today is considerably narrower, a clean correction of a clerical chapter selection error, preservation of the procedural status quo, and an orderly path toward either entry of a Chapter 11 relief or a prompt adjudication of the genuinely-disputed threshold issues.

Turning to the compliance with the standing scheduling order, the petition, summons, and standing scheduling order were served on Green Sapphire on July 27th. The return and certificate of service are at Docket 26. The Joint Preconference Statement was filed at Docket No. 30 as a single document, and was signed by Counsel for the Petitioning Creditors and Counsel for Green Sapphire.

Counsel met and conferred by telephone yesterday. The participants were myself and Adam Swick. During that conference, we discussed the intended Chapter 11 designation, the possible entry of an order for relief, Global's motion to dismiss, the proposed corrective amendments, the stipulated and disputed facts, anticipated motions, exhibits, discovery, and the procedure for an evidentiary hearing.

Based on that record, the Petitioning Creditors certify their compliance with the standing scheduling order.

As to the relief requested today, the Petitioning Creditors request five specific items.

First, we ask the Court to permit us to file or set an immediate deadline for us to file a motion for leave to amend a corrected Official Form 205 and a proposed order changing only the chapter designation from Chapter 7 to Chapter 11. We are prepared to file that package immediately.

Now, like I said, we have not been able to get a hold of Charles Vanoverberghe. So if we were to move quickly, we

would only file with two Petitioning Creditors the Amended Form 205, which I do not think causes a problem since we have two joinders that would join in on the amended petition, and then that would bring us up to four creditors that are wanting to proceed in the Chapter 11.

Second, we ask that the amended order expressly provide that the correction does not alter the original's July 21st petition date and does not supersede, invalidate, or otherwise impair the joinders filed at Docket Numbers 25 and 26.

Third, we ask this Court to take account of Green Sapphire's stated non-opposition to the entry of the order for relief under Chapter 11.

Fourth, our primary request is that the Court permit the limited correction and enter an order for relief under Chapter 11. Green Sapphire, the Alleged Debtor, does not oppose that relief.

Fifth, if the Court determines that Global's threshold allegations should be resolved before entry of an order for relief, then our alternative request is an evidentiary hearing after all discovery is finalized. And since we were served with discovery last week with requests for production of documents and interrogatories, we would like a scheduling order be entered that would provide my clients with sufficient time to respond to the discovery and prepare and

serve our own discovery, on the basis that we believe the Judgment Creditor to have unclean hands.

So if we were to set a hearing on the order for relief concurrently with the motion to dismiss, we would ask that that evidentiary hearing take place at least four weeks from now, to provide us with enough time to complete discovery. And we would ask that a scheduling order specify when discovery should be concluded.

Section 303 expressly permits an involuntary case under either Chapter 7 or Chapter 11. It also expressly permits an eligible creditor to join an involuntary petition before dismissal or entry of an order for relief with the same effect as if the creditor had been an Original Petitioner. The two filed joinders are therefore not merely statements of support. They are statutory joinders by creditors who expressly elected Chapter 11 and subjected themselves to the obligations and potential consequences applicable to Petitioning Creditors.

The Petitioning Creditors are not asking this Court to accept disputed facts on argument alone. They are asking the Court to preserve the statutory process, correct the form to reflect the relief actually intended, and determine any remaining factual disputes promptly upon an appropriate record.

For those reasons, Your Honor, we respectfully request

permission to file a corrective amendment immediately, preservation of the July 21st petition date and the two filed joinders, and either entry of an order for relief under Chapter 11 today or the prompt setting of a focused evidentiary hearing.

Thank you, Your Honor.

THE COURT: All right. So if I understand, Mr. Tittle, you filed a Chapter 11 voluntary petition under ECF, but the petition attached checked the box that says Chapter 7. Is that correct?

MR. TITTLE: Yes, Your Honor.

THE COURT: Okay. Thank you very much.

I will now turn to the Alleged Debtor. Mr. Swick?

MR. SWICK: Yes, Your Honor. Once again, Adam Swick on behalf of Green Sapphire.

(garbled) Mr. Tittle summarized our conference yesterday and the status of this case. Obviously, we did not -- we did oppose the dismissal in the Bankruptcy Court in Illinois. We think it's best for all creditors, as evidenced by the receivership action that was filed. And so we concur and do not oppose the involuntary (inaudible).

THE COURT: Okay. So Green Sapphire is prepared to be a Debtor in Chapter 11?

MR. SWICK: That's correct, Your Honor.

THE COURT: All right.

All right. And is it Pfaehler?

MR. PFAEHLER: Yes.

THE COURT: Okay.

MR. PFAEHLER: Thank you, Your Honor.

THE COURT: Mr. Pfaehler, please.

MR. PFAEHLER: Ken Pfaehler from Dentons.

We oppose the motion, and we'd also like to address several matters --

THE COURT: Of course.

MR. PFAEHLER: -- in the status conference. But we oppose the motion for a number of reasons. This is plainly a collusive filing, Your Honor. There was a Chapter 11 case filed before Judge Jacqueline Cox, the Chief Judge for the Northern District of Illinois. That case, she found, was filed for the purpose of derailing the Court of Chancery case. Not asking you to take my word for it. That is her finding.

On July 17th, the Friday before this case was filed, she had -- she dismissed the Chapter 11 case in the Northern District of Illinois. And she barred Green Sapphire from filing again for a year.

Four days later, five days later, but just two business days later, the filing is made by Green Sapphire's own lawyers. Lawyers who are working for Green Sapphire -- in the case of the Lazareff Le Bars firm, right at this minute

-- and still doing work and presumably still billing for it, have now joined in.

And let me just read you, if I could, Your Honor, two paragraphs from Judge Cox's dismissal: This bankruptcy case is dismissed for cause because it was filed in bad faith to interfere with the Chancery Court and because it involves property that does not belong to the Debtor.

There's a cite to *In re Tekena*, a Northern District of Illinois case.

(continuing reading) Its only purpose is to relitigate issues already resolved elsewhere. The Debtor's focus herein has not been to reorganize or to pursue other proper bankruptcy goals and objectives, but to continue to litigate issues now resolved by the Delaware Court. Considering the circumstances described by Vice Chancellor Laster, which shed light on what was going on when this bankruptcy case was initiated, this Court finds that it was filed in bad faith to delay and harass its creditors. All the Debtor is doing is making a collateral attack on the rulings and authority of the Delaware Court. That kind of effort has to be made on appeal, not in this federal trial court.

Well, we just heard, Your Honor, one second ago from Mr. Tittle that they want to call Global Capital witnesses at the motion to dismiss hearing to show that Global Capital has unclean hands, quote/unquote. What does that mean? They

want to retry again the trial that was held before the Chancery Court last summer that resulted in a 120-page opinion, finding that the property that is the core of this bankruptcy and the Chapter 11 that was going on in front of Judge Cox is not the property of the Debtor.

There is an appeal from that order. That is the proper way to handle it. They want to relitigate the exact same thing.

We have served discovery. We've called for responses by this Friday. Why have we done that, Your Honor? Because we are going to show that this is a collusive filing. That four days, and two business days after Judge Cox's order, the lawyers who work for, the lawyers who work for Green Sapphire suddenly come in -- now, none of them, by the way, none of them were ever approved professionals during the two years of the bankruptcy, the year and a half of the bankruptcy in Illinois. None of them were approved by the Court to work from there. But Michael Legamaro goes back over a decade or more with Thane Ritchie. He's accused of being his agent and being involved in the guns that were in that house in Texas.

We've got -- now we have Lazareff Le Bars showing up. They're actively representing Green Sapphire right now in the French court, trying to undo Vice Chancellor Laster's order. By the way, making a filing on the night of the 21st -- the same day, 21st of July, that this case was filed -- the

afternoon we were in front of Vice Chancellor Laster, not knowing, and Green Sapphire's attorneys, who -- Akerman, who have entered here, Mr. Dupre, who's on this call, not mentioning to the Court ever that there was this collusive filing going on. But they did tell the Court that the French action, the French action, they said, was simply an attempt in France, what was necessary to enforce Vice Chancellor Laster's order.

Well, that night, the Lazareff Le Bars firm filed papers showing that statement made just hours before was a complete untruth. And the next day, the Lazareff firm argued in the Paris court that Vice Chancellor Laster's order should be treated as a nullity, that it did not have to be enforced, that it didn't control.

Your Honor, we are in the midst of a very straightforward, extremely transparent collusive attempt to undo again the ability of the Chancery Court to enforce its order.

Green Sapphire is a Delaware corporation. Judge Cox found that Vice Chancellor Laster had properly conducted a trial and had properly found that the property at issue is not the property of the estate. And when we got the bankruptcy lifted and got in front of the Vice Chancellor for a receivership order, immediately, this action is filed.

None of these so-called debtors, Your Honor, have filed

any actions in any state court anywhere to collect their fees that have supposedly been unpaid. None of them filed claims in the bankruptcy action in -- in -- in --

THE COURT: Illinois?

MR. PFAEHLER: -- Illinois. Yep. We have -- now have $628,000 or $800,000 of claims from the Lazareff Le Bars firm. They say, well, we did all this work. Our Saudi Arabian office did $628,000 of work on the civil action that's pending in the Northern District of Illinois, just upstairs from Judge Cox.

Well, that action, nobody's done any work in that. All that the Plaintiff has done there is repeatedly amended their complaint. Not one time, not two times, not three times. Four times now. They have a Fourth Amended Complaint. That's all they've done there. Lazareff Le Bars never entered an appearance there. It's their Saudi Arabian office that's claiming to have done this work. Why in the world? And the work would necessarily have to have been being done during the Chapter 11 proceeding, when, frankly, there was no application to Judge Cox to retain Lazareff Le Bar either for the Northern District of Illinois case or the French case.

Your Honor, we've got a plainly collusive situation here. We're not asking to argue everything today, but we are asking the Court to please expedite our motion to dismiss. There is -- there have now been five, six cases at least filed, in

open contempt of Vice Chancellor Laster's order entered on April 14th and final judgment in the Chancery Court case. We've had actions filed in -- or threatened to be filed in the islands. We have the French action. We had an adversary proceeding that was -- that's subject to a motion to dismiss that will be decided shortly by Judge Cox and that has since been withdrawn. We have the filing in this Court.

This is nothing but what Judge Cox said -- and let me quote her again: Recall as noted on Page 3 that Illinois Supreme Court Justice Sanjay Tailor said in 2019, when he was a trial court judge, that the Debtor's principal, Mr. Ritchie, Thane Ritchie, attempted to do nothing short of selling anarchy in the civil justice system. Close quote.

This Debtor is selling anarchy in the civil justice system today by pursuing what it failed to obtain in the Delaware action, raising the same issues in this bankruptcy case in its response to a motion to dismiss in Adversary Proceeding 26-370 and possibly in the District Court case upstairs from her.

Your Honor, we need to expedite the motion to dismiss, and we need to expedite the discovery for it. We need to get a receiver in place. They are doing everything they can to -- they haven't bonded their appeal. They haven't done anything that would allow the Court to enter a stay. The Court required a $26 million bond from Alpha Carta and from

Green Sapphire. They haven't done anything towards that. We need to get this expedited. This is just an end run around Judge Cox's one-year refile bar.

With respect to the application that was made to amend, I am really struck by the fact that this is a motion but we've never seen a motion. We never heard about it. There was no meet-and-confer with us. We never heard about it until the Pretrial Joint Statement was filed last night. We were not included for some reason in the Pretrial Joint Statement conference, because we would have had some things we would have said we'd like to have addressed today. And no motion has been filed.

We'd request an opportunity to oppose the motion if the Court is going to consider it, but we don't think it should even be considered, Your Honor, until our motion to dismiss can be heard. And the motion to dismiss really is a matter of urgency. They're doing everything they can to obstruct Vice Chancellor Laster's rulings, and we've got to put a stop to it if we possibly can.

By the way, there is, according to the Debtor's own schedules, and this underlies our sanctions Rule 11 letter, which Your Honor has seen. They attached it to the papers. And remember, initially, Mr. Legamaro and one of the others, I think it was Mr. Vanoverberghe, said, okay, we'll withdraw. And Mr. Tittle's firm said they would agree to dismiss the

case.

MR. TITTLE: Your Honor, I'm going to be objecting. They're bringing up settlement discussions, which is completely a violation of Rule 408. They blatantly attached these on the docket. These were settlement discussions that should not be disclosed anywhere, should not be discussed in open court, but yet they flagrantly continue to do so.

MR. PFAEHLER: Your Honor, I'm sorry that Mr. Tittle chose to interrupt me, but I'll address that point. These are not covered by Rule 408. This is a Rule 11 "safe harbor" letter. And they responded to the letter by saying, well, we disagree with everything, we're going to move to dismiss the action. And even if it was covered by Rule 408, and we never agreed to, nobody captioned 408, nobody focused on that point, but it's Rule 11, not Rule 408, that governs, and Rule 9011.

And the fact is there's a fraud going on here. There is a fraud. So even if there was some 408 privilege at work here, it would be waived by the Crime Fraud Exception, Your Honor.

MR. TITTLE: Your Honor, may I respond?

THE COURT: Yes, you may respond, Mr. Tittle.

MR. TITTLE: Everything I just heard from opposing counsel was about Global and what Global has done. These are attorneys that deserve to get paid. They represent a holding

company that does not have operations. We have a Judgment Creditor that's going to loot everything that this Debtor has. They have a receivership order that they propose that's going to require the Debtor release and dismiss all lawsuits and claims against Global. They will take everything. All of the attorneys, every creditor except this Judgment Creditor, will not get paid if this case is dismissed. These -- again, this is a holding company. This is not an operating entity. The only creditors you're going to have at a holding company are professional fees and taxes, which is exactly what the Debtor's schedules are going to show.

Your Honor, there was no claims -- there was no claim bar date with the Bankruptcy Court. So these attorneys did not have to file a proof of claim.

THE COURT: I understand. That case was --

MR. TITTLE: Judge --

THE COURT: -- was short-lived. And I grant you that. I mean, --

MR. TITTLE: Judge, --

MR. PFAEHLER: Your Honor, this is an open attack on the Chancery Court. We just heard Mr. Tittle refer to a receiver --

MR. TITTLE: I'm still trying to talk.

MR. PFAEHLER: I was talking. You interrupted me twice, sir.

THE COURT: Okay. Mr. Pfaehler, he lodged an objection, and then I heard him out, and then --

MR. PFAEHLER: May I respond?

THE COURT: But everyone is seeking to be heard at the same time. And if we keep this up, we won't have any more WebEx hearings, because we can't exercise proper decorum.

Ms. Kippes has risen, and I will hear Ms. Kippes.

MS. KIPPES: Thank you, Your Honor. Meredyth Kippes on behalf of the United States Trustee. Again, I'm here purely in an --

THE COURT: Yes.

MS. KIPPES: -- observing capacity, but I will share with the Court and the parties my observations.

THE COURT: Yes.

MS. KIPPES: It seems like this is a case that if an order for relief and a Chapter 11 were entered, it would be appropriate to have a Chapter 11 trustee. Because nobody gets along. This is a classic irreconcilable differences sort of case. And I don't think there's -- it just doesn't seem, from listening to all of this today, that everybody is going to be a happy family if an order for relief is entered. And then we have a debtor-in-possession.

I haven't seen the facts. I've just listened to what was said today.

I will tell the Court that I have read the Chicago Court's dismissal order, so I am familiar with Judge Cox's order and her findings.

THE COURT: Uh-huh.

MS. KIPPES: And, anyway, that's my observation, that this doesn't seem like a case where it should be simply an order for relief and a debtor-in-possession. I will reserve and am happy to change my opinion based upon facts that are adduced, but the circumstances today sound like it's an irreconcilable differences kind of case.

THE COURT: Thank you very much, Ms. Kippes.

All right. Mr. Pfaehler, please proceed.

MR. PFAEHLER: Yes, if I may just briefly be heard in response.

We just heard Mr. Tittle refer to a Delaware receiver to be appointed, and this is an independent receiver, to be appointed by the Delaware Court of Chancery, which is charged by statute with supervising Delaware corporations, to run a Delaware corporation, we were just told that that would be, quote, looting Green Sapphire and precluding any other debtors from getting paid. That is an open collateral attack on the authority of the Delaware Court and its ability to enforce its order.

Secondly, Green Sapphire is not in any financial distress, as its own schedules in front of Judge Cox showed,

and this is part of the reason why she dismissed the case. Green Sapphire has over $23 million in assets. Is it an operating company? It doesn't have operations. It holds real estate through subsidiaries. It has $23 million.

In the schedules that were filed in the Northern District of Illinois, the most updated versions, there was about $11.2 or $11.3 million in debts. Ten million dollars clear. Of that, $8.6 million is the judgment debt that's owed to Global Capital.

So the idea that there would be nothing left, nothing left, and we -- that paying Global Capital would loot, is wrong. There would be $14 million left after Global Capital to pay the other debtors.

Now we have Lazareff, Lazareff Le Bars is popping up, saying, We're owed $800,000. Well, they could still be paid. The other three law firms, all of them lawyers working for Green Sapphire, can all be paid.

This isn't a financial distress situation, Your Honor. Green Sapphire's own schedules show that. That is why we're, in part, why we're bringing the sanctions motion which will be filed this week, because there is no good faith basis to allege that this Debtor is -- or this Alleged Debtor is insolvent.

THE COURT: All right. Thank you very much, Mr. Pfaehler.

All right. Anyone else wish to be heard today?

MR. SWICK: Yes, Your Honor. This is Adam Swick on behalf of Green Sapphire.

Once again, this is about a trust. This is the Terra Carta Trust. Green Sapphire is a subsidiary of that trust. And that trust is for the benefit of a mother and her three children. It is Thane Ritchie, the guy that's -- all this is being talked about, he's been thrown under the bus constantly by Global Capital, is just, you know, he does have an interest because this is a trust that was supposed to benefit his wife and children.

What's in the -- in the RICO complaint, it is alleged over and over again that what Global Capital has done, it's operated with the trust's own former fiduciaries to get this loan and security agreement done. To get it done.

And also what hasn't been discussed in front of the Delaware Court are several things, including many, many fraudulent transfers, at Global Capital's and its directors' direction, from assets of this trust out. And there is -- there was an adversary complaint filed with those and that's -- it's not been in front of the Delaware Court. So assets to get -- and this case screams, bright lights of bankruptcy need to be upon this and look at everything, and that's what people are asking for here today.

There's other creditors here. The receivership motion --

so, the case -- the bankruptcy case is denied. Then you have a receivership motion filed almost immediately in Delaware, seeking what? To take over the entire company. All right? So they (inaudible) of the RICO actions, and which is what's happened. The RICO case was filed, alleging what's bad acts of the insiders, the fiduciaries. And then everything has been expedited as quickly as possible to try and take the assets of Green Sapphire. Alpha Carta is another one. And seek receivers over those, to ultimately do what? Take control of them to dismiss the RICO action.

So, and if the RICO action is done, much of the assets -- many assets are going to come into the estate that can pay the creditors. And there are clearly other third-party creditors here besides just Global Capital.

THE COURT: All right. Thank you.

MR. PFAEHLER: Your Honor, may I respond? May I respond briefly?

THE COURT: Yes.

MR. PFAEHLER: Unfortunately, everything Mr. Swick just told you is not true. All of these allegations were made and tried in the case in Delaware. Alpha Carta came in and alleged fraudulent transfers. We have a 120-page opinion, Your Honor, from Vice Chancellor Laster following the trial. And for Green Sapphire's counsel to sit here now and say this wasn't tried, that the alleged fraudulent

transfers from the Debtor weren't tried in the case in Chancery, is both not true, and if something wasn't tried, it was their choice, because all of it was at issue. The decision could not be clearer. It's a 120 pages, and it frankly shows that what was just said to the Court is simply not true.

Beyond that, Green Sapphire is bound by those decisions by collateral estoppel. The RICO case doesn't change that. The amendment to the RICO case is another breach of the -- of Vice Chancellor Laster's contempt order.

But, again, what I just heard from our friend from Akerman is that they do intend to try to use this case to try to completely relitigate the case that was tried in Chancery. This is a collateral attack. They just admitted it again. Mr. Tittle was admitting it before. That's all they want to do, is relitigate what's already been tried. That's why this case needs to get dismissed. That's why sanctions need to be entered.

This is exactly what was tried in the Court in Illinois, and they're doing it again here, Your Honor. And it's in open contempt of Vice Chancellor Laster's order.

And by the way, Akerman is also appearing for Green Sapphire in front of Vice Chancellor Laster.

MR. TITTLE: Your Honor, may I quickly respond?

Judge Jernigan's decision in *Legacy* shows that you have

to look at each Petitioner to see what their basis was for filing the petition. This was a recent decision. She actually put each -- each Petitioner that wanted to participate, she wanted them on the witness stand to figure out what their basis was.

Each one of these Petitioning Creditors has an independent economic reason for filing this involuntary. Everything else is just noise. We satisfied 303 because we have more than three creditors whose claims total more than $25,000. Each one of them has a true claim that is not disputed. The only issue is whether it was done in bad faith. Everything that opposing counsel is alluding to is that it was bad faith. But there's no testimony or evidence about any of that.

The evidence is going to show that each one of these creditors was retained directly by my firm with engagement letters. That one of the Petitioning Creditors agreed to pay my fees. Those fees came directly from that creditor. There was no collusion with any of the parties with Green Sapphire. I represent each one of these parties directly, which is what all of the emails are going to show, which are attorney-client privileged.

But each one of these creditors are going to testify that if they -- if the receiver is appointed, if the case is dismissed, they will not get paid. That they have real

claims for attorney fees. And that they have an independent economic reason for filing the petition, and that is the only thing that matters in an involuntary.

I have seen very few cases where a judgment creditor is the one to derail an involuntary petition. In most cases, like the *Legacy* one, it is the debtor that challenges the filing of an involuntary.

Here, we have a Judgment Creditor. A Judgment Creditor is trying to derail the involuntary, not the Debtor. The Debtor is in support. The Debtor wants, along with the Judgment -- the Petitioning Creditors, to have an orderly Chapter 11 administration of the estate, so that not just one creditor takes everything for itself. That is the purpose of Chapter 11. That is -- that's why's why our clients, my clients are going to testify that this was their economic reasons for filing the petition, was so that their unpaid invoices for legal services could get paid.

THE COURT: All right. Thank you, Mr. Tittle.

All right.

MR. PFAEHLER: Your Honor?

THE COURT: Mr. Pfaehler, does your client --

MR. PFAEHLER: Just --

THE COURT: -- have an opposite -- no, no. I still have a case coming up after this one, and we are not just treading into the motion to dismiss, we are trampling all

over into the territory of the motion to dismiss. And we will have an evidentiary hearing on that.

So my first question for you, Mr. Pfaehler, is does your client have an opposition to the Petitioning Creditors' motion for leave to amend the involuntary petition to correct the chapter designation?

MR. PFAEHLER: Your Honor, I don't think we have a position on that at this moment. I would be inclined to oppose it because I think it should be dismissed. I also want to consider what we heard from the U.S. Trustee. And again, we got no notice that this would be on the docket until the Pretrial Statement was filed last night. If we could have a day or two to respond to the Court on that question.

THE COURT: Yes, I'm not intending to put you on the spot. It's just, again, this was, like you said, it was just raised in a filing yesterday, well after hours, that I didn't even have an opportunity to see before today as well, in the status report.

So I think that what we'll do is we'll go ahead and we'll look at the calendar in terms of a hearing on the motion to dismiss. I recognize that a lot of these creditors' -- I know a fair amount of the representatives may be outside of Texas. If this is going to be what I think it is, which is going to be a hearing where the credibility of various

witnesses is going to be paramount, then what it's going to need to be is an in-person hearing. Okay? I am not opposed to a hybrid hearing, but any witness that is going to testify hybrid, there's going to have to be, number one, the agreement of all of the parties, and they can inform the Court why that is so; and number two, they are going to have to have physical documents in front of them in terms of exhibits.

So I understand that the creditor locations are Geneva and Chicago and Paris and the UAE and things of this nature, but these creditors also decided to file an involuntary in Dallas, Texas.

So I am certain, at a minimum, that there is a great deal of dispute relative to the nature of the filing. None of that is being decided today. I think you guys definitely each stuck your flags in the ground as to your positions. So I think that the best that we can do today is set a hearing on the motion to dismiss. So let me look at when that was filed.

MR. PFAEHLER: Yes. And Your Honor, we have a pending motion to expedite on that as well.

THE COURT: Yes. So it was filed on the 31st. So the first thing I'm going to need is a time estimate. This sounds like a full day because, at a minimum, I will hear from each of the Involuntary Petitioning Creditors. How many

witnesses do you think you'll have, Mr. Pfaehler?

MR. PFAEHLER: Your Honor, I was not believing we need to call any witnesses. We've got court orders. We've got findings of fact after trial, 120 pages.

THE COURT: Okay. So you have no witnesses, is what you're saying?

MR. PFAEHLER: Not planning to call witnesses, Your Honor.

THE COURT: Okay.

MR. TITTLE: Your Honor, I know Michael Legamaro is out on a religious sabbatical.

THE COURT: For how long?

MR. TITTLE: I don't know the details of that. He said his participation would be limited to WebEx, but I'll circle back with him. I do know that Le Bars and McNutt have both agreed to fly in to be in person. Dominique Lecocq, I have -- he has agreed to serve as a witness, but through WebEx. I'll have to coordinate with him whether he will appear in person. I think he will. So that will give us at least three witnesses.

We only need three in order to have the involuntary stick. I'm not sure what Your Honor would do with the Petitioners that don't agree to fly in for an in-person hearing. Maybe their -- maybe their petition is withdrawn. I'm not sure how you want to handle that. But I

do agree, you know, we need to have as -- we need at least three witnesses to show up, and I do think we need a full day.

And the other issue is how long we're going to have for discovery to be completed.

THE COURT: All right. And Mr. Swick, how many witnesses does the Debtor believe that the Alleged Debtor will have?

MR. SWICK: Certainly one, if not two.

THE COURT: Okay.

MR. PFAEHLER: Can we ask who that witness will be?

MR. SWICK: It will be the -- a director or directors of Green Sapphire.

THE COURT: All right.

MR. PFAEHLER: And who are they at this moment, Mr. Swick?

MR. SWICK: Paul Wolfe, Garrett Vail.

MR. PFAEHLER: And they both have been held in contempt, Your Honor, by the Chancery Court personally for their contempt of the Chancery Court's final judgment and order. And they both have been found not to be credible in the Chancery Court's 120-page opinion.

THE COURT: Okay. Mr. Pfaehler, I just want to set the stage for my particular court. I understand in spades how upset your client is. I understand that it appears

hundreds of pages of ink has been spilled on the Illinois Bankruptcy and the Chancery Court decision, and I am certain that your client is very upset with that, and if you have been involved in it, that you echo their concerns.

However, you have to also recognize that I am a bankruptcy judge. Every single day, the people who come into court in front of me are unhappy. Every single day, somebody had just filed -- they had filed their foreclosure, and they filed a petition on the last day. They had just sought a receiver, and somebody filed a bankruptcy petition, or there is bar order somewhere, and they have filed in violation of the bar order.

I recognize that, and I recognize how incredibly frustrating that is. I was a bankruptcy practitioner for 25 years. I walked into court unhappy plenty of times. However, due process: I have to hear the case before me. I have to hold people to their standards and to their burdens. I hear everything you're saying, and it certainly lands, but at the same time I have to let this process play out.

And so I'm not trying to be hard on you in any way and I'm not trying to predetermine or certainly favor anyone here; I am just trying to recognize that, from this point forward, I have to establish a process, and the first part of that process is setting a hearing date. And it sounds like we're going to need a full day of hearing, which is the first

hurdle, because I do have a busy schedule. So let me look and tell you what I have, and then I'm going to allow the parties to confer and get back to me. And I think that, based upon the schedule, the week that I have the most time in is going to be the week of September 14th.

September 14th, I have, let me look, I've got the 14th, the 16th, the 17th, and the 18th, I believe, unless Ms. Harden tells me that I am wrong, that I have the ability to give you a full day of hearings. And so we can find days where people don't have religious holidays and when they can travel and things of that nature to get people before us. Yes. So, that week, I have every day currently today, although days are given away every hour, I have that amount of time.

Mr. Tittle, I hope that someone can fit in during that week, if you have five Petitioning Creditors, now, hopefully, you can get three during that week, because I don't think that at this juncture that, given Mr. Pfaehler's motion has been on file, I think, for about 18 days now, that we need to go much further out than that.

MR. TITTLE: Okay.

THE COURT: So, with that, do the parties need any assistance with discovery deadlines or are they capable of conferring outside of court?

MR. TITTLE: My suggestion was another two weeks to

respond to Global's discovery requests. They were due -- they're due Friday, and I would just ask for another two weeks, because we also have our response to the motion to dismiss that's due Friday. And so then if we can get discovery out to them, then we would give them the same 21 days to respond to ours.

So a little bit truncated. Usually, you get 30 days. We're just asking for 21.

MR. PFAEHLER: Your Honor, we would suggest that while we could certainly agree to give some additional time, two weeks is too long. We're not -- we're asking for the communications about their claims here and about filing this case. It's not hard for any of them to get that together. We'd agree to an additional week until the 28th. We want to get those documents, and then we need to depose these witnesses ahead of the hearing, so we don't have a lot of time to work with.

We would ask the Court, if possible, to please hold the date of the 14th. It's a date that's available in our schedule on our side and we wouldn't want to lose that. Hopefully, we can arrange for everyone who needs to be there to be there on that date.

MR. TITTLE: Your Honor, they have sought interrogatories from each one of my Petitioning Creditors, including the Joinders. And again, we're dealing with French

attorneys who are on holiday in St. Barts. The likelihood of getting those interrogatories back in a short period of time could be unlikely.

We're also going to have to produce a privilege log, since 90 percent of what they've asked for is going to be attorney-client privileged. So we'll probably have a fight over discovery, because they want every single email I've sent my client, because they think it's some type of fraud or scheme to get around the dismissal order. But, again, these are attorney-client-privileged emails about my representation directly with these Petitioners, so I do feel like these issues are going to have to be raised before the hearing on the motion to dismiss.

MR. PFAEHLER: Again, Your Honor, that would suggest to me we need the responses earlier rather than later, particularly since the Crime --

THE COURT: I understand. I understand. We are going to have the discovery responses from the Petitioning Creditors due August 28th, which is plenty of time before the hearing. And when were the -- wait, give me one moment. When was the discovery propounded?

MR. TITTLE: It was I think late Thursday night, like at 10:00 o'clock at night, so I didn't even see it until Friday the 14th. So that's only giving us two weeks to respond to --

THE COURT: Oh, so this -- okay. I thought the discovery was --

MR. TITTLE: -- in-depth discovery.

THE COURT: -- propounded with the motion to dismiss. When was the discovery propounded? Was it on the 13th or the 14th?

MR. TITTLE: 10:00 o'clock on the 13th.

THE COURT: Okay.

MR. TITTLE: So I didn't see it until the 14th.

THE COURT: Okay. I see.

MR. TITTLE: So we were hoping to get until the 4th to respond.

THE COURT: Okay. When did you propound your own discovery?

MR. TITTLE: We have not done so yet because we've been trying to respond to a motion to dismiss and all of the other things that we're doing currently.

MR. PFAEHLER: Your Honor, our discovery could have been propounded earlier, except that we thought the case was going to be dismissed pursuant to the correspondence between myself and Mr. Tittle.

MR. TITTLE: And if we're going to go into it, which you continue to try to do so with --

THE COURT: We are not going to go into it. We have gone so far beyond what a status conference is. What we're

going to do is, based upon the filing date of the 13th, I am going to give until September 4th for the responses to the written discovery. That way, any depositions that need to be had can be had the week of the 7th, in preparation for a hearing on the week of the 14th. We will block the 14th, as you've requested, Mr. Pfaehler.

Relative to your own discovery, Mr. Tittle, since you have French clients, you can explain, you can say that the Court recommended you get that out *tout de suite*, because you're going to run out of days. And I grant you you have a lot of arrows pointed at you and things to produce and filing deadlines, but something tells me you saw this fight coming.

So, with that said, I definitely -- your discovery will be due September 4th, any depositions can be had the week of September 7th, and we'll have that hearing the week of the 14th.

If it's not the 14th, as I said, I've got every day but the 15th ready. We will prepare for a full day. Given that we've got lots of out-of-town clients, let's prepare to confer as to our witnesses and try to stipulate to as much as we can relative to making the hearing go smoothly.

With respect to your motion to amend, you just need to get that on file as soon as possible. I think that we could probably just hear that in connection with the motion to dismiss.

Obviously, that will give Mr. Pfaehler a better opportunity to, number one, see and understand the relief and see if his client does not oppose it. Maybe they do. Maybe they don't.

MR. TITTLE: The only --

THE COURT: Go ahead.

MR. TITTLE: Your Honor, the only issue with that is we need to have amended joinders to attach to the amended petition. So I guess what we could do is have amended joinders that I guess already attach to the amended petition, even though it's not filed. That's just kind of a procedural issue, because we want to make sure that our joinders are attaching to the amended petition.

THE COURT: So can I assume the only thing that is stopping you from filing an amended petition today is that you want the relief to --

MR. TITTLE: Charles to sign it.

THE COURT: Exactly.

MR. TITTLE: Charles has not signed it yet because he's on holiday in St. Barts. Otherwise, I would have filed it on Saturday. And I don't feel comfortable doing it without him telling me whether he wants to sign it or not.

THE COURT: But you have two other creditors?

MR. TITTLE: I do have two other Petitioning Creditors that have already signed the amended petition, so I

can go forward with just their amended petitions, since we now have two joinders, so that does bring the number to four.

THE COURT: Well, I think at this point I think you just need to file your motion, then. Obviously, you've got enough different -- as I sit here, I can think of issues. I don't know anything that would prevent the filing of an amended petition. What you're asking for is what relief flows from the filing of an amended petition, which you could file with four and basically footnote and explain why you don't have the fifth.

But what you're asking for is something that's different, relative to either relation back or an extension of 303 to the amended petition. So I don't want to speak to that without a filing, so I'll let you make that filing. We'll see, after Mr. Pfaehler and his team and the Debtor have an opportunity to review it, if it is opposed or not. If not, my intention is probably still to set that with the motion to dismiss, unless there is a reason for it to be set earlier. And if so, you'll need to lay that out in a motion to expedite. Okay?

MR. SWICK: Your Honor, may I, just one administrative thing? I know we have the 14th there, but if we could remove the 16th from consideration, I have a hearing that morning and I'm set to speak at a conference that afternoon.

THE COURT: Okay. All right. So now we have the 14th, the 17th, and the 18th. And again, confer and just get together on one email with all of you on it and Ms. Harden, and then we can knock out the -- let's see what I -- oh, just one moment.

I also, just for sake of the record, Ms. Harden just reminded me, I have an event the evening of September 17th. It is local. However, I believe it probably would require me to leave here at about 5:30, 5:45. So we'd have a full day, but a full day with a hard stop. So just FYI.

All right. Anything else, gentlemen?

MR. PFAEHLER: Thank you, Your Honor.

MR. TITTLE: Thank you, Your Honor.

MR. SWICK: Thank you, Your Honor.

THE COURT: So, with that, Ms. Kippes, do you want to be kept in the loop on the planning, or you want to just keep apprised by the docket?

MS. KIPPES: Your Honor, I'll just keep apprised by the docket. Once I, if I, --

THE COURT: Yes.

MS. KIPPES: If there is an order for relief, then obviously I want to be kept in the loop.

THE COURT: Okay.

MS. KIPPES: And we'll go from there.

THE COURT: All right. Thank you very much.

Okay. So, with that, like I said, you'll let Ms. Harden know what days work for you between the 14th, the 17th, and the 18th. And I think that's all. Thank you very much.

MR. PFAEHLER: Thank you, Your Honor.

THE COURT: You guys have a great day.

(Conclusion of proceedings at 11:02 a.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **08/19/2026**

______________________________________ _____________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS 30

END OF PROCEEDINGS 43

INDEX 44

# EXHIBIT 2

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Pfaehler, Kenneth J. |
| **Sent:** | Friday, September 04, 2026 1:27 PM |
| **To:** | Brandon Tittle; Petts, Nicholas W.; Siegien, Samantha; Richards, Robert E.; Hamilton, Spencer D. |
| **Cc:** | david.parham_akerman.com; adam.swick@akerman.com |
| **Subject:** | RE: Green Sapphire - Request for Brief Extension of Discovery Deadline |

Brandon, that is fine. Why don't we say 3:00 p.m. tomorrow for all parties to serve their interrogatory responses and verifications.

Also, can you let us know if your clients agree with the protective order we sent yesterday, which mirrors the terms of the protective order in place in Delaware, which was agreed to by Green Sapphire.

Thanks, Ken

Kenneth J. Pfaehler

+1 202 408 6468
Washington, DC

---

**From:** Brandon Tittle <btittle@tittlesantiago.com>
**Sent:** Friday, September 04, 2026 1:17 PM
**To:** Petts, Nicholas W. <nicholas.petts@dentons.com>; Pfaehler, Kenneth J. <kenneth.pfaehler@dentons.com>; Siegien, Samantha <samantha.siegien@dentons.com>; Richards, Robert E. <robert.richards@dentons.com>; Hamilton, Spencer D. <spencer.hamilton@dentons.com>
**Cc:** david.parham_akerman.com <david.parham@akerman.com>; adam.swick@akerman.com
**Subject:** Green Sapphire - Request for Brief Extension of Discovery Deadline

**[WARNING: EXTERNAL SENDER]**

---

Counsel:

We respectfully request a brief extension, until 3:00 p.m. Central tomorrow, Saturday, September 5, 2026, to serve the Petitioning Creditors' interrogatory responses and verifications. Because all of our clients are overseas, the time-zone differences have made it difficult to obtain each client's signed verification by the current deadline.

We expect to have the signed responses completed and served by 3:00 p.m. tomorrow. Please let me know as soon as possible whether Global will agree to this brief extension.

Best,
Brandon

# EXHIBIT 3

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Dellplain, Melanie |
| **Sent:** | Friday, September 04, 2026 11:46 PM |
| **To:** | btittle@tittlesantiago.com; 'adam.swick@akerman.com'; 'Manolo Santiago' |
| **Cc:** | Petts, Nicholas W.; Pfaehler, Kenneth J.; Richards, Robert E.; Siegien, Samantha; Hamilton, Spencer D. |
| **Subject:** | In re Green Sapphire - Case No. 26-33254-mv111 |
| **Attachments:** | 2026.09.04 Global Capital Document Production (Volume GCP_TX001) Letter 01.pdf; 2026.09.04 Global Capital Resp. and Obj. to Petitioning Creditors RFPs and RFAs.pdf |

Dear Counsel,

Please find attached Global Capital Partners, LLC's Responses and Objections to Petitioning Creditors' Requests for Production and Requests for Admission for In re Green Sapphire Holdings, Inc., Case No. 26-33254-mv111.

Additionally, please find below the link to Volume GCP_TX001 of Global Capital's document production:

https://alethea.sharefile.com/d-sb513856e83794a41889bd29d335dddef

The means to access the password will follow shortly in a separate email.

Regards,
Melanie

Melanie Dellplain
Associate

+1 202 408 3933
melanie.dellplain@dentons.com | Website
Assistant: Paula Etheridge
Dentons US LLP | 1900 K Street, NW, Washington, DC 20006-1102

DENTONS

Our Legacy Firms | Client Experience (CX)

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices | Privacy | Cookies

# EXHIBIT 4

## Dellplain, Melanie

| | |
|---|---|
| **From:** | Dellplain, Melanie |
| **Sent:** | Saturday, September 05, 2026 3:01 PM |
| **To:** | 'btittle@tittlesantiago.com'; 'adam.swick@akerman.com'; 'Manolo Santiago' |
| **Cc:** | Petts, Nicholas W.; Pfaehler, Kenneth J.; Richards, Robert E.; Siegien, Samantha; Hamilton, Spencer D. |
| **Subject:** | In re Green Sapphire - Case No. 26-33254-mv111 |
| **Attachments:** | Global_Capital_Responses_and_Objections_to_Petitioning_Creditors_Interrogatories[75250].pdf |

Dear Counsel,

Please find attached Global Capital Partners, LLC's Objections and Answers to Petitioning Creditors' First Interrogatories for In re Green Sapphire Holdings, Inc., Case No. 26-33254-mv111.

Regards,
Melanie

Melanie Dellplain
Associate

+1 202 408 3933
melanie.dellplain@dentons.com | Website
Assistant: Paula Etheridge
Dentons US LLP | 1900 K Street, NW, Washington, DC 20006-1102

DENTONS

Our Legacy Firms | Client Experience (CX)

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices | Privacy | Cookies

# EXHIBIT 5

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Brandon Tittle <btittle@tittlesantiago.com> |
| **Sent:** | Saturday, September 05, 2026 7:32 PM |
| **To:** | Pfaehler, Kenneth J.; Petts, Nicholas W.; Siegien, Samantha; Hamilton, Spencer D. |
| **Cc:** | david.parham_akerman.com; 'adam.swick@akerman.com'; Manolo Santiago |
| **Subject:** | Green Sapphire - Involuntary Petitioners' Discovery Responses and Document Production |
| **Attachments:** | Green Sapphire - lecocqassociate_Hanoverberge_Legamaro - Responses and Objections to Discovery - Final.pdf; Green Sapphire - lecocqassociate_Hanoverberge_Legamaro - Responses and Objections to ROGs - Signed.pdf; Green Sapphire - Lazareff Le Bars Entities - Responses and Objections to Discovery - Final.pdf; Green Sapphire - Lazareff Le Bars Entities - Responses and Objections to ROGs - Signed.pdf; Green Sapphire - Petitioning Creditors' Privilege Log - Final.pdf |

**[WARNING: EXTERNAL SENDER]**

Counsel,

Attached please find the Petitioning Creditors' written responses and objections to Global's interrogatories and requests for production.

The accompanying consolidated document production, bearing Bates numbers **Involuntary Petitioners -- 00001 through Involuntary Petitioners -- 01616**, is available through the following ShareFile link:

https://tittlesantiagopllc.sharefile.com/d-s0ef015ba89b84f0d8376b13d7565a289

Please confirm receipt and successful access to the production, and notify us promptly of any difficulty downloading or opening the files.

Best,
Brandon

# EXHIBIT 6

Brandon J. Tittle
Texas Bar No. 24090436
Manolo R. Santiago
Texas Bar No. 24129258
**TITTLE SANTIAGO, PLLC**
1125 Legacy Dr., Ste. 230
Frisco, Texas 75034
Telephone: 972.213.2316
Email: btittle@tittlesantiago.com
Email: msantiago@tittlesantiago.com

**COUNSEL FOR PETITIONING CREDITORS**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 26-33254-mvl-11** |
| **GREEN SAPPHIRE HOLDINGS INC.,** | § | |
| | § | **Chapter 11** |
| **Alleged Debtor.** | § | |

# PETITIONING CREDITORS' RESPONSES AND OBJECTIONS TO GLOBAL CAPITAL PARTNERS, LLC'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS

Lecocqassociate ("Responding Party 1"), Legamaro Banipal LLP ("Responding Party 2"), and Charles-Hubert Vanoverberghe ("Responding Party 3"), (collectively the "First Petitioners" or "Responding Parties"), through undersigned counsel, serve these responses and objections to Global Capital Partners, LLC's First Requests for Production of Documents dated August 13, 2026 ("GCP First RFPs"). Global Capital Partners, LLC is defined here in as "GCP" or "Global Capital".

## PRELIMINARY STATEMENT AND PRODUCTION PROTOCOL

The responses are provided jointly by the First Petitioners to comply with the GCP First RFPs wherein the First Petitioners were served collectively a single Request for Production. As such, the responses of the First Petitioners contain the documents collectively provided by those Petitioning Creditors and separate responses by each of the Responding Parties are not provided.

These responses follow a reasonable search of sources reasonably accessible and within each Responding Party's possession, custody, or control, including responsive client materials maintained by Tittle Santiago on a Responding Party's behalf. The collective response does not represent that every document is possessed or controlled by every Responding Party. Objections are asserted only where stated in the individual response, and each response states whether responsive material is being withheld.

The consolidated production consists of 141 document units totaling 1,616 pages, Bates-labeled Involuntary Petitioners -- 00001 through Involuntary Petitioners -- 01616. Sixty-three document units contain targeted redactions, and 78 document units are produced without redaction. Redacted items appear at Involuntary Petitioners -- 00001–00193, 01090–01091, 01093–01095, 01098–01101, and 01104–01105.

Consistent with the production instructions, the electronic production includes 1,616 single-page, 300-dpi, CCITT Group IV TIFF images; Concordance DAT, IPRO LFP, and Opticon OPT load files; and a CSV manifest. A Bates-stamped consolidated PDF is supplied as a convenience copy. The DAT and CSV identify the responding set and request designations for each document.

The privilege and redaction log identifies 50 document units withheld in full and 37 produced items containing privilege or work-product redactions. Twenty-six additional produced items contain only targeted financial, privacy, or security redactions, for which no privilege is claimed. Withheld documents are not Bates labeled and are not included in the production image or load files. Nonprivileged redactions are limited to personal-data identifiers governed by Federal Rule of Bankruptcy Procedure 9037 and nonresponsive bank-account, payment-access, medical, or comparable sensitive information. Public filings are produced as filed. If Global Capital contends that a redacted datum is relevant and necessary, Responding Parties will meet and confer concerning production under an appropriate protective arrangement.

Responsive nonprivileged attachments and enclosures located in the reviewed collection are included. Exact duplicates are produced once. The Zoom invitation refers to an invite.ics file that was not separately supplied. A reasonable search did not locate a separately maintained copy; Responding Parties will supplement if one is later located. Public filings are included once and Employer Identification Numbers appearing in public filings are not redacted. Although several documents predate the default Relevant Period, they are produced because they bear directly on the origin, amount, due status, and collection history of Mr. Vanoverberghe’s claim. Responding Parties will supplement or correct these responses as required by Federal Rule of Civil Procedure 26(e), made applicable by Federal Rule of Bankruptcy Procedure 7026.

Production does not waive objections to admissibility, authenticity, or permissible use. Federal Rule of Evidence 408 is preserved as to admissibility and use of compromise communications but is not invoked as a freestanding discovery privilege. Any document withheld or redacted on privilege grounds rests on attorney-client privilege, work product, or another protection specifically stated in the privilege and redaction log.

## LIMITED OBJECTIONS TO DEFINITIONS

**Definition 7 ("Green Sapphire")**. Responding Parties object to the definition of "Green Sapphire" as overbroad, vague, and factually unsupported. The definition presently expands the scope of discovery to third parties for which no argument or factual basis is presented to do so by defining the Debtor to include not only the directors of the Debtor and the Debtor, but to include also (i) A.R. Thane Ritchie, (ii) 60 Degrees Group SEZC, Ltd., (iv) Tim Yuskus, or any other person or entity as Green Sapphire or its agent, representative, affiliate, or controlling person.

Based on information presently available, Green Sapphire is held through a Trust and acts through its trustee where A.R. Thane Ritchie is not a beneficiary of the Trust, a director or officer of the Trustee or of the Debtor and as a result of the Debtor being in that Trust cannot control that Trust or Trustee and is not the owner of that Trist or Trustee. 60 Degrees is a separate third-party company that may provide administrative support, and Mr. Yuskus is understood to be associated with 60 Degrees. For purposes of these responses, "Green Sapphire" means Green Sapphire Holdings, Inc. and a person shown by the evidence to have acted as its authorized representative concerning the matter at issue. Mr. Ritchie, 60 Degrees, and Mr. Yuskus are excluded absent such a particularized showing. No agency, affiliation, ownership, or control is admitted.

**Definition 12 ("Relevant Period")**: Responding Parties object to the January 1, 2025-to-present period as overbroad and disproportionate to the alleged coordination or collusion leading to the July 2026 Petition. For purposes of these responses, Responding Parties construe the Relevant Period as March 31, 2026, through the present. If a broader period is determined to be appropriate, Responding Parties preserve their objection to any default period beginning earlier than January 1, 2026, absent request-specific relevance. To avoid a scope dispute and provide a complete record, Responding Parties nevertheless searched for and produced or identified directly relevant earlier materials concerning the underlying claims, invoices, collection history, professional engagements, and Illinois bankruptcy. No responsive material or information is withheld solely on this temporal objection.

**Definition 17 ("You" or "Your").** Responding Parties object to this definition to the extent it aggregates separate Responding Parties, treats every agent, representative, advisor, or attorney as an independent responding party, or purports to require a response based on information or documents beyond a Responding Party's legal possession, custody, or control. Each Responding Party provides these responses for itself after reasonable inquiry and based on information reasonably available to it. The definition does not make unrelated third parties responsive merely because they provided professional or administrative services, and it does not waive attorney-client privilege, work-product protection, or any other applicable protection. Client-related materials maintained by Tittle Santiago on a Responding Party's behalf were included in the reasonable search; documents held solely for other clients or unrelated third parties are not thereby within a Responding Party's control.

## GENERAL OBJECTIONS

Responding Parties, through counsel, hereby incorporates the following objections in response to each Request in addition the specifically stated objections therein:

1. Responding Parties object to these Requests to the extent that the basis of the Request or Definition is predicated or based upon, directly or indirectly, allegedly decided in *Global Capital Partners, LLC, et ano. v. Green Sapphire Holdings, Inc., C.A. No. 2024-0877-JTL.* Global Capital Limited defined in Definition 3 the *Global Capital Partners, LLC, et ano. v. Green Sapphire Holdings, Inc., C.A. No. 2024-0877-JTL* as the "Delaware Action". The Debtor and Intervening Party have separately appealed the Delaware Chancery Post-Trial Opinion & Order dated March 13, 2026 (Del. Ch. March 13, 2026), the Order & Final Judgment dated April 14, 2026 (Del. Ch. April 14, 2026), and the Cost Order dated June 1, 2026 ((Del. Ch. June 1, 2026),

(collectively defined as "Delaware Chancery Orders"). In addition, the Debtor and the two directors of the Debtor have appealed on July 21, 2026, the Memorandum Opinion of Contempt dated June 23, 2026, and the Order on Contempt dated July 6, 2026. Prior to any evaluation of such findings in the Delaware Action relied upon in the Motion to Dismiss, Global Capital treats findings in the Post-Trial Opinion dated March 13, 2026, as final when such findings are required to be evaluated in consideration of involve collateral estoppel (issue preclusion) and the full faith and credit doctrine. The standard issues for such evaluation include (i) the factual or legal issue in the bankruptcy court must be identical to the one decided by the Delaware Chancellor (e.g., a finding of fraud, breach of fiduciary duty, or a specific asset valuation) and (ii) the specific findings must have been critical to the Chancery Court's final ultimate determination, not just passing remarks (*obiter dicta*). The allegations of Global Capital in these proceedings against the Responding Parties involve different parties that those parties in the Delaware Action and the factual or legal issue in the bankruptcy court is not identical to the one decided by the Delaware Chancellor or even in the prior Illinois Bankruptcy (Definition 8). In addition, the findings relied upon the Motion to dismiss and appear to have been used to in the Requests for Production and Interrogatories in both the Definitions and certain Requests and Interrogatories are not specific findings that "must have been critical to the Chancery Court's final ultimate determination". Prior to the Court examining these issues, it would be inappropriate to assume for the purposes of discovery that Global capital would prevail on such findings for the purposes of motivating the Requests for Production and Interrogatories. Should the Court determine that such findings of the Delaware Chancellor in the Delaware Action have any probative value in consideration of the Motion to Dismiss and further disclosure of documents and additional responses to the Interrogatories is required then the Responding Parties will address those issues at that time.

2. Responding Parties object to these Requests to the extent they are vague, overbroad, unduly burdensome, and impose obligations in excess of those imposed by the Federal Rules of Civil Procedure, made applicable by the Federal Rules of Civil Procedure.

3. Responding Parties object to these Requests because the <u>January 1, 2025-to-present</u> period as overbroad and disproportionate to the alleged coordination or collusion leading to the July 2026 Petition as explained above in the objection to Definition 12.

4. Responding Parties object to these Requests insofar as they separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

5. Responding Parties object to these Requests insofar as they separately name 60 Degrees Group SEZC, Ltd., and Tim Yuskus or treat it or him as Green Sapphire or its representative as explained above in the objection to **Definition 7,** Consistent with the objection to **Definition 7**, 60 Degrees Group SEZC, Ltd., and Tim Yuskus are excluded from the scope.

6. Responding Parties object to these Requests to the extent that they seek information that is neither relevant to this litigation nor reasonable calculated to lead to the discovery of admissible evidence.

7. Responding Parties object to these Requests to the extent that they seek information protected from disclosure by the attorney-client privilege, the work-product privilege, and/or any other applicable privilege, protection, or immunity.

8. Responding Parties object to these Requests to the extent they seek information regarding information which Defendant has intentionally precluded Responding Parties from uncovering through discovery in connection with this Cause.

9. Responding Parties submit these Responses and Objections without conceding the relevancy or materiality of the subject matter of any response to any Interrogatory.

10. Responding Parties do not waive the right to object, on any and all grounds, to (i) the evidentiary use of any response provided to these Requests and/or any documents produced or referenced in response to these Interrogatories, and (ii) future discovery requests relating to such responses or documents.

## LIMITED OBJECTIONS TO INSTRUCTIONS

**Instruction 3 (Continuing Nature).** Responding Parties object to the extent this Instruction imposes a continuing-discovery obligation broader than Federal Rule of Civil Procedure 26(e). Responding Parties will supplement or correct their responses as Rule 26(e), made applicable by Federal Rule of Bankruptcy Procedure 7026, requires.

**Instruction 7 (Entire Documents).** Responding Parties object to the extent this Instruction requires production of nonresponsive, privileged, work-product-protected, confidential, or disproportionate material merely because another portion of a document is responsive. Responding Parties have produced complete documents and document families where reasonably necessary for context, subject to the targeted redactions identified in the privilege and redaction log.

**Instruction 8 (Possession, Custody, or Control).** Responding Parties object to the extent this Instruction deems them to control documents held by former personnel, agents' representatives, consultants, contractors, vendors, fiduciaries, clients, or other third parties without the legal right or practical ability to obtain the documents on demand. Responding Parties searched sources reasonably accessible and within their actual or legal possession, custody, or control, including responsive client materials maintained by Tittle Santiago on their behalf, while excluding materials held solely for other clients or unrelated third parties.

**Instruction 11 (Time Period).** Responding Parties incorporate their objection to **Definition 12** and construe the default period as March 31, 2026, through the present, while producing directly relevant earlier materials as stated above.

Responding Parties do not object to the remaining Instructions except as stated in an individual response. These limited objections do not excuse a substantive response; each response states whether responsive material or information is being withheld.

## RESPONSES AND OBJECTIONS

**REQUEST FOR PRODUCTION NO. 1:**

*All Documents and Communications between You and Tittle Santiago concerning a potential involuntary petition and the decision to file or the filing of the Petition, including but not limited to Communications concerning the purpose, timing, strategy, or anticipated effect of the filing.*

**RESPONSE AND OBJECTIONS:**

Responding Parties produce nonprivileged communications concerning the contemplated and filed petition. Confidential legal advice, counsel's mental impressions, and litigation strategy are withheld or redacted only under the attorney-client privilege or work-product doctrine.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00001–00113;
- Involuntary Petitioners -- 00117–00131;
- Involuntary Petitioners -- 00189–00224; and
- Involuntary Petitioners -- 00253–00272.

The DAT and CSV manifests provide document-level request designations and metadata.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 2:**

*All Communications between You and any of Green Sapphire, Thane Ritchie, Garrett Vail, Paul Wolfe, or others purporting to act on behalf of Green Sapphire concerning the Petition or the possibility of filing an involuntary petition against Green Sapphire, including but not limited to Communications concerning the purpose, timing, or coordination of such a filing.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to the Request insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Responding Parties further object to these Requests insofar as they separately name 60 Degrees Group SEZC, Ltd., and Tim Yuskus or treat it or him as Green Sapphire or its representative as explained above in the objection to **Definition 7,** Consistent with the objection to **Definition 7**, 60 Degrees Group SEZC, Ltd., and Tim Yuskus are excluded from the scope.

Subject to and without waiving that limited objection, after a reasonable search no communications were located between any Responding Party and Green Sapphire, Garrett Vail, Paul Wolfe, or another authorized Green Sapphire representative concerning whether, when, or why to file the Petition.

None of the Responding Parties discussed whether to file with Mr. Ritchie.

Tittle Santiago separately communicated with each of the three Responding Parties and, upon commencement of each representation, instructed each not to communicate with Green Sapphire or Mr. Ritchie concerning whether to file, filing strategy, prosecution, direction, control, or funding, and not to request, accept, or receive funds from either.

No responsive material is being withheld under an objection.

**REQUEST FOR PRODUCTION NO. 3:**

*All Communications between You and any of Green Sapphire, Thane Ritchie, Garrett Vail, Paul Wolfe, or others purporting to act on behalf of Green Sapphire during the Relevant Period, including but not limited to Communications concerning Global Capital.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to this Request insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Responding Parties object to these Requests insofar as they separately name 60 Degrees Group SEZC, Ltd., and Tim Yuskus or treat it or him as Green Sapphire or its representative as explained above in the objection to **Definition 7,** Consistent with the objection to **Definition 7**, 60 Degrees Group SEZC, Ltd., and Tim Yuskus are excluded from the scope.

Responding Parties also object to the Relevant Period and construe it as March 31, 2026, through the present, while identifying directly relevant material outside that period.

Responding Parties further object to the extent the Request reaches communications arising solely from a separate professional representation of Green Sapphire in matters unrelated to the Petition, Global Capital, the Delaware Action, the Illinois bankruptcy, or the unpaid claims at issue. Responding Parties construe the Request as directed to communications in their capacity as petitioning creditors (or joining creditors) concerning those subjects; no client privilege is waived.

Subject to and without waiving those limited objections, Responding Parties searched for communications with Green Sapphire, Garrett Vail, Paul Wolfe, or another authorized Green Sapphire representative concerning Green Sapphire, Global Capital, the Illinois bankruptcy, the Delaware action, the Petition, and the claims at issue. Responsive nonprivileged communications are produced in response to the more specific requests below.

No responsive material is withheld solely on the temporal objection.

Necessary post-petition counsel-to-counsel communications are separately produced and do not reflect debtor-side control or funding of the petitioners' decisions.

No responsive material is being withheld under an objection.

**REQUEST FOR PRODUCTION NO. 4:**

*All Communications between You and any other purported creditors of Green Sapphire concerning the Petition, Green Sapphire, or the claims they assert against Green Sapphire.*

**RESPONSE AND OBJECTIONS:**

Responding Parties produce responsive communications with other known creditors. Joint-client communications containing confidential legal advice or litigation strategy are withheld or redacted only on privilege or work-product grounds.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00005–00007;
- Involuntary Petitioners -- 00010–00113;
- Involuntary Petitioners -- 00117–00129;
- Involuntary Petitioners -- 00144–00182;
- Involuntary Petitioners -- 00194–00225; and
- Involuntary Petitioners -- 00238–00271.

The DAT and CSV manifests provide document-level request designations and metadata.

Targeted nonprivileged redactions are limited to bank-account, routing, IBAN, SWIFT, payment-access, electronic-meeting-access, exact-date-of-birth, or non-responsive personal medical information unnecessary to show the responsive transaction or communication. Parties will confer regarding production of any redacted identifier under an appropriate protective arrangement if Global Capital contends it is necessary.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 5:**

*All Documents and Communications concerning Your basis for asserting that Green Sapphire is generally not paying its debts as they become due, including but not limited to Documents and Communications concerning its financial condition, solvency, or ability to pay debts.*

**RESPONSE AND OBJECTIONS:**

Responding Parties produce the nonprivileged factual materials bearing on unpaid debts, assets, liquidity, the proposed receivership, and the basis for the Petition, including documents showing the origin and continued nonpayment of the Responding Parties' claims. The October 10, 2023, acknowledgement was an unsigned proposal and is not characterized as an executed admission by Green Sapphire. Counsel's confidential legal analysis and mental impressions are withheld or redacted and logged.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00001–00040;
- Involuntary Petitioners -- 00043–00048;
- Involuntary Petitioners -- 00053–00113;
- Involuntary Petitioners -- 00117–00131;
- Involuntary Petitioners -- 00144–00182;
- Involuntary Petitioners -- 00189–00225;
- Involuntary Petitioners -- 00238–00252;
- Involuntary Petitioners -- 00272; and
- Involuntary Petitioners -- 01092–01103.

The DAT and CSV manifests provide document-level request designations and metadata.

Targeted nonprivileged redactions are limited to bank-account, routing, IBAN, SWIFT, payment-access, electronic-meeting-access, exact-date-of-birth, or non-responsive personal medical information unnecessary to show the responsive transaction or communication. Responding Parties will confer regarding production of any redacted identifier under an appropriate protective arrangement if Global Capital contends it is necessary.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 6:**

*All Documents and Communications concerning Your knowledge of Green Sapphire's assets and liabilities as reported in the Illinois Bankruptcy, including but not limited to Green Sapphire's*

*schedules, monthly operating reports, and any Documents reflecting that Green Sapphire reported total assets in excess of $22,000,000.*

**RESPONSE AND OBJECTIONS:**

Responding Parties produce the Illinois Bankruptcy Schedules and other located factual materials concerning Green Sapphire's assets, liabilities, and liquidity. Public filings are produced without an objection based on public availability. The Illinois schedules, statement of financial affairs, and summary of assets and liabilities appear at: Involuntary Petitioners -- 01051–01086.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00001–00004;
- Involuntary Petitioners -- 00008–00009;
- Involuntary Petitioners -- 00059–00113;
- Involuntary Petitioners -- 00117–00131;
- Involuntary Petitioners -- 00144–00182;
- Involuntary Petitioners -- 00202–00225;
- Involuntary Petitioners -- 00238–00252;
- Involuntary Petitioners -- 00272;
- Involuntary Petitioners -- 00737–00928; and
- Involuntary Petitioners -- 01051–01086.

The DAT and CSV manifests provide document-level request designations and metadata.

Targeted nonprivileged redactions are limited to bank-account, routing, IBAN, SWIFT, payment-access, electronic-meeting-access, exact-date-of-birth, or nonresponsive personal medical information unnecessary to show the responsive transaction or communication. Responding Parties will confer regarding production of any redacted identifier under an appropriate protective arrangement if Global Capital contends it is necessary.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 7:**

*Documents sufficient to show all monies You received, directly or indirectly, from Green Sapphire, Thane Ritchie, or Alpha Carta Ltd. during the Relevant Period.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to this Request insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Responding Parties object to this Request insofar as it separately names Alpha Carta Ltd. On information and belief, Alpha Carta Ltd. is a legal entity in a different trust with a different trustee than Green Sapphire. as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Responding Parties also object to the Relevant Period and construe it as March 31, 2026, through the present, while identifying directly relevant material outside that period.

Subject to and without waiving those limited objections, Responding Parties respond only as to monies received from Green Sapphire. The produced records reflect amounts billed, payment and credit information located in Responding Parties' files, and the absence of payment on the claims asserted in the Petition.

No responsive material is withheld solely on the temporal objection.

After reasonable inquiry, Responding Parties did not locate any document showing receipt of money from Green Sapphire within the construed period.

After a reasonable search, no responsive nonprivileged documents showing the receipt of money from Green Sapphire were located. No responsive material is withheld under an objection.

**<u>REQUEST FOR PRODUCTION NO. 8:</u>**

*All Documents and Communications reflecting and concerning the amounts You claim to be owed by Green Sapphire, including Documents sufficient to show when those amounts became due and owing.*

**<u>RESPONSE AND OBJECTIONS:</u>**

Responding Parties produce invoices, claim documentation, final engagement agreements, and nonprivileged communications sufficient to show the amounts claimed and when they became due. Privilege is not asserted merely as to the existence of an engagement, ordinary fee terms, invoice totals, or due dates. Before accepting an engagement and before filing, Tittle Santiago required each prospective petitioner to identify its own direct economic interest and to provide facts and documents sufficient to evaluate whether it held a noncontingent claim not subject to a bona fide dispute as to liability or amount.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00005–00007;
- Involuntary Petitioners -- 00010–00040;
- Involuntary Petitioners -- 00043–00048;
- Involuntary Petitioners -- 00053–00058;
- Involuntary Petitioners -- 00117–00129;

- Involuntary Petitioners -- 00144–00182;
- Involuntary Petitioners -- 00189–00201;
- Involuntary Petitioners -- 00225;
- Involuntary Petitioners -- 00238–00252; and
- Involuntary Petitioners -- 01087–01103.

The DAT and CSV manifests provide document-level request designations and metadata.

Targeted nonprivileged redactions are limited to bank-account, routing, IBAN, SWIFT, payment-access, electronic-meeting-access, exact-date-of-birth, or nonresponsive personal medical information unnecessary to show the responsive transaction or communication. Responding Parties will confer regarding production of any redacted identifier under an appropriate protective arrangement if Global Capital contends it is necessary.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 9:**

*All Documents and Communications concerning any effort by You to collect, demand payment of, or otherwise seek satisfaction of the claims asserted by You in the Petition, including but not limited to demand letters, collection letters, invoices, account statements, collection suit filings, or any other pre-petition effort to recover payment from Green Sapphire.*

**RESPONSE AND OBJECTIONS:**

Responding Parties produce the located invoices, engagement records, invoice-transmittal email, payment-schedule communications, follow-up demands, and the unsigned proposed acknowledgement reflecting collection efforts and the unpaid claims. The October 10, 2023, acknowledgement was never executed. No separate pre-petition collection action was located. Confidential communications with counsel concerning collection or litigation strategy are withheld or redacted and logged.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00144–00182;
- Involuntary Petitioners -- 00252; and
- Involuntary Petitioners -- 01092–01103.

The DAT and CSV manifests provide document-level request designations and metadata.

Targeted nonprivileged redactions are limited to bank-account, routing, IBAN, SWIFT, payment-access, electronic-meeting-access, exact-date-of-birth, or non-responsive personal medical information unnecessary to show the responsive transaction or communication.

Responding Parties will confer regarding production of any redacted identifier under an appropriate protective arrangement if Global Capital contends it is necessary.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 10:**

*All proofs of claim, motions, pleadings, or other filings submitted by You in the Illinois Bankruptcy.*

**RESPONSE AND OBJECTIONS:**

After reasonable inquiry, Responding Parties did not locate any proof of claim, motion, pleading, or other paper filed by them in the Illinois bankruptcy in their capacities as creditors. Accordingly, no responsive nonprivileged document was located. Related public materials produced under other requests are not identified as responsive to this Request.

No responsive material is being withheld under an objection.

**REQUEST FOR PRODUCTION NO. 11:**

*All Documents and Communications reflecting or concerning Your participation in, monitoring of, or knowledge of proceedings in the Illinois Bankruptcy, including but not limited to docket alerts, court filings, Communications with counsel, or attendance at hearings.*

**RESPONSE AND OBJECTIONS:**

Responding Parties produce the located nonprivileged records reflecting their knowledge or monitoring of the Illinois bankruptcy. Confidential counsel communications and work product are withheld or redacted and logged.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00117–00129;
- Involuntary Petitioners -- 00263–00264;
- Involuntary Petitioners -- 00272;
- Involuntary Petitioners -- 00737–00928;
- Involuntary Petitioners -- 01051–01086; and
- Involuntary Petitioners -- 01131–01151.

The DAT and CSV manifests provide document-level request designations and metadata.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 12:**

*All Communications between You and any other person or entity, including Tittle Santiago, concerning the Illinois Bankruptcy, including but not limited to Communications concerning the Order Granting Motion to Dismiss and Refiling Bar entered on July 17, 2026 (ECF 140).*

**RESPONSE AND OBJECTIONS:**

Responding Parties produce nonprivileged communications and located public materials concerning the Illinois bankruptcy, including dismissal-related materials. Confidential legal advice and counsel work product are withheld or redacted and logged.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00001–00004;
- Involuntary Petitioners -- 00008–00009;
- Involuntary Petitioners -- 00059–00113;
- Involuntary Petitioners -- 00117–00131;
- Involuntary Petitioners -- 00144–00182;
- Involuntary Petitioners -- 00202–00225;
- Involuntary Petitioners -- 00238–00252;
- Involuntary Petitioners -- 00263–00264;
- Involuntary Petitioners -- 00272;
- Involuntary Petitioners -- 00737–00928;
- Involuntary Petitioners -- 01051–01086; and
- Involuntary Petitioners -- 01131–01151.

The DAT and CSV manifests provide document-level request designations and metadata.

Targeted nonprivileged redactions are limited to bank-account, routing, IBAN, SWIFT, payment-access, electronic-meeting-access, exact-date-of-birth, or non-responsive personal medical information unnecessary to show the responsive transaction or communication. Responding Parties will confer regarding production of any redacted identifier under an appropriate protective arrangement if Global Capital contends it is necessary.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 13:**

*All Communications between You and any other person or entity, including Tittle Santiago, concerning the Delaware Action, including but not limited to Communications concerning the Post-Trial Opinion dated March 13, 2026 and the Order and Final Judgment dated April 14, 2026.*

**RESPONSE AND OBJECTIONS:**

Responding Parties produce nonprivileged communications and located public materials concerning the Delaware action. Confidential legal advice and work product are withheld or redacted and logged.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00059–00113;
- Involuntary Petitioners -- 00117–00131;
- Involuntary Petitioners -- 00202–00224;
- Involuntary Petitioners -- 00272;
- Involuntary Petitioners -- 00276–01086;
- Involuntary Petitioners -- 01111–01118; and
- Involuntary Petitioners -- 01121–01129.

The DAT and CSV manifests provide document-level request designations and metadata.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 14:**

*All copies of court orders, judgments, opinions, and hearing transcripts from the Illinois Bankruptcy and the Delaware Action in Your possession, custody, or control, including Documents sufficient to show when and from whom You received such orders, judgments, opinions, and transcripts.*

**RESPONSE AND OBJECTIONS:**

Responding Parties produce the located copies of court orders, judgments, opinions, transcripts, schedules, and related public filings. Employer Identification Numbers appearing in public filings have not been redacted. The July 21, 2026, Delaware Court of Chancery oral-argument transcript appears at Involuntary Petitioners -- 00686–00736.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00276–01086;
- Involuntary Petitioners -- 01111–01118; and
- Involuntary Petitioners -- 01122–01129.

The DAT and CSV manifests provide document-level request designations and metadata.

No responsive material is being withheld under an objection.

**REQUEST FOR PRODUCTION NO. 15:**

*All Documents reflecting or concerning any engagement, retainer, or fee agreement between You and Tittle Santiago, including any Documents reflecting who is responsible for payment of its legal fees and costs in connection with the Petition.*

**RESPONSE AND OBJECTIONS:**

Final signed engagement agreements and ordinary nonprivileged fee and payment information are produced. The agreements are direct engagements between Tittle Santiago and the petitioning creditors; neither Green Sapphire nor Mr. Ritchie is responsible for Responding Parties' fees. Prior versions and drafts of engagement letters are withheld as attorney work product because they reflect counsel's proposed litigation scope, filing conditions, joint-representation or conflicts analysis, or strategic terms prepared for the anticipated proceeding. Those items are separately identified on the privilege and redaction log. No ordinary fee term is withheld merely because it appears in an engagement document.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00001–00040;
- Involuntary Petitioners -- 00043–00048;
- Involuntary Petitioners -- 00053–00058;
- Involuntary Petitioners -- 00144–00201;
- Involuntary Petitioners -- 00225; and
- Involuntary Petitioners -- 00238–00271.

The DAT and CSV manifests provide document-level request designations and metadata.

Targeted nonprivileged redactions are limited to bank-account, routing, IBAN, SWIFT, payment-access, electronic-meeting-access, exact-date-of-birth, or nonresponsive personal medical information unnecessary to show the responsive transaction or communication. Parties will confer regarding production of any redacted identifier under an appropriate protective arrangement if Global Capital contends it is necessary.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 16:**

*All Documents and Communications concerning any payment, reimbursement, indemnification, or promise of payment or benefit from Green Sapphire, Thane Ritchie, Paul Wolfe, Garrett Vail, or other Green Sapphire representatives to You or any other person or entity in connection with the filing of the Petition or any legal services rendered in this case.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to this Request insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Subject to and without waiving that limited objection, Responding Parties produce the located nonprivileged records concerning responsibility for fees, payments, reimbursements, and allocation of legal expenses.

Upon commencement of each engagement, counsel expressly instructed each Responding Party not to request, obtain, accept, or receive funding, reimbursement, indemnification, or other financial support from Green Sapphire, Paul Wolfe, Garrett Vail, and any actual Green Sapphire representative did not fund the petitioning creditors' legal fees.

Notwithstanding the objection and while preserving that objection, each Responding Party confirms after reasonable inquiry that it has not requested, obtained, accepted, or received funding, reimbursement, indemnification, or other financial support from Mr. Ritchie.

Each Responding Party confirms after reasonable inquiry that it has no indemnification agreement with Mr. Ritchie, Green Sapphire, Paul Wolfe, Garrett Vail, or another Green Sapphire representative.

Notwithstanding the objection and while preserving that objection, each Responding Party confirms after reasonable inquiry that it has no indemnification agreement with Mr. Ritchie.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00005–00007;
- Involuntary Petitioners -- 00010–00040;
- Involuntary Petitioners -- 00043–00048;
- Involuntary Petitioners -- 00053–00058;
- Involuntary Petitioners -- 00144–00201;
- Involuntary Petitioners -- 00225; and
- Involuntary Petitioners -- 00238–00271.

The DAT and CSV manifests provide document-level request designations and metadata.

Targeted nonprivileged redactions are limited to bank-account, routing, IBAN, SWIFT, payment-access, electronic-meeting-access, exact-date-of-birth, or non-responsive personal medical information unnecessary to show the responsive transaction or communication. Responding Parties will confer regarding production of any redacted identifier under an appropriate protective arrangement if Global Capital contends it is necessary.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 17:**

*All Documents and Communications reflecting or concerning any agreement, understanding, or arrangement between You and any of Green Sapphire, Thane Ritchie, Garrett Vail, Paul Wolfe, or any other Green Sapphire representatives regarding the filing of the Petition, including but not limited to any Communications concerning the automatic stay, the Delaware Action, or the appointment of a receiver over Green Sapphire.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to this Request insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Subject to and without waiving that limited objection, Responding Parties produce nonprivileged documents bearing on agreements or understandings concerning the Petition, the automatic stay, the Delaware Action, and the proposed receiver.

No agreement between any Responding Party and Green Sapphire or any actual representative to file, direct, fund, or maintain the Petition was located. Tittle Santiago separately communicated with the three Responding Parties and required each creditor to rely on its own direct economic interest and qualifying unpaid claim, decide independently, obtain no funding or direction from Green Sapphire, and refrain from communicating directly with Green Sapphire or its counsel concerning whether to file. The postpetition communications reflect counsel-to-counsel, court, discovery, and hearing coordination; they do not reflect debtor-side control or funding.

Tittle Santiago thereafter contacted the Responding Parties. Upon commencement of each representation, counsel required each creditor to proceed on its own direct economic interest and qualifying claim, to decide independently whether to file, not to communicate with Green Sapphire or Mr. Ritchie concerning filing strategy, prosecution, direction, control, or funding, and not to request or accept funding from either. The post-petition communications reflect counsel-to-counsel, court, discovery, and hearing coordination; they do not reflect an agreement by Green Sapphire or its representatives to direct, control, fund, or maintain the Petition.

Notwithstanding the objection and while preserving that objection, each Responding Party confirms that they did not discuss whether to file the Petition with Mr. Ritchie.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00144–00193;
- Involuntary Petitioners -- 00225;
- Involuntary Petitioners -- 00238–00271;
- Involuntary Petitioners -- 00331–00639;
- Involuntary Petitioners -- 00642–00654;
- Involuntary Petitioners -- 00656–00736;
- Involuntary Petitioners -- 00929–01050;
- Involuntary Petitioners -- 01104–01129; and
- Involuntary Petitioners -- 01131–01151.

The DAT and CSV manifests provide document-level request designations and metadata.

Targeted nonprivilege redactions are limited to bank-account, routing, IBAN, SWIFT, payment-access, electronic-meeting-access, exact-date-of-birth, or nonresponsive personal medical information unnecessary to show the responsive transaction or communication. Responding Parties will confer regarding production of any redacted identifier under an appropriate protective arrangement if Global Capital contends it is necessary.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**REQUEST FOR PRODUCTION NO. 18:**

*All Communications between You and any other person or entity, including Tittle Santiago, concerning the Rule 11 Letter and Rule 11 Response, including but not limited to Communications concerning any actual or potential decision to dismiss the Petition.*

**RESPONSE AND OBJECTIONS:**

The July 29, 2026, Rule 9011 demand is produced at:

- Involuntary Petitioners -- 01152–01154.

The August 3, 2026, transmittal email is produced at:

- Involuntary Petitioners -- 00202–00203, and

- its attached proposed Settlement Agreement, Release, Covenant Not to Sue, and Standstill Agreement is produced without redaction at Involuntary Petitioners -- 00204–00211.

Located nonprivileged communications with Global Capital's counsel are also produced. Internal client communications and counsel work product concerning legal advice, client instructions, dismissal, sanctions exposure, or response strategy are withheld or redacted and logged. Responding Parties reserve all rights under Federal Rule of Evidence 408 concerning admissibility and permissible use of the settlement materials and negotiations; Rule 408 is not asserted as an independent discovery privilege.

Related nonprivileged communications appear at:

- Involuntary Petitioners -- 00059–00108;
- Involuntary Petitioners -- 00202–00224; and
- Involuntary Petitioners -- 00273–00274.

After a reasonable search of sources reasonably accessible and within Responding Parties' possession, custody, or control, responsive nonprivileged documents are produced at:

- Involuntary Petitioners -- 00059–00113;
- Involuntary Petitioners -- 00117–00131;
- Involuntary Petitioners -- 00202–00224;
- Involuntary Petitioners -- 00273–00274;
- Involuntary Petitioners -- 01152–01154.

The DAT and CSV manifests provide document-level request designations and metadata.

Responsive attorney-client communications and attorney work product have been withheld or redacted. Each privilege-based withholding or redaction is identified on the privilege and redaction log. No responsive material is withheld under any other objection stated in this response.

**<u>REQUEST FOR PRODUCTION NO. 19:</u>**

*All Communications between Tittle Santiago and any of Green Sapphire, Thane Ritchie, Garrett Vail, Paul Wolfe, or any other Green Sapphire representatives, including but not limited to Communications concerning the Petition, the Rule 11 Letter, or the Rule 11 Response.*

**<u>RESPONSE AND OBJECTIONS:</u>**

Responding Parties object to this Request insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Responding Parties object to the extent the Request seeks every communication involving Tittle Santiago regardless of whether it concerns the Petition, the Rule 11 Letter, or the Rule 11

Response, and to the extent it seeks documents outside Responding Parties' possession, custody, or control.

Responding Parties construe the Request consistently with its subject matter and with the defined Petition—the petition filed in this case on July 21, 2026. Subject to and without waiving those limited objections, Responding Parties conducted a reasonable search of their records and responsive copies maintained in counsel's collection.

Responding Parties produce the located nonprivileged communications between Tittle Santiago and Green Sapphire's separate counsel or other representatives concerning the filed Petition, related proceedings, discovery, the joint pre-conference statement, and hearing logistics at:

- Involuntary Petitioners -- 01104–01151.

The July 29 Rule 9011 demand is produced at:

- Involuntary Petitioners -- 01152–01154.

Those post-petition communications do not establish that any Responding Party agreed with Green Sapphire to file the Petition or that Green Sapphire directed, controlled, or funded any Responding Party's decision.

Documents falling outside the foregoing construction are not being produced on the basis of the stated scope objection. Any communication within that construction that is withheld or redacted under the attorney-client privilege or work-product doctrine is identified on the privilege and redaction log.

Dated: September 5, 2026

Respectfully submitted,

**TITTLE SANTIAGO, PLLC**

*/s/ Brandon J. Tittle*
Brandon J. Tittle
Texas Bar No. 24090436
Manolo R. Santiago
Texas Bar No. 24129258
**TITTLE SANTIAGO, PLLC**
1125 Legacy Dr., Ste. 230
Frisco, Texas 75034
Telephone: 972.213.2316
Email: btittle@tittlesantiago.com
Email: msantiago@tittlesantiago.com

**Counsel for Petitioning Creditors Lecocqassociate, Legamaro Banipal LLP, and Charles-Hubert Vanoverberghe**

**CERTIFICATE OF SERVICE**

I certify that on September 5, 2026, a true and correct copy of the foregoing responses and objections, together with the associated document production and privilege/redaction log, was served by electronic mail on counsel for Global Capital Partners, LLC at the addresses stated below.

Kenneth J. Pfaehler - kenneth.pfaehler@dentons.com
Nicholas W. Petts - nicholas.petts@dentons.com
Spencer D. Hamilton - spencer.hamilton@dentons.com

*/s/ Brandon J. Tittle*
Brandon J. Tittle

# EXHIBIT 7

Brandon J. Tittle
Texas Bar No. 24090436
Manolo R. Santiago
Texas Bar No. 24129258
**TITTLE SANTIAGO, PLLC**
1125 Legacy Dr., Ste. 230
Frisco, Texas 75034
Telephone: 972.213.2316
Email: btittle@tittlesantiago.com
Email: msantiago@tittlesantiago.com

**COUNSEL FOR PETITIONING CREDITORS**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 26-33254** |
| **GREEN SAPPHIRE HOLDINGS INC.,** | § | |
| | § | **Chapter 11** |
| **Alleged Debtor.** | § | |

**PETITIONING CREDITORS LECOCQASSOCIATE, LEGAMARO BANIPAL LLP, AND CHARLES-HUBERT VANOVERBERGHE'S RESPONSES AND OBJECTIONS TO GLOBAL CAPITAL PARTNERS, LLC'S FIRST SET OF INTERROGATORIES**

Lecocqassociate ("Responding Party 1"), Legamaro Banipal LLP ("Responding Party 2"), and Charles-Hubert Vanoverberghe ("Responding Party 3"), (collectively the "First Petitioners" or "Responding Parties"), through undersigned counsel, serve these responses and objections to Global Capital Partners, LLC's First Set of Interrogatories dated August 13, 2026 ("GCP First Interrogatories"). Global Capital Partners, LLC is defined here in as "GCP" or "Global Capital".

The responses are provided jointly by the First Petitioners to comply with the GCP First Interrogatories wherein the First Petitioners were served collectively a single Set of Interrogatories. As such, the responses of the First Petitioners contain the documents collectively provided by those Petitioning Creditors and separate responses to each Interrogatory by each of the Responding Parties is not provided.

The Responding Parties answer on the basis of their present recollection, their business records, and the documents produced with Bates labels Involuntary Petitioners -- 00001 through 01616.

The consolidated production consists of 141 document units totaling 1,616 pages. The petition was filed to collect mature, unpaid professional-fee claims and to place Green Sapphire Holdings, Inc. ("Green Sapphire") in a collective Chapter 11 proceeding before Global Capital, as the holder of a multi-million-dollar Delaware judgment described to Responding Parties as

approximately $9.5 million with interest, could obtain a receiver with control over substantially all of Green Sapphire's assets and litigation claims.

During ensuing telephone calls at the end of June and in early July 2026, counsel discussed the pending receivership hearing, the authority requested in the proposed receivership order, and Green Sapphire's balance-sheet and liquidity information. Counsel explained the distinction between gross book or scheduled asset values and cash or other assets available to pay debts as they became due. Each Responding Party instructed counsel to prepare an involuntary Chapter 11 Petition and to commence this involuntary Chapter 11 case.

Upon commencement of each representation and before filing, counsel instructed each Responding Party that it must possess a direct economic interest in recovering its own debt and a valid, noncontingent claim not subject to a bona fide dispute as to liability or amount; must independently decide whether to file; must not communicate with Green Sapphire or A.R. Thane Ritchie concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and must not request, accept, or receive funding from Green Sapphire or Mr. Ritchie.

Upon commencement of each representation and before filing and in consideration of certain allegations made in the Illinois Bankruptcy and in the Delaware Action, counsel instructed each Responding Party that it must not communicate with A.R. Thane Ritchie concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and must not request, accept, or receive funding from Mr. Ritchie.

Each Responding Party independently elected to proceed to recover its own unpaid fees. Each Responding Party confirms that it has not discussed whether to file the Petition with Paul Wolfe, Garrett Vail. Each Responding Party confirms that it has not discussed whether to file the Petition with Mr. Ritchie.

Each Responding Party is a licensed legal professional or law firm with independent professional and ethical obligations. This limited factual disclosure is not intended to waive privilege or work-product protection as to other legal advice, analysis, or communications.

The Petition's file stamp is July 21, 2026, at 1:02:04 p.m. Interrogatory No. 9's July 22 premise is therefore incorrect. The checked reference to Chapter 7 was a clerical error by counsel which the Responding parties requested counsel to promptly rectify. Responding Parties retained counsel and acted to commence an involuntary Chapter 11 case.

## LIMITED OBJECTIONS TO DEFINITIONS

**Definition 7 ("Green Sapphire").** Responding Parties object to the definition of "Green Sapphire" as overbroad, vague, and factually unsupported. The definition presently expands the scope of discovery to third parties for which no argument or factual basis is presented to do so by defining the Debtor to include not only the directors of the Debtor and the Debtor, but to include also (i) A.R. Thane Ritchie, (ii) 60 Degrees Group SEZC, Ltd., (iv) Tim Yuskus, or any other person or entity as Green Sapphire or its agent, representative, affiliate, or controlling person. Based on information presently available, Green Sapphire is held through a Trust and acts through its trustee where A.R. Thane Ritchie is not a beneficiary of the Trust, a director or officer of the

Trustee or of the Debtor and as a result of the Debtor being in that Trust cannot control that Trust or Trustee and is not the owner of that Trist or Trustee. 60 Degrees is a separate third-party company that may provide administrative support, and Mr. Yuskus is understood to be associated with 60 Degrees. For purposes of these responses, "Green Sapphire" means Green Sapphire Holdings, Inc. and a person shown by the evidence to have acted as its authorized representative concerning the matter at issue. Mr. Ritchie, 60 Degrees, and Mr. Yuskus are excluded absent such a particularized showing. No agency, affiliation, ownership, or control is admitted.

**Definition 12 ("Relevant Period").** Responding Parties object to the January 1, 2025-to-present period as overbroad and disproportionate to the alleged coordination or collusion leading to the July 2026 Petition. For purposes of these responses, Responding Parties construe the Relevant Period as March 31, 2026, through the present. If a broader period is determined to be appropriate, Responding Parties preserve their objection to any default period beginning earlier than January 1, 2026, absent request-specific relevance. To avoid a scope dispute and provide a complete record, Responding Parties nevertheless searched for and produced or identified directly relevant earlier materials concerning the underlying claims, invoices, collection history, professional engagements, and Illinois bankruptcy. No responsive material or information is withheld solely on this temporal objection.

**Definition 17 ("You" or "Your").** Responding Parties object to this definition to the extent it aggregates separate Responding Parties, treats every agent, representative, advisor, or attorney as an independent responding party, or purports to require a response based on information or documents beyond a Responding Party's legal possession, custody, or control. Each Responding Party provides these responses for itself after reasonable inquiry and based on information reasonably available to it. The definition does not make unrelated third parties responsive merely because they provided professional or administrative services, and it does not waive attorney-client privilege, work-product protection, or any other applicable protection. Client-related materials maintained by Tittle Santiago on a Responding Party's behalf were included in the reasonable search; documents held solely for other clients or unrelated third parties are not thereby within a Responding Party's control.

## <u>GENERAL OBJECTIONS</u>

Responding Parties, through counsel, hereby incorporates the following objections in response to each Interrogatory in addition the specifically stated objections therein:

1. Responding Parties object to these Interrogatories to the extent that the basis of the Request or Definition is predicated or based upon, directly or indirectly, allegedly decided in *Global Capital Partners, LLC, et ano. v. Green Sapphire Holdings, Inc., C.A. No. 2024-0877-JTL.* Global Capital Limited defined in Definition 3 the *Global Capital Partners, LLC, et ano. v. Green Sapphire Holdings, Inc., C.A. No. 2024-0877-JTL* as the "Delaware Action". The Debtor and Intervening Party have separately appealed the Delaware Chancery Post-Trial Opinion & Order dated March 13, 2026 (Del. Ch. March 13, 2026), the Order & Final Judgment dated April 14, 2026 (Del. Ch. April 14, 2026), and the Cost Order dated June 1, 2026 ((Del. Ch. June 1, 2026), (collectively defined as "Delaware Chancery Orders"). In addition, the Debtor and the two directors of the Debtor have appealed on July 21, 2026, the Memorandum Opinion of Contempt

dated June 23, 2026, and the Order on Contempt dated July 6, 2026. Prior to any evaluation of such findings in the Delaware Action relied upon in the Motion to Dismiss, Global Capital treats findings in the Post-Trial Opinion dated March 13, 2026, as final when such findings are required to be evaluated in consideration of collateral estoppel (issue preclusion) and the full faith and credit doctrine. The standard issues for such evaluation include (i) the factual or legal issue in the bankruptcy court must be identical to the one decided by the Delaware Chancellor (e.g., a finding of fraud, breach of fiduciary duty, or a specific asset valuation) and (ii) the specific findings must have been critical to the Chancery Court's final ultimate determination, not just passing remarks (*obiter dicta*). The allegations of Global Capital in these proceedings against the Responding Parties involve different parties than those parties in the Delaware Action and the factual or legal issue in the bankruptcy court is not identical to the one decided by the Delaware Chancellor or even in the prior Illinois Bankruptcy (Definition 8). In addition, the findings relied upon the Motion to dismiss and appear to have been used to in the Requests for Production and Interrogatories in both the Definitions and certain Requests and Interrogatories are not specific findings that "must have been critical to the Chancery Court's final ultimate determination". Prior to the Court examining these issues, it would be inappropriate to assume for the purposes of discovery that Global capital would prevail on such findings for the purposes of motivating the Requests for Production and Interrogatories. Should the Court determine that such findings of the Delaware Chancellor in the Delaware Action have any probative value in consideration of the Motion to Dismiss and further disclosure of documents and additional responses to the Interrogatories is required then the Responding Parties will address those issues at that time.

2. Responding Parties object to these Interrogatories to the extent they are vague, overbroad, unduly burdensome, and impose obligations in excess of those imposed by the Federal Rules of Civil Procedure, made applicable by the Federal Rules of Civil Procedure.

3. Responding Parties object to the Interrogatories because the January 1, 2025-to-present period as overbroad and disproportionate to the alleged coordination or collusion leading to the July 2026 Petition as explained above in the objection to Definition 12.

4. Responding Parties object to these Interrogatories insofar as they separately name A.R. Thane Ritchie or treats him as Green Sapphire or its representative. as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

5. Responding Parties object to these Interrogatories insofar as they separately name 60 Degrees Group SEZC, Ltd., and Tim Yuskus or treat it or him as Green Sapphire or its representative as explained above in the objection to **Definition 7,** Consistent with the objection to **Definition 7**, 60 Degrees Group SEZC, Ltd., and Tim Yuskus are excluded from the scope.

6. Responding Parties object to these Interrogatories to the extent that they seek information that is neither relevant to this litigation nor reasonable calculated to lead to the discovery of admissible evidence.

7. Responding Parties object to these Interrogatories to the extent that they seek information protected from disclosure by the attorney-client privilege, the work-product privilege, and/or any other applicable privilege, protection, or immunity.

8. Responding Parties object to these Interrogatories to the extent they seek responses regarding information which Defendant has intentionally precluded Responding Parties from uncovering through discovery in connection with this Cause.

9. Responding Parties submit these Responses and Objections without conceding the relevancy or materiality of the subject matter of any response to any Interrogatory.

10. Responding Parties do not waive the right to object, on any and all grounds, to (i) the evidentiary use of any response provided to these Interrogatories and/or any documents produced or referenced in response to these Interrogatories, and (ii) future discovery requests relating to such responses or documents.

## LIMITED GENERAL STATEMENTS

1. These answers follow a reasonable inquiry and are based on information presently known or reasonably available. Responding Parties will supplement or correct them as required by Federal Rule of Civil Procedure 26(e), made applicable by Federal Rule of Bankruptcy Procedure 7026.

2. Responding Parties answer each Interrogatory to the extent it seeks information within their possession, custody, or control. The answers provide the material nonprivileged facts known after reasonable inquiry and identify principal supporting Bates ranges.

3. Attorney-client communications and attorney work product are withheld or redacted only where the specific answer so states, and each such document is identified on the privilege and redaction log. That log identifies 50 documents withheld in full, 37 produced with privilege redactions, and 26 produced with nonprivileged privacy, security, or financial redactions. No nonprivileged responsive fact stated in these answers is withheld on privilege grounds.

4. Federal Rule of Evidence 408 is preserved as to admissibility and permissible use of compromise communications but is not asserted as an independent discovery privilege. Bates references use the legend “Involuntary Petitioners --” followed by a five-digit number.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1

*Describe the circumstances leading to the filing of the Petition, including: (a) who first proposed or suggested the filing of an involuntary petition against Green Sapphire; (b) the date on which such proposal was first made; (c) the identity of all persons involved in the discussions or communications regarding a potential involuntary petition; (d) the decision to file; and (e) the purpose or purposes of the filing.*

**RESPONSE AND OBJECTIONS:**

Responding Parties have withheld or redacted only attorney-client communications and attorney work product identified on the privilege and redaction log. The material nonprivileged facts follow.

Each Responding Party's consideration of an involuntary petition arose from its own unpaid professional fee claim and its separate communications with Tittle Santiago.

Dominique Lecocq states on behalf of lecocqassociate that lecocqassociate was owed a significant debt by Green Sapphire. Mr. Lecocq recalls that Mr. Tittle initiated contact on June 29; after attempts to connect, they spoke by telephone. Then Mr. Tittle followed up with an email to Mr. Lecocq on June 30, 2026, at 3:58 p.m. He understands that Mr. Tittle obtained his contact information from the Illinois bankruptcy materials. Mr. Tittle explained the differences between the voluntary bankruptcy in Chicago and an involuntary bankruptcy, and between Chapter 11 and Chapter 7. Counsel also advised Mr. Lecocq of the parallel Delaware proceeding in which Global Capital sought control of Green Sapphire through a receivership. Mr. Lecocq concluded that a federal bankruptcy proceeding offered a better means to protect lecocqassociate's interest as a significant foreign creditor. In light of the debt owed, lecocqassociate agreed to advance the initial retainer on the condition that, if additional creditors joined, lecocqassociate would be reimbursed for the excess advance and thereafter bear its *pro rata* share of counsel's fees. Mr. Lecocq instructed Mr. Tittle to prepare an involuntary petition naming lecocqassociate together with at least two other qualifying petitioning creditors; counsel explained that he was attempting to contact other creditors to satisfy the statutory petition requirements.

Michael Legamaro states on behalf of Legamaro Banipal LLP that he contacted Mr. Tittle by telephone on July 21, 2026. Mr. Tittle emailed him at 10:21 a.m. that day, and they spoke. Mr. Tittle explained the Chapter 11 process, including its outline, timetable, and anticipated costs. Mr. Legamaro understood that Legamaro Banipal LLP had no other effective remedy for its unpaid claim and instructed Mr. Tittle to prepare the filing with Legamaro Banipal LLP as a petitioning creditor. Although generally familiar with bankruptcy, Mr. Legamaro required counsel's explanation of the particular bankruptcy procedure, timetable, and costs before authorizing participation.

Charles-Hubert Vanoverberghe states that he was generally familiar with the problems in the Illinois bankruptcy and began considering an involuntary bankruptcy when that case was dismissed or appeared at risk of dismissal. Mr. Vanoverberghe recalls that Mr. Tittle initiated contact on June 29; after attempts to connect, they spoke by telephone. Then Mr. Tittle followed up with an email to Mr. Vanoverberghe on July 1, 2026, at 4:57 p.m. Mr. Vanoverberghe does not know how Mr. Tittle obtained his contact information but assumes it came from the Illinois bankruptcy materials. Mr. Tittle explained the differences between Chapter 11 and Chapter 7 and advised him of the parallel Delaware proceeding in which Global Capital sought control of Green Sapphire through a receivership. Mr. Vanoverberghe concluded that a federal bankruptcy proceeding offered a better means to protect his interest as a foreign creditor. Mr. Vanoverberghe instructed Mr. Tittle to prepare an involuntary petition naming him together with at least two other

qualifying petitioning creditors; counsel explained that he was attempting to contact other creditors to satisfy the statutory petition requirements.

During the related calls, counsel explained that each creditor had to possess a direct economic interest in payment of its own debt and a valid, noncontingent claim not subject to a bona fide dispute. Upon commencement of each representation, counsel instructed each creditor to decide independently; not to communicate with Green Sapphire concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and not to request, accept, or receive funding from either. The Responding parties confirm that each of them did not and has not communicated with Green Sapphire or its counsel concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and has not requested, accepted, or received funding from Green Sapphire or its counsel.

Upon commencement of each representation and before filing and in consideration of certain allegations made in the Illinois Bankruptcy and in the Delaware Action, counsel instructed each Responding Party that it must not communicate with A.R. Thane Ritchie concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and must not request, accept, or receive funding from Mr. Ritchie. The Responding parties confirm that each of them did not and has not communicated with A.R. Thane Ritchie concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and has not requested, accepted, or received funding from Mr. Ritchie.

On July 21, 2026, and after reviewing the circumstances and confirming their respective unpaid claims, the three Responding Parties (lecocqassociate, Legamaro Banipal LLP, and Mr. Vanoverberghe) independently authorized the filing of the Petition. The material facts they considered included Global Capital's judgment of approximately $9.5 million with interest; the pending receivership hearing; the authority requested in the proposed receivership order; and the absence of cash or other liquid assets corresponding to the Debtor's stated gross asset values. Their purpose was to pursue payment through a collective Chapter 11 proceeding.. None discussed whether to file with Paul Wolfe, Garrett Vail, or Mr. Ritchie

While maintaining the objection, the Responding Parties confirm that none discussed whether to file with Mr. Ritchie.

*See* Involuntary Petitioners -- 00001–00009; Involuntary Petitioners -- 00144–00193; Involuntary Petitioners -- 00238–00272; Involuntary Petitioners -- 01087–01103, and the Privilege and Redaction Log.

**INTERROGATORY NO. 2**

*State the factual basis for filing the Petition, including: (a) each debt You contend Green Sapphire has failed to pay; (b) the amount of each such debt; (c) the date each such debt became due; (d) the identity of each creditor; and (e) all facts and Documents upon which You rely for filing the Petition.*

**RESPONSE AND OBJECTIONS:**

Before accepting each engagement and before filing, Tittle Santiago required each Responding Party to identify its direct economic interest in recovering its own debt and to provide facts and documents sufficient to evaluate whether it possessed a valid, noncontingent claim not subject to a bona fide dispute as to liability or amount. Each Responding Party supplied claim documentation and confirmed that its claim remained unpaid. After reasonable inquiry, each Responding Party held a noncontingent, undisputed unsecured professional-fee claim that was due and unpaid when the Petition was filed. The Petition states an aggregate of US$174,784.66 for the original three petitioners. The principal claim information is set out below.

| Creditor | Claim | Invoice/due information | Principal Bates ranges |
|---|---|---|---|
| Lecocqassociate | CHF 78,900.54; petition amount US$97,047.86 | Invoices dated Oct. 24, Nov. 25, and Nov. 30, 2024; Mar. 25, Mar. 28, Apr. 11, Apr. 14, July 24, July 31, Aug. 21, Sept. 24, and Nov. 12, 2025; and Feb. 25, 2026. Each stated 20-day payment terms. | 00001–00002; 00144–00178; 00272 |
| Legamaro Banipal LLP | US$8,060.00 | Invoice 16656: US$5,785, dated and due Mar. 21, 2024. Invoice 16690: US$2,275, dated and due Apr. 21, 2024. | 00008–00009; 00181–00182; 00272 |

| Creditor | Claim | Invoice/due information | Principal Bates ranges |
|---|---|---|---|
| Charles-Hubert Vanoverberghe | €61,075; petition amount US$69,676.80 | Executed engagement dated Dec. 20, 2022; work completed Feb. 2, 2023; invoice 2023-214 issued Apr. 2, 2023. The invoice does not state a separate due date, and Mr. Vanoverberghe understood it to be payable upon presentation. On July 7, 2023, debtor-side counsel stated that Green Sapphire intended to pay one half after refinancing expected within 10–14 business days and the balance upon a contemplated sale expected within 90–120 days. An Oct. 10, 2023 proposed acknowledgement stated a Dec. 1 date, but the proposal was never executed. | 00003–00004; 00179–00180; 00272; 01087–01089; 01092–01103 |

**INTERROGATORY NO. 3**

D*escribe Your knowledge of Green Sapphire's assets and liabilities as of the date of the Petition, including whether You were aware that Green Sapphire's schedules filed in the Illinois Bankruptcy reflected total assets in excess of $22,000,000, and if so, explain Your basis for contending that Green Sapphire is in financial distress or otherwise eligible to be a debtor in a bankruptcy case.*

**RESPONSE AND OBJECTIONS:**

The response distinguishes gross scheduled assets from liquidity and whether debts were generally being paid as they became due. Responding Parties knew that the Illinois schedules reported substantial gross assets. The schedules produced here report approximately US$97.94 million in assets and approximately US$97.62 million in liabilities; the Delaware receiver papers separately described approximately US$21.47 million of assets. Thus, the Interrogatory's reference to "schedules" reflecting only US$22 million is imprecise.

Counsel discussed the Debtor's balance sheet, the absence of corresponding liquidity, and the pending receivership hearing with the original three petitioners by telephone at the end of June and in early July 2026. Responding Parties understood that the listed assets were overwhelmingly non-cash, illiquid, disputed, or litigation-related; that Green Sapphire had not paid their long-outstanding fee claims; and that Global Capital sought a receiver empowered to (i) take control of Green Sapphire's property, (ii) marshal and sell assets for Global Capital's judgment, and (iii)

dismiss specified litigation claims, including the RICO action, claims in the former Chicago adversary proceeding and actions before French Courts. The additional collection records further show Mr. Vanoverberghe's repeated 2023 payment requests and an unfulfilled stated payment schedule; the proposed acknowledgement was unsigned and is not treated as a Green Sapphire admission. Based on those facts, Responding Parties believed Green Sapphire was not generally paying debts as they became due and that a collective Chapter 11 case was appropriate.

*See Involuntary Petitioners -- 00253–01086, including Involuntary Petitioners -- 00817–00831 and Involuntary Petitioners -- 01051–01086; and Involuntary Petitioners -- 01092–01103.*

**INTERROGATORY NO. 4**

*Describe in detail all efforts made by You to collect, demand payment of, or otherwise seek satisfaction of Your claim against Green Sapphire prior to the filing of the Petition, including: (a) whether any demand letter was sent (and if so, the date and manner of delivery); (b) whether any collection suit was filed (and if so, identify the court, case number, and date of filing); (c) whether any invoice or account statement was sent (and if so, the dates); and (d) the response, if any, received from Green Sapphire to any such effort.*

**RESPONSE AND OBJECTIONS:**

After reasonable inquiry, each creditor issued and transmitted the invoices identified in Response No. 2 and sought payment in the ordinary course:

- Lecocqassociate's thirteen invoices stated twenty-day payment terms;
- Legamaro Banipal LLP issued invoices 16656 and 16690 on March 21 and April 21, 2024;
- Mr. Vanoverberghe entered the produced engagement on December 20, 2022; completed the work on February 2, 2023; transmitted invoice 2023-214 on April 2, 2023, with a request for prompt payment; requested a payment schedule on June 7; and participated in follow-up communications on June 8. On July 7, Charles Mack stated that Green Sapphire was pursuing refinancing, expected within 10–14 business days, and intended to pay one half at refinancing and the balance upon a sale expected within 90–120 days. Mr. Vanoverberghe followed up on July 27 and August 1. On October 11 he transmitted an unsigned proposed acknowledgement of debt and requested review; he followed up on October 16 and October 19 and asked whether a collection dispute should be commenced. The proposal was never executed. The available records do not reflect that any Responding Party filed a separate collection action before the Petition. Green Sapphire made no payment on the listed claims and did not communicate a good-faith dispute as to liability or amount before filing.

*See* Involuntary Petitioners -- 00144–00182 and Involuntary Petitioners -- 01087–01103.

**INTERROGATORY NO. 5**

*State whether You filed a proof of claim, motion, pleading, objection, or any other filing in the Illinois Bankruptcy, and if so, identify each such filing by date, docket number, and subject matter. If no such filing was made, explain why.*

**RESPONSE AND OBJECTIONS:**

After reasonable inquiry, none of the Responding Parties filed a proof of claim, motion, pleading, or objection in the Illinois bankruptcy in its capacity as a creditor. The creditors' claims and relationships were reflected in Green Sapphire's records and, to varying degrees, its schedules; no proof of claim was filed before the Illinois case was dismissed. Responding Parties did not understand a separate creditor filing to be necessary before dismissal.

*See Involuntary Petitioners -- 00817–00831 and Involuntary Petitioners -- 01051–01086.*

**INTERROGATORY NO. 6**

*Describe the extent of Your participation in, monitoring of, or knowledge of proceedings in the Illinois Bankruptcy, including whether You: (a) received notice of filings in that case; (b) reviewed any pleadings, orders, or transcripts from that case; (c) attended or monitored any hearing in that case; or (d) communicated with any party or counsel in that case.*

**RESPONSE AND OBJECTIONS:**

Responding Parties had general knowledge of the Illinois bankruptcy and, through counsel or publicly available records, reviewed or received selected pleadings, orders, docket information, and information concerning dismissal. They did not direct or control Green Sapphire's conduct in that case. On current recollection, none personally appeared at or monitored an Illinois bankruptcy hearing as a creditor. Nonprivileged public filings, docket materials, and post-petition court-facing communications concerning the former Chicago case are produced at:

*See Involuntary Petitioners -- 00253–01086 and Involuntary Petitioners -- 01131–01151.*

Privileged communications concerning those materials are withheld or redacted and identified on the privilege and redaction log.

**INTERROGATORY NO. 7**

*State whether Green Sapphire or any of its representatives, including but not limited to Thane Ritchie, Garrett Vail, Paul Wolfe, or any entity owned or controlled by Ritchie, has made, offered, or promised any payment, reimbursement, indemnification, or other benefit to You in connection with the Petition or any legal services rendered in this Texas Bankruptcy Case. If so, describe the nature, amount, and terms of any such payment or promise.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to the Interrogatory insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Responding Parties object to this Interrogatory insofar as the Interrogatory requests the Responding Parties to state whether "*any entity owned or controlled by Ritchie*" has made, offered, or promised any payment, reimbursement, indemnification, or other benefit to a Responding Party in connection with the Petition or any legal services rendered in this Texas Bankruptcy Case. Such a request is overbroad and without foundation. Notwithstanding this objection and while maintaining this objection, Except for the additional petitioners, agreement to pay for legal services rendered by counsel in rendered in this Texas Bankruptcy Case, the Responding Parties have not been approached by any party offering, promising making any payment, reimbursement, indemnification, or other benefit to a Responding Party in connection with the Petition or any legal services rendered in this Texas Bankruptcy Case.

Subject further to and without waiving that limited objection, Responding Parties further state that none of Green Sapphire, Garrett Vail, Paul Wolfe, or another Green Sapphire representative made, offered, or promised a Responding Party any payment, reimbursement, indemnification, or other benefit in connection with filing the Petition or Tittle Santiago's services. Upon commencement of each engagement, counsel instructed each Responding Party not to seek, obtain, accept, or receive any financial support from Green Sapphire. In addition, Upon commencement of each engagement, counsel instructed each Responding Party not to seek, obtain, accept, or receive any financial support from Mr. Ritchie. The petitioning creditors funded counsel from their own funds.

*See* Involuntary Petitioners -- 00183–00193 and Involuntary Petitioners -- 00238–00251.

**INTERROGATORY NO. 8**

*State whether any agreement, understanding, or arrangement—whether written or oral—exists between You and any of Green Sapphire, Thane Ritchie, Paul Wolfe, Garrett Vail, or other Green Sapphire representatives regarding: (a) the filing of the Petition; (b) the automatic stay; (c) the Delaware Action; or (d) the potential appointment of a receiver over Green Sapphire. If so, describe the terms of any such agreement, understanding, or arrangement in full.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to the Interrogatory insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Subject to and without waiving that limited objection, Responding Parties state after reasonable inquiry that no agreement, understanding, or arrangement—whether written or oral—exists between any and each of the Responding Parties and any of Green Sapphire, Paul Wolfe, Garrett Vail, or other Green Sapphire representatives regarding: (a) the filing of the Petition; (b) the automatic stay; (c) the Delaware Action; or (d) the potential appointment of a receiver over Green Sapphire.

Subject to and without waiving that limited objection, Responding Parties state after reasonable inquiry that no agreement, understanding, or arrangement—whether written or oral—exists between any and each of the Responding Parties and Mr. Ritchie regarding: (a) the filing of the Petition; (b) the automatic stay; (c) the Delaware Action; or (d) the potential appointment of a receiver over Green Sapphire.

Upon commencement of each representation, Tittle Santiago instructed each Responding Party to decide independently based on its own claim and direct economic interest; not to communicate with Green Sapphire concerning whether to file or the strategy, prosecution, direction, control, or funding of the proceeding; and not to request or accept funding from either. Those safeguards were imposed by counsel and were not an agreement with Green Sapphire. Responding Parties did not discuss with Mr. Wolfe, Mr. Vail, or Green Sapphire's counsel whether to file. Their decisions were independent and driven by their own unpaid claims and the perceived risk to creditor recovery created by the proposed receivership.

Upon commencement of each representation and before filing and in consideration of certain allegations made in the Illinois Bankruptcy and in the Delaware Action, Tittle Santiago instructed each Responding Party to decide independently based on its own claim and direct economic interest; not to communicate with Mr. Ritchie concerning whether to file or the strategy, prosecution, direction, control, or funding of the proceeding; and not to request or accept funding from either. Those safeguards were imposed by counsel and were not an agreement with Mr. Ritchie. Responding Parties did not discuss with Mr. Ritchie whether to file. Their decisions were independent and driven by their own unpaid claims and the perceived risk to creditor recovery created by the proposed receivership.

*See Involuntary Petitioners -- 00001–00009, Involuntary Petitioners -- 00144–00193, Involuntary Petitioners -- 00238–00272, and Involuntary Petitioners -- 01087–01103.*

**INTERROGATORY NO. 9**

*Describe the timeline of events leading to the filing of the Petition on July 22, 2026, including: (a) when You first contacted Tittle Santiago; (b) when the decision to file was made; (c) why the petition was filed on July 22, 2026, approximately one hour before the hearing on the motion to appoint a receiver in the Delaware Action and whether that receivership hearing was a factor in the decision to file the Petition; and (d) whether You had knowledge of the July 22, 2026 hearing in the Delaware Action prior to filing the Petition, and the source of such knowledge.*

**RESPONSE AND OBJECTIONS:**

Responding Parties consider that Interrogatory's July 22 premise is incorrect. The Petition was filed July 21, 2026, at 1:02:04 p.m. Responding Parties have withheld or redacted only attorney-client communications and work product identified on the privilege and redaction log; no nonprivileged responsive fact is withheld.

The first located email to lecocqassociate is dated June 30 at 3:58 p.m.; the first located email to Mr. Vanoverberghe is dated July 1 at 4:57 p.m.; and the first located email to Legamaro Banipal LLP is dated July 21 at 10:21 a.m. Mr. Legamaro states that he first called Mr. Tittle on July 21, and Mr. Tittle then emailed him. During the ensuing telephone calls, counsel discussed the potential Chapter 11 case, the pending receivership hearing, the proposed order, and the Debtor's balance sheet and liquidity. Counsel required each creditor to possess a direct economic interest and a qualifying claim and, after each representation began, instructed the creditor not to communicate with Green Sapphire concerning filing, strategy, prosecution, direction, control, or funding and not to obtain funding from either. In addition, and in consideration of certain allegations made in the Illinois Bankruptcy and in the Delaware Action, counsel required instructed the creditor not to communicate with Mr. Ritchie concerning filing, strategy, prosecution, direction, control, or funding and not to obtain funding from Mr. Ritchie.

Each creditor independently authorized filing on July 21.

The Responding Parties each considered that the pending receiver request was a material timing factor because the proposed order would give a receiver control over substantially all of Green Sapphire's assets and authority to dismiss the RICO action and claims in the former Chicago adversary proceeding as well as other proceedings in France. The Debtor's balance sheet reported substantial gross assets, but those book values consisted predominantly of non-cash, illiquid, disputed, or litigation-related assets and did not demonstrate an ability to pay debts as they became due. The requested receivership relief would further diminish the practical prospect that ordinary unsecured creditors would be paid and impair Green Sapphire's ability to pay debts outside the receiver's control. The Petition was filed to pursue the creditors' own repayment through Chapter 11, not pursuant to any agreement with Green Sapphire or its representatives.

*See Involuntary Petitioners -- 00001–00009, Involuntary Petitioners -- 00253–00272, Involuntary Petitioners -- 00331–00639, Involuntary Petitioners -- 00817–00831, Involuntary Petitioners -- 01051–01086, and the Privilege and Redaction Log.*

**INTERROGATORY NO. 10**

*Identify any and all other creditors of Green Sapphire with whom You have communicated concerning the Petition, and for each such creditor: (i) identify the date(s) of such communication(s); (ii) describe the manner of such communication, whether by email, telephone, or other means; and (iii) describe the substance of such communication(s).*

**RESPONSE AND OBJECTIONS:**

The original petitioners communicated with one another through joint email chains and counsel beginning July 21 concerning confirmation of their claims, engagement of counsel, execution and filing of the Petition, and allocation of legal expenses. The produced and logged communications identify dates and participants.

*See Involuntary Petitioners -- 00007–00058, Involuntary Petitioners -- 00130–00131, Involuntary Petitioners -- 00181–00193, Involuntary Petitioners -- 00194–00201, and Involuntary Petitioners -- 00238–00251.* Joint-client legal advice and counsel work product are withheld or redacted and identified on the Privilege and Redaction Log.

After Michael McNutt of Lazareff Le Bars Legal Advisory Limited (ADGM) contacted Tittle Santiago on August 11 and counsel returned his call on August 12, counsel separately discussed with Mr. McNutt the same material factual subjects previously discussed with the original petitioners: the pending receivership hearing, the relief sought in the proposed order, the dismissal of the Chicago bankruptcy, and the Debtor's balance sheet and available liquidity. Counsel also communicated with Lazareff Le Bars Legal Advisory Limited (ADGM) and Benoit Le Bars of Lazareff Le Bars SARL, a separate legal entity and petitioner, concerning their respective unpaid claims, supporting invoices, joinders, engagement terms, and sharing of case expenses.

The first produced group email which directly includes representatives of all five creditors is dated August 21, 2026.

*See* Involuntary Petitioners -- 00109–00129, Involuntary Petitioners -- 00132–00143, Involuntary Petitioners -- 00189–00193, Involuntary Petitioners -- 00226–00237, and the Privilege and Redaction Log.

Each of the Responding Parties confirms that the decision to file on July 21 was made prior to any contact by any of the Responding Parties with either of the two joining creditors (Lazareff le Bars Legal Advisory Limited (ADGM) and Lazareff Le Bars Eurl) and was decided without any consultation with those later-joining creditors.

**INTERROGATORY NO. 11**

*Identify all Communications between You and any of Green Sapphire, Thane Ritchie, Paul Wolfe, Garrett Vail, or any other Green Sapphire representatives concerning the filing of the Petition, the automatic stay, or the Delaware Action, including any Communications about preventing or delaying the appointment of a receiver over Green Sapphire.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to the Interrogatory insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Responding Parties state that none of the Responding Parties themselves communicated with Green Sapphire, Paul Wolfe, or Garrett Vail before filing to obtain approval, coordinate the decision to file, invoke the automatic stay, or prevent or delay appointment of a receiver.

Subject to and without waiving that limited objection, Responding Parties state that neither of the Responding Parties themselves communicated with Green Sapphire, Paul Wolfe, or Garrett Vail before filing to obtain approval, coordinate the decision to file, invoke the automatic stay, or prevent or delay appointment of a receiver.

Tittle Santiago thereafter contacted the Responding Parties. Upon commencement of each representation, counsel instructed each Responding Party to maintain separation from Green Sapphire concerning whether to file and the strategy, prosecution, direction, control, or funding of the involuntary proceeding, and not to obtain funding from Green Sapphire, its directors or its agents and counsel.

Responding Parties confirm and state that none of the Responding Parties themselves communicated with Green Sapphire, Paul Wolfe, or Garrett Vail before filing to obtain approval, coordinate the decision to file, invoke the automatic stay, or prevent or delay appointment of a receiver.

While maintaining the objection, Responding Parties confirm and state that none of the Responding Parties themselves communicated with Thane Ritchie before filing to obtain approval, coordinate the decision to file, invoke the automatic stay, or prevent or delay appointment of a receiver.

Each Responding Party confirms it independently evaluated and authorized filing based on its own unpaid claim.

After filing, Tittle Santiago exchanged nonprivileged communications with Green Sapphire's separate counsel—principally Mr. Swick and David Parham—concerning filed pleadings, the automatic stay, the Delaware and Chicago proceedings, the joint pre-conference statement, discovery, and hearing logistics. Global Capital's counsel and court personnel were copied on some communications. Those post-petition communications do not reflect that Green Sapphire approved, directed, controlled, or funded the filing. Those post-petition communications are produced at Involuntary Petitioners -- 01104–01151.

After filing, Dominique Lecocq advised Mr. Ritchie of the existence of the pending proceeding arising from nonpayment. That notice did not seek approval and did not concern filing strategy, prosecution, direction, control, or funding.

Ordinary-course communications with Green Sapphire concerning the underlying professional engagements or invoices did not concern whether to file the Petition.

In addition, Mr. Vanoverberghe's 2023 engagement and collection communications appear at Involuntary Petitioners -- 01087–01103.

No nonprivileged responsive communication is withheld.

**INTERROGATORY NO. 12**

*Identify each individual or entity responsible for paying Tittle Santiago's legal bills in connection with this Texas Bankruptcy Case, and identify all sources of funds, direct or indirect, for paying such bills.*

**RESPONSE AND OBJECTIONS:**

Lecocqassociate agreed to advance and paid an initial US$80,000 retainer to Tittle Santiago on the condition that additional joining creditors would reimburse the excess advance and that lecocqassociate thereafter would bear its *pro rata* share of counsel's fees.

After the two Lazareff entities joined, Michael McNutt, on behalf of Lazareff Le Bars Legal Advisory Limited (ADGM), agreed to contribute US$120,000 toward legal fees on behalf of the two joining creditors as follows: $70,000 of the initial retainer as the two claims to allow the reimbursement of the advanced retainer paid by Lecocqassociate and an additional $50,000 of fees as a result of the additional work resulting from the joining of the two creditors. Counsel then reimbursed US$70,000 to lecocqassociate as agreed. The remaining responsibility for fees is governed by the petitioning creditors' engagement and allocation arrangements.

Consistent with counsel's independence instructions, no Responding Party requested or received funds from Green Sapphire for Tittle Santiago's fees. The funds provided by Lecocqassociate are from its legal services, and the source of such funds is therefore privileged. However, Lecocqassociate states that the source of such funds is not Green Sapphire, Paul Wolfe, Garrett Vail, and their affiliates, direct or indirect funds. and while preserving its objections, not from Mr. Ritchie.

*See Involuntary Petitioners -- 00183–00193 and Involuntary Petitioners -- 00226–00251.*

Consistent with counsel's independence instructions, no Responding Party requested or received funds from Mr. Ritchie for Tittle Santiago's fees.

**INTERROGATORY NO. 13**

*State whether You have communicated with any of Thane Ritchie, Paul Wolfe, Garrett Vail, or other representatives or agents of Green Sapphire concerning the Delaware Action, the Illinois Bankruptcy, or the Petition by means of an ephemeral messaging system. If so, (i) identify the type*

*of ephemeral messaging system(s) employed for such communications; (ii) identify the date(s) of such communication(s); and (iii) describe the substance of such communication(s).*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to the Interrogatory insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

Subject to and without waiving that limited objection, each of Responding Parties states that it has not communicated using an ephemeral messaging system with Mr. Ritchie concerning the Delaware Action, the Illinois Bankruptcy, or the Petition by means of an ephemeral messaging system.

After reasonable inquiry, each of the Responding Parties states it did not use an ephemeral messaging system to communicate with Paul Wolfe, Garrett Vail, or another Green Sapphire representative or agent concerning the Delaware Action, the Illinois bankruptcy, or the Petition.

Mr. Vanoverberghe used WhatsApp with Tittle Santiago, his counsel, as reflected in the produced, privilege-redacted thread at Involuntary Petitioners -- 00130–00131; Tittle Santiago is not a Green Sapphire representative or agent.

**INTERROGATORY NO. 14**

*Describe the timeline of events leading to Your decision not to dismiss the Petition as of August 12, 2026, including: (a) when You "independently" decided to dismiss the Petition, as stated in the Rule 11 Response; and (b) when You reversed Your decision to dismiss the Petition. Describe all facts and circumstances leading to the decisions in (a) and (b).*

**RESPONSE AND OBJECTIONS:**

Responding Parties disagree with the premise that there was a final collective decision to dismiss followed by a reversal. The material nonprivileged chronology follows. Attorney-client advice and work product are withheld or redacted and identified on the privilege and redaction log. Rule 408 is preserved as to admissibility and permissible use but is not asserted as a discovery privilege.

The nonprivileged chronology is as follows:

- On July 29, Global Capital's counsel delivered a Rule 9011 demand and requested dismissal.

- On July 31, Lecocqassociate indicated willingness to authorize a consensual dismissal only if specified waivers and releases were secured. Legamaro Banipal LLP separately indicated it could withdraw if it otherwise would be the only petitioner remaining. Mr. Vanoverberghe had not consented to dismissal.

- On August 4, Lecocqassociate instructed counsel to hold off, and Legamaro Banipal LLP stated it was reconsidering withdrawal.

- On August 7, counsel advised the petitioners that the proposed release-and-dismissal arrangement had not been approved and that, absent approval, the case would be defended.

- By August 12, there had never been a final, unconditional, unanimous decision by all petitioners to dismiss;

Therefore there was no collective decision that was later "reversed."

*See* Involuntary Petitioners -- 00059–00108, Involuntary Petitioners -- 00202–00224, Involuntary Petitioners -- 00273–00274, and Involuntary Petitioners -- 01152–01154, and the Privilege and Redaction Log.

**KEY PRODUCTION REFERENCES**

The Bates references below identify the principal nonprivileged documents supporting these answers. They are not intended to limit the Responding Parties' reliance on other produced documents, public filings, or testimony.

| Subject | Bates range |
|---|---|
| Initial outreach, creditor authorization, and filing communications | 00001–00058; 00130–00131; 00194–00201; 00238–00251 |
| Rule 9011/dismissal chronology | 00059–00108; 00202–00224; 00273–00274; 01152–01154 |
| Original-creditor invoices, engagement, and collection communications | 00144–00182; 01087–01103 |
| Retainer/payment and cost allocation | 00183–00193 |
| Executed original-creditor engagement letters | 00238–00251 |
| Filed involuntary petition | 00272 |
| Public pleadings, docket, schedules, and financial filings | 00253–01086 |
| Postpetition counsel, court, discovery, and hearing communications | 01104–01151 |

Docusign Envelope ID: F4DCF3CE-7714-87D2-8346-8E94E297FF54


Dated: September 5, 2026

Respectfully submitted,

**TITTLE SANTIAGO, PLLC**

*/s/ Brandon J. Tittle*
Brandon J. Tittle
Texas Bar No. 24090436
Manolo R. Santiago
Texas Bar No. 24129258
1125 Legacy Dr., Ste. 230
Frisco, Texas 75034
Telephone: 972.213.2316
Email: btittle@tittlesantiago.com
Email: msantiago@tittlesantiago.com

**COUNSEL FOR
PETITIONING CREDITORS**

**VERIFICATION**

I, Dominique Lecocq, am an authorized representative of Lecocqassociate. I have reviewed the foregoing answers to interrogatories and declare under penalty of perjury under the laws of the United States of America that the answers attributable to that entity are true and correct based on my personal knowledge and the information reasonably available to the entity.

Executed on September 5, 2026

DocuSigned by:
BE2EC8AED30544F...

**Dominique Lecocq**
Authorized Representative

**VERIFICATION**

I, Michael Legamaro, am an authorized representative of Legamaro Banipal LLP. I have reviewed the foregoing answers to interrogatories and declare under penalty of perjury under the laws of the United States of America that the answers attributable to that entity are true and correct based on my personal knowledge and the information reasonably available to the entity.

Executed on September 5, 2026

DocuSigned by:



92E066E706814FD...

**Michael Legamaro**
Authorized Representative

# VERIFICATION

I, Charles-Hubert Vanoverberghe, have reviewed the foregoing answers to interrogatories and declare under penalty of perjury under the laws of the United States of America that the answers attributable to me are true and correct based on my personal knowledge and the information reasonably available to me.

Executed on September 5, 2026

Signé par :

Charles-Hubert Vanoverberghe

796F760219034DA...

**Charles-Hubert Vanoverberghe**
Responding Party

**CERTIFICATE OF SERVICE**

I certify that on September 5, 2026, a true and correct copy of the foregoing was served by electronic mail upon:

Kenneth J. Pfaehler — kenneth.pfaehler@dentons.com
Nicholas W. Petts — nicholas.petts@dentons.com
Spencer D. Hamilton — spencer.hamilton@dentons.com

*/s/ Brandon J. Tittle*
Brandon J. Tittle

# EXHIBIT 8

Brandon J. Tittle
Texas Bar No. 24090436
Manolo R. Santiago
Texas Bar No. 24129258
**TITTLE SANTIAGO, PLLC**
1125 Legacy Dr., Ste. 230
Frisco, Texas 75034
Telephone: 972.213.2316
Email: btittle@tittlesantiago.com
Email: msantiago@tittlesantiago.com

**COUNSEL FOR JOINING PETITIONING CREDITORS**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 26-33254** |
| **GREEN SAPPHIRE HOLDINGS INC.,** | § | |
| | § | **Chapter 11** |
| **Alleged Debtor.** | § | |

**LAZAREFF LE BARS SARL AND LAZAREFF LE BARS LEGAL ADVISORY LIMITED (ADGM)'S RESPONSES AND OBJECTIONS TO GLOBAL CAPITAL PARTNERS, LLC'S FIRST SET OF INTERROGATORIES**

Responding Parties, Lazareff Le Bars Legal Advisory Limited (ADGM) ("Responding Party 4" and Lazareff Le Bars SARL ("Responding Party 5") (collectively, "Joining Petitioners" or "Responding Parties") through undersigned counsel, serve these responses and objections to Global Capital Partners, LLC's First Set of Interrogatories dated August 15, 2026 ("GCP First Interrogatories"). Global Capital Partners, LLC is defined here in as "GCP" or "Global Capital".

The responses are provided jointly by the Joining Petitioners to comply with the GCP First Interrogatories wherein the Joining Petitioners were served collectively a single Set of Interrogatories. As such, the responses of the Joining Petitioners contain the documents collectively provided by those Petitioning Creditors and separate responses to each Interrogatory by each of the Joining Petitioners is not provided.

The Joining Petitioners answer on the basis of their present recollection, their business records, and the documents produced with Bates labels Involuntary Petitioners -- 00001 through 01616 and in particular Bates labels Involuntary Petitioners -- 01155 through Involuntary Petitioners -- 01616 (the supplemental Cayman, Illinois, and French litigation materials). Many of the documents produced with Bates labels Involuntary Petitioners -- 00001 through 01154, with the exception of Joining Petitioners invoices, were obtained by the Joining Petitioners from counsel and after joining the Petition. For example, none of the communication between counsel and the first three Petitioning Creditors was known to the Joining Petitioners as the Joining

Petitioning Creditors had no contact with any of the three other petitioning creditors prior to the filing the application to join the Petition.

The consolidated production of all Responding Parties consists of 1,616 pages. Each entity joined to pursue payment of its own mature, unpaid professional-fee claim. The petition was filed to collect mature, unpaid professional-fee claims and to place Green Sapphire Holdings, Inc. ("Green Sapphire") in a collective Chapter 11 proceeding before Global Capital, as the holder of a multi-million-dollar Delaware judgment described to Responding Parties as approximately $9.5 million with interest, could obtain a receiver with control over substantially all of Green Sapphire's assets and litigation claims.

Michael McNutt of Responding Party 4 was the first person acting for either Joining Petitioner to contact Tittle Santiago: he called on August 11, 2026, and counsel returned the call on August 12. During the August 12 return call, counsel discussed with Mr. McNutt the pending receivership hearing, the authority requested in the proposed receivership order, and Green Sapphire's balance-sheet and liquidity information. Counsel explained the distinction between gross book or scheduled asset values and cash or other assets available to pay debts as they became due. Each of the Joining Petitioners instructed counsel to prepare the application to join the involuntary Chapter 11 Petition.

Upon commencement of each representation and before filing the application to join, counsel instructed each Joining Petitioner that it must possess a direct economic interest in recovering its own debt and a valid, noncontingent claim not subject to a *bona fide* dispute as to liability or amount; must independently decide whether to file; must not communicate with Green Sapphire concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and must not request, accept, or receive funding from Green Sapphire.

Upon commencement of each representation and before filing and in consideration of certain allegations made in the Illinois Bankruptcy and in the Delaware Action, counsel instructed each Responding Party that it must not communicate with A.R. Thane Ritchie concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and must not request, accept, or receive funding from Mr. Ritchie.

Each Joining Petitioners independently elected to proceed to recover its own unpaid fees. Each Joining Petitioners confirms that it has not discussed whether to join the Petition with Paul Wolfe, Garrett Vail. Each Joining Petitioners confirms that it has not discussed whether to join the Petition with Mr. Ritchie.

Each Responding Party is a licensed legal professional or law firm with independent professional and ethical obligations. This limited factual disclosure is not intended to waive privilege or work-product protection as to other legal advice, analysis, or communications.

Joining Petitioners are also must comply with applicable Bar regulations issued by the Paris Bar and other jurisdictions as required also for the other Petitioning Creditors. Such Bar Regulations are materially different from country-to-country and from Bar Association to Bar Association and as such the Joining Creditors reserve the right to invoke such privilege and other

regulations or legal requirements concerning disclosure. Disclosure contained herein is compliant with the Joining Creditors obligations. The Joining Creditors have objected to certain Definitions and Interrogatories herein as well as certain Directions and Requests. The Joining Creditors waive no such protections provided by the applicable law and Bar regulations to each of the Joining Creditors and collectively to each other as well as that protection concerning the relationships with other Petitioning Creditors which are bound by their respective laws and Bar Regulations and reserve all rights accordingly.

## LIMITED OBJECTIONS TO DEFINITIONS

**Definition 7 ("Green Sapphire").** Joining Petitioners object to the definition of "Green Sapphire" as overbroad, vague, and factually unsupported. The definition presently expands the scope of discovery to third parties for which no argument or factual basis is presented to do so by defining the Debtor to include not only the directors of the Debtor and the Debtor, but to include also (i) A.R. Thane Ritchie, (ii) 60 Degrees Group SEZC, Ltd., (iv) Tim Yuskus, or any other person or entity as Green Sapphire or its agent, representative, affiliate, or controlling person. Based on information presently available, Green Sapphire is held through a Trust and acts through its trustee where A.R. Thane Ritchie is not a beneficiary of the Trust, a director or officer of the Trustee or of the Debtor and as a result of the Debtor being in that Trust cannot control that Trust or Trustee and is not the owner of that Trust or Trustee. 60 Degrees is a separate third-party company that may provide administrative support, and Mr. Yuskus is understood to be associated with 60 Degrees. For purposes of these responses, "Green Sapphire" means Green Sapphire Holdings, Inc. and a person shown by the evidence to have acted as its authorized representative concerning the matter at issue. Mr. Ritchie, 60 Degrees, and Mr. Yuskus are excluded absent such a particularized showing. No agency, affiliation, ownership, or control is admitted.

**Definition 12 ("Relevant Period").** Joining Petitioners object to the January 1, 2025-to-present period as overbroad and disproportionate to the alleged coordination or collusion leading to the July 2026 Petition. For purposes of these responses, Joining Petitioners construe the Relevant Period as March 31, 2026, through the present. If a broader period is determined to be appropriate, Joining Petitioners preserve their objection to any default period beginning earlier than January 1, 2026, absent request-specific relevance. To avoid a scope dispute and provide a complete record, Responding Parties nevertheless searched for and produced or identified directly relevant earlier materials concerning the underlying claims, invoices, collection history, professional engagements, and Illinois bankruptcy. No responsive material or information is withheld solely on this temporal objection.

**Definition 17 ("You" or "Your").** Joining Petitioners object to this definition to the extent it aggregates separate Responding Parties, treats every agent, representative, advisor, or attorney as an independent responding party, or purports to require a response based on information or documents beyond a Responding Party's legal possession, custody, or control. Each Joining Petitioner provides these responses for itself after reasonable inquiry and based on information reasonably available to it. The definition does not make unrelated third parties responsive merely because they provided professional or administrative services, and it does not waive attorney-client privilege, work-product protection, or any other applicable protection. Client-related materials maintained by Tittle Santiago on a Responding Party's behalf were included in the reasonable

search; documents held solely for other clients or unrelated third parties are not thereby within a Responding Party's control.

## GENERAL OBJECTIONS

Joining Petitioners, through counsel, hereby incorporates the following objections in response to each Interrogatory in addition the specifically stated objections therein:

1. Joining Petitioners object to these Interrogatories to the extent that such Interrogatories are to assist the Global Capital in supporting its Motion to Dismiss dated July 31, 2026. That Motion to Dismiss was submitted prior to the Joining Petitioners application to join on August 15, 2026. There is no reference Joining Petitioners in the Motion to Dismiss and the Motion to Dismiss has not been amended. Notwithstanding this objection, the Joining Petitioners seek to ensure the Court has a clear understanding of the bona fide nature and circumstances of the decision to join these proceedings.

2. Joining Petitioners object to these Interrogatories to the extent that the basis of the Request or Definition is predicated or based upon, directly or indirectly, allegedly decided in *Global Capital Partners, LLC, et ano. v. Green Sapphire Holdings, Inc., C.A. No. 2024-0877-JTL.* Global Capital Limited defined in Definition 3 the *Global Capital Partners, LLC, et ano. v. Green Sapphire Holdings, Inc., C.A. No. 2024-0877-JTL* as the "Delaware Action". The Debtor and Intervening Party have separately appealed the Delaware Chancery Post-Trial Opinion & Order dated March 13, 2026 (Del. Ch. March 13, 2026), the Order & Final Judgment dated April 14, 2026 (Del. Ch. April 14, 2026), and the Cost Order dated June 1, 2026 ((Del. Ch. June 1, 2026), (collectively defined as "Delaware Chancery Orders"). In addition, the Debtor and the two directors of the Debtor have appealed on July 21, 2026, the Memorandum Opinion of Contempt dated June 23, 2026, and the Order on Contempt dated July 6, 2026. Prior to any evaluation of such findings in the Delaware Action relied upon in the Motion to Dismiss, Global Capital treats findings in the Post-Trial Opinion dated March 13, 2026, as final when such findings are required to be evaluated in consideration of collateral estoppel (issue preclusion) and the full faith and credit doctrine. The standard issues for such evaluation include (i) the factual or legal issue in the bankruptcy court must be identical to the one decided by the Delaware Chancellor (e.g., a finding of fraud, breach of fiduciary duty, or a specific asset valuation) and (ii) the specific findings must have been critical to the Chancery Court's final ultimate determination, not just passing remarks (*obiter dicta*). The allegations of Global Capital in these proceedings against the Responding Parties involve different parties than those parties in the Delaware Action and the factual or legal issue in the bankruptcy court are not identical to the one decided by the Delaware Chancellor or even in the prior Illinois Bankruptcy (Definition 8). In addition, the findings relied upon the Motion to dismiss and appear to have been used to in the Requests for Production and Interrogatories in both the Definitions and certain Requests and Interrogatories are not specific findings that "must have been critical to the Chancery Court's final ultimate determination". Prior to the Court examining these issues, it would be inappropriate to assume for the purposes of discovery that Global capital would prevail on such findings for the purposes of motivating the Requests for Production and Interrogatories. Should the Court determine that such findings of the Delaware Chancellor in the Delaware Action have any probative value in consideration of the Motion to Dismiss and further disclosure of documents and additional responses to the Interrogatories is required then the Responding Parties will address those issues at that time.

3. Joining Petitioners object to these Interrogatories to the extent they are vague, overbroad, unduly burdensome, and impose obligations in excess of those imposed by the Federal Rules of Civil Procedure, made applicable by the Federal Rules of Civil Procedure.

4. Joining Petitioners object to the Interrogatories because the January 1, 2025-to-present period as overbroad and disproportionate to the alleged coordination or collusion leading to the July 2026 Petition as explained above in the objection to **Definition 12**.

5. Joining Petitioners object to these Interrogatories insofar as they separately name A.R. Thane Ritchie or treats him as Green Sapphire or its representative. as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

6. Joining Petitioners object to these Interrogatories insofar as they separately name 60 Degrees Group SEZC, Ltd., and Tim Yuskus or treat it or him as Green Sapphire or its representative as explained above in the objection to **Definition 7,** Consistent with the objection to **Definition 7**, 60 Degrees Group SEZC, Ltd., and Tim Yuskus are excluded from the scope.

7. Joining Petitioners object to these Interrogatories to the extent that they seek information that is neither relevant to this litigation nor reasonable calculated to lead to the discovery of admissible evidence and in particular in circumstances where the Motion to Dismiss has not been amended and which was submitted prior to the joinder of the tow Joining Petitioners.

8. Joining Petitioners object to these Interrogatories to the extent that they seek information protected from disclosure by the attorney-client privilege, the work-product privilege, and/or any other applicable privilege, protection, or immunity as provided for the bar regulations and other regulations application to each of the Joining Petitioners individually or collectively and in consideration of the rights and privileges governing the other Petitioning Creditors.

9. Joining Petitioners object to these Interrogatories to the extent they seek responses regarding information which Defendant has intentionally precluded Responding Parties from uncovering through discovery in connection with this Cause.

10. Joining Petitioners submit these Responses and Objections without conceding the relevancy or materiality of the subject matter of any response to any Interrogatory.

11. Joining Petitioners do not waive the right to object, on any and all grounds, to (i) the evidentiary use of any response provided to these Interrogatories and/or any documents produced or referenced in response to these Interrogatories, and (ii) future discovery requests relating to such responses or documents.

## LIMITED GENERAL STATEMENTS

1. These answers follow a reasonable inquiry and are based on information presently known or reasonably available. Joining Petitioners will supplement or correct them as required by

Federal Rule of Civil Procedure 26(e), made applicable by Federal Rule of Bankruptcy Procedure 7026.

2. Joining Petitioners answer each Interrogatory to the extent it seeks information within their possession, custody, or control. The answers provide the material nonprivileged facts known after reasonable inquiry and identify principal supporting Bates ranges.

3. Attorney-client communications and attorney work product are withheld or redacted only where the specific answer so states, and each such document is identified on the privilege and redaction log. No nonprivileged responsive fact stated in these answers is withheld on privilege grounds. Such Attorney-client communications and attorney work product are withheld or redacted under attorney-client privilege, the work-product doctrine and in consideration of Bar regulations and other legislation applicable to the Joining Petitioners, individually or collectively

4. Federal Rule of Evidence 408 is preserved as to admissibility and permissible use of compromise communications but is not asserted as an independent discovery privilege. Bates references use the legend "Involuntary Petitioners --" followed by a five-digit number.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1

*Describe the circumstances leading to Your joining the Petition, including: (a) who first proposed or suggested that You join the Petition; (b) the date on which such proposal was first made; (c) the identity of all persons involved in the discussions or communications regarding Your joining the Petition; (d) the decision to join; and (e) the purpose(s) of joining.*

### RESPONSE AND OBJECTIONS:

Joining Petitioners have withheld or redacted only attorney-client communications and attorney work product identified on the privilege and redaction log. The material nonprivileged facts follow.

Before Joining Petitioners became involved, Tittle Santiago separately communicated with the original petitioners, including an email to Dominique Lecocq on June 30, 2026, at 3:58 p.m.; an email to Charles-Hubert Vanoverberghe on July 1, 2026, at 4:57 p.m.; and an email to Michael Legamaro on July 21, 2026, at 10:21 a.m. Joining Petitioners were not involved in those communications or the original petitioners' July 21 filing decision. See Involuntary Petitioners -- 00001–00004 and 00008–00009 (the respective initial emails).

On August 11, 2026, Mr. McNutt of Responding Party 4 independently called Tittle Santiago and left a voicemail requesting a return call concerning his involvement as a creditor and supporting documents. Mr. Tittle returned the call on August 12. Counsel imposed the same independence, claim-qualification, and no-debtor-funding conditions on any potential joinder by either of Responding Party 4 or Responding Party 5.

The material factual subjects discussed in the call with Mr. McNutt were the pending hearing on Global Capital's request for a limited-purpose receiver in Delaware that Mr. McNutt was already aware of as a result of services provided by the Joining Petitioners to the Debtor and Alpha Carta Limited; the relief requested in the proposed receivership order by Global Capital; dismissal of Green Sapphire's Chicago bankruptcy case, including the authority of the proposed receiver to dismiss the RICO action and the adversary proceeding previously pending in Chicago; and Green Sapphire's balance sheet, including the distinction between gross book values and cash or liquid assets avai,lable to pay debts as they became due. After considering Lazareff Le Bars Legal Advisory Limited (ADGM)'s unpaid claim—the largest petitioning-creditor claim—Mr. McNutt independently decided that it should join. Mr. McNutt advised that he would communicate the detail of our discussion with Benoit Le Bars, the managing director of Lazareff Le Bars Eurl, an affiliate of Responding Party 4. After considering Lazareff Le Bars Eurl's unpaid claim—the second largest petitioning-creditor claim—Mr. Benoit Le Bars independently decided that it should join.

Between August 12 and August 15, the communications concerning joinder involved Mr. McNutt, Mr. Benoit Le Bars and Mr. Tittle. Mr. McNutt and Mr. Le Bars instructed counsel to promptly prepare the application to join the ongoing Petition. The two Joining Petitioners returned executed documents drafted by counsel to join the Petition, and their joinders were filed on August 15. Each entity joined to collect its own overdue fees through Chapter 11, not to benefit Green Sapphire or its principals. See Involuntary Petitioners -- 00275 (August 11 callback record), 00114–00116 (August 12 email), 00132–00135 (August 12–15 WhatsApp), 00136–00143 (invoices), 00226–00237 (executed Tittle Santiago engagements), and 00189–00193 (later fee correspondence), and the Privilege and Redaction Log. The proposed RICO fourth amended complaint is at 00552–00611 as litigation background; the later joint pre-conference statement discusses the joinders at 01124.

**INTERROGATORY NO. 2**

*State the factual basis for the Petition, including: (a) each debt You contend Green Sapphire has failed to pay; (b) the amount of each such debt; (c) the date each such debt became due; (d) the identity of each creditor; and (e) all facts and Documents upon which You rely for joining the Petition.*

**RESPONSE AND OBJECTIONS:**

As a threshold matter, counsel informed Mr. McNutt and Mr. Me Bars that each of the Joining Petitioners could join only if each of those parties possessed its own direct economic interest and an actual claim satisfying 11 U.S.C. § 303, including a claim that was noncontingent and not subject to a bona fide dispute as to liability or amount. Counsel reviewed the claim documentation before joinder. After reasonable inquiry, counsel agreed that each of the Joining Petitioner entities held a noncontingent, undisputed unsecured professional-fee claim that was due and unpaid when the Petitioning Creditors joined.

The claims of Responding Party 4 arose from legal services performed for Green Sapphire in connection with (i) legal proceedings before the Cayman islands Courts where Green Sapphire has guaranteed a loan from two individuals, (ii) the Delaware Action, (iii) the RICO action and (iv) related coordination matters involving ongoing proceedings in France and with local counsel assisting in the various jurisdictions. The principal claim information is set out below.

The claims of Responding Party 5 arose from legal services performed for Green Sapphire in connection with (i) ongoing legal proceedings in France (Basse-Terre and Paris), (ii) the Delaware Action and in relation to alleged contempt of certain Orders, (iii) the Delaware Action in relation to the appeals of the Delaware judgments and Orders issued on March 13, 2026, April 14, 2026 and June 1, 2026. The principal claim information is set out below.

The services provided by Responding Party 4 and 5 are distinct from one another as Respondent 4 is the principal party assisting Green Sapphire and for non-France matters and Respondent 5 assists Green Sapphire on a more limited basis and principally in relation to French law matters. This difference in scope is reflected in the number of hours spent by each of the Responding Parties and when such hours are in fact occurred.

In addition, neither of the Joining Parties assisted in the voluntary bankruptcy procedure of Green Sapphire. None of the Joining Parties partners, of counsel or associates assisting Green Sapphire are qualified in any U.S. State and are not members of any Bar Association in any U.S. State and therefore provide no legal advice in Delaware or Texas and rely on counsel for such matters. Joining Petitioners state that neither of those Joining Petitioners dealt with any matter in the voluntary bankruptcy procedure as they were not qualified to do so.

In addition, the Joining Creditors and their representatives, including Mr. McNutt and Mr. Le Bars had no contact or even the contact details of any of the original Petitioning Creditors and were first introduced to those petitioning creditors by Brandon Tittle and after the application to join had been submitted.

Joining Petitioner 5 states that Green Sapphire received the invoices in the ordinary course. No payment was made and no good-faith dispute concerning liability or amount was communicated before joinder. Responding Parties rely on their engagements, invoices, collection history, joinders and supporting declarations, the Petition, and produced public records.

| Creditor | Claim | Invoice/due information | Principal Bates ranges |
|---|---|---|---|
| Lazareff Le Bars Legal Advisory Limited (ADGM) | US$628,800 | Invoices dated Jan. 5, Apr. 5, July 5, and Aug. 5, 2026; stated due dates Jan. 10, Apr. 10, July 10, and Aug. 10, 2026. | 00136; 00138; 00140; 00142 (invoices) |

| Creditor | Claim | Invoice/due information | Principal Bates ranges |
|---|---|---|---|
| Lazareff Le Bars SARL | €137,550; joinder amount US$165,060 | Invoices dated Jan. 5, Apr. 5, July 5, and Aug. 5, 2026; stated due dates Jan. 10, Apr. 10, July 10, and Aug. 10, 2026. | 00137; 00139; 00141; 00143 (invoices) |

**INTERROGATORY NO. 3**

*Describe Your knowledge of Green Sapphire's assets and liabilities as of the date of joining the Petition, including whether You were aware that Green Sapphire's schedules filed in the Illinois Bankruptcy reflected total assets in excess of $22,000,000, and if so, explain Your basis for contending that Green Sapphire is in financial distress or otherwise eligible to be a debtor in a bankruptcy case.*

**RESPONSE AND OBJECTIONS:**

The response distinguishes gross scheduled assets from liquidity and from whether debts were generally being paid as they became due. By August 15, Joining Petitioners knew the Illinois schedules reported substantial gross assets. Prior however to counsel discussing those schedules with Mr. McNutt, neither of the Joining Creditors was aware of the schedule in the Illinois bankruptcy proceeding as they had not been involved in that proceeding. The Interrogatory's reference to "schedules" reflecting only US$22 million is imprecise and Joining Creditors understand that the produced schedules report approximately US$97.94 million in assets and approximately US$97.62 million in liabilities; the Delaware receiver papers separately described approximately US$21.47 million of assets. See Involuntary Petitioners -- 01086 (June 2025 summary of assets and liabilities) and 00342 (Global Capital's receiver-motion discussion). In addition, as a result of Responding Party 4 providing ongoing services to Green Sapphire in the Cayman Islands and for the RICO claims, Responding Party 5 providing ongoing services in France and both Joining Petitioners providing assistance in relation to the Delaware Action, the Joining Petitioners were aware that the assets of Green Sapphire in France , namely its shares in a French subsidiary, were contested in the Delaware Action and that relevant sums of monies and assets were allegedly misappropriated and otherwise taken through fraud and other violations of U.S. and French law by Global Capital and others. The Joining Petitioners are aware of those claims as the Joining Petitioners assist in the preparation of those claims in the various jurisdictions. As such claims involve multi-jurisdictional fraud, fraudulent transfers, violation of a duty of loyalty and care by former directors of Green Sapphire and in particular involving in rem asset claims subject to the jurisdiction of French Courts and involving Cayman Island legal entities for which precautionary injunctive relief may be sought, the lack of cash resources of Green Sapphire was well understood by Mr. McNutt and also Mr. Le Bars.

Counsel discussed the Debtor's balance sheet and confirmed to Mr. McNutt the absence of corresponding liquidity during the August 12 return call. Counsel also briefly discussed the risk of appointment of a receiver in Delaware, but Mr. McNutt considered an Order for a receiver to be unlikely. In any event, the Joining Petitioners understood that the listed assets were

overwhelmingly non-cash, illiquid, disputed, or litigation-related; that their invoices totaling US$793,860 in the joinder applications remained unpaid and that Global Capital sought a receiver empowered to control and sell Green Sapphire's assets for its judgment and dismiss specified litigation, including the RICO action and opposition to recognition of the Delaware Orders in France as well as actions in Cayman Islands and all other actions contemplated by Green Sapphire and that the Joining Creditor were assisting with as counsel or advisor.

*See Involuntary Petitioners -- 00331–00344 (receiver motion), particularly 00342, and 00635–00639 (proposed receiver order), particularly 00636–00637 (requested litigation-dismissal and asset powers). The separate RICO allegations are in the proposed fourth amended complaint at 00552–00611.*

In proving that assistance to Green Sapphire commencing in October 2025, the Joining Creditors considered that Green Sapphire had legitimate claims that may result in significant damages to be awarded to Green Sapphire and therefore Green Sapphire lacked cash, but possessed relevant legal claims and some limited assets. In addition, during the course of reviewing the RICO claims and contemplating claims in France, the Joining Parties considered that the financial condition of Green Sapphire was largely caused by the parties that had damaged the company, including Global Capital, and against whom the RICO action and other actions were contemplated.

In addition, Mr. McNutt had assisted Green Sapphire to renegotiate its payment terms with its former counsel assisting the Delaware Action prior to the issuance of the Post Trial Opinion on March 13, 2026 and so he and Mr. Le Bars were aware of the lack of funds and income of Green Sapphire. As the Joining Petitioners learned in October 2025 through the Cayman Island legal proceedings that Green Sapphire has commenced a voluntary bankruptcy proceeding in Illinois in mid-2025, the fact that Green Sapphire did so indicate to the Joining Petitioners that Green Sapphire was unable to pay its debts when due.

Those facts supported the conclusion that Green Sapphire was not generally paying debts as they became due and that a collective Chapter 11 case was appropriate as opposed to any other remedy for the Joining Petitioners. See Involuntary Petitioners -- 00136–00143 (invoices), 00342 and 00635–00639 (receiver-motion assertions and proposed powers), 00626–00634 (October 2025 amended Schedule A/B), 01051–01086 (June 2025 financial filings), and 00552–00611 (proposed RICO fourth amended complaint). These sources distinguish financial statements and proposed relief from allegations in the separate civil action.

**INTERROGATORY NO. 4**

*Describe in detail all efforts made by You to collect, demand payment of, or otherwise seek satisfaction of Your claim against Green Sapphire prior to joining the Petition, including: (a) whether any demand letter was sent (and if so, the date and manner of delivery); (b) whether any collection suit was filed (and if so, identify the court, case number, and date of filing); (c) whether any invoice or account statement was sent (and if so, the dates); and (d) the response, if any, received from Green Sapphire to any such effort.*

**RESPONSE AND OBJECTIONS:**

After reasonable inquiry, each Lazareff entity issued the invoices identified in Response No. 2 and sought payment in the ordinary course. Responding Parties state from present recollection that invoices were transmitted to debtor-side contacts, including Paul Wolfe, but the presently produced invoices do not themselves establish the recipient and date of every transmittal. However, Mr. McNutt had frequent discussions with the directors of Green Sapphire, and in particular Mr. Wolfe, from October 2025 onwards about the litigation matters that Responding Party 4 was assisting with, together with Respondent 5. Many such discussions were attended by Mr. Le Bars. In such discussions, the payment of invoices of the Joining Petitioners were discussed.

The invoices were dated January 5, April 5, July 5, and August 5, 2026, with stated payment due five days later. No separate collection lawsuit was filed before joinder by either of the Petitioning Creditors. To do so would have been impractical as Green Sapphire was in voluntary bankruptcy proceedings in Illinois and claims would need to be made in Abu Dhabi, UAE for Responding Party 4 and in France for Responding Party 5. However, as the Joining Petitioners were still assisting (and further assist now), it would be irrational to have submitted such a claim for either of the Petitioning Creditors. After the voluntary bankruptcy procedure was dismissed, Mr. McNutt considered that Chapter 11 bankruptcy law was the best protection for both Joining Petitioners to be able to have effective remedy and obtain payment of the fees. Responding Party 4 is presently assisting another client in a separate Delaware bankruptcy proceeding and had been assisting since March 2025 and therefore was aware generally of the benefits for a creditor to seek an involuntary bankruptcy of an entity that could act as a litigation vehicle and that had legitimate claims but was unable to pay its debts when due. Green Sapphire made no payment and did not communicate a good-faith dispute as to liability or amount before joinder. See Involuntary Petitioners -- 00136–00143 (invoice amounts, stated invoice dates, and due dates). The collection conversations and absence of payment are stated from Responding Parties' inquiry and recollection, not established in full by the face of those invoices.

**INTERROGATORY NO. 5:**

*State whether You filed a proof of claim, motion, pleading, objection, or any other filing in the Illinois Bankruptcy, and if so, identify each such filing by date, docket number, and subject matter. If no such filing was made, explain why.*

**RESPONSE AND OBJECTIONS:**

After reasonable inquiry, neither Petitioning Creditor filed a proof of claim, motion, pleading, or objection in the Illinois bankruptcy in its capacity as a creditor. Lazareff Le Bars Legal Advisory Limited (ADGM)'s work connected to related civil litigation did not constitute a creditor filing in the Illinois bankruptcy. No proof of claim was filed by either Petitioning Creditor before the Illinois Bankruptcy was dismissed. Responding Parties did not understand a separate creditor filing to be necessary before dismissal of those proceedings. See Involuntary Petitioners -- 00817–00831 (July 2, 2026 docket snapshot) and 00613–00624 (July 17 dismissal order and notices), as related procedural background. Those records are not identified as a complete claims register or independent proof of the absence of every filing by either Joining Petitioner.

**INTERROGATORY NO. 6**

*Describe the extent of Your participation in, monitoring of, or knowledge of proceedings in the Illinois Bankruptcy, including whether You: (a) received notice of filings in that case; (b) reviewed any pleadings, orders, or transcripts from that case; (c) attended or monitored any hearing in that case; or (d) communicated with any party or counsel in that case.*

**RESPONSE AND OBJECTIONS:**

Responding Parties had limited knowledge of the Illinois Bankruptcy, but greater knowledge of the RICO proceedings, Cayman Island proceedings, Delaware Action and the related French proceedings through their professional work, publicly available records, selected pleadings and orders, and counsel.

By August 12, Mr. McNutt had been advised by counsel that the Illinois Bankruptcy had been dismissed. Neither of the Joining Petitioners appeared at an Illinois Bankruptcy hearing in its capacity as a creditor to the best of Mr. McNutt and Mr. Le Bars's recollection except for the hearing on September 1, 2026, where Mr. McNutt appeared for Responding Party 4. Mr. Le Bars did not appear for Responding Party 5 at that hearing.

Neither of the Joining Petitioners monitored an Illinois bankruptcy hearing in its capacity as a creditor to the best of Mr. McNutt and Mr. Le Bars's recollection.

In addition, and to the best of Mr. McNutt and Mr. Le Bars's current recollection, neither Mr. McNutt nor Mr. Le Bars communicated with any counsel in the Illinois Bankruptcy. In any event if such communication occurred it would have not been as a creditor, but as counsel for non-Illinois and non-US matters and such communication would be privileged.

Nonprivileged Illinois public filings and docket materials are produced at Involuntary Petitioners -- 00346–00384, 00443–00545, 00613–00634, 00737–00928, 01051–01086, and 01299–01358. The related counsel and Texas-court correspondence concerning the Chicago reopening proceeding and stay/hearing coordination is at 01117 and 01131–01151. Privileged communications concerning those materials are withheld or redacted and identified on the privilege and redaction log.

**INTERROGATORY NO. 7**

*Identify any and all other creditors of Green Sapphire with whom You have communicated concerning the Petition, and for each such creditor: (i) identify the date(s) of such communication(s); (ii) describe the manner of such communication, whether by email, telephone, or other means; and (iii) describe the substance of such communication(s).*

**RESPONSE AND OBJECTIONS:**

Beginning August 12, 2026, Mr. McNutt communicated through Tittle Santiago, which also represented Lecocqassociate, Legamaro Banipal LLP, and Charles-Hubert Vanoverberghe. Mr. Le Bars participated for Lazareff Le Bars SARL by August 14–15. The first produced group email including representatives of all five creditors is dated August 21, 2026; subsequent group communications continued thereafter. The communications concerned verification of unpaid claims, supporting invoices, joinder papers, engagement of Tittle Santiago, filing logistics, and allocation of legal expense. See Involuntary Petitioners -- 00114–00116 and 00132–00135 (McNutt/counsel communications), 00136–00143 (invoices), 00189–00193 (group-creditor fee correspondence, beginning with the August 21 email at 00189), and 00226–00251 (counsel engagements), and the privilege and redaction log. Joint-client legal advice and work product are withheld or redacted and identified on the privilege and redaction log.

Neither Joining Petitioner participated in the original petitioners' July 21 decision to file. Neither Petitioning Creditor possessed the contact information of the original petitioning creditors prior to being introduced to those parties by Mr. Tittle. Consequently, no discussions occurred between the Petitioning Creditors and the original creditors until after the application to join the Petition had been filed.

The Joining Petitioners confirm that neither entity communicated with another creditor for the purpose of acting at the direction of Green Sapphire, Paul Wolfe, or Garrett Vail. While maintaining the objection, the Joining Petitioners confirm that neither entity communicated with another creditor for the purpose of acting at the direction of Mr. Ritchie. This instruction did not prohibit communications among jointly represented creditors or necessary counsel-to-counsel communications after joinder.

**INTERROGATORY NO. 8**

*Identify all Communications between You and any of Michael Legamaro, Charles-Hubert Vanoverberghe, Dominique Lecocq, Green Sapphire, Thane Ritchie, Paul Wolfe, or Garrett Vail, concerning Your joining of the Petition, the automatic stay, or the Delaware Action, including any Communications about preventing or delaying the appointment of a receiver over Green Sapphire.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to this Interrogatory as overly broad and unduly burdensome. Responding Parties further object to the Interrogatory because Thane Ritchie is not a party to this proceeding. Notwithstanding the objection, Responding Parties state that from August 12 through August 15, Mr. McNutt and, subsequently, Mr. Le Bars communicated with Tittle Santiago concerning their unpaid claims, supporting records, joinder papers, engagement terms, filing logistics, the pending receivership, and allocation of legal expense. Counsel made clear that each entity had to decide independently based on its own direct economic interest and qualifying claim; could not obtain filing funds, reimbursement, indemnity, authorization, or direction from Green Sapphire or Mr. Ritchie; and should not communicate directly with either concerning whether to

join. Counsel separately communicated with Dominique Lecocq, Michael Legamaro, and Charles-Hubert Vanoverberghe. The first produced group email directly including representatives of all five creditors is dated August 21, 2026. See Involuntary Petitioners -- 00114–00116 and 00132–00135 (McNutt/counsel communications), 00136–00143 (invoices), 00189–00193 (group fee correspondence, with the August 21 email at 00189), and 00226–00251 (counsel engagements).

Joint-client legal advice and work product are withheld or redacted and identified on the privilege and redaction log. After joinder, Tittle Santiago exchanged nonprivileged counsel-to-counsel communications concerning filed pleadings, the automatic stay, related proceedings, discovery, and hearing logistics. See Involuntary Petitioners -- 01117, 01119–01122, and 01130–01151 (post-joinder correspondence), with the related joint pre-conference statement at 01123–01129.

Mr. McNutt did not discuss whether to join with Green Sapphire, Paul Wolfe, or Garrett Vail. Mr. McNutt did not discuss whether to join with Mr. Richie. Mr. Le Bars did not discuss whether to join the Petition with Green Sapphire, Paul Wolfe, or Garrett Vail. Mr. Le Bars did not discuss whether to join the Petition with Mr. Richie

Ordinary-course pre-joinder invoice communications with Green Sapphire and its directors concerned the underlying bills and collection, not joinder, the stay, or delaying the receiver. The issue of joinder arose only after Mr. McNutt became aware of the commencement of the proceeding as a result of submissions in the Delaware Action. Mr. McNutt then informed Mr. Le Bars. Responding Parties had no agreement with Green Sapphire or its representatives concerning joinder, the automatic stay, the Delaware Action, or the receiver. Necessary post-joinder communications by Tittle Santiago with Green Sapphire's separate counsel do not reflect that Green Sapphire approved, directed, controlled, or funded Responding Parties' decision.

**INTERROGATORY NO. 9**

*Identify each individual or entity responsible for paying Tittle Santiago's legal bills in connection with this Texas Bankruptcy Case, and identify all sources of funds, direct or indirect, for paying such bills.*

**RESPONSE AND OBJECTIONS:**

Responding Parties 4 and 5 understand that Lecocqassociate agreed to advance and paid an initial US$80,000 retainer to Tittle Santiago on the condition that additional joining creditors would reimburse the excess advance and that lecocqassociate thereafter would bear its *pro rata* share of counsel's fees.

In consideration of that agreement, Michael McNutt, on behalf of Lazareff Le Bars Legal Advisory Limited (ADGM), agreed to contribute US$120,000 toward legal fees on behalf of the two joining creditors as follows: $70,000 of the initial retainer as the two claims to allow the reimbursement of the advanced retainer paid by Lecocqassociate and an additional $50,000 of fees as a result of the additional work resulting from the joining of the two creditors. Counsel then

reimbursed US$70,000 to Lecocqassociate as agreed. The remaining responsibility for fees is governed by the petitioning creditors' engagement and allocation arrangements.

Counsel instructed Responding Parties not to obtain funds, reimbursement, indemnity, or another benefit from Green Sapphire or Mr. Ritchie. All funds came from the petitioning creditors; Green Sapphire, Mr. Ritchie, Paul Wolfe, Garrett Vail, and their affiliates supplied no direct or indirect funds.

The funds provided by Responding Party 4 on behalf of Responding Party 4 and 5, are from its legal services provided to other clients and the source of such funds is therefore privileged. However, the Joining Petitioners state that the source of such funds is not Green Sapphire, Paul Wolfe, Garrett Vail, and their affiliates, direct or indirect funds. and while preserving its objections, nor from Mr. Ritchie.

*See Involuntary Petitioners -- 00183–00188 (initial retainer payment/SWIFT records and Tittle Santiago invoice), 00189–00193 (fee-allocation, reported remittance, and reimbursement correspondence, particularly 00191), and 00226–00251 (counsel engagements).*

**INTERROGATORY NO. 10**

*Identify each individual or entity outside of Lazareff that You have communicated with regarding the Petition and for each such individual or entity (i) describe all modes of communication employed (e.g., e-mail, text message, telephone, ephemeral messaging system), and (ii) state the date on which You first communicated with such individual or entity regarding the Petition.*

**RESPONSE AND OBJECTIONS:**

The persons or entities outside Lazareff known after reasonable inquiry are: (1) Mr. Tittle/Tittle Santiago—voicemail or telephone beginning August 11, followed by telephone, email, and WhatsApp on and after August 12; (2) Manolo Santiago/Tittle Santiago—email beginning August 12; (3) Dominique Lecocq/Lecocqassociate—group email beginning August 21; (4) Michael Legamaro/Legamaro Banipal LLP—group email beginning August 21; and (5) Charles-Hubert Vanoverberghe—group email beginning August 21. Through Tittle Santiago after joinder, Responding Parties also communicated with separate counsel and court personnel concerning filed pleadings, the automatic stay, discovery, the joint pre-conference statement, and hearing logistics. See Involuntary Petitioners -- 00275 (August 11 callback), 00114–00116 and 00132–00135 (August 12–15 counsel communications), 00189–00193 (group-creditor fee correspondence), and 01117, 01119–01122, and 01130–01151 (post-joinder correspondence), with the related joint pre-conference statement at 01123–01129, and the privilege and redaction log.

The Joining Creditors have not discussed their joinder of the Petition with other legal counsel assisting in France, the Cayman Islands, Delaware or Illinois except to inform them of the joinder itself due to deontological obligations required by the Paris Bar in particular. Mr. McNutt communicated the fact of the two Joining Creditors having joined to counsel in the Cayman and Delaware promptly as required. Mr. Le Bars did the same with counsel assisting in France.

While maintaining their objections, the Joining Creditors confirm they have not discussed their joinder of the Petition with the Alpha Carta Ltd., Mr. Ritchie or Mr. Yukus.

The Joining Creditors confirm they have not discussed their joinder of the Petition with any media.

The Joining Creditors confirm that ordinary-course invoice communications with Paul Wolfe or Garrett Vail predated the Petition and did not concern whether Lazareff should join.

Each of the Joining Petitioners confirms that the decision to join was made prior to any contact by any of the Joining Petitioners with either of the three original Petitioning Creditors and was decided without any consultation with those original Petitioning Creditors.

**INTERROGATORY NO. 11**

*State whether You have communicated with any of Michael Legamaro, Charles-Hubert Vanoverberghe, Dominique Lecocq, Thane Ritchie, Paul Wolfe, or Garrett Vail concerning the Delaware Action, the Illinois Bankruptcy, or the Petition by means of an ephemeral messaging system. If so, (i) state the type of ephemeral messaging system(s) employed for such communications; (ii) state the date(s) of such communication(s); and (iii) describe the substance of such communication(s).*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to this Interrogatory as overly broad and unduly burdensome. Responding Parties further object to the Interrogatory because Thane Ritchie is not a party to this proceeding. Notwithstanding the objection, Responding Parties state no. After reasonable inquiry, Responding Parties did not use an ephemeral messaging system to communicate with Michael Legamaro, Charles-Hubert Vanoverberghe, Dominique Lecocq, Thane Ritchie, Paul Wolfe, or Garrett Vail concerning the Delaware Action, the Illinois bankruptcy, or the applications to join the Petition. After the Responding Parties 4 and 5 joined the Petition and were introduced via email to the original petitioning creditors, Mr. McNutt has spoken with Dominique Lecocq twice by telephone and only in the last week to coordinate the attendance in Dallas for the hearing on September 14. McNutt has spoken once with Charles-Hubert Vanoverberghe on the telephone concerning expired building permits of properties owned by a company in which Green Sapphire owns shares. Mr. McNutt speaks frequently to Mr. Wolfe about ongoing litigation matters in Cayman Islands and Delaware. Mr. McNutt and Mr. le Bars have on occasion spoken together with Mr. Wolfe about French proceedings. Mr. McNutt has not spoken to Mr. Vail in over three months. Mr. Le Bars has not spoken with Mr. Vail unless attended by Mr. McNutt and therefore also has not spoken with Mr. Vail in over three months. Mr. McNutt speaks frequently with counsel involved in the Delaware Action, the RICO proceedings, the Cayman island proceedings and the French proceedings, including Mr. Le Bars. Mr. Le Bars speaks frequently with counsel involved in the Delaware Action, but rarely and together with Mr. McNutt, with counsel assisting in the RICO proceedings and the Cayman island proceedings. All of such conversations are considered privileged pursuant to Paris Bar rules and any disclosure of dates and times of such discussions as

well as the method of such communications also is considered to violate Paris Bar Rules and privacy restrictions in the EU.

Mr. McNutt has never spoken to Michael Legamaro. Mr. Le Bars has never spoken to any of Michael Legamaro, Charles-Hubert Vanoverberghe or Dominique Lecocq,

Mr. McNutt used WhatsApp with Mr. Tittle, his counsel, between August 12 and August 15, as reflected in the produced, privilege-redacted thread at Involuntary Petitioners -- 00132–00135; Mr. Tittle is not one of the persons identified in the Interrogatory.

## KEY PRODUCTION REFERENCES

The Bates references below identify the principal nonprivileged documents supporting these answers. They are not intended to limit the responding parties' reliance on other produced documents, public filings, or testimony.

| Subject | Bates range |
|---|---|
| August 11 call and August 12–15 counsel email/WhatsApp | 00275; 00114–00116; 00132–00135 |
| Lazareff invoices | 00136–00143 |
| Retainer payment, invoice, and cost-allocation correspondence | 00183–00193 |
| Executed Lazareff agreements retaining Tittle Santiago | 00226–00237 |
| Filed Texas involuntary petition; later joint pre-conference statement | 00279–00282; 01123–01129 |
| Illinois docket snapshot; original financial filings; amended Schedule A/B | 00817–00831; 01051–01086; 00626–00634 |
| Postpetition counsel/court correspondence (both before and after joinder) | 01104–01122; 01130–01151 |
| Cayman, Illinois, and French litigation supplement | 01155–01616; Illinois portion: 01299–01358 |

Dated: September 5, 2026

Respectfully submitted,

**TITTLE SANTIAGO, PLLC**

*/s/ Brandon J. Tittle*
Brandon J. Tittle
Texas Bar No. 24090436
Manolo R. Santiago
Texas Bar No. 24129258
1125 Legacy Dr., Ste. 230
Frisco, Texas 75034
Telephone: 972.213.2316
Email: btittle@tittlesantiago.com
Email: msantiago@tittlesantiago.com

**COUNSEL FOR JOINING PETITIONING CREDITORS**

Docusign Envelope ID: A0514878-63E0-844F-81B0-32251562018C


# VERIFICATION

I, J. Michael McNutt, am an authorized representative of Lazareff Le Bars Legal Advisory Limited (ADGM). I have reviewed the foregoing answers to interrogatories and declare under penalty of perjury under the laws of the United States of America that the answers attributable to that entity are true and correct based on my personal knowledge and the information reasonably available to the entity.

Executed on September 5, 2026

Signed by:
J. Michael McNutt
2DE563ABA8324EF...

**J. Michael McNutt**
Authorized Representative

## VERIFICATION

I, Benoit Le Bars, am an authorized representative of Lazareff Le Bars SARL. I have reviewed the foregoing answers to interrogatories and declare under penalty of perjury under the laws of the United States of America that the answers attributable to that entity are true and correct based on my personal knowledge and the information reasonably available to the entity.

Executed on September 5, 2026

DocuSigned by:
Benoit LE BARS
A2C21ECAED2B4A6...

**Benoit Le Bars**
Authorized Representative

**CERTIFICATE OF SERVICE**

I certify that on September 5, 2026, a true and correct copy of the foregoing was served by electronic mail upon:

Kenneth J. Pfaehler — kenneth.pfaehler@dentons.com
Nicholas W. Petts — nicholas.petts@dentons.com
Spencer D. Hamilton — spencer.hamilton@dentons.com

*/s/ Brandon J. Tittle*
Brandon J. Tittle

# EXHIBIT 9

Brandon J. Tittle
Texas Bar No. 24090436
Manolo R. Santiago
Texas Bar No. 24129258
**TITTLE SANTIAGO, PLLC**
1125 Legacy Dr., Ste. 230
Frisco, Texas 75034
Telephone: 972.213.2316
Email: btittle@tittlesantiago.com
Email: msantiago@tittlesantiago.com

**COUNSEL FOR JOINING PETITIONING CREDITORS**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 26-33254** |
| **GREEN SAPPHIRE HOLDINGS INC.,** | § | |
| | § | **Chapter 11** |
| **Alleged Debtor.** | § | |

**LAZAREFF LE BARS SARL AND LAZAREFF LE BARS LEGAL ADVISORY LIMITED (ADGM)'S RESPONSES AND OBJECTIONS TO GLOBAL CAPITAL PARTNERS, LLC'S FIRST SET OF INTERROGATORIES**

Responding Parties, Lazareff Le Bars Legal Advisory Limited (ADGM) ("Responding Party 4" and Lazareff Le Bars SARL ("Responding Party 5") (collectively, "Joining Petitioners" or "Responding Parties") through undersigned counsel, serve these responses and objections to Global Capital Partners, LLC's First Set of Interrogatories dated August 15, 2026 ("GCP First Interrogatories"). Global Capital Partners, LLC is defined here in as "GCP" or "Global Capital".

The responses are provided jointly by the Joining Petitioners to comply with the GCP First Interrogatories wherein the Joining Petitioners were served collectively a single Set of Interrogatories. As such, the responses of the Joining Petitioners contain the documents collectively provided by those Petitioning Creditors and separate responses to each Interrogatory by each of the Joining Petitioners is not provided.

The Joining Petitioners answer on the basis of their present recollection, their business records, and the documents produced with Bates labels Involuntary Petitioners -- 00001 through 01616 and in particular Bates labels Involuntary Petitioners -- 01155 through Involuntary Petitioners -- 01616 (the supplemental Cayman, Illinois, and French litigation materials). Many of the documents produced with Bates labels Involuntary Petitioners -- 00001 through 01154, with the exception of Joining Petitioners invoices, were obtained by the Joining Petitioners from counsel and after joining the Petition. For example, none of the communication between counsel and the first three Petitioning Creditors was known to the Joining Petitioners as the Joining

Petitioning Creditors had no contact with any of the three other petitioning creditors prior to the filing the application to join the Petition.

The consolidated production of all Responding Parties consists of 1,616 pages. Each entity joined to pursue payment of its own mature, unpaid professional-fee claim. The petition was filed to collect mature, unpaid professional-fee claims and to place Green Sapphire Holdings, Inc. ("Green Sapphire") in a collective Chapter 11 proceeding before Global Capital, as the holder of a multi-million-dollar Delaware judgment described to Responding Parties as approximately $9.5 million with interest, could obtain a receiver with control over substantially all of Green Sapphire's assets and litigation claims.

Michael McNutt of Responding Party 4 was the first person acting for either Joining Petitioner to contact Tittle Santiago: he called on August 11, 2026, and counsel returned the call on August 12. During the August 12 return call, counsel discussed with Mr. McNutt the pending receivership hearing, the authority requested in the proposed receivership order, and Green Sapphire's balance-sheet and liquidity information. Counsel explained the distinction between gross book or scheduled asset values and cash or other assets available to pay debts as they became due. Each of the Joining Petitioners instructed counsel to prepare the application to join the involuntary Chapter 11 Petition.

Upon commencement of each representation and before filing the application to join, counsel instructed each Joining Petitioner that it must possess a direct economic interest in recovering its own debt and a valid, noncontingent claim not subject to a *bona fide* dispute as to liability or amount; must independently decide whether to file; must not communicate with Green Sapphire concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and must not request, accept, or receive funding from Green Sapphire.

Upon commencement of each representation and before filing and in consideration of certain allegations made in the Illinois Bankruptcy and in the Delaware Action, counsel instructed each Responding Party that it must not communicate with A.R. Thane Ritchie concerning whether to file or the strategy, prosecution, direction, control, or funding of the involuntary proceeding; and must not request, accept, or receive funding from Mr. Ritchie.

Each Joining Petitioners independently elected to proceed to recover its own unpaid fees. Each Joining Petitioners confirms that it has not discussed whether to join the Petition with Paul Wolfe, Garrett Vail. Each Joining Petitioners confirms that it has not discussed whether to join the Petition with Mr. Ritchie.

Each Responding Party is a licensed legal professional or law firm with independent professional and ethical obligations. This limited factual disclosure is not intended to waive privilege or work-product protection as to other legal advice, analysis, or communications.

Joining Petitioners are also must comply with applicable Bar regulations issued by the Paris Bar and other jurisdictions as required also for the other Petitioning Creditors. Such Bar Regulations are materially different from country-to-country and from Bar Association to Bar Association and as such the Joining Creditors reserve the right to invoke such privilege and other

regulations or legal requirements concerning disclosure. Disclosure contained herein is compliant with the Joining Creditors obligations. The Joining Creditors have objected to certain Definitions and Interrogatories herein as well as certain Directions and Requests. The Joining Creditors waive no such protections provided by the applicable law and Bar regulations to each of the Joining Creditors and collectively to each other as well as that protection concerning the relationships with other Petitioning Creditors which are bound by their respective laws and Bar Regulations and reserve all rights accordingly.

## LIMITED OBJECTIONS TO DEFINITIONS

**Definition 7 ("Green Sapphire").** Joining Petitioners object to the definition of "Green Sapphire" as overbroad, vague, and factually unsupported. The definition presently expands the scope of discovery to third parties for which no argument or factual basis is presented to do so by defining the Debtor to include not only the directors of the Debtor and the Debtor, but to include also (i) A.R. Thane Ritchie, (ii) 60 Degrees Group SEZC, Ltd., (iv) Tim Yuskus, or any other person or entity as Green Sapphire or its agent, representative, affiliate, or controlling person. Based on information presently available, Green Sapphire is held through a Trust and acts through its trustee where A.R. Thane Ritchie is not a beneficiary of the Trust, a director or officer of the Trustee or of the Debtor and as a result of the Debtor being in that Trust cannot control that Trust or Trustee and is not the owner of that Trust or Trustee. 60 Degrees is a separate third-party company that may provide administrative support, and Mr. Yuskus is understood to be associated with 60 Degrees. For purposes of these responses, "Green Sapphire" means Green Sapphire Holdings, Inc. and a person shown by the evidence to have acted as its authorized representative concerning the matter at issue. Mr. Ritchie, 60 Degrees, and Mr. Yuskus are excluded absent such a particularized showing. No agency, affiliation, ownership, or control is admitted.

**Definition 12 ("Relevant Period").** Joining Petitioners object to the January 1, 2025-to-present period as overbroad and disproportionate to the alleged coordination or collusion leading to the July 2026 Petition. For purposes of these responses, Joining Petitioners construe the Relevant Period as March 31, 2026, through the present. If a broader period is determined to be appropriate, Joining Petitioners preserve their objection to any default period beginning earlier than January 1, 2026, absent request-specific relevance. To avoid a scope dispute and provide a complete record, Responding Parties nevertheless searched for and produced or identified directly relevant earlier materials concerning the underlying claims, invoices, collection history, professional engagements, and Illinois bankruptcy. No responsive material or information is withheld solely on this temporal objection.

**Definition 17 ("You" or "Your").** Joining Petitioners object to this definition to the extent it aggregates separate Responding Parties, treats every agent, representative, advisor, or attorney as an independent responding party, or purports to require a response based on information or documents beyond a Responding Party's legal possession, custody, or control. Each Joining Petitioner provides these responses for itself after reasonable inquiry and based on information reasonably available to it. The definition does not make unrelated third parties responsive merely because they provided professional or administrative services, and it does not waive attorney-client privilege, work-product protection, or any other applicable protection. Client-related materials maintained by Tittle Santiago on a Responding Party's behalf were included in the reasonable

search; documents held solely for other clients or unrelated third parties are not thereby within a Responding Party's control.

## GENERAL OBJECTIONS

Joining Petitioners, through counsel, hereby incorporates the following objections in response to each Interrogatory in addition the specifically stated objections therein:

1. Joining Petitioners object to these Interrogatories to the extent that such Interrogatories are to assist the Global Capital in supporting its Motion to Dismiss dated July 31, 2026. That Motion to Dismiss was submitted prior to the Joining Petitioners application to join on August 15, 2026. There is no reference Joining Petitioners in the Motion to Dismiss and the Motion to Dismiss has not been amended. Notwithstanding this objection, the Joining Petitioners seek to ensure the Court has a clear understanding of the bona fide nature and circumstances of the decision to join these proceedings.

2. Joining Petitioners object to these Interrogatories to the extent that the basis of the Request or Definition is predicated or based upon, directly or indirectly, allegedly decided in *Global Capital Partners, LLC, et ano. v. Green Sapphire Holdings, Inc., C.A. No. 2024-0877-JTL.* Global Capital Limited defined in Definition 3 the *Global Capital Partners, LLC, et ano. v. Green Sapphire Holdings, Inc., C.A. No. 2024-0877-JTL* as the "Delaware Action". The Debtor and Intervening Party have separately appealed the Delaware Chancery Post-Trial Opinion & Order dated March 13, 2026 (Del. Ch. March 13, 2026), the Order & Final Judgment dated April 14, 2026 (Del. Ch. April 14, 2026), and the Cost Order dated June 1, 2026 ((Del. Ch. June 1, 2026), (collectively defined as "Delaware Chancery Orders"). In addition, the Debtor and the two directors of the Debtor have appealed on July 21, 2026, the Memorandum Opinion of Contempt dated June 23, 2026, and the Order on Contempt dated July 6, 2026. Prior to any evaluation of such findings in the Delaware Action relied upon in the Motion to Dismiss, Global Capital treats findings in the Post-Trial Opinion dated March 13, 2026, as final when such findings are required to be evaluated in consideration of collateral estoppel (issue preclusion) and the full faith and credit doctrine. The standard issues for such evaluation include (i) the factual or legal issue in the bankruptcy court must be identical to the one decided by the Delaware Chancellor (e.g., a finding of fraud, breach of fiduciary duty, or a specific asset valuation) and (ii) the specific findings must have been critical to the Chancery Court's final ultimate determination, not just passing remarks (*obiter dicta*). The allegations of Global Capital in these proceedings against the Responding Parties involve different parties than those parties in the Delaware Action and the factual or legal issue in the bankruptcy court are not identical to the one decided by the Delaware Chancellor or even in the prior Illinois Bankruptcy (Definition 8). In addition, the findings relied upon the Motion to dismiss and appear to have been used to in the Requests for Production and Interrogatories in both the Definitions and certain Requests and Interrogatories are not specific findings that "must have been critical to the Chancery Court's final ultimate determination". Prior to the Court examining these issues, it would be inappropriate to assume for the purposes of discovery that Global capital would prevail on such findings for the purposes of motivating the Requests for Production and Interrogatories. Should the Court determine that such findings of the Delaware Chancellor in the Delaware Action have any probative value in consideration of the Motion to Dismiss and further disclosure of documents and additional responses to the Interrogatories is required then the Responding Parties will address those issues at that time.

3. Joining Petitioners object to these Interrogatories to the extent they are vague, overbroad, unduly burdensome, and impose obligations in excess of those imposed by the Federal Rules of Civil Procedure, made applicable by the Federal Rules of Civil Procedure.

4. Joining Petitioners object to the Interrogatories because the January 1, 2025-to-present period as overbroad and disproportionate to the alleged coordination or collusion leading to the July 2026 Petition as explained above in the objection to **Definition 12**.

5. Joining Petitioners object to these Interrogatories insofar as they separately name A.R. Thane Ritchie or treats him as Green Sapphire or its representative. as explained above in the objection to **Definition 7**. Consistent with the objection to **Definition 7**, Mr. Ritchie is excluded from the scope.

6. Joining Petitioners object to these Interrogatories insofar as they separately name 60 Degrees Group SEZC, Ltd., and Tim Yuskus or treat it or him as Green Sapphire or its representative as explained above in the objection to **Definition 7,** Consistent with the objection to **Definition 7**, 60 Degrees Group SEZC, Ltd., and Tim Yuskus are excluded from the scope.

7. Joining Petitioners object to these Interrogatories to the extent that they seek information that is neither relevant to this litigation nor reasonable calculated to lead to the discovery of admissible evidence and in particular in circumstances where the Motion to Dismiss has not been amended and which was submitted prior to the joinder of the tow Joining Petitioners.

8. Joining Petitioners object to these Interrogatories to the extent that they seek information protected from disclosure by the attorney-client privilege, the work-product privilege, and/or any other applicable privilege, protection, or immunity as provided for the bar regulations and other regulations application to each of the Joining Petitioners individually or collectively and in consideration of the rights and privileges governing the other Petitioning Creditors.

9. Joining Petitioners object to these Interrogatories to the extent they seek responses regarding information which Defendant has intentionally precluded Responding Parties from uncovering through discovery in connection with this Cause.

10. Joining Petitioners submit these Responses and Objections without conceding the relevancy or materiality of the subject matter of any response to any Interrogatory.

11. Joining Petitioners do not waive the right to object, on any and all grounds, to (i) the evidentiary use of any response provided to these Interrogatories and/or any documents produced or referenced in response to these Interrogatories, and (ii) future discovery requests relating to such responses or documents.

## LIMITED GENERAL STATEMENTS

1. These answers follow a reasonable inquiry and are based on information presently known or reasonably available. Joining Petitioners will supplement or correct them as required by

Federal Rule of Civil Procedure 26(e), made applicable by Federal Rule of Bankruptcy Procedure 7026.

2. Joining Petitioners answer each Interrogatory to the extent it seeks information within their possession, custody, or control. The answers provide the material nonprivileged facts known after reasonable inquiry and identify principal supporting Bates ranges.

3. Attorney-client communications and attorney work product are withheld or redacted only where the specific answer so states, and each such document is identified on the privilege and redaction log. No nonprivileged responsive fact stated in these answers is withheld on privilege grounds. Such Attorney-client communications and attorney work product are withheld or redacted under attorney-client privilege, the work-product doctrine and in consideration of Bar regulations and other legislation applicable to the Joining Petitioners, individually or collectively

4. Federal Rule of Evidence 408 is preserved as to admissibility and permissible use of compromise communications but is not asserted as an independent discovery privilege. Bates references use the legend "Involuntary Petitioners --" followed by a five-digit number.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1

*Describe the circumstances leading to Your joining the Petition, including: (a) who first proposed or suggested that You join the Petition; (b) the date on which such proposal was first made; (c) the identity of all persons involved in the discussions or communications regarding Your joining the Petition; (d) the decision to join; and (e) the purpose(s) of joining.*

### RESPONSE AND OBJECTIONS:

Joining Petitioners have withheld or redacted only attorney-client communications and attorney work product identified on the privilege and redaction log. The material nonprivileged facts follow.

Before Joining Petitioners became involved, Tittle Santiago separately communicated with the original petitioners, including an email to Dominique Lecocq on June 30, 2026, at 3:58 p.m.; an email to Charles-Hubert Vanoverberghe on July 1, 2026, at 4:57 p.m.; and an email to Michael Legamaro on July 21, 2026, at 10:21 a.m. Joining Petitioners were not involved in those communications or the original petitioners' July 21 filing decision. See Involuntary Petitioners -- 00001–00004 and 00008–00009 (the respective initial emails).

On August 11, 2026, Mr. McNutt of Responding Party 4 independently called Tittle Santiago and left a voicemail requesting a return call concerning his involvement as a creditor and supporting documents. Mr. Tittle returned the call on August 12. Counsel imposed the same independence, claim-qualification, and no-debtor-funding conditions on any potential joinder by either of Responding Party 4 or Responding Party 5.

The material factual subjects discussed in the call with Mr. McNutt were the pending hearing on Global Capital's request for a limited-purpose receiver in Delaware that Mr. McNutt was already aware of as a result of services provided by the Joining Petitioners to the Debtor and Alpha Carta Limited; the relief requested in the proposed receivership order by Global Capital; dismissal of Green Sapphire's Chicago bankruptcy case, including the authority of the proposed receiver to dismiss the RICO action and the adversary proceeding previously pending in Chicago; and Green Sapphire's balance sheet, including the distinction between gross book values and cash or liquid assets avai,lable to pay debts as they became due. After considering Lazareff Le Bars Legal Advisory Limited (ADGM)'s unpaid claim—the largest petitioning-creditor claim—Mr. McNutt independently decided that it should join. Mr. McNutt advised that he would communicate the detail of our discussion with Benoit Le Bars, the managing director of Lazareff Le Bars Eurl, an affiliate of Responding Party 4. After considering Lazareff Le Bars Eurl's unpaid claim—the second largest petitioning-creditor claim—Mr. Benoit Le Bars independently decided that it should join.

Between August 12 and August 15, the communications concerning joinder involved Mr. McNutt, Mr. Benoit Le Bars and Mr. Tittle. Mr. McNutt and Mr. Le Bars instructed counsel to promptly prepare the application to join the ongoing Petition. The two Joining Petitioners returned executed documents drafted by counsel to join the Petition, and their joinders were filed on August 15. Each entity joined to collect its own overdue fees through Chapter 11, not to benefit Green Sapphire or its principals. See Involuntary Petitioners -- 00275 (August 11 callback record), 00114–00116 (August 12 email), 00132–00135 (August 12–15 WhatsApp), 00136–00143 (invoices), 00226–00237 (executed Tittle Santiago engagements), and 00189–00193 (later fee correspondence), and the Privilege and Redaction Log. The proposed RICO fourth amended complaint is at 00552–00611 as litigation background; the later joint pre-conference statement discusses the joinders at 01124.

**INTERROGATORY NO. 2**

*State the factual basis for the Petition, including: (a) each debt You contend Green Sapphire has failed to pay; (b) the amount of each such debt; (c) the date each such debt became due; (d) the identity of each creditor; and (e) all facts and Documents upon which You rely for joining the Petition.*

**RESPONSE AND OBJECTIONS:**

As a threshold matter, counsel informed Mr. McNutt and Mr. Me Bars that each of the Joining Petitioners could join only if each of those parties possessed its own direct economic interest and an actual claim satisfying 11 U.S.C. § 303, including a claim that was noncontingent and not subject to a bona fide dispute as to liability or amount. Counsel reviewed the claim documentation before joinder. After reasonable inquiry, counsel agreed that each of the Joining Petitioner entities held a noncontingent, undisputed unsecured professional-fee claim that was due and unpaid when the Petitioning Creditors joined.

The claims of Responding Party 4 arose from legal services performed for Green Sapphire in connection with (i) legal proceedings before the Cayman islands Courts where Green Sapphire has guaranteed a loan from two individuals, (ii) the Delaware Action, (iii) the RICO action and (iv) related coordination matters involving ongoing proceedings in France and with local counsel assisting in the various jurisdictions. The principal claim information is set out below.

The claims of Responding Party 5 arose from legal services performed for Green Sapphire in connection with (i) ongoing legal proceedings in France (Basse-Terre and Paris), (ii) the Delaware Action and in relation to alleged contempt of certain Orders, (iii) the Delaware Action in relation to the appeals of the Delaware judgments and Orders issued on March 13, 2026, April 14, 2026 and June 1, 2026. The principal claim information is set out below.

The services provided by Responding Party 4 and 5 are distinct from one another as Respondent 4 is the principal party assisting Green Sapphire and for non-France matters and Respondent 5 assists Green Sapphire on a more limited basis and principally in relation to French law matters. This difference in scope is reflected in the number of hours spent by each of the Responding Parties and when such hours are in fact occurred.

In addition, neither of the Joining Parties assisted in the voluntary bankruptcy procedure of Green Sapphire. None of the Joining Parties partners, of counsel or associates assisting Green Sapphire are qualified in any U.S. State and are not members of any Bar Association in any U.S. State and therefore provide no legal advice in Delaware or Texas and rely on counsel for such matters. Joining Petitioners state that neither of those Joining Petitioners dealt with any matter in the voluntary bankruptcy procedure as they were not qualified to do so.

In addition, the Joining Creditors and their representatives, including Mr. McNutt and Mr. Le Bars had no contact or even the contact details of any of the original Petitioning Creditors and were first introduced to those petitioning creditors by Brandon Tittle and after the application to join had been submitted.

Joining Petitioner 5 states that Green Sapphire received the invoices in the ordinary course. No payment was made and no good-faith dispute concerning liability or amount was communicated before joinder. Responding Parties rely on their engagements, invoices, collection history, joinders and supporting declarations, the Petition, and produced public records.

| Creditor | Claim | Invoice/due information | Principal Bates ranges |
|---|---|---|---|
| Lazareff Le Bars Legal Advisory Limited (ADGM) | US$628,800 | Invoices dated Jan. 5, Apr. 5, July 5, and Aug. 5, 2026; stated due dates Jan. 10, Apr. 10, July 10, and Aug. 10, 2026. | 00136; 00138; 00140; 00142 (invoices) |

| Creditor | Claim | Invoice/due information | Principal Bates ranges |
|---|---|---|---|
| Lazareff Le Bars SARL | €137,550; joinder amount US$165,060 | Invoices dated Jan. 5, Apr. 5, July 5, and Aug. 5, 2026; stated due dates Jan. 10, Apr. 10, July 10, and Aug. 10, 2026. | 00137; 00139; 00141; 00143 (invoices) |

**INTERROGATORY NO. 3**

*Describe Your knowledge of Green Sapphire's assets and liabilities as of the date of joining the Petition, including whether You were aware that Green Sapphire's schedules filed in the Illinois Bankruptcy reflected total assets in excess of $22,000,000, and if so, explain Your basis for contending that Green Sapphire is in financial distress or otherwise eligible to be a debtor in a bankruptcy case.*

**RESPONSE AND OBJECTIONS:**

The response distinguishes gross scheduled assets from liquidity and from whether debts were generally being paid as they became due. By August 15, Joining Petitioners knew the Illinois schedules reported substantial gross assets. Prior however to counsel discussing those schedules with Mr. McNutt, neither of the Joining Creditors was aware of the schedule in the Illinois bankruptcy proceeding as they had not been involved in that proceeding. The Interrogatory's reference to "schedules" reflecting only US$22 million is imprecise and Joining Creditors understand that the produced schedules report approximately US$97.94 million in assets and approximately US$97.62 million in liabilities; the Delaware receiver papers separately described approximately US$21.47 million of assets. See Involuntary Petitioners -- 01086 (June 2025 summary of assets and liabilities) and 00342 (Global Capital's receiver-motion discussion). In addition, as a result of Responding Party 4 providing ongoing services to Green Sapphire in the Cayman Islands and for the RICO claims, Responding Party 5 providing ongoing services in France and both Joining Petitioners providing assistance in relation to the Delaware Action, the Joining Petitioners were aware that the assets of Green Sapphire in France , namely its shares in a French subsidiary, were contested in the Delaware Action and that relevant sums of monies and assets were allegedly misappropriated and otherwise taken through fraud and other violations of U.S. and French law by Global Capital and others. The Joining Petitioners are aware of those claims as the Joining Petitioners assist in the preparation of those claims in the various jurisdictions. As such claims involve multi-jurisdictional fraud, fraudulent transfers, violation of a duty of loyalty and care by former directors of Green Sapphire and in particular involving in rem asset claims subject to the jurisdiction of French Courts and involving Cayman Island legal entities for which precautionary injunctive relief may be sought, the lack of cash resources of Green Sapphire was well understood by Mr. McNutt and also Mr. Le Bars.

Counsel discussed the Debtor's balance sheet and confirmed to Mr. McNutt the absence of corresponding liquidity during the August 12 return call. Counsel also briefly discussed the risk of appointment of a receiver in Delaware, but Mr. McNutt considered an Order for a receiver to be unlikely. In any event, the Joining Petitioners understood that the listed assets were

overwhelmingly non-cash, illiquid, disputed, or litigation-related; that their invoices totaling US$793,860 in the joinder applications remained unpaid and that Global Capital sought a receiver empowered to control and sell Green Sapphire's assets for its judgment and dismiss specified litigation, including the RICO action and opposition to recognition of the Delaware Orders in France as well as actions in Cayman Islands and all other actions contemplated by Green Sapphire and that the Joining Creditor were assisting with as counsel or advisor.

*See Involuntary Petitioners -- 00331–00344 (receiver motion), particularly 00342, and 00635–00639 (proposed receiver order), particularly 00636–00637 (requested litigation-dismissal and asset powers). The separate RICO allegations are in the proposed fourth amended complaint at 00552–00611.*

In proving that assistance to Green Sapphire commencing in October 2025, the Joining Creditors considered that Green Sapphire had legitimate claims that may result in significant damages to be awarded to Green Sapphire and therefore Green Sapphire lacked cash, but possessed relevant legal claims and some limited assets. In addition, during the course of reviewing the RICO claims and contemplating claims in France, the Joining Parties considered that the financial condition of Green Sapphire was largely caused by the parties that had damaged the company, including Global Capital, and against whom the RICO action and other actions were contemplated.

In addition, Mr. McNutt had assisted Green Sapphire to renegotiate its payment terms with its former counsel assisting the Delaware Action prior to the issuance of the Post Trial Opinion on March 13, 2026 and so he and Mr. Le Bars were aware of the lack of funds and income of Green Sapphire. As the Joining Petitioners learned in October 2025 through the Cayman Island legal proceedings that Green Sapphire has commenced a voluntary bankruptcy proceeding in Illinois in mid-2025, the fact that Green Sapphire did so indicate to the Joining Petitioners that Green Sapphire was unable to pay its debts when due.

Those facts supported the conclusion that Green Sapphire was not generally paying debts as they became due and that a collective Chapter 11 case was appropriate as opposed to any other remedy for the Joining Petitioners. See Involuntary Petitioners -- 00136–00143 (invoices), 00342 and 00635–00639 (receiver-motion assertions and proposed powers), 00626–00634 (October 2025 amended Schedule A/B), 01051–01086 (June 2025 financial filings), and 00552–00611 (proposed RICO fourth amended complaint). These sources distinguish financial statements and proposed relief from allegations in the separate civil action.

**INTERROGATORY NO. 4**

*Describe in detail all efforts made by You to collect, demand payment of, or otherwise seek satisfaction of Your claim against Green Sapphire prior to joining the Petition, including: (a) whether any demand letter was sent (and if so, the date and manner of delivery); (b) whether any collection suit was filed (and if so, identify the court, case number, and date of filing); (c) whether any invoice or account statement was sent (and if so, the dates); and (d) the response, if any, received from Green Sapphire to any such effort.*

**RESPONSE AND OBJECTIONS:**

After reasonable inquiry, each Lazareff entity issued the invoices identified in Response No. 2 and sought payment in the ordinary course. Responding Parties state from present recollection that invoices were transmitted to debtor-side contacts, including Paul Wolfe, but the presently produced invoices do not themselves establish the recipient and date of every transmittal. However, Mr. McNutt had frequent discussions with the directors of Green Sapphire, and in particular Mr. Wolfe, from October 2025 onwards about the litigation matters that Responding Party 4 was assisting with, together with Respondent 5. Many such discussions were attended by Mr. Le Bars. In such discussions, the payment of invoices of the Joining Petitioners were discussed.

The invoices were dated January 5, April 5, July 5, and August 5, 2026, with stated payment due five days later. No separate collection lawsuit was filed before joinder by either of the Petitioning Creditors. To do so would have been impractical as Green Sapphire was in voluntary bankruptcy proceedings in Illinois and claims would need to be made in Abu Dhabi, UAE for Responding Party 4 and in France for Responding Party 5. However, as the Joining Petitioners were still assisting (and further assist now), it would be irrational to have submitted such a claim for either of the Petitioning Creditors. After the voluntary bankruptcy procedure was dismissed, Mr. McNutt considered that Chapter 11 bankruptcy law was the best protection for both Joining Petitioners to be able to have effective remedy and obtain payment of the fees. Responding Party 4 is presently assisting another client in a separate Delaware bankruptcy proceeding and had been assisting since March 2025 and therefore was aware generally of the benefits for a creditor to seek an involuntary bankruptcy of an entity that could act as a litigation vehicle and that had legitimate claims but was unable to pay its debts when due. Green Sapphire made no payment and did not communicate a good-faith dispute as to liability or amount before joinder. See Involuntary Petitioners -- 00136–00143 (invoice amounts, stated invoice dates, and due dates). The collection conversations and absence of payment are stated from Responding Parties' inquiry and recollection, not established in full by the face of those invoices.

**INTERROGATORY NO. 5:**

*State whether You filed a proof of claim, motion, pleading, objection, or any other filing in the Illinois Bankruptcy, and if so, identify each such filing by date, docket number, and subject matter. If no such filing was made, explain why.*

**RESPONSE AND OBJECTIONS:**

After reasonable inquiry, neither Petitioning Creditor filed a proof of claim, motion, pleading, or objection in the Illinois bankruptcy in its capacity as a creditor. Lazareff Le Bars Legal Advisory Limited (ADGM)'s work connected to related civil litigation did not constitute a creditor filing in the Illinois bankruptcy. No proof of claim was filed by either Petitioning Creditor before the Illinois Bankruptcy was dismissed. Responding Parties did not understand a separate creditor filing to be necessary before dismissal of those proceedings. See Involuntary Petitioners -- 00817–00831 (July 2, 2026 docket snapshot) and 00613–00624 (July 17 dismissal order and notices), as related procedural background. Those records are not identified as a complete claims register or independent proof of the absence of every filing by either Joining Petitioner.

**INTERROGATORY NO. 6**

*Describe the extent of Your participation in, monitoring of, or knowledge of proceedings in the Illinois Bankruptcy, including whether You: (a) received notice of filings in that case; (b) reviewed any pleadings, orders, or transcripts from that case; (c) attended or monitored any hearing in that case; or (d) communicated with any party or counsel in that case.*

**RESPONSE AND OBJECTIONS:**

Responding Parties had limited knowledge of the Illinois Bankruptcy, but greater knowledge of the RICO proceedings, Cayman Island proceedings, Delaware Action and the related French proceedings through their professional work, publicly available records, selected pleadings and orders, and counsel.

By August 12, Mr. McNutt had been advised by counsel that the Illinois Bankruptcy had been dismissed. Neither of the Joining Petitioners appeared at an Illinois Bankruptcy hearing in its capacity as a creditor to the best of Mr. McNutt and Mr. Le Bars's recollection except for the hearing on September 1, 2026, where Mr. McNutt appeared for Responding Party 4. Mr. Le Bars did not appear for Responding Party 5 at that hearing.

Neither of the Joining Petitioners monitored an Illinois bankruptcy hearing in its capacity as a creditor to the best of Mr. McNutt and Mr. Le Bars's recollection.

In addition, and to the best of Mr. McNutt and Mr. Le Bars's current recollection, neither Mr. McNutt nor Mr. Le Bars communicated with any counsel in the Illinois Bankruptcy. In any event if such communication occurred it would have not been as a creditor, but as counsel for non-Illinois and non-US matters and such communication would be privileged.

Nonprivileged Illinois public filings and docket materials are produced at Involuntary Petitioners -- 00346–00384, 00443–00545, 00613–00634, 00737–00928, 01051–01086, and 01299–01358. The related counsel and Texas-court correspondence concerning the Chicago reopening proceeding and stay/hearing coordination is at 01117 and 01131–01151. Privileged communications concerning those materials are withheld or redacted and identified on the privilege and redaction log.

**INTERROGATORY NO. 7**

*Identify any and all other creditors of Green Sapphire with whom You have communicated concerning the Petition, and for each such creditor: (i) identify the date(s) of such communication(s); (ii) describe the manner of such communication, whether by email, telephone, or other means; and (iii) describe the substance of such communication(s).*

**RESPONSE AND OBJECTIONS:**

Beginning August 12, 2026, Mr. McNutt communicated through Tittle Santiago, which also represented Lecocqassociate, Legamaro Banipal LLP, and Charles-Hubert Vanoverberghe. Mr. Le Bars participated for Lazareff Le Bars SARL by August 14–15. The first produced group email including representatives of all five creditors is dated August 21, 2026; subsequent group communications continued thereafter. The communications concerned verification of unpaid claims, supporting invoices, joinder papers, engagement of Tittle Santiago, filing logistics, and allocation of legal expense. See Involuntary Petitioners -- 00114–00116 and 00132–00135 (McNutt/counsel communications), 00136–00143 (invoices), 00189–00193 (group-creditor fee correspondence, beginning with the August 21 email at 00189), and 00226–00251 (counsel engagements), and the privilege and redaction log. Joint-client legal advice and work product are withheld or redacted and identified on the privilege and redaction log.

Neither Joining Petitioner participated in the original petitioners' July 21 decision to file. Neither Petitioning Creditor possessed the contact information of the original petitioning creditors prior to being introduced to those parties by Mr. Tittle. Consequently, no discussions occurred between the Petitioning Creditors and the original creditors until after the application to join the Petition had been filed.

The Joining Petitioners confirm that neither entity communicated with another creditor for the purpose of acting at the direction of Green Sapphire, Paul Wolfe, or Garrett Vail. While maintaining the objection, the Joining Petitioners confirm that neither entity communicated with another creditor for the purpose of acting at the direction of Mr. Ritchie. This instruction did not prohibit communications among jointly represented creditors or necessary counsel-to-counsel communications after joinder.

**INTERROGATORY NO. 8**

*Identify all Communications between You and any of Michael Legamaro, Charles-Hubert Vanoverberghe, Dominique Lecocq, Green Sapphire, Thane Ritchie, Paul Wolfe, or Garrett Vail, concerning Your joining of the Petition, the automatic stay, or the Delaware Action, including any Communications about preventing or delaying the appointment of a receiver over Green Sapphire.*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to this Interrogatory as overly broad and unduly burdensome. Responding Parties further object to the Interrogatory because Thane Ritchie is not a party to this proceeding. Notwithstanding the objection, Responding Parties state that from August 12 through August 15, Mr. McNutt and, subsequently, Mr. Le Bars communicated with Tittle Santiago concerning their unpaid claims, supporting records, joinder papers, engagement terms, filing logistics, the pending receivership, and allocation of legal expense. Counsel made clear that each entity had to decide independently based on its own direct economic interest and qualifying claim; could not obtain filing funds, reimbursement, indemnity, authorization, or direction from Green Sapphire or Mr. Ritchie; and should not communicate directly with either concerning whether to

join. Counsel separately communicated with Dominique Lecocq, Michael Legamaro, and Charles-Hubert Vanoverberghe. The first produced group email directly including representatives of all five creditors is dated August 21, 2026. See Involuntary Petitioners -- 00114–00116 and 00132–00135 (McNutt/counsel communications), 00136–00143 (invoices), 00189–00193 (group fee correspondence, with the August 21 email at 00189), and 00226–00251 (counsel engagements).

Joint-client legal advice and work product are withheld or redacted and identified on the privilege and redaction log. After joinder, Tittle Santiago exchanged nonprivileged counsel-to-counsel communications concerning filed pleadings, the automatic stay, related proceedings, discovery, and hearing logistics. See Involuntary Petitioners -- 01117, 01119–01122, and 01130–01151 (post-joinder correspondence), with the related joint pre-conference statement at 01123–01129.

Mr. McNutt did not discuss whether to join with Green Sapphire, Paul Wolfe, or Garrett Vail. Mr. McNutt did not discuss whether to join with Mr. Richie. Mr. Le Bars did not discuss whether to join the Petition with Green Sapphire, Paul Wolfe, or Garrett Vail. Mr. Le Bars did not discuss whether to join the Petition with Mr. Richie

Ordinary-course pre-joinder invoice communications with Green Sapphire and its directors concerned the underlying bills and collection, not joinder, the stay, or delaying the receiver. The issue of joinder arose only after Mr. McNutt became aware of the commencement of the proceeding as a result of submissions in the Delaware Action. Mr. McNutt then informed Mr. Le Bars. Responding Parties had no agreement with Green Sapphire or its representatives concerning joinder, the automatic stay, the Delaware Action, or the receiver. Necessary post-joinder communications by Tittle Santiago with Green Sapphire's separate counsel do not reflect that Green Sapphire approved, directed, controlled, or funded Responding Parties' decision.

**INTERROGATORY NO. 9**

*Identify each individual or entity responsible for paying Tittle Santiago's legal bills in connection with this Texas Bankruptcy Case, and identify all sources of funds, direct or indirect, for paying such bills.*

**RESPONSE AND OBJECTIONS:**

Responding Parties 4 and 5 understand that Lecocqassociate agreed to advance and paid an initial US$80,000 retainer to Tittle Santiago on the condition that additional joining creditors would reimburse the excess advance and that lecocqassociate thereafter would bear its *pro rata* share of counsel's fees.

In consideration of that agreement, Michael McNutt, on behalf of Lazareff Le Bars Legal Advisory Limited (ADGM), agreed to contribute US$120,000 toward legal fees on behalf of the two joining creditors as follows: $70,000 of the initial retainer as the two claims to allow the reimbursement of the advanced retainer paid by Lecocqassociate and an additional $50,000 of fees as a result of the additional work resulting from the joining of the two creditors. Counsel then

reimbursed US$70,000 to Lecocqassociate as agreed. The remaining responsibility for fees is governed by the petitioning creditors' engagement and allocation arrangements.

Counsel instructed Responding Parties not to obtain funds, reimbursement, indemnity, or another benefit from Green Sapphire or Mr. Ritchie. All funds came from the petitioning creditors; Green Sapphire, Mr. Ritchie, Paul Wolfe, Garrett Vail, and their affiliates supplied no direct or indirect funds.

The funds provided by Responding Party 4 on behalf of Responding Party 4 and 5, are from its legal services provided to other clients and the source of such funds is therefore privileged. However, the Joining Petitioners state that the source of such funds is not Green Sapphire, Paul Wolfe, Garrett Vail, and their affiliates, direct or indirect funds. and while preserving its objections, nor from Mr. Ritchie.

*See Involuntary Petitioners -- 00183–00188 (initial retainer payment/SWIFT records and Tittle Santiago invoice), 00189–00193 (fee-allocation, reported remittance, and reimbursement correspondence, particularly 00191), and 00226–00251 (counsel engagements).*

**INTERROGATORY NO. 10**

*Identify each individual or entity outside of Lazareff that You have communicated with regarding the Petition and for each such individual or entity (i) describe all modes of communication employed (e.g., e-mail, text message, telephone, ephemeral messaging system), and (ii) state the date on which You first communicated with such individual or entity regarding the Petition.*

**RESPONSE AND OBJECTIONS:**

The persons or entities outside Lazareff known after reasonable inquiry are: (1) Mr. Tittle/Tittle Santiago—voicemail or telephone beginning August 11, followed by telephone, email, and WhatsApp on and after August 12; (2) Manolo Santiago/Tittle Santiago—email beginning August 12; (3) Dominique Lecocq/Lecocqassociate—group email beginning August 21; (4) Michael Legamaro/Legamaro Banipal LLP—group email beginning August 21; and (5) Charles-Hubert Vanoverberghe—group email beginning August 21. Through Tittle Santiago after joinder, Responding Parties also communicated with separate counsel and court personnel concerning filed pleadings, the automatic stay, discovery, the joint pre-conference statement, and hearing logistics. See Involuntary Petitioners -- 00275 (August 11 callback), 00114–00116 and 00132–00135 (August 12–15 counsel communications), 00189–00193 (group-creditor fee correspondence), and 01117, 01119–01122, and 01130–01151 (post-joinder correspondence), with the related joint pre-conference statement at 01123–01129, and the privilege and redaction log.

The Joining Creditors have not discussed their joinder of the Petition with other legal counsel assisting in France, the Cayman Islands, Delaware or Illinois except to inform them of the joinder itself due to deontological obligations required by the Paris Bar in particular. Mr. McNutt communicated the fact of the two Joining Creditors having joined to counsel in the Cayman and Delaware promptly as required. Mr. Le Bars did the same with counsel assisting in France.

While maintaining their objections, the Joining Creditors confirm they have not discussed their joinder of the Petition with the Alpha Carta Ltd., Mr. Ritchie or Mr. Yukus.

The Joining Creditors confirm they have not discussed their joinder of the Petition with any media.

The Joining Creditors confirm that ordinary-course invoice communications with Paul Wolfe or Garrett Vail predated the Petition and did not concern whether Lazareff should join.

Each of the Joining Petitioners confirms that the decision to join was made prior to any contact by any of the Joining Petitioners with either of the three original Petitioning Creditors and was decided without any consultation with those original Petitioning Creditors.

**INTERROGATORY NO. 11**

*State whether You have communicated with any of Michael Legamaro, Charles-Hubert Vanoverberghe, Dominique Lecocq, Thane Ritchie, Paul Wolfe, or Garrett Vail concerning the Delaware Action, the Illinois Bankruptcy, or the Petition by means of an ephemeral messaging system. If so, (i) state the type of ephemeral messaging system(s) employed for such communications; (ii) state the date(s) of such communication(s); and (iii) describe the substance of such communication(s).*

**RESPONSE AND OBJECTIONS:**

Responding Parties object to this Interrogatory as overly broad and unduly burdensome. Responding Parties further object to the Interrogatory because Thane Ritchie is not a party to this proceeding. Notwithstanding the objection, Responding Parties state no. After reasonable inquiry, Responding Parties did not use an ephemeral messaging system to communicate with Michael Legamaro, Charles-Hubert Vanoverberghe, Dominique Lecocq, Thane Ritchie, Paul Wolfe, or Garrett Vail concerning the Delaware Action, the Illinois bankruptcy, or the applications to join the Petition. After the Responding Parties 4 and 5 joined the Petition and were introduced via email to the original petitioning creditors, Mr. McNutt has spoken with Dominique Lecocq twice by telephone and only in the last week to coordinate the attendance in Dallas for the hearing on September 14. McNutt has spoken once with Charles-Hubert Vanoverberghe on the telephone concerning expired building permits of properties owned by a company in which Green Sapphire owns shares. Mr. McNutt speaks frequently to Mr. Wolfe about ongoing litigation matters in Cayman Islands and Delaware. Mr. McNutt and Mr. le Bars have on occasion spoken together with Mr. Wolfe about French proceedings. Mr. McNutt has not spoken to Mr. Vail in over three months. Mr. Le Bars has not spoken with Mr. Vail unless attended by Mr. McNutt and therefore also has not spoken with Mr. Vail in over three months. Mr. McNutt speaks frequently with counsel involved in the Delaware Action, the RICO proceedings, the Cayman island proceedings and the French proceedings, including Mr. Le Bars. Mr. Le Bars speaks frequently with counsel involved in the Delaware Action, but rarely and together with Mr. McNutt, with counsel assisting in the RICO proceedings and the Cayman island proceedings. All of such conversations are considered privileged pursuant to Paris Bar rules and any disclosure of dates and times of such discussions as

well as the method of such communications also is considered to violate Paris Bar Rules and privacy restrictions in the EU.

Mr. McNutt has never spoken to Michael Legamaro. Mr. Le Bars has never spoken to any of Michael Legamaro, Charles-Hubert Vanoverberghe or Dominique Lecocq,

Mr. McNutt used WhatsApp with Mr. Tittle, his counsel, between August 12 and August 15, as reflected in the produced, privilege-redacted thread at Involuntary Petitioners -- 00132–00135; Mr. Tittle is not one of the persons identified in the Interrogatory.

**KEY PRODUCTION REFERENCES**

The Bates references below identify the principal nonprivileged documents supporting these answers. They are not intended to limit the responding parties' reliance on other produced documents, public filings, or testimony.

| Subject | Bates range |
|---|---|
| August 11 call and August 12–15 counsel email/WhatsApp | 00275; 00114–00116; 00132–00135 |
| Lazareff invoices | 00136–00143 |
| Retainer payment, invoice, and cost-allocation correspondence | 00183–00193 |
| Executed Lazareff agreements retaining Tittle Santiago | 00226–00237 |
| Filed Texas involuntary petition; later joint pre-conference statement | 00279–00282; 01123–01129 |
| Illinois docket snapshot; original financial filings; amended Schedule A/B | 00817–00831; 01051–01086; 00626–00634 |
| Postpetition counsel/court correspondence (both before and after joinder) | 01104–01122; 01130–01151 |
| Cayman, Illinois, and French litigation supplement | 01155–01616; Illinois portion: 01299–01358 |

Dated: September 5, 2026

Respectfully submitted,

**TITTLE SANTIAGO, PLLC**

*/s/ Brandon J. Tittle*
Brandon J. Tittle
Texas Bar No. 24090436
Manolo R. Santiago
Texas Bar No. 24129258
1125 Legacy Dr., Ste. 230
Frisco, Texas 75034
Telephone: 972.213.2316
Email: btittle@tittlesantiago.com
Email: msantiago@tittlesantiago.com

**COUNSEL FOR JOINING PETITIONING CREDITORS**

**VERIFICATION**

I, J. Michael McNutt, am an authorized representative of Lazareff Le Bars Legal Advisory Limited (ADGM). I have reviewed the foregoing answers to interrogatories and declare under penalty of perjury under the laws of the United States of America that the answers attributable to that entity are true and correct based on my personal knowledge and the information reasonably available to the entity.

Executed on September 5, 2026

Signed by:
J. Michael McNutt
2DE563ABA8324EF...

**J. Michael McNutt**
Authorized Representative

Docusign Envelope ID: A0514878-63E0-844F-81B0-32251562018C


**VERIFICATION**

I, Benoit Le Bars, am an authorized representative of Lazareff Le Bars SARL. I have reviewed the foregoing answers to interrogatories and declare under penalty of perjury under the laws of the United States of America that the answers attributable to that entity are true and correct based on my personal knowledge and the information reasonably available to the entity.

Executed on September 5, 2026

DocuSigned by:
Benoit LE BARS
A2C21ECAED2B4A6...

**Benoit Le Bars**
Authorized Representative

**CERTIFICATE OF SERVICE**

I certify that on September 5, 2026, a true and correct copy of the foregoing was served by electronic mail upon:

Kenneth J. Pfaehler — kenneth.pfaehler@dentons.com
Nicholas W. Petts — nicholas.petts@dentons.com
Spencer D. Hamilton — spencer.hamilton@dentons.com

*/s/ Brandon J. Tittle*
Brandon J. Tittle

# EXHIBIT 10

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Petts, Nicholas W. |
| **Sent:** | Monday, September 07, 2026 11:36 AM |
| **To:** | Brandon Tittle; 'adam.swick@akerman.com'; david.parham_akerman.com; Manolo Santiago |
| **Cc:** | Pfaehler, Kenneth J.; Richards, Robert E.; Siegien, Samantha; Hamilton, Spencer D.; Dellplain, Melanie; O'Sullivan, Erin P. |
| **Subject:** | Green Sapphire, Case No. 26-33254 |

Brandon, Adam,

As you know, Judge Larson said that any depositions that need to be had can be had the week of the 7th, in preparation for a hearing on the week of the 14th. Please identify the witnesses you intend to call at the hearing and provide their availability for depositions later this week. In addition, please provide Michael Legamaro's availability for a deposition this week.

Thank you,

Nicholas W. Petts

+1 202 496 7356
nicholas.petts@dentons.com | Bio | Website
Dentons US LLP

DENTONS

Our Legacy Firms | Client Experience (CX)

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices | Privacy | Cookies

# EXHIBIT 11

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Brandon Tittle <btittle@tittlesantiago.com> |
| **Sent:** | Tuesday, September 08, 2026 2:50 PM |
| **To:** | Petts, Nicholas W.; 'adam.swick@akerman.com'; david.parham_akerman.com; Manolo Santiago |
| **Cc:** | Pfaehler, Kenneth J.; Richards, Robert E.; Siegien, Samantha; Hamilton, Spencer D.; Dellplain, Melanie; O'Sullivan, Erin P. |
| **Subject:** | Re: Green Sapphire, Case No. 26-33254 |
| **Attachments:** | Green Sapphire - Transcript Dated August 18, 2026.pdf |

**[WARNING: EXTERNAL SENDER]**

Nick:

We acknowledge receipt of your email yesterday, 7 September, which does not constitute a formal notice of deposition. As you are aware, that was a national public holiday and consequently you should have had no expectation that I would have reviewed that email, researched issues related to your email or to be able to confer with clients. I have reviewed your email but have been unable to confer with all of my clients as some are traveling this morning, In short, we object to this belated request as untimely and unreasonable under the circumstances.

Federal Rule 30(b)(1) requires a party to give reasonable notice in writing to every other party to the action. The notice shall state the time and place for taking the deposition and the name and address of each person to be examined, if known. In addition, Federal Rule 30(b)(2) requires the party taking the deposition shall state in the notice the method by which the testimony shall be recorded. Such notice must also take into consideration the requirements of Federal Rule 30(b)(4) and Federal Rule 30(b)(7).

We dispute your interpretation of the Court's directions in the Status Conference of 18 August 2026.

The directions of the Court on 18 August did not alter those requirements or could it. Our understanding of Judge Larson's comments at the August 18 Status Conference is that the Court identified this week as an opportunity for depositions if the parties wished to arrange them. The Court did not set any particular deposition, establish agreed dates, or dispense with the requirement of reasonable written notice under Rule 30(b)(1). The party requesting such depositions must do so in consideration of the requirements of Fed Rule 30(b). Global has had since August 19 to request and reserve dates and coordinate these examinations. Global alone is responsible for its decision belatedly request depositions with a defective email and not incompliance with Fed Rule 30(b)(1) and 30(b)(2) and to request the depositions only after receipt of the responses to Global Interrogatories and Requests for Production.

In such circumstances where Global is represented by competent counsel, the email notice of 7 September can only be considered a bad faith procedural attempt to circumvent the requirement of the Fed Rules. Global and its counsel would be well aware that the requirement for "reasonable notice" requires not less than 10 days' notice in consideration of *Bovine Music, Inc. v. Nick's Clubs, Inc.–Dallas-Lipstick*, No. 3:24-cv-523-K, Dkt. 22, at 5–9 (N.D. Tex. Oct. 8, 2024) (holding that **"**at least ten days is normally required" for the notice requirement of Rule 30(b)).

Request to depose Witnesses attending Hearing, Monday, 14 September is opposed: Your request to depose any of the witnesses that will be notified, together with Exhibit lists, pursuant to the three-calendar-day deadline in N.D. Tex. L.B.R. 9014-1(c)(2) on Friday, 11 September, is opposed. The fact is that you have prematurely requested Federal Rule 30(b) of witnesses before such witnesses are to be notified per N.D. Tex. L.B.R. 9014-1(c)(2) and have done so without compliance with the conditions of Fed Rule 30(b).

Request to depose Mr. Legamaro is opposed: Your request to depose Mr. Legamaro this week is opposed. Your email request fails to comply with Fed Rule 30(b)(1) and Fed Rule 30(b)(2). In addition, the email notice does not appear to have considered the requirements of Fed Rule 30(b)(4) and Fed Rule 30(b)(7) in circumstances where Mr. Legamaro is not a resident of Dallas, Texas. Your email notice improperly attempts to shift the burden as to Mr. Legamaro's availability for a deposition. The burden to issue a proper notice rests with Global and you have failed in that requirement.

Should you wish to maintain your request then please provide proper notices and they will be addressed in due course. Should you wish to apply to the Court to seek remedy and for the Court to order such depositions, then we first must be provided proper notice and the opportunity to submit a Motion for a Protective Order to oppose your requests. Our client's due process rights cannot be circumvented simply because you have failed to act in a timely manner.

For the sake of completeness, we further advise as follows:

1. You are aware that all but one of the Petitioning Creditors is located outside the United States. Such persons will not be familiar with the deposition process provided for under Fed Rule 30(b). A deposition would require substantial preparation with counsel in addition to the examination itself. The Petitioning Creditors are all legal professionals with existing professional commitments. As such reasonable time to schedule depositions with such persons requires more than a request effectively today, Tuesday, 8 September. and with only three business days this week to even attempt to schedule such a deposition. We oppose any depositions on the weekend dates and in advance of the hearing as such time is required to prepare for the hearing itself. In addition, we oppose remote depositions as it is not possible for counsel to be present to assist those persons outside of the United States that are unfamiliar with the deposition process and have the right for counsel to be present and who are preparing to travel here for Monday's hearing. Any of those persons that will be attending the hearing on Monday, 14 September, will be required to travel long distances to Dallas. For example, a direct flight from Dubai to Dallas is just shy of 16 hours with longer time for a connecting flight. A flight from Paris to Dallas also effectively takes almost an entire day as well. Consequently, Global and its counsel would be well aware that to schedule a deposition this week for those persons who would be attending Monday would be nearly impossible in consideration of existing professional commitments and travel requirements. Even if such persons were available, requiring preparation and examinations during these final predeparture days would materially disrupt their schedules and preparation for Monday's hearing. Attempting to move the examinations to the weekend would instead interfere with recovery from international travel, time-zone adjustment, and final hearing preparation. We advise you that for the witnesses we intend to notify on Friday, that even if you consider that your email notice is sufficient and compliant with Fed Rule 30(b) and consider that you have respected the requirement for reasonable time, professional obligations cause those persons to be unavailable to accommodate deposition preparation and an examination on the compressed schedule this week now proposed. In any event, your notice fails to comply with Fed Rule 30(b) and we will submit a Motion for a Protective Order to quash your deposition request and insist on a proper notice.

2. Mr. Legamaro is unavailable this week and should you provide a proper notice for deposition then reasonable time must be accorded and such deposition of Mr. Legamaro will not take place this week. We advise you that even if you consider that your email notice is sufficient and compliant with Fed Rule 30(b), Mr. Legamaro has a separate, week-long conflict arising from his responsibilities with a charity program in which he is actively involved. His responsibilities including attending a long scheduled public event and he is unavailable to accommodate deposition preparation and an examination on the compressed schedule now proposed. In any event, your notice fails to comply with Fed Rule 30(b) and we will submit a Motion for a Protective Order to quash your deposition request and insist on a proper notice.

---

**From:** Petts, Nicholas W. <nicholas.petts@dentons.com>
**Sent:** Monday, September 7, 2026 10:35 AM
**To:** Brandon Tittle <btittle@tittlesantiago.com>; 'adam.swick@akerman.com' <adam.swick@akerman.com>; david.parham_akerman.com <david.parham@akerman.com>; Manolo Santiago <msantiago@tittlesantiago.com>
**Cc:** Pfaehler, Kenneth J. <kenneth.pfaehler@dentons.com>; Richards, Robert E. <robert.richards@dentons.com>; Siegien, Samantha <samantha.siegien@dentons.com>; Hamilton, Spencer D. <spencer.hamilton@dentons.com>; Dellplain, Melanie <melanie.dellplain@dentons.com>; O'Sullivan, Erin P. <erin.osullivan@dentons.com>
**Subject:** Green Sapphire, Case No. 26-33254

Brandon, Adam,

As you know, Judge Larson said that any depositions that need to be had can be had the week of the 7th, in preparation for a hearing on the week of the 14th. Please identify the witnesses you intend to call at the hearing and provide their availability for depositions later this week. In addition, please provide Michael Legamaro's availability for a deposition this week.

Thank you,

Nicholas W. Petts

+1 202 496 7356

nicholas.petts@dentons.com | Bio | Website
Dentons US LLP

Our Legacy Firms | Client Experience (CX)

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices | Privacy | Cookies

# EXHIBIT 12

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | adam.swick@akerman.com |
| **Sent:** | Tuesday, September 08, 2026 4:51 PM |
| **To:** | Petts, Nicholas W.; btittle@tittlesantiago.com; david.parham@akerman.com; msantiago@tittlesantiago.com |
| **Cc:** | Pfaehler, Kenneth J.; Richards, Robert E.; Siegien, Samantha; Hamilton, Spencer D.; Dellplain, Melanie; O'Sullivan, Erin P.; laura.taveras@akerman.com; andrew.dupre@akerman.com |
| **Subject:** | RE: Green Sapphire, Case No. 26-33254 |

**[WARNING: EXTERNAL SENDER]**

---

Mr. Petts:

We also received your email from yesterday requesting deposition times. We note that we have not previously discussed taking any depositions in this case. So your email, sent on a federal holiday, was a complete surprise.

My client is also unavailable this week. My client has preexisting work obligations in another state, must travel to Dallas for the hearing on September 14, 2026, and deserves the opportunity to be prepared for any deposition and the hearing. Under the circumstances, these cannot occur with your late notice.

Regards,

Chambers RANKED IN USA 2026 Adam Swick

**R. Adam Swick**
Chair, International Insolvency
Partner
Akerman LLP | 500 West 5th Street, Suite 1210 | Austin, TX 78701
D: 737 999 7103
adam.swick@akerman.com

Profile

akerman

700+ Lawyers
akerman.com

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

---

**From:** Petts, Nicholas W. <nicholas.petts@dentons.com>
**Sent:** Monday, September 7, 2026 10:36 AM

**To:** Brandon Tittle <btittle@tittlesantiago.com>; Swick, Adam (Ptnr-Aus) <adam.swick@akerman.com>; Parham, David (Ptnr-Dal) <david.parham@akerman.com>; Manolo Santiago <msantiago@tittlesantiago.com>
**Cc:** Pfaehler, Kenneth J. <kenneth.pfaehler@dentons.com>; Richards, Robert E. <robert.richards@dentons.com>; Siegien, Samantha <samantha.siegien@dentons.com>; Hamilton, Spencer D. <spencer.hamilton@dentons.com>; Dellplain, Melanie <melanie.dellplain@dentons.com>; O'Sullivan, Erin P. <erin.osullivan@dentons.com>
**Subject:** Green Sapphire, Case No. 26-33254

**[External to Akerman]**

Brandon, Adam,

As you know, Judge Larson said that any depositions that need to be had can be had the week of the 7th, in preparation for a hearing on the week of the 14th. Please identify the witnesses you intend to call at the hearing and provide their availability for depositions later this week. In addition, please provide Michael Legamaro's availability for a deposition this week.

Thank you,

Nicholas W. Petts

+1 202 496 7356
nicholas.petts@dentons.com | Bio | Website
Dentons US LLP

DENTONS

Our Legacy Firms | Client Experience (CX)

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices | Privacy | Cookies

# EXHIBIT 13

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Petts, Nicholas W. |
| **Sent:** | Tuesday, September 08, 2026 6:57 PM |
| **To:** | 'adam.swick@akerman.com'; btittle@tittlesantiago.com; david.parham@akerman.com; msantiago@tittlesantiago.com |
| **Cc:** | Pfaehler, Kenneth J.; Richards, Robert E.; Siegien, Samantha; Hamilton, Spencer D.; Dellplain, Melanie; O'Sullivan, Erin P.; laura.taveras@akerman.com; andrew.dupre@akerman.com |
| **Subject:** | RE: Green Sapphire, Case No. 26-33254 |

Brandon and Adam,

Respectfully, we disagree with your assertions below. My email of yesterday should not have come as a surprise. At the status conference on August 18, you advised that you would call witnesses but were not sure about who they would be. We stated that we would need to depose your witnesses ahead of the hearing on September 14. Judge Larson stated twice that any depositions that need to be had can be had this week of September 7. Judge Larson expects the parties to work together to get these depositions done and we are prepared to do so.

To that end, we are willing to take the depositions by Zoom for the convenience of the witnesses, and also to take depositions this Saturday if need be. But you cannot now claim you did not have notice they would be deposed. And, surprisingly, you still have not identified what persons you expect to call as witnesses on Monday.

Your discovery responses were untimely. The documents had to be produced Friday and were not. Your discovery responses also are deficient in numerous substantive respects, which we will be identifying shortly. Nevertheless, we are prepared to take depositions later this week or this weekend.

Please identify your witnesses and provide their availability for Zoom depositions.

Thank you,

Nicholas W. Petts

+1 202 496 7356

---

**From:** adam.swick@akerman.com <adam.swick@akerman.com>
**Sent:** Tuesday, September 08, 2026 4:51 PM
**To:** Petts, Nicholas W. <nicholas.petts@dentons.com>; btittle@tittlesantiago.com; david.parham@akerman.com; msantiago@tittlesantiago.com
**Cc:** Pfaehler, Kenneth J. <kenneth.pfaehler@dentons.com>; Richards, Robert E. <robert.richards@dentons.com>; Siegien, Samantha <samantha.siegien@dentons.com>; Hamilton, Spencer D. <spencer.hamilton@dentons.com>; Dellplain, Melanie <melanie.dellplain@dentons.com>; O'Sullivan, Erin P. <erin.osullivan@dentons.com>; laura.taveras@akerman.com; andrew.dupre@akerman.com
**Subject:** RE: Green Sapphire, Case No. 26-33254

**[WARNING: EXTERNAL SENDER]**

---

Mr. Petts:

We also received your email from yesterday requesting deposition times. We note that we have not previously discussed taking any depositions in this case. So your email, sent on a federal holiday, was a complete surprise.

My client is also unavailable this week. My client has preexisting work obligations in another state, must travel to Dallas for the hearing on September 14, 2026, and deserves the opportunity to be prepared for any deposition and the hearing. Under the circumstances, these cannot occur with your late notice.

Regards,

Chambers RANKED IN USA 2026 Adam Swick

**R. Adam Swick**
Chair, International Insolvency
Partner
Akerman LLP | 500 West 5th Street, Suite 1210 | Austin, TX 78701
D: 737 999 7103
adam.swick@akerman.com

Profile

akerman

700+ Lawyers
akerman.com

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

---

**From:** Petts, Nicholas W. <nicholas.petts@dentons.com>
**Sent:** Monday, September 7, 2026 10:36 AM
**To:** Brandon Tittle <btittle@tittlesantiago.com>; Swick, Adam (Ptnr-Aus) <adam.swick@akerman.com>; Parham, David (Ptnr-Dal) <david.parham@akerman.com>; Manolo Santiago <msantiago@tittlesantiago.com>
**Cc:** Pfaehler, Kenneth J. <kenneth.pfaehler@dentons.com>; Richards, Robert E. <robert.richards@dentons.com>; Siegien, Samantha <samantha.siegien@dentons.com>; Hamilton, Spencer D. <spencer.hamilton@dentons.com>; Dellplain, Melanie <melanie.dellplain@dentons.com>; O'Sullivan, Erin P. <erin.osullivan@dentons.com>
**Subject:** Green Sapphire, Case No. 26-33254

**[External to Akerman]**

Brandon, Adam,

As you know, Judge Larson said that any depositions that need to be had can be had the week of the 7th, in preparation for a hearing on the week of the 14th. Please identify the witnesses you intend to call at the hearing and provide their availability for depositions later this week. In addition, please provide Michael Legamaro's availability for a deposition this week.

Thank you,

Nicholas W. Petts

+1 202 496 7356
nicholas.petts@dentons.com | Bio | Website
Dentons US LLP

DENTONS

Our Legacy Firms | Client Experience (CX)

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices | Privacy | Cookies

# EXHIBIT 14

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Brandon Tittle <btittle@tittlesantiago.com> |
| **Sent:** | Tuesday, September 08, 2026 5:50 PM |
| **To:** | Pfaehler, Kenneth J.; Petts, Nicholas W.; Siegien, Samantha; Richards, Robert E.; Hamilton, Spencer D. |
| **Cc:** | david.parham_akerman.com; 'adam.swick@akerman.com'; Manolo Santiago |
| **Subject:** | Green Sapphire - Global's Discovery Deficiencies |

**[WARNING: EXTERNAL SENDER]**

Counsel,

We refer to Global Objections & Responses dated September 4, 2026, to Petitioning Creditors Request for Admissions, Global Document Production Objections & Responses dated September 4, 2026, to Petitioning Creditors Requests for Document Production and the documents produced under Federal Rules of Bankruptcy Procedure 7026, 7034, and 7036.

Failure to comply in form & content to the Requirements: We consider that Global's responses to the Request for Admissions and Request for Document Production are inadequate and present unfounded objections that we oppose. We consider that you have acted with the intent to deprive the Petitioning Creditors of the information's use in these proceedings and reserve the right to seek adverse inference determinations against Global as permitted under Rule 37(e)to restore the adversary balance of the proceeding and punish your wrongful conduct. Your claim that Petitioning Creditors seek documents that are more readily accessible from Green Sapphire is rejected. Your claim that Global is not involved in the fraudulent transfers citing the adversary proceeding in Illinois ignores the RICO Fourth Amended Complaint pending now for admittance before the Illinois Court. Your contention that arguments could and should have been raised in the Delaware Action and your reliance on an alleged protective order of July 9, 2026, is simply ridiculous in circumstances where the Petitioning Creditors are not party to those proceedings and could not raise any issue in those proceedings. Whether or not Green Sapphire raised or could have raised an issue will be properly addressed in litigation that the Petitioning Creditors consider must be commenced in these proceedings against Mr. Cicoski, Global, and others.

Failure of an Authorized Company Representative to certify the Production: We object to counsel having supplied the production without any attestation by an authorized company representative confirming the submission. We understand that Global has a sole director, Mr. Spingett, and as such, he is required to confirm the submission. We reserve the right to examine Mr. Springett on the submission including the objections.

Protective order of July 9: You have cited a protective order issued in the Delaware Action but have not provided that Order to support your objection. We request that you promptly do so now and not later than 9:00am tomorrow, Wednesday, September 9.

General Objection 4 does not provide detail or explanation, or a log of documents Global has withheld in its claim that a July 9 protective order prevents them from doing so. Global has failed to explain how nan Order in the Delaware Action is somehow relevant and applicable to refuse production in these proceedings for discovery requested by Petitioning Creditors who are not parties to the Delaware Action. Please identify the affected materials, producing/designating parties, and precise restrictions asserted, accounting for paragraphs 19, 25, and 27, including the procedure for court-ordered production. In addition, any Order obtained by Mr. Cicoski in the Delaware Action also does not, on its face, bar Global from producing responsive records already within its control, and Global has not explained how such a Cicoski Order is relevant in any event.

Petitioning Creditors Request for Admissions: Please supplement Responses to Admissions 1, 4, 12–16, and 19–20. In particular, reconcile Global's categorical relationship denial with its own evidence concerning Access Management and Tailwind; identify the specific Delaware findings and legal effects Global asserts; and supply the omitted identities and intended evidence. General references to documents that "speak for themselves" do not answer those questions.

Document Production: You provided a bundle of documents and a cover letter with your objections and indication that Global "will provide documents..." However, your correspondence did not present under each Request the responsible document you presented in a bundle with Bates citations to allow a review for compliance for a specific request. You presented no table or index listing the documents provided for each Request. Consequently, and int eh absence of such information as required, we are unable to determine your compliance with the Request or the documents produced for a specific request. We request that you to provide a listing of each of the documents provided for a specific request to remedy the situation and to do so by tomorrow, 9:00am tomorrow, Wednesday, September 9.

We also seek direct answers to RFAs 3–18 and 25–28, particularly whether Global requested receiver authority to dismiss specified defendants—not merely why it sought a receiver. Your answers are woefully deficient, and we contend they are intentionally deficient.

Please confirm, for each disputed request, whether production is complete; no responsive records were located, or responsive material is being withheld—and on what basis. Provide corresponding Bates ranges or explain how the production preserves its ordinary-course organization. Our priority requests are RFPs 4, 8, 11–15, and 17–33, including underlying financial data and transaction records. Please also explain the exclusions resulting from Global's narrowed date range and definition of "You," and identify the bases for substantive redactions and privilege claims.

Request for meet and confer at 1pm, Wednesday, September 9: Global's discovery responses and production leave material issues unresolved. Please provide your availability for a telephone meet-and-confer tomorrow, Wednesday, 1pm, Central Time. With the September 14 hearing looming, we need concrete supplementation commitments and deadlines for your compliance or a Motion to Compel will be required to be submitted.

Please be prepared to identify what Global will supplement, what it will produce, and when. We would prefer to resolve these issues today. Otherwise, we will seek expedited relief under Rules 37 and 36(a)(6), together with appropriate expenses.

# EXHIBIT 15

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Petts, Nicholas W. |
| **Sent:** | Wednesday, September 09, 2026 10:28 AM |
| **To:** | 'Brandon Tittle'; Pfaehler, Kenneth J.; Siegien, Samantha; Richards, Robert E.; Hamilton, Spencer D. |
| **Cc:** | david.parham_akerman.com; 'adam.swick@akerman.com'; Manolo Santiago |
| **Subject:** | RE: Green Sapphire - Global's Discovery Deficiencies |

Brandon,

We reject your characterizations of Global Capital's discovery responses. In fact, the petitioners' discovery responses and document production reflect serious deficiencies, as set forth below. We are generally available to meet and confer regarding these deficiencies and your email below tomorrow, Thursday. Please circulate a calendar invite and zoom link. We also continue to request that you identify the persons you intend to call as witnesses at the hearing and advise when you will make them available for depositions. Thank you.

*Objections to discovery concerning Ritchie*. Requests for Production 2, 3, 7, 16, 17, 19 and Interrogatories 7, 8, 11 seek documents and information concerning connections between the petitioning creditors and A.R. Thane Ritchie. The petitioners have objected to each request "insofar as it separately names A.R. Thane Ritchie or treats him as Green Sapphire or its representative," on grounds that he "is not a party to this proceeding" and "cannot control" Green Sapphire. The objection is improper for multiple reasons.

A central claim of Global Capital's motion to dismiss is that the petitioners filed in bad faith and in collusion with Green Sapphire and Thane Ritchie. The petitioners' communications with Ritchie and any payments they have received from Ritchie and his family office entities in the last eighteen months are highly relevant to that claim. In addition, the contention that Ritchie "cannot control" Green Sapphire is contrary to established fact. The Delaware Court of Chancery in its 120-page post-trial opinion expressly found that Thane Ritchie does control Green Sapphire and used it to file collusive claims in that case. The petitioners must supplement their interrogatory answers and produce documents and communications exchanged with Ritchie and Ritchie-affiliated entities during the relevant period.

*Objection to the Relevant Time Period*. The discovery requests define the Relevant Period as January 1, 2025 to the present. The petitioners have objected and unilaterally decided to construe the relevant period as beginning on March 31, 2026. However, the recent history of communications and payments from Ritchie and his family office to petitioners is highly probative of their current relationship. In addition, instances in the last eighteen months in which Alpha Carta has paid Legamaro Banipal on invoices it has issued to Green Sapphire would undermine the claim that Green Sapphire is not paying its debts as they come due.

*Interrogatory 1*. Interrogatory 1 seeks the "circumstances leading to the filing of the Petition." The petitioners' response is woefully incomplete in several respects.

As to petitioner Legamaro Banipal, the answer only states that "Michael Legamaro ... contacted Mr. Tittle by telephone on July 21, 2026" and they spoke, apparently for the first time, just hours before the petition

was filed. The answer must be supplemented to disclose the missing facts and circumstances that led Mr. Legamaro to contact Mr. Tittle in the first instance, including how he managed to learn of Mr. Tittle and his preparation of the involuntary petition.

Likewise, as to joining petitioner Lazareff Le Bars Legal Advisory Limited, the answer only states that "On August 11, 2026, Mr. McNutt ... independently called Tittle Santiago" about joining the petition. The answer must be supplemented to disclose the facts and circumstances that led Mr. McNutt to learn about the involuntary bankruptcy and contact Tittle Santiago in the first instance.

As to petitioner lecocqassociate, the answer only states that "Mr. Tittle initiated contact" with Dominique Lecocq regarding an involuntary bankruptcy on June 29, 2026—three weeks before Green Sapphire's first bankruptcy case in Illinois was dismissed. The answer must be supplemented to disclose the facts and circumstances that led the Texas-based Mr. Tittle to contact a creditor in a then-pending Illinois bankruptcy case about filing a new involuntary bankruptcy case in Texas, including any facts and circumstances prior to June 29, 2026.

*Interrogatory 9*. Interrogatory 9 asks whether the petitioners "had knowledge of the July 21, 2026 hearing in the Delaware Action prior to filing the Petition, and the source of such knowledge." The answer states only that the petitioners "considered that the pending receiver request was a material timing factor." The answer must be supplemented to disclose the source of their knowledge of the hearing.

*Interrogatory 14*. Interrogatory 14 seeks all the facts and circumstances regarding Legamaro Banipal and lecocqassociate's decision to dismiss their petition and their subsequent reversal of that decision just days later. The petitioners' answer is incomplete in multiple respects.

As to the decision to dismiss, the answer only states that on July 31 "Lecocqassociate indicated willingness to authorize a consensual dismissal" and "Legamaro Banipal LLP separately indicated it could withdraw if it otherwise would be the only petitioner remaining." It does not disclose the date on which the petitioners "independently instructed Tittle Santiago that they no longer wish to prosecute the involuntary petition and authorize counsel to seek dismissal," as stated in Tittle Santiago's letter of August 3, 2026. As important, the answer does not disclose the facts and circumstances that led Lecocqassociate and Legamaro Banipal to instruct counsel to seek dismissal. The answer must be supplemented to disclose the missing information, which is not privileged.

As to the reversal of the decision, the answer only states "On August 4, Lecocqassociate instructed counsel to hold off, and Legamaro Banipal LLP stated it was reconsidering withdrawal." The answer does not disclose the facts and circumstances that led Lecocqassociate or Legamaro Banipal to change their positions on dismissal. Similarly, the answer states that "On August 7, counsel advised the petitioners that the proposed that the proposed release-and-dismissal arrangement had not been approved and that, absent approval, the case would be defended." But the answer does not disclose the facts and circumstances that led Lecocqassociate and Legamaro Banipal not to approve the release-and-settlement arrangement. The answer to Interrogatory 14 must be supplemented to disclose this factual information.

Nicholas W. Petts

+1 202 496 7356

**From:** Brandon Tittle <btittle@tittlesantiago.com>
**Sent:** Tuesday, September 08, 2026 5:50 PM
**To:** Pfaehler, Kenneth J. <kenneth.pfaehler@dentons.com>; Petts, Nicholas W. <nicholas.petts@dentons.com>; Siegien, Samantha <samantha.siegien@dentons.com>; Richards, Robert E. <robert.richards@dentons.com>; Hamilton, Spencer D. <spencer.hamilton@dentons.com>
**Cc:** david.parham_akerman.com <david.parham@akerman.com>; 'adam.swick@akerman.com' <adam.swick@akerman.com>; Manolo Santiago <msantiago@tittlesantiago.com>
**Subject:** Green Sapphire - Global's Discovery Deficiencies

**[WARNING: EXTERNAL SENDER]**

---

Counsel,

We refer to Global Objections & Responses dated September 4, 2026, to Petitioning Creditors Request for Admissions, Global Document Production Objections & Responses dated September 4, 2026, to Petitioning Creditors Requests for Document Production and the documents produced under Federal Rules of Bankruptcy Procedure 7026, 7034, and 7036.

Failure to comply in form & content to the Requirements: We consider that Global's responses to the Request for Admissions and Request for Document Production are inadequate and present unfounded objections that we oppose. We consider that you have acted with the intent to deprive the Petitioning Creditors of the information's use in these proceedings and reserve the right to seek adverse inference determinations against Global as permitted under Rule 37(e)to restore the adversary balance of the proceeding and punish your wrongful conduct. Your claim that Petitioning Creditors seek documents that are more readily accessible from Green Sapphire is rejected. Your claim that Global is not involved in the fraudulent transfers citing the adversary proceeding in Illinois ignores the RICO Fourth Amended Complaint pending now for admittance before the Illinois Court. Your contention that arguments could and should have been raised in the Delaware Action and your reliance on an alleged protective order of July 9, 2026, is simply ridiculous in circumstances where the Petitioning Creditors are not party to those proceedings and could not raise any issue in those proceedings. Whether or not Green Sapphire raised or could have raised an issue will be properly addressed in litigation that the Petitioning Creditors consider must be commenced in these proceedings against Mr. Cicoski, Global, and others.

Failure of an Authorized Company Representative to certify the Production: We object to counsel having supplied the production without any attestation by an authorized company representative confirming the submission. We understand that Global has a sole director, Mr. Spingett, and as such, he is required to confirm the submission. We reserve the right to examine Mr. Springett on the submission including the objections.

Protective order of July 9: You have cited a protective order issued in the Delaware Action but have not provided that Order to support your objection. We request that you promptly do so now and not later than 9:00am tomorrow, Wednesday, September 9.

General Objection 4 does not provide detail or explanation, or a log of documents Global has withheld in its claim that a July 9 protective order prevents them from doing so. Global has failed to explain how nan Order in the Delaware Action is somehow relevant and applicable to refuse production in these proceedings for discovery requested by Petitioning Creditors who are not parties to the Delaware Action. Please identify the affected materials, producing/designating parties, and precise restrictions asserted, accounting for paragraphs 19, 25, and 27, including the procedure for court-ordered production. In addition, any Order obtained by Mr. Cicoski in the

Delaware Action also does not, on its face, bar Global from producing responsive records already within its control, and Global has not explained how such a Cicoski Order is relevant in any event.

Petitioning Creditors Request for Admissions: Please supplement Responses to Admissions 1, 4, 12–16, and 19–20. In particular, reconcile Global's categorical relationship denial with its own evidence concerning Access Management and Tailwind; identify the specific Delaware findings and legal effects Global asserts; and supply the omitted identities and intended evidence. General references to documents that "speak for themselves" do not answer those questions.

Document Production: You provided a bundle of documents and a cover letter with your objections and indication that Global "will provide documents..." However, your correspondence did not present under each Request the responsible document you presented in a bundle with Bates citations to allow a review for compliance for a specific request. You presented no table or index listing the documents provided for each Request. Consequently, and int eh absence of such information as required, we are unable to determine your compliance with the Request or the documents produced for a specific request. We request that you to provide a listing of each of the documents provided for a specific request to remedy the situation and to do so by tomorrow, 9:00am tomorrow, Wednesday, September 9.

We also seek direct answers to RFAs 3–18 and 25–28, particularly whether Global requested receiver authority to dismiss specified defendants—not merely why it sought a receiver. Your answers are woefully deficient, and we contend they are intentionally deficient.

Please confirm, for each disputed request, whether production is complete; no responsive records were located, or responsive material is being withheld—and on what basis. Provide corresponding Bates ranges or explain how the production preserves its ordinary-course organization. Our priority requests are RFPs 4, 8, 11–15, and 17–33, including underlying financial data and transaction records. Please also explain the exclusions resulting from Global's narrowed date range and definition of "You," and identify the bases for substantive redactions and privilege claims.

Request for meet and confer at 1pm, Wednesday, September 9: Global's discovery responses and production leave material issues unresolved. Please provide your availability for a telephone meet-and-confer tomorrow, Wednesday, 1pm, Central Time. With the September 14 hearing looming, we need concrete supplementation commitments and deadlines for your compliance or a Motion to Compel will be required to be submitted.

Please be prepared to identify what Global will supplement, what it will produce, and when. We would prefer to resolve these issues today. Otherwise, we will seek expedited relief under Rules 37 and 36(a)(6), together with appropriate expenses.

# EXHIBIT 16

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Brandon Tittle <btittle@tittlesantiago.com> |
| **Sent:** | Wednesday, September 09, 2026 2:48 PM |
| **To:** | TXNB MVL_Settings; Petts, Nicholas W. |
| **Cc:** | Hamilton, Spencer D.; Manolo Santiago; adam.swick@akerman.com; david.parham_akerman.com |
| **Subject:** | Re: 26-33254 Green Sapphire Holdings Inc. |

**[WARNING: EXTERNAL SENDER]**

Ms. Harden:

We intend to go forward with the hearing on Monday considering that we have three witnesses flying in from overseas for the in-person hearing.

---

**From:** TXNB MVL_Settings <mvl_settings@txnb.uscourts.gov>
**Sent:** Wednesday, September 9, 2026 11:18 AM
**To:** Petts, Nicholas W. <nicholas.petts@dentons.com>
**Cc:** Hamilton, Spencer D. <spencer.hamilton@dentons.com>; Manolo Santiago <msantiago@tittlesantiago.com>; Brandon Tittle <btittle@tittlesantiago.com>; adam.swick@akerman.com <adam.swick@akerman.com>; david.parham_akerman.com <david.parham@akerman.com>
**Subject:** Re: 26-33254 Green Sapphire Holdings Inc.

Dear Mr. Petts,

Please get your notice of hearing on file for the hearing on the motion to dismiss set for 9/14 at 9:30AM. I don't see one on file.

Thank you,

Dawn Harden

Dawn Harden
Courtroom Depu
to the Honorable
U.S. Bankruptcy
Northern District

---

**From:** Petts, Nicholas W. <nicholas.petts@dentons.com>
**Sent:** Monday, August 24, 2026 5:24 PM
**To:** TXNB MVL_Settings <mvl_settings@txnb.uscourts.gov>
**Cc:** Hamilton, Spencer D. <spencer.hamilton@dentons.com>; Manolo Santiago <msantiago@tittlesantiago.com>;

Brandon Tittle <btittle@tittlesantiago.com>; adam.swick@akerman.com <adam.swick@akerman.com>; david.parham_akerman.com <david.parham@akerman.com>
**Subject:** Re: 26-33254 Green Sapphire Holdings Inc.

**CAUTION - EXTERNAL:**

Thanks for confirming, Bryon

---

**From:** TXNB MVL_Settings <mvl_settings@txnb.uscourts.gov>
**Sent:** Monday, 24 August 2026 17:44:04
**To:** Petts, Nicholas W. <nicholas.petts@dentons.com>
**Cc:** Hamilton, Spencer D. <spencer.hamilton@dentons.com>; Manolo Santiago <msantiago@tittlesantiago.com>; Brandon Tittle <btittle@tittlesantiago.com>
**Subject:** Re: 26-33254 Green Sapphire Holdings Inc.

**[WARNING: EXTERNAL SENDER]**

---

Mr. Petts,

We have reserved the entire day on September 14th in CHAP for Green Sapphire.

Thanks,

Bryon

---

**From:** Petts, Nicholas W. <nicholas.petts@dentons.com>
**Sent:** Monday, August 24, 2026 4:39 PM
**To:** TXNB MVL_Settings <mvl_settings@txnb.uscourts.gov>
**Cc:** Hamilton, Spencer D. <spencer.hamilton@dentons.com>; Manolo Santiago <msantiago@tittlesantiago.com>; Brandon Tittle <btittle@tittlesantiago.com>
**Subject:** Re: 26-33254 Green Sapphire Holdings Inc.

**CAUTION - EXTERNAL:**

Hello Ms. Harden,

Just following up on the email below to confirm that the hearing in the above-referenced case is set for September 14. Please let us know if there is any other information needed.

Thank you,
Nick

Nicholas W. Petts

+1 202 496 7356

**From:** Petts, Nicholas W. <nicholas.petts@dentons.com>
**Sent:** Friday, August 21, 2026 1:36 PM
**To:** TXNB MVL_Settings <mvl_settings@txnb.uscourts.gov>
**Cc:** Hamilton, Spencer D. <spencer.hamilton@dentons.com>; Manolo Santiago <msantiago@tittlesantiago.com>; Brandon Tittle <btittle@tittlesantiago.com>
**Subject:** 26-33254 Green Sapphire Holdings Inc.

Good afternoon Ms. Harden,

We write further to the August 18 status hearing in the above-referenced case. The parties have agreed on a hearing date of September 14 for the pending motion to dismiss and motion to amend the petition.

Please let us know if there is any additional information we can provide.

Thank you,

Nicholas W. Petts

+1 202 496 7356

nicholas.petts@dentons.com | Bio | Website
Dentons US LLP

Our Legacy Firms | Client Experience (CX)

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices | Privacy | Cookies

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Nicholas W. Petts

+1 202 496 7356

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# EXHIBIT 17

**Dellplain, Melanie**

| | |
|---|---|
| **From:** | Kevin McCullough <kdm@romclaw.com> |
| **Sent:** | Wednesday, September 09, 2026 4:00 PM |
| **To:** | TXNB MVL_Settings |
| **Cc:** | Brandon Tittle; Petts, Nicholas W.; Manolo Santiago; adam.swick@akerman.com; david.parham_akerman.com; Hamilton, Spencer D.; Pfaehler, Kenneth J.; Richards, Robert E.; Petts, Nicholas W.; Emily Moon |
| **Subject:** | 26-33254 Green Sapphire Holdings Inc. - Request for Continuation of Hearing |

**[WARNING: EXTERNAL SENDER]**

Ms. Harden,

I am just entering my appearance and am representing Global Capital as local counsel in the referenced case.

Global Capital is withdrawing its motion to dismiss the involuntary petition, without prejudice to refiling at a later date after adequate discovery can be carried out. The hearing set for Monday, September 14, can therefore be cancelled. My co-counsel will file a notice on the docket shortly.

Global Capital also wishes to advise the Court and relevant parties that it will be filing a motion to transfer venue of the case to the United States District Court for the Northern District of Illinois, Eastern Division.

Sincerely,

Kevin McCullough

KEVIN MCCULLOUGH
901 MAIN ST., SUITE 3200 | DALLAS, TEXAS 75202
D: (214) 580-2580 | EFAX: 1 (888) 467-5979
WWW.ROMCLAW.COM | KDM@ROMCLAW.COM

R O M C Rochelle • McCullough LAWYERS

# EXHIBIT 18

EFiled: Mar 13 2026 01:37PM EDT
Transaction ID 78722860
Case No. 2024-0877-JTL

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

GLOBAL CAPITAL PARTNERS LLC and ACCESS MANAGEMENT, S.A.S., INC.,

Plaintiffs,

v.

GREEN SAPPHIRE HOLDINGS, INC.

Defendant.

---

ALPHA CARTA, LTD.,

Third-Party Plaintiff-Intervenor,

v.

GREEN SAPPHIRE HOLDINGS, INC., and GLOBAL CAPITAL PARTNERS, LLC,

Defendants.

C.A. No. 2024-0877-JTL

**POST-TRIAL OPINION**

Date Submitted: December 12, 2025
Date Decided: March 13, 2026

Philip Trainer, Jr., Samuel M. Gross, ASHBY & GEDDES, P.A., Wilmington, Delaware; Kenneth J. Pfaehler, Nicholas W. Petts, DENTONS US LLP, Washington, District of Columbia; *Attorneys for Global Capital Partners, LLC and Access Management, S.A.S., Inc.*

Sidney S. Liebesman, J. Peter Shindel, Jr., Seth A. Niederman, Joshua K. Tufts, FOX ROTHSCHILD LLP, Wilmington, Delaware; Marc P. Trent, TRENT LAW FIRM, P.C., Chicago, Illinois; *Attorneys for Alpha Carta, Ltd.*

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; *Attorneys for Green Sapphire Holdings, Inc.*

**LASTER, V.C.**

A lender loaned $10 million to a borrower, secured by the borrower's equity interest in a subsidiary that owned real estate. The borrower defaulted, and the lender demanded repayment. To settle the dispute, the borrower agreed that the lender owned the subsidiary's equity. But the borrower never recognized that the lender had gained control of the subsidiary and, through it, the real estate. After the borrower interfered with the lender's ability to access the real estate, the lender and the subsidiary filed suit seeking equitable relief to secure their rights.

The borrower and a third-party intervenor have done their best to turn that simple story into a huge mess. Although nominally adverse parties, a single human controls them both.

A.R. Thane Ritchie is a former hedge fund manager turned secretive international investor who set up a multi-entity structure to manage his wealth. Through the Petro Carta Trust (the "Family Trust"), Ritchie controls and manages assets for his family's benefit. Through the Family Trust, Ritchie controls defendant Green Sapphire Holdings, Inc. (the "Borrower"). Through a subsidiary, the Borrower owns real estate on the Caribbean island of St. Barthélemy (the "Properties").

Through the Alpha Carta Trust (the "Personal Trust"), Ritchie controls and manages assets for his own benefit. Through the Personal Trust, Ritchie controls third-party intervenor Alpha Carta, Ltd. ("Alpha"). Ritchie caused Alpha to fund the Borrower through a loan agreement containing facially non-market terms that qualify the investment as equity rather than debt.

Confronting a liquidity crisis that threatened his business empire, Ritchie turned to Robert Brownell, his longtime confidant and dealmaker. Ritchie asked Brownell to secure a bridge loan using the Properties as collateral.

Brownell developed terms for a short-term loan that he could present to accredited investors as part of a mini-syndication (the "Loan"). He created plaintiff Global Capital Partners LLC (the "Lender") as a special purpose vehicle to conduct the syndication and make the loan. The plan was for the Lender to raise capital from Brownell's network of investors, then use the capital to make the Loan to the Borrower. The principal security for the Loan would be the Properties. But the Borrower owned the Properties through a wholly owned subsidiary (the "Subsidiary"), and because enforcing mortgages on St. Barts is difficult, the Borrower also granted the Lender a security interest in the shares of the Subsidiary that it owned (the "Subsidiary Shares"). Having Brownell control the Lender benefited Ritchie, because it meant Ritchie's longtime confidant and trusted advisor would stand between Ritchie and the real lenders when it came time to enforce the Loan and potentially foreclose on the collateral.

Brownell's effort to raise money from his own network fizzled, so he turned to Tailwind Ltd., a fledgling private credit firm. Tailwind successfully shopped the loan to its stable of investors, but those investors did not want to fund an entity Brownell controlled. Rather than restructure the transaction, Brownell transferred control over the Lender to Tailwind. Its investors provided the funding, and the Lender made the Loan. Ritchie used the proceeds to pay off his most pressing debts.

Ritchie's team planned to repay the Loan using the proceeds from a separate sale of real estate, but Ritchie repurposed the proceeds at the last minute. The Borrower could not pay the Loan and defaulted.

To settle the debt, the Borrower agreed that the Lender owned the Subsidiary Shares and the Properties. The Lender also received a fee in the form of shares of stock in a different company.

Around the same time, Ritchie and Brownell had a falling out. Suspecting that Brownell had been double-crossing him for years, Ritchie commissioned an internal investigation into every deal Brownell touched, including the Loan. Ritchie's associates examined each transaction with jaundiced eyes. Working off a limited documentary record, they developed a narrative in which Brownell used the Loan to defraud Ritchie. They disputed the settlement and prevented the Lender from accessing the Properties.

The Lender filed this lawsuit to enforce the settlement. Believing it had obtained the Subsidiary Shares, the Lender caused the Subsidiary to sue as well. Ritchie caused Alpha to intervene and assert fraudulent transfer claims against the Borrower, which Ritchie himself controlled, and the Lender.

This post-trial opinion rules in favor of the Lender and the Subsidiary on their core breach of contract claim. The Lender owns the Subsidiary Shares, and the Subsidiary owns the Properties. The Borrower must stop interfering with the Lender's ownership and take all actions reasonably necessary to ensure that the Lender can control the Subsidiary Shares and the Properties.

This post-trial opinion rules against Alpha on all of its fraudulent transfer claims. Only a creditor can assert fraudulent transfer claims, and Alpha is not a bona fide creditor of the Borrower. Alpha is an equity investor that has tried to dress up its equity investments as loans. Alpha's claims are collusive, because Ritchie controls both Alpha and the Borrower. The claims would fail on the merits, but the court need not reach them.

The court awards the Lender damages of €3 million. The Lender is entitled to recover its expenses (including attorneys' fees) because of the Borrower's and Alpha's bad-faith litigation conduct. Alpha's loans to the Borrower are equitably subordinated to the Lender's recovery.

## I. FACTUAL BACKGROUND

The facts are drawn from the post-trial record. Trial took place over three days. The parties introduced 449 exhibits and lodged depositions from eleven witnesses. Seven witnesses testified live. The parties agreed on just twenty-three stipulations of fact.[1] Having assessed the credibility of the witnesses and weighed the evidence as a whole, the court makes the following factual findings. The facts supporting the decree of specific performance rest on clear and convincing evidence. The facts as a whole rest on a preponderance of the evidence.

---

[1] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits. Citations in the form "PTO ¶ __" refer to the Pre-Trial Stipulation and Order.

### A. A Preliminary Note On The Record And Credibility

The parties presented wildly divergent versions of events. Several factors make it difficult to discern what actually happened.

First, Ritchie is a key player in the dispute, yet he communicated almost exclusively through phone calls and ephemeral messages that left no discoverable written record. He also took pains to avoid appearing on documents. His affiliates' document preservation was at best inadequate and arguably sanctionable.[2] Those business practices reduced the quantum of contemporaneous records on which the court could rely.

Second, all parties are repeat players in international financial transactions where tax avoidance and regulatory anonymity are highly prized. They prioritized creating the appearances necessary to achieve those goals over accurately documenting what occurred. Those efforts undermined the reliability of the written records that do exist.

Third, one of Ritchie's entities refused to waive privilege over his former counsel's contemporaneous notes, even though two other Ritchie-controlled entities—Alpha and the Borrower—waived privilege.[3] Ritchie thus kept the notes out of the

---

[2] *See* Azzopardi Tr. 643 (Q: "[W]ere any steps taken by any of the entities for which you were a director to preserve evidence in the days after February 10 . . . ?" A: "We were meeting and trying to recall what happened, but, yeah, nothing specific.").

[3] *See* Cicoski Tr. 238–39. The court does not infer anything from the failure to waive privilege. *See* D.R.E. 512.

record with one hand, while creating the impression with the other that he wanted them available. Ritchie also declined to appear at trial, despite causing Alpha to intervene in his action. Those decisions left gaps in the factual record.

The court has therefore been forced to rely heavily on trial testimony. The witnesses who sought to support Ritchie's litigation narrative either lacked credibility or had limited personal knowledge. Garrett Vail's testimony fell short on both counts. He spun wide-ranging conspiracy theories, split hairs relentlessly, and refused to give straight answers. He also lacked contemporaneous personal knowledge and testified based on a suspicion-fueled, after-the-fact investigation he conducted into Brownell's dealings.

Paul Wolfe and Mark Azzopardi's testimony fell short for lack of personal knowledge. Wolfe knew some things, but he lacked information on key points. Azzopardi relied almost exclusively on a self-serving narrative that Ritchie gave him after his falling out with Brownell.

By contrast, two witnesses performed well. Dustin Springett, the founder of Tailwind and the Lender's representative, testified credibly and from personal knowledge about the actions he took on behalf of his firm and the Lender. Ryan Cicoski, a Delaware lawyer and the former general counsel of Ritchie's organization, testified credibly and from personal knowledge about the Loan, its origins, his interactions with Ritchie, and the case as a whole.

## B. The Family Office

Ritchie is a wealthy former hedge fund principal turned private investor who now largely operates overseas.[4] Ritchie manages his personal investments through a network of interconnected trusts, holding companies, and other entities that make up his "Family Office."[5] Two of the top-tier entities in the Family Office are the Personal Trust and the Family Trust.

The trustee of the Personal Trust is Prairie Private Trust Company Ltd. (the "Personal Trustee").[6] In addition to holding ownership in various other entities, the Personal Trust is the sole owner of third-party intervenor Alpha.[7] Alpha holds a portfolio of primarily non-United States-based assets.[8]

---

[4] At one time, Ritchie's former hedge fund, the Chicago-based Ritchie Capital Management, had several billion dollars in assets under management. *See* Yuskus Tr. 646. Despite the court's urging, Ritchie refused to come to the United States for deposition or trial. *See* Dkt. 217; Dkt. 254 at 7–11. During his remote deposition, conducted via Zoom, Ritchie testified that he was a Cayman Islands resident and was "overseas," but his counsel instructed him not to provide any other information about his whereabouts. Ritchie Dep. 31–32.

[5] Ritchie and his associates use this term. *See* JX 292 ¶ 340 (referring to the entities owned or controlled by the Personal Trust, Alpha, the Family Trust, the Family Trustee, and their affiliates collectively as the "Family Office Trust Structure"); Azzopardi Tr. 572 (Alpha witness referring to the "Ritchie Family Office").

[6] Azzopardi Tr. 573; JX 196.

[7] PTO ¶ 44.

[8] *See* Cicoski Tr. 225.

The trustee of the Family Trust is NorthSea, LLC (the "Family Trustee").[9] The Family Trust is the sole owner of the Borrower, which holds a portfolio of primarily United States-based real estate investments.[10] Through a wholly owned subsidiary, Access Management, S.A.S. (the "Island Subsidiary"), the Borrower owned the Properties, comprising a villa, associated land, and a separate undeveloped parcel.[11] The Properties stand as an unexplained exception to the Family Trust's policy of holding United States-based properties.

The Family Office has centralized its accounting, administrative, legal, and other professional services functions within 60 Degrees Group SEZC, Ltd. (the "Back Office").[12] As a result, many Family Office entities have no employees.[13] The Back Office serves as the central nervous system for Ritchie's sprawling empire.

The following diagram depicts relevant aspects of the Family Office:

[9] PTO ¶ 49.

[10] *See* Cicoski Tr. 221. The Borrower was incorporated on December 13, 2006, under the name Organic Fuels Holdings, Inc. *See* PTO ¶ 43; JX 4; JX 8.

[11] PTO ¶ 34; JX 248 at 10.

[12] Cicoski Tr. 220. A third top-tier entity—the Prairie II Trust—controls the Back Office. That trust also controls another entity stack that is not relevant to this dispute. JX 196.

[13] Cicoski Tr. 220.




## C. Ritchie's Control

Ritchie exercises control over every entity in the Family Office.[14] Alpha and the Borrower dispute Ritchie's control, but the record establishes convincingly that the Family Office entities form a unified organization that Ritchie runs.[15] Key personnel at the Family Office, including Cicoski and then-CFO Stacey McHugh,

---

[14] Cicoski Tr. 295; *see Huizenga Managers Fund, LLC v. Ritchie*, Case No. 07-CH-9626, at 37 (Ill. Cir. Ct. Cook Cty. Jan. 27, 2015).

[15] Cicoski Tr. 226–27, 294–95; *see* Azzopardi Tr. 584, 586, 608 (testifying to uneasiness agreeing to anything as a director of Ritchie's entities without confirming Ritchie knew about it).

reported directly to Ritchie. Both regularly secured his “big thumbs-up”— sometimes just the literal emoji—before acting.[16]

Despite exercising actual control, Ritchie goes to great lengths to conceal his involvement. He operates “from the shadows” and maintains a tight grip on information.[17] Some trusted lieutenants work closely with him. Others remain at arm’s length and depend on intermediaries for instructions.

Rather than holding organizational roles himself, Ritchie relies on a handful of longtime associates to serve in key positions. Wolfe, Vail, and Azzopardi are three of those associates. For a time, so were Cicoski and Brownell.

Wolfe is a trusted lieutenant who interacts directly with Ritchie. He has worked for Ritchie since 2001, having previously worked for Ritchie’s father.[18] From January 2022 to November 2023, he served as a director of the Borrower.[19] After a brief absence, he rejoined the Borrower’s board in February 2024, when he also

---

[16] Cicoski Tr. 296; *id.* at 226–27 (Q: “Were there any significant business decisions at Alpha Carta made without Thane Ritchie’s approval?” A: “I can’t think of any.” Q: “How about for Green Sapphire?” A: “No. He would have been consulted, informed, advised, and more often an integral part of the process.”). For example, McHugh communicated regularly with Ritchie to obtain approvals for payments from various entities in the Ritchie Family Office. *See* JX 59 (screenshot of messages between McHugh and “A” (i.e., Ritchie) seeking approval for payments); Wolfe Tr. 705 (testifying that seeking payment approvals in this format was “not unique”); JX 199 (text between McHugh, Wolfe, and Ritchie regarding payment approvals).

[17] Cicoski Tr. 229.

[18] Wolfe Tr. 676–78.

[19] *See* JX 20; Wolfe Tr. 680.

became a director of the Family Trustee.[20] At the time of trial, he simultaneously served as a director of the Borrower, a director of the Back Office, and a director of the Personal Trustee, which controls the Personal Trust and Alpha.[21] Wolfe thus embodied and could act contemporaneously on behalf of the entities on both sides of the purported dispute between the Borrower and Alpha.

Vail is another trusted lieutenant who interacts directly with Ritchie. A former lawyer, Vail has worked for Ritchie's entities since 2009, having previously represented Ritchie's entities in recovering money allegedly lost in a Ponzi scheme.[22] From around February 2024 through at least March 2025, Vail served as a director of Alpha. He was an Alpha director when Alpha intervened in this litigation, and he verified Alpha's third-party complaint.[23] Yet since February 2024, Vail has also been a director of the Borrower,[24] and at trial, he appeared as the Borrower's client representative.[25] Like Wolfe, he embodied and could act contemporaneously on behalf

---

[20] Wolfe Tr. 680, 702; Azzopardi Tr. 576.

[21] *See* Wolfe Tr. 698; Cicoski Tr. 279; JX 196. Plus Wolfe was an authorized signatory on Alpha's bank account. Wolfe Tr. 703.

[22] *See* Vail Tr. 721–24, 755.

[23] Dkt. 67; Vail Tr. 749–50.

[24] Vail Tr. 724, 726; JX 130 at 7.

[25] *See* Vail Tr. 751. Yet despite Vail's involvement with both the Borrower and Alpha, those entities claim they are not under common control. Vail even claimed at trial that the Borrower "has nothing to do with Mr. Ritchie." *Id.* at 756.

of the entities on both sides of the purported dispute between the Borrower and Alpha.

Azzopardi, by contrast, does not often interact directly with Ritchie and historically received information on a need-to-know basis. He has served as a director of various Family Office entities, including Alpha, for over ten years.[26] He has also periodically served as a consultant for the Family Office, receiving between €5,000 and €7,000 per month.[27] From approximately 2021 until 2025, he served as a director of the Family Trustee.[28] He remains a director of Alpha and the Personal Trustee.[29] A resident of Malta, he performs his duties at a distance, rarely travels across the Atlantic, and knows little about what the Family Office entities were actually doing.[30]

Cicoski interacted directly with Ritchie, but not to the same degree as Wolfe. In 2019, Ritchie hired Cicoski, previously a senior associate at a prominent Delaware

---

[26] Azzopardi Tr. 572–74, 620–21.

[27] *Id.* at 572–78.

[28] *Id.* at 573–74.

[29] *Id.* at 572–73; *see* JX 282 at 8 ("Thane [Ritchie] wants to use Mark [Azzopardi] as his surrogate on all global projects.").

[30] Azzopardi Tr. 582 ("I was frustrated at the time that I wasn't having enough contact," "sitting in Malta and taking on these roles," and "not having the ability to be on the ground and understand what everyone is doing all the time."); *id.* at 583–84 ("Malta is far away. With the technology it's easier today, obviously, but there's a time difference. I didn't travel that often across the Atlantic to be here. . . . I didn't have much contact with [Ritchie] during 2023 . . . . Thane was difficult to contact.").

law firm, as his general counsel.[31] Although the Back Office formally employed Cicoski, he provided legal services to the Family Office generally, including the Borrower, Alpha, and many other entities.[32] In August 2021, Cicoski became a director of the Borrower.[33] He also became a director of the Family Trustee and the Back Office.[34] He held those positions until he resigned in February 2024.[35]

Ritchie's "closest confidant" was Brownell, a long-time consultant and investment partner.[36] As Ritchie well knew, Brownell had served ten years in prison for conspiracy to commit mail and wire fraud.[37] After his discharge, Brownell and Ritchie worked closely together, with Brownell serving as Ritchie's go-to real estate advisor, dealmaker, and financial partner.[38] The pair were "inseparable" and often traveled and invested together.[39] Brownell regularly acted as a front man for Ritchie

---

[31] *See* Cicoski Tr. 219–20. Cicoski relocated to the Cayman Islands to perform his duties. *Id.* at 453.

[32] *See id.* at 221.

[33] JX 17.

[34] Cicoski Tr. 278–79.

[35] JX 101.

[36] Cicoski Tr. 243.

[37] *See id.* at 258, 389–92; Brownell Dep. 6. Brownell testified that his cellmate introduced him to Ritchie. *See id.* at 23.

[38] *See* Cicoski Tr. 243–44.

[39] *Id.* at 243 ("Robert visited with Mr. Ritchie—three times a month would not be unusual to have him flying out and them having hours of meetings. When they

by putting down deposits or making purchases, then obtaining reimbursement from the Family Office.[40] During their collaboration, Ritchie insisted that Brownell use an alias—Robert Bigelow—to invite fewer questions about his past.[41] But Ritchie and his associates all knew about Brownell's history.[42]

In addition to operating through surrogates, Ritchie strives to avoid creating any persistent record of his interactions.[43] He regularly communicated by phone or through ephemeral messaging applications like Telegram, Confide, and Signal.[44] He also insisted that his associates not keep written records. As Cicoski testified, "[I]f

---

went to look at properties, they'd go together. They'd go to different countries to look at properties, different states."); Brownell Dep. 26 ("I . . . was on [Ritchie's] private jet constantly going back and forth to Cabo where I would rent villas for him . . . .").

[40] Cicoski Tr. 324; Brownell Dep. 26.

[41] *See* Cicoski Tr. 391; Springett Tr. 22.

[42] *See* Cicoski Tr. 257, 391. The exception was Azzopardi, who discovered the truth much later and felt that others had kept him in the dark. Azzopardi Tr. 595–96.

[43] Cicoski Tr. 231 (testifying that Ritchie "did not like to put his name on legal documents, emails, anything . . . that could possibly come up in litigation down the road"); *id.* (explaining that Ritchie wanted "the ability to deny any action that his directors took in the future"); Brownell Dep. 23 (testifying that Ritchie "was adamant that he wanted his name on nothing, everything was to remain verbal"); *id.* at 18 (Ritchie "told me he wanted no record.").

[44] *See* Cicoski Tr. 228–29, 360, 433; Azzopardi Tr. 620. On the Confide platform, messages would self-destruct within thirty seconds. Cicoski Tr. 229. On other platforms, Ritchie set messages to automatically delete in twenty-four hours or less. *Id.* at 230. Ironically, the rapid auto-deletion forced Cicoski and other Ritchie associates to carry notepads and pens to keep track of Ritchie's multiple messages, despite Ritchie's instructions to the contrary. *Id.* at 229–30.

Mr. Ritchie had known I was taking notes or documenting those conversations, it would have been a bad afternoon for me."[45] Other employees and associates in the Family Office used email to communicate, but with the applications set to delete messages automatically after forty-five days.[46] When Cicoski recommended more practical document retention schedules, Ritchie refused.[47]

**D. The Liquidity Crisis**

During the years leading up to this dispute, Ritchie often acquired illiquid assets that did not generate recurring revenue.[48] Ritchie regularly used leverage in his investment strategies, but without steady cash flow, Ritchie had to obtain loans from private capital providers who demanded high interest rates and tight covenants.[49]

In late 2022, as a result of those practices, the Family Office faced a "significant liquidity crunch."[50] Ritchie had failed to support a SPAC that he sponsored, fallen

---

[45] Cicoski Tr. 433.

[46] *See* JX 285; Azzopardi Tr. 643.

[47] Cicoski Tr. 393 (explaining that Ritchie "flat out refused" his records retention proposals); Azzopardi Tr. 591–92 (testifying about his "concerns about the corporate governance" in the Family Office because "there wasn't enough communication" and his attempts to "put in regular investment committees" were rejected).

[48] *See* JX 250; JX 251; Springett Tr. 30; Cicoski Tr. 251–52.

[49] Cicoski Tr. 251–52, 283.

[50] *Id.* at 232.

significantly behind in paying law firms handling key cases, missed payments for his private jet, and failed to pay employees and contractors.[51] As the Family Office's financial position deteriorated, its entities risked covenant defaults and other adverse loan events.[52]

The Borrower in particular faced the imminent maturity of millions of dollars in debt, including (1) approximately $4 million owed to Dominion Bank and secured by the receivables from a commercial real estate portfolio[53] and (2) approximately $3

---

[51] *Id.* The law firm bills were a serious problem. *Id.* at 232, 235; *see* JX 199 at 1 (Wolfe on November 11, 2022: "I know there is pressure from law firms to pay before year end."); *id.* at 2 (McHugh: "There are +150 legal invoices with some dating back to April 2021. I don't think firms care which invoice is paid at this point."). A seven-figure obligation to Winston & Strawn loomed large, because Winston was representing the Family Office in "incredibly contentious litigation" and had threatened it would withdraw for non-payment, which would have jeopardized Cicoski's ability to negotiate a global settlement. Cicoski Tr. 236.

The failure to pay employees was another major issue, and Brownell helped out by advancing money to Cicoski and other Family Office employees. *Id.* at 317, 321–22, 374–75; Brownell Dep. 12. At one point, Brownell helped Cicoski scout out residential properties in Pennsylvania. Cicoski Tr. 326–28. In this litigation, Alpha portrays Brownell's assistance as a successful effort to turn Cicoski against Ritchie, but the record—including Cicoski's credible testimony—proves otherwise. The assistance was part of Brownell efforts to help Ritchie, not a plot against him. *See id.* at 317, 321–22, 374–75.

[52] *Id.* at 232, 237–38.

[53] *See id.* at 232–33. At one point, Ritchie considered paying the Dominion loan by tapping a $4 million reserve earmarked for the Internal Revenue Service. *See* JX 28; McHugh Dep. 39–40. Ultimately, Ritchie decided against using the tax reserve. *See* JX 199. Alpha and the Borrower claim that the ability to use the tax reserve undercuts the claimed liquidity crisis. To the contrary, it shows that the crisis was sufficiently real that Ritchie was considering redeploying money earmarked for the United States Treasury. In addition, the tax reserve would not have addressed Ritchie's other impending obligations.

million owed to a hard money lender and secured by several different properties.[54] If the Borrower defaulted, it would lose the underlying collateral.[55] And the Borrower was not a cash-generating entity. Since 2017, it had operated at a loss,[56] with Ritchie funding its expenses through advances from Alpha.[57]

## E. The Effort To Secure Bridge Financing

Cicoski and Wolfe, the Borrower's two directors, both knew about the Family Office's liquidity crisis. So did Ritchie and Azzopardi.[58] It was a daily topic of conversation within Ritchie's organization.[59] Ritchie and Wolfe planned to address the crisis by generating $11 million from selling Cayman Islands real estate known as the Calma Property, but that sale kept getting delayed.[60]

---

[54] Cicoski Tr. 234.

[55] *Id.* at 233–35.

[56] *See* JX 275 at 3; Yuskus Tr. 654. The Borrower booked positive net income in 2021, but that resulted from a write-up of investment value, not from cash income. Johnston Tr. 480.

[57] Yuskus Tr. 654–55; Johnston Tr. 478, 481. Sometimes Alpha paid the Borrower's creditors directly. *See* Yuskus Tr. 655; Johnston Tr. 481.

[58] *See* Cicoski Tr. 236–37; Azzopardi Tr. 621–22.

[59] Cicoski Tr. 238.

[60] *See id.* at 237; Wolfe Tr. 684, 699–700.

Ritchie therefore turned to Brownell, who had secured financing for Ritchie in the past.[61] Although Brownell ran point, Ritchie stayed heavily involved and spoke with Brownell frequently, often multiple times per day.[62]

With Ritchie's approval, Brownell worked with the Ritchie's longtime deal counsel, Charles Mack.[63] They envisioned using a special purpose vehicle to raise capital from investors in Brownell's network, then having the special purpose vehicle

---

[61] Sometimes, Brownell provided the loans himself. As late as summer 2022, Brownell had loaned several million dollars to the Family Office without documentation and with terms to be worked out in the future. *See* Cicoski Tr. 246; McHugh Dep. 42. On other occasions, he arranged financing from third parties. One loan—for approximately $1.5 million from Dallas Salazar—was coming due. *See* Cicoski Tr. 281; Mack Dep. 76.

[62] *See* Cicoski Tr. 249 ("He and Mr. Brownell would have worked through the economic terms on this particular loan, yes. And almost every other loan or transaction that I can think of, in my experience, they would have worked on the terms, the economic terms together."); *id.* at 243 ("In my measure, they spoke eight or nine times a day."); *id.* at 244 ("It was very well known that they had this type of relationship."); Brownell Dep. 26–27 ("I would speak with Thane Ritchie 365 days a year, Christmas, July 4th. It didn't matter. 6:00 in the morning until 11:00 at night. . . . So yeah, we spoke all the time, every day, seven days a week."); Wolfe Tr. 711 (Q: "And during Mr. Brownell's time with the Ritchie Family Office, he and Mr. Ritchie communicated regularly, didn't they? A: "I believe so.").

[63] Mack had represented Ritchie's entities on dozens of transactions, ranging from real estate deals and joint ventures to personal matters for Ritchie and his family. Mack Dep. 18. Mack had represented the Borrower on multiple occasions. *See* Cicoski Tr. 242; Mack Dep. 12–13. Tasking Brownell to handle a deal with counsel was not unusual. When raising capital secured by his overseas assets, Ritchie typically would consult with Wolfe, then speak with Brownell, then have Brownell and counsel carry out the plan. Cicoski Tr. 242 ("Thane [Ritchie] would speak to Paul [Wolfe] and speak to Robert [Brownell]. Robert would go out and try to execute on that plan, and he would be advised either by Mr. Mack or by one of our several other outside law firms . . . ."); *accord id.* at 244 ("Typically the way that it would work is that Thane would give the direction and Robert and Charlie would go out and try to execute.").

make the loan to the Borrower.[64] In September 2022, they formed the Lender for that purpose.[65]

Everyone understood that investors would only fund a loan to a distressed entity like the Borrower on an expedited basis if they received sufficient security and the loan carried an attractive interest rate.[66] Ritchie, Wolfe, and Brownell decided to use the Properties as collateral,[67] but the Properties were located in St. Barts, a jurisdiction governed by French law. Given the complexities of granting mortgages on the Properties themselves, they also planned to include the Subsidiary Shares as collateral. At the time, that meant the shares of the Island Subsidiary, which owned the Properties.[68]

---

[64] Cicoski Tr. 241 ("It would have been common knowledge. . . . I know that I had conversations at the time with all three of them [i.e., Ritchie, Wolfe, and Brownell], and everybody knew that the BNW, which is Robert's family office, the family office was going to be providing some sort of capital for us.").

[65] *See* PTO ¶ 41; JX 433. They originally formed the entity as a Delaware limited liability company with Brownell as the sole member. JX 26.

[66] *See* McHugh Dep. 40–41.

[67] *See* Cicoski Tr. 241.

[68] *See* JX 211 at 96. Internally, Family Office personnel referred to the deal as the "St. Barts loan." McHugh Dep. 40.

### F. Cicoski Gets Involved.

In December 2022, Brownell retained a French lawyer to structure the loan in compliance with French law.[69] They sought to ensure that the Lender could foreclose on the Properties in the event of default.[70] The French lawyer advised that an authorized representative—like Cicoski—would need to sign documents for the Borrower.[71]

---

[69] Brownell used his alias when interacting with the lawyer and signed the engagement letter on the Borrower's behalf as "Robert Bigelow." JX 31.

[70] JX 32 at 13–17; *see* JX 211 at 96 (discussing "Right to foreclose" with Salazar, who was considering funding a portion of the loan at the time but later backed out); Springett Tr. 31 ("To get investors to pull money from their other positions for a four-month—for a 120-day loan, a good rate of return—risk-adjusted rate of return had to be offered."). In this litigation, Alpha and the Borrower claim that Brownell was acting on his own to accomplish a "loan-to-own" scheme so he could get the Properties for himself. They point out that Brownell controlled the Lender, was trying to ensure that the Lender could secure the Properties in the event of default, and wanted an attractive rate of return. Those facts are true, but not the spin. Brownell was trying to structure a deal that investors would fund, and no one would fund the Loan unless it provided an attractive rate of return and the Lender had the ability to obtain the Properties in the event of default. Brownell controlled the Lender at that point because he was acting as a loan syndicator and arranger to set up the transaction. If he had remained in control of the Lender, that would have benefited Ritchie, because it would mean that Ritchie's longtime friend and confidant would be in a gatekeeping position at the Lender for purposes of enforcement (somewhat analogous to a bond trustee). As events transpired, Tailwind's investors correctly perceived Brownell's involvement with the Lender as a risk for them—not Ritchie—and insisted on Springett controlling the Lender. The idea that Brownell was double-crossing Ritchie when setting up the Loan is a conspiracy theory that Ritchie and his team invented after Ritchie and Brownell had their falling out.

[71] JX 32 at 1.

Cicoski knew that Brownell and Mack were working on a loan, but his main job was managing litigation, so he had not been closely involved.[72]

In early January 2023, Ritchie and Wolfe gave Cicoski clear instructions: "Robert Brownell's family office is going to loan the money or arrange a loan. We are not concerned with the terms of the loan. Just get it done."[73] Cicoski complied.[74]

Brownell pitched the loan to his investor network, but he could not assemble the necessary financing.[75] Several factors made the transaction tough to execute. One was the short time frame. Another was Ritchie's reputation for litigiousness, which

---

[72] Cicoski Tr. 219–20, 241, 251. Ritchie typically relied on outside legal counsel for transactional matters. *Id.* at 241–42.

[73] *Id.* at 237; *see* JX 68 (Cicoski to McHugh on January 2, 2023: "In brief, the situation is this. Thane understands the need for short-term funding, wants me to put together whatever is necessary to accomplish that in the next 24-36 hours, and will work on the details with Robert this weekend."). Based on Cicoski's testimony, it appears the instructions came either through encrypted messages or "conversations" or both. *See* Cicoski Tr. 237–38.

[74] Mack took contemporaneous handwritten notes of a meeting with Brownell and others involved in the fundraising effort on January 3, 2023. JX 211 at 80. The group discussed the loan structure, the plan that the Lender would get the Properties in the event of default, and the fact that Cicoski was joining the team. *Id.* ("loan would be paid by [the Brownell family office] and [it would] own the real estate"). Cicoski was not personally present at the meeting, but someone reported that Cicoski was "willing to cooperate." *Id.* Alpha and the Borrower claim that means Cicoski would be complicit in Brownell's supposed "loan-to-own" scheme. The credible evidence shows that Cicoski was willing to cooperate as general counsel to the Family Office by taking on a lot of work to complete the Loan on a compressed timetable, even though it would distract him from his principal duties. *See* Cicoski Tr. 247–48 (describing assistance with negotiating non-economic deal terms).

[75] Some investors passed outright. Two investors, including Salazar, initially expressed interest, but they backed out. *See* JX 458 at 2.

made some investors nervous. A third was the location of the Properties in a foreign jurisdiction, which raised questions about the security.[76]

### G. Tailwind Gets Involved.

Brownell turned next to Nathan Smith, a former Family Office CFO with connections in the Caribbean private loan industry.[77] Smith contacted a friend at Tailwind, then a fledgling private lender based in the Cayman Islands that specializes in private credit. Smith's contact put him in touch with Springett, Tailwind's founder. Other than knowing who Smith was, Springett had no prior connections to Smith, Brownell, or Ritchie.[78]

Smith asked Springett to fund the transaction that Brownell and Mack had designed. Springett understood that the Borrower needed $10 million on short notice to pay off near-term debts. The Borrower would repay the loan plus 10% interest in a lump sum in 120 days. The security would be the Properties and the Subsidiary Shares.[79]

---

[76] *See* Cicoski Tr. 245.

[77] *See* Smith Dep. 9; Springett Tr. 34–35.

[78] Springett Tr. 19, 23. Springett initially knew Brownell as Bigelow. Over the course of the transaction, Springett learned Brownell's real name. *See* Springett Tr. 23.

[79] *Id.* at 18–19, 24–25; JX 458.

Springett conducted some due diligence primarily focused on the security.[80] As part of that effort, the Borrower provided an appraisal that valued the Properties well above the loan amount, and although Tailwind's internal appraisal suggested a lower value, Springett thought the purchase price for the Properties showed the security would be sufficient.[81] The Borrower also provided several years of financial statements reflecting substantial assets, although most were illiquid.[82] Tailwind also reviewed financial statements from Brownell's family office, which would guarantee the loan, and confirmed that "they also had plenty of assets."[83]

Tailwind's outside counsel assisted with due diligence and reviewed the Ritchie entities' corporate documents.[84] Tailwind also conducted "Know Your Customer" checks on the entity stack that owned the Properties—including the Island Subsidiary, the Borrower, and the Family Trustee.[85]

---

[80] Springett Tr. 28.

[81] *Id.* at 25–26; *see* JX 459 at 6.

[82] Springett Tr. 29–30; JX 250; JX 251.

[83] Springett Tr. 28–29. Brownell's family office also received an option to purchase the Loan if the Borrower defaulted. *Id.* at 66, 123; JX 459 at 5. That was not a big deal. It was the functional equivalent of the right to subrogation against a borrower that arises whenever a guarantor repays a loan, but it would enable the guarantor to enforce the Loan directly rather than indirectly.

[84] Springett Tr. 29.

[85] *Id.* Tailwind did not check the ultimate beneficiaries of the Family Trust because it received "confirmation that no beneficiary had more than 20 percent ownership in the trust." *Id.* at 28; *see* JX 364. The Family Trust has only four beneficiaries—Ritchie's wife and three children—so that is mathematically

Springett viewed the terms as appropriate given the need to raise the money on short notice and the risk associated with collateral in a foreign jurisdiction.[86] He testified credibly that stepping in to fund a pre-packaged loan was not uncommon in his business, and that Tailwind often does deals on short notice if the terms are satisfactory.[87]

Tailwind does not have committed capital that it can deploy itself. Instead, like Brownell, Tailwind has a pool of investors that it contacts on a deal-by-deal basis.[88] Springett presented the opportunity to his network, and Smith looked for other possible investors.[89]

---

impossible. Alpha and the Borrower argue that Cicoski made a false representation to Tailwind to avoid having to inform Ritchie's wife and children about the Loan, but the record does not support that theory. Cicoski testified credibly that he made the representation based on the advice of the Family Trust's counsel and because Ritchie "did not want to disclose who the ultimate beneficial owners were." Cicoski Tr. 341–50. If the blame falls anywhere, it lies with the Family Trust's trust counsel and Ritchie.

[86] *See* Springett Tr. 41–42 ("So this was a short-term deal with assets in a foreign jurisdiction, in a different language, and the rate had already kind of been established. . . . This rate is not that unusual.").

[87] Springett Tr. 40–41. Alpha and the Borrower argue that Springett should have done more due diligence and uncovered Brownell's criminal conviction. They suggest Springett went light on due diligence because the deal was too good to be true. In reality, Springett was presented with a tight timeline and had to make a business decision about how much due diligence to conduct. He made a reasonable decision. But even if he did not, that failure might give rise to potential claims by Tailwind's investors. It would not give the Borrower grounds to escape the Loan.

[88] *Id.* at 15–17.

[89] *See* JX 456 at 6–7; Springett Tr. 143–44.

## H. The Loan Authorization

Meanwhile, the lawyers turned drafts of the loan documents and consulted with experts on French law.[90] As part of the loan documentation, Tailwind asked its outside counsel to opine on the enforceability of the loan documents.[91] To give the opinion, outside counsel needed a resolution from the Borrower authorizing the transaction.[92] On January 29, 2023, Cicoski and Azzopardi executed a written consent from the Family Trustee, which controlled the Family Trust, the Borrower's sole stockholder, acting in their capacity as the only directors of the Family Trustee (the "Initial Consent"). They also authorized a guarantee from the Family Trust.[93] Ritchie and Wolfe knew about the Loan and the consent.[94]

After hearing from his investors, Springett told Brownell that they needed to modify the loan documents. The original plan envisioned a two-step transaction in which Tailwind's special purpose vehicle would loan money to the Lender, which would extend the Loan to the Borrower. Springett's investors did not want a

---

[90] *Id.* at 34; Cicoski Tr. 248–49; JX 40.

[91] Springett Tr. 148–49; JX 248 at 8, 12.

[92] Springett Tr. 176.

[93] *See* JX 33; JX 34; Azzopardi Tr. 621–22; Cicoski Tr. 262.

[94] Cicoski Tr. 264–65. At trial, Wolfe disclaimed contemporaneous knowledge of the Loan and claimed he would not have approved it. *See* Wolfe Tr. 681 ("Had it been shared with anybody else other than Brownell, who had suckered [Cicoski] into the situation, it would have been immediately called out that this is a horrendous deal and improper."); *accord id.* 682–86. Wolfe's testimony on these points was not credible; Cicoski's was. *See* Cicoski Tr. 264–65.

middleman; they wanted to loan directly to the Borrower.[95] Brownell understood their position, and the parties could have redrafted the loan documents to provide for a loan from Tailwind's entity to the Borrower. But time was short, and the lawyers had documented the Loan from the Lender to the Borrower.[96] As a timesaver, Brownell assigned all member interests in the Lender to Tailwind's vehicle, and Springett became the Lender's manager.[97] After the assignment, Brownell had no ownership interest in or control over the Lender.[98]

**I. The Loan Closes.**

On February 2, 2023, the Borrower and the Lender executed a Loan and Security Agreement (the "Loan Agreement").[99] Cicoski signed the Loan Agreement for the Borrower as its director.[100] The Loan Agreement tracked the terms Brownell

---

[95] Springett Tr. 36.

[96] *Id.* at 32–33. Redoing the paperwork would have required several days, including because some documents needed translating to or from French. *Id.*

[97] JX 35. Brownell received no consideration for the assignment. Alpha and the Borrower see the lack of compensation as suspicious, but it reinforces the reality that Brownell was acting on behalf of Ritchie to facilitate an expedited loan. He transferred the entity freely because he was trying to help his friend get a deal done.

[98] Springett Tr. 38–39.

[99] JX 248. Even before signing, because of the Borrower's urgent need for funds, one of Smith's investors transferred $900,000 to Mack's IOLTA account on January 31, 2023. Springett Tr. 55, 173; JX 39; JX 164 at 33. On McHugh's instructions, Mack wired $225,555.56 to a hard money lender to pay a loan extension fee for the Borrower, then wired the remaining $674,444.44 to Alpha. JX 38; *see* Cicoski Tr. 281–82, 424.

[100] JX 248 at 39.

and Mack had worked out in advance. The Loan consisted of a $10,000,000 advance to the Borrower, with repayment in full plus ten percent interest due in 120 days (i.e., on June 2, 2023).[101] The Loan was secured by "all of Borrower's right, title and interest in and to" the shares of stock of the Island Subsidiary,[102] plus a commitment by the Borrower to cause the Island Subsidiary to grant a mortgage or other security interest in the Properties within thirty days.[103]

The Borrower also committed to "cause [the Island Subsidiary] to change its domicile to Florida, United States of America prior to granting the mortgages on the Properties."[104] Springett viewed that commitment as a key business term.[105] The reason is obvious: it meant the situs of the shares would be in the United States and readily subject to an enforcement action in a United States court.

The Borrower executed a promissory note and pledge agreement in connection with the Loan.[106] Separately, the Borrower agreed to pay $700,000 of the proceeds to

---

[101] *Id.* §§ 2.1–2.3.

[102] *Id.* §§ 1.1, 3.1.

[103] *Id.* § 3.5 ("Within thirty (30) days of the date of this Agreement, the Borrower shall have such first lien mortgage properly recorded or registered in the records of St. Barthelemy and provide a copy of such recorded or mortgage and any attestations or affirmations as may be reasonably required by Lender affirming the first lien position of the mortgage on the [Properties] and due and proper execution of all related documents.").

[104] *Id.* § 5.3.

[105] Springett Tr. 51–52.

[106] JX 44; JX 45.

Tailwind as an underwriting fee and another $100,000 as an "Agency" fee.[107] In a side letter, the Borrower agreed to pay Brownell $2.6 million in syndication and underwriting fees.[108] The Lender was not a party to the side deal with Brownell, and Springett knew nothing about it until this litigation.[109]

### J. The Florida Subsidiary And The First Modification

On February 3, 2023, Mack filed a certificate of domestication and articles of incorporation, signed by Cicoski, to domesticate the Island Subsidiary in Florida under the name Access Management S.A.S. Inc. (the "Florida Subsidiary").[110] Meanwhile, Tailwind reported a delay in securing the $10 million and asked to modify

---

[107] JX 397 at 2–3; JX 228; Springett Tr. 128.

[108] JX 397 at 2–3.

[109] Springett Tr. 137. Alpha and the Borrower point to the high fees as an indication that Brownell was using the Loan to line his own pockets at Ritchie's expense. The fee to Brownell is high, but the record shows that Brownell was involved in many transactions with Ritchie, and they moved money around through many channels. They easily could have used those fees as one path to repay some amount that Ritchie owed Brownell. In any case, the side payment to Brownell would not affect the Loan, because Springett and Tailwind had no involvement with it. Plus, the Borrower never paid any fees to Brownell. *See* JX 397 at 2–3.

[110] JX 47; JX 57. Because the parties dispute whether the Island Subsidiary and the Florida Subsidiary are distinct, this decision strives to refer to the appropriate version and to use the term "Subsidiary" where a distinction is not warranted. The term "Subsidiary Shares" refers to the shares the Borrower posted as collateral for the Loan, no matter where the Subsidiary is domiciled. This decision ultimately finds that the Borrower committed to domesticate the Island Subsidiary in Florida such that it is now the Florida Subsidiary.

the documents to reflect that development.[111] Tailwind also asked for confirmation that Cicoski could sign the modification for the Borrower.[112]

On February 15, 2023, Cicoski and Azzopardi executed a second written consent as the sole directors of the Family Trustee that caused the Family Trust—in its capacity as the Borrower's sole stockholder—to ratify all of the actions the Borrower had taken (the "Ratifying Consent").[113] There was arguably ambiguity in the language of the Initial Consent as to whether both Cicoski and Azzopardi had to sign the Loan or whether either of them could act alone, and the Ratifying Consent sought to eliminate any concerns about the Borrower's authority to enter into the Loan and related documents.[114] The Ratifying Consent expressly empowered Cicoski to act alone and authorized the Florida domestication.[115]

The next day, the Lender and Borrower entered into a First Amendment to the Loan Agreement (the "First Modification"). It addressed the funding delay, extended the maturity date by two weeks, and reflected the Island Subsidiary's domestication in Florida as the Florida Subsidiary.[116] The Lender fully funded the second tranche

---

[111] Cicoski Tr. 280–81; *see* JX 458 at 1.

[112] *See* Cicoski Tr. 271–72.

[113] JX 49 at 1–2; Azzopardi Tr. 623–24.

[114] Cicoski Tr. 272, 383–84.

[115] JX 49.

[116] JX 50.

promptly after the First Modification.[117] On February 17, Tailwind's outside counsel wired the net proceeds of $8,849,910 on the Lender's behalf to Mack's IOLTA account.[118] Mack wired $7.1 million to Alpha and approximately $1.5 million to Brownell's family office to repay an earlier loan Brownell had secured for the Borrower.[119] The remaining $240,000 paid for legal fees and Tailwind's transaction fee.[120]

---

[117] Springett ended up sourcing the investors who provided $6.5 million of the $10 million loan, with Smith sourcing the investors who provided the rest. Springett Tr. 143–44, 181. They worked out a side deal that paid Springett a portion of Tailwind's underwriting fee. JX 228; JX 229; Springett Tr. 165 (testifying that a fee-sharing arrangement like Tailwind and Smith negotiated was "pretty normal in the business").

[118] JX 54; JX 165; Springett Tr. 56–57. The transfer reflected the full $10 million loan, less the $900,000 pre-signing payment and approximately $250,000 in transaction fees. Mack Dep. 45.

[119] JX 55; JX 56; Cicoski Tr. 281–82; Mack Dep. 76.

[120] JX 55. The following table breaks down the disbursements:

| | | |
|---|---|---|
| **Advance (January 31, 2023)** | **$ 900,000.00** | |
| Loan Extension Payment | | $ 225,555.56 |
| Alpha | | $ 674,444.44 |
| **Withheld For Lender Transaction Fees** | **$ 250,090.00** | |
| **Remaining Proceeds (February 17, 2023)** | **$ 8,849,910.00** | |
| Alpha | | $7,100,000.00 |
| Brownell Family Office / Salazar Loan | | $1,510,006.00 |
| Additional Tailwind Fees | | $ 139,914.00 |
| Tailwind Counsel Legal Fees | | $ 68,490.00 |
| Mack Legal Fees | | $ 31,500.00 |
| **Total Loan Proceeds** | **$10,000,000.00** | |

Alpha transferred at least $3.65 million of the loan proceeds to the Borrower's bank account.[121] The Borrower used the funds to pay Dominion Bank.[122] The Borrower also benefited from the loan payoff that went through Brownell. The Back Office used the rest of the funds to pay overdue bills from law firms, contractors, and other vendors.[123] The Borrower recorded a debt of $8 million on its books.[124]

McHugh and Cicoski kept Ritchie and Wolfe updated on the flow of funds.[125] "Everyone wanted to know when these funds came in. It was a signal day for us when they did."[126]

---

[121] *See* Johnston Tr. 512; JX 60. Vail testified at trial that "money was never delivered to Green Sapphire" and that "Global Capital never actually delivered money to anybody." Vail Tr. 730–31. Those statements were false. Even Vail admitted that Tailwind's counsel delivered funds to Mack. *See id.* at 731–32. And neither Vail nor Wolfe could deny that the Borrower received a benefit from the Loan. *See* Wolfe Tr. 708–09; Vail Tr. 732–33. The Borrower's general ledger and credible testimony from plaintiffs' forensic accounting expert confirm that the Borrower not only benefited from the Loan but received a portion of the proceeds in its bank account. JX 164 at 7; Johnston Tr. 512–17; *see also* Cicoski Tr. 281–82.

[122] JX 164 at 7; *see* Wolfe Tr. 708–09 (admitting that "ultimately, yes, Green Sapphire enjoyed a benefit of 3.6 to 4 million in the retirement of the debt with Dominion").

[123] Cicoski Tr. 281–82.

[124] JX 164 at 33; Johnston Tr. 510.

[125] Cicoski Tr. 282.

[126] *Id.*

### K. The Extension

When the Loan came due on June 16, 2023, the Borrower failed to pay. Neither the Borrower nor Ritchie had the money.[127] The Calma Property sale remained in limbo, and other funding sources had not panned out.[128] When the Borrower asked for an extension, Springett and his investors agreed.[129] They were not happy, but they preferred not to go through the expense and burden of a foreclosure proceeding.[130]

On June 16, 2023, the Borrower, the Lender, and the guarantors into a Second Loan Modification and Ratification Agreement (the "Second Modification").[131] It extended the Loan maturity date to October 31, 2023, and deferred payment of $1 million in past due interest to September 1, 2023. In return, Lender advanced an additional $1 million.[132]

The modification came with significant fees. The Lender received a $500,000 "Modification Fee" due at maturity, a monthly $250,000 "Maintenance Fee" starting in July 2023 and continuing until full repayment, and a $350,000 "Second

---

[127] *Id.* at 283.

[128] *See id.* at 283–85; JX 211 at 14–23.

[129] *See* JX 69 at 2.

[130] Springett Tr. 46–47, 59.

[131] JX 71. Alpha and the Borrower claim that Ritchie knew nothing about the Second Modification. Cicoski testified credibly otherwise. Cicoski Tr. 294–97. Plus Alpha produced an executed version of the Second Modification from its files, so Alpha had it. *See* JX 71 (showing Alpha Bates number); Yuskus Tr. 663–64.

[132] JX 71 at 3.

Underwriting Fee."[133] Brownell was to receive a $500,000 "Guaranty Fee" for continuing to guarantee the Loan, but he never got it.[134] The Borrower also paid the Lender's legal fees.[135]

The additional $1 million advance went to pay past due fees from the original Loan and a portion of the additional fees: $525,000 covered overdue Tailwind's underwriting and agency fees and a portion of the Second Underwriting Fee; $250,000 covered the first Maintenance Fee; and $105,000 covered the Lender's legal fees.[136] The remaining $120,000 went to Mack's IOLTA account for the Borrower's benefit.[137]

As Springett acknowledged, those fees were high. But Tailwind and its investors had provided a distressed entity with funds on short notice that it otherwise could not obtain, and the Borrower had now shown that it could not repay in accordance with the original terms. The fees compensated the Lender for the additional risk of the extension, and the Maintenance Fee was designed to incentivize

---

[133] *Id.* at 4.

[134] *Id.*

[135] *Id.*

[136] JX 79 at 3; Springett Tr. 63–65. The Borrower had only paid $350,000 of Tailwind's original underwriting fee. JX 397 at 2–3. It still owed Tailwind $450,000 to cover the remainder of its original underwriting and agency fees. *Id.*; Springett Tr. 65. Brownell had not been paid any fees he was supposed to receive, and he did not receive any money from the Second Modification. *See* JX 397 at 2–3. Separately, Tailwind and Brownell extended the option to acquire the loan. JX 474.

[137] JX 79 at 3; JX 80.

prompt repayment.[138] Cicoski did not like the deal but believed the alternatives were worse. He thought that if the Lender foreclosed, it could create another liquidity crisis.[139]

### L. Ritchie Creates Greater Dysfunction.

During 2023, Ritchie grew increasingly difficult and unpredictable.[140] Cicoski, McHugh, and Azzopardi had tried to improve the Family Office's internal processes and governance, but they met with little success.[141] Instead, Ritchie terminated McHugh and replaced her with Tim Yuskus, a longtime employee who had worked for Ritchie in support roles since 2003.[142] Around the same time, Ritchie stopped paying his team, including Cicoski and Azzopardi.[143] Azzopardi was fed up and decided to resign.[144]

---

[138] Springett Tr. 63–65, 122.

[139] *See* Cicoski Tr. 290–91.

[140] *Id.* at 253.

[141] *See* JX 78 at 3 ("If this organization is going to continue—we have to focus and cut projects until 1 or more turns cash flowing . . . . We have 15+ projects over the world. All great opportunities. But we don't have the resources (people and cash) to support[.]"); Azzopardi Tr. 624–26.

[142] Cicoski Tr. 254–55; Yuskus Tr. 645–50.

[143] Cicoski Tr. 355, 358; Azzopardi Tr. 599–601; JX 367; JX 348.

[144] Azzopardi Tr. 627–28; Cicoski Tr. 254–255 (Azzopardi was resigning in part because "Thane had reneged on a contractual commitment [Cicoski] made to him."); JX 349.

The closing of the Calma Property sale created a moment of hope.[145] Ritchie's team had earmarked those funds to repay the Loan, but Ritchie transferred them elsewhere.[146] The Family Office faced another liquidity crisis.[147]

**M. The Borrower Defaults.**

When the extended Loan matured again on October 31, 2023, the Borrower could not repay it. Cicoski had to decide between taking a hard line and forcing the Lender to sue or working out a compromise. As Cicoski explained at trial, he believed the latter option was the better choice:

> I felt an obligation to honor a contract that I had signed, as bad as it was, and I didn't believe that it was right to have the lender chase us all over the earth, spend years in litigation—I had already seen that too many times with this organization and the destruction that it caused. . . . We did not have the money. We could not repay it. We were in default. They had the right to foreclose. I wanted to prevent that. I thought the assets were worth much more than what we currently could do. I just did not think the nuclear option of litigation at that point was viable.[148]

He therefore tried to negotiate a settlement.[149]

---

[145] Cicoski Tr. 291.

[146] *Id.*; Wolfe Tr. 685.

[147] Cicoski Tr. 291–92.

[148] *Id.* at 293–94.

[149] *Id.* at 302–03.

Springett also preferred a settlement.[150] But he was not sure Ritchie could be trusted given his failure to pay a second time.[151] Brownell's family office likewise had not come through on its guarantee, nor had it taken out Tailwind by purchasing the Loan.[152] The Tailwind investors wanted their money back.[153]

After weeks of negotiation over a standstill agreement, the Lender sent the Borrower a notice of default on December 12, 2023.[154] The notice gave the Borrower twenty-four hours to accept the Lender's standstill agreement or the Lender would foreclose.[155]

When the Borrower failed to agree, the Lender seized the Subsidiary Shares on December 15, 2023, then acted by written consent to remove Cicoski and make Springett its sole director.[156] Cicoski continued to negotiate. With the Borrower

---

[150] Springett Tr. 46, 68–69.

[151] *Id.* at 61.

[152] *Id.* at 66–67.

[153] *See* JX 486.

[154] JX 89. During this time, Tailwind explored what a foreclosure sale would involve. Springett Tr. 27. As part of that process, Springett learned that the original appraiser's figures had been altered and that the value of the Properties was "way lower" than the Borrower's initial appraisal, though still adequate to cover the loan. *Id.* at 27–28; *see* JX 243; JX 245.

[155] JX 89 at 2.

[156] JX 90; JX 91; JX 92. The Lender's "biggest concern" was preserving its collateral. Springett Tr. 75–76 ("[W]e had already seen that Thane Ritchie could go in the bank account and take stuff, take money from it. So this put us in protect your collateral.").

lacking any near-term ability to repay the Loan, Cicoski sought to stop interest and fees from accruing and avoid costly litigation.[157]

On February 7, 2024, the Borrower and Lender entered into a Loan Settlement Agreement (the "Settlement Agreement").[158] Cicoski signed it for the Borrower, and Brownell for the guarantor.[159]

The Lender understood the Settlement Agreement to confirm that it had acquired ownership of the Florida Subsidiary and the Properties.[160] The Settlement Agreement also provided for the Borrower to pay a $335,000 fee to Tailwind plus a "Lender Settlement Fee" of $1,665,000 "to settle any and all claims Lender may have under the Loan Documents."[161] The Borrower committed to pay these fees using shares of stock in a company called Proton Green, rather than in cash.

On February 9, 2024, the parties signed an amendment to the Settlement Agreement. The amendment included a provision stating that, "Borrower relinquishes any residual rights or claims it may have to the Subsidiary Shares to Lender."[162]

---

[157] Cicoski Tr. 440–41.

[158] JX 94.

[159] *Id.* at 7.

[160] Springett Tr. 76–77.

[161] JX 94 at 2–3.

[162] JX 95 at 2.

### N. Things Fall Apart.

To help Ritchie with his financial crisis, Brownell had not only structured the Loan. He had also loaned Ritchie millions of dollars of his own money. Ritchie never paid any of it back, and tensions grew between them.[163]

On February 7, 2024, Brownell's lawyers severed his ties with Ritchie, the Family Trust, and its affiliates.[164] He also informed Ritchie that he would not be providing any additional financial support.[165]

Brownell's line in the sand put Ritchie in a bind. He had relied on Brownell for years, not only for money but also as a dealmaker. Two days later, Ritchie fired back, writing:

> 60 Degrees [i.e., the Back Office] continues to weigh the damages caused by your clients' behavior. However, we specifically point your attention to the fact that the Brownell Parties, as recently as four days ago, represented to 60 Degrees that they were continuing to lead a number

---

[163] Cicoski Tr. 254 ("[T]here was also the strain that the [Brownell] Family Office had lent Mr. Ritchie millions and millions of dollars, and, in fact, in December of '23 would lend another million dollars to Mr. Ritchie to pay a significant IRS portion of what was to be settled. So even in late '23 he was dropping off checks for a million dollars, but to the best of my understanding, those monies were not repaid. . . . And Robert's family I think had put a lot of pressure on him to recover some of the sums that were due.").

[164] JX 279. Brownell also may have become uncomfortable with some of Ritchie's new associates and recent behavior. *See* Cicoski Tr. 254 ("And, frankly, [Ritchie] had started to surround himself with people who were not people that I was comfortable with and I think that Robert, in particular, was uncomfortable with. . . . And I suspect that Robert also had learned what I learned in the February, March time frame about what happened at the house in Driftwood that Thane used to live at, which is what precipitated my own resignation."); *see also id.* at 260–61.

[165] JX 279.

> of important transactions involving sales and monetization of certain 60 Degrees' assets (the "***60 Degrees Transactions***").
>
> Your client's abrupt and unilateral termination of its relationship with 60 Degrees, without reasonable notice or any effort whatsoever to transition their roles leading the 60 Degrees Transactions, has jeopardized the viability of these transactions. In short, 60 Degrees has been left scrambling to understand the status of the 60 Degrees Transactions to ensure that they, despite your clients' reckless and damaging behavior, close these transactions without incurring further damages.[166]

Those transactions included selling property in Texas. According to Wolfe, Brownell told Ritchie that the property would sell for $96 million.[167] After Brownell cut ties, Ritchie learned the property had sold for around $40 million.[168]

These events caused Ritchie to suspect that Brownell had defrauded him, and he ordered Vail to dig into every transaction that Brownell had touched.[169] Fueled (at a minimum) by resentment born of circumstance, Ritchie, Vail, and Wolfe constructed a narrative in which Brownell had been double-crossing Ritchie for years. They decided that Brownell had paid off Cicoski to participate in the conspiracy and that the Loan was another example of Brownell's disloyalty.

On February 10, 2024, Ritchie called Azzopardi and told him that Brownell and Cicoski had been conspiring against him for over a year. Azzopardi had approved

---

[166] JX 280 (formatting modified).

[167] Wolfe Tr. 713.

[168] *Id.*; Vail Tr. 725.

[169] Vail Tr. 725–27.

some of their actions as a director, including the Loan. Ritchie berated Azzopardi for his involvement and blamed him for the results.

Azzopardi was shocked.[170] Ritchie always kept him at arms' length, and Azzopardi had relied on Cicoski for information about what Ritchie wanted. Azzopardi had never doubted Cicoski.[171] Now, Ritchie was telling him something very different and accusing him of wrongdoing.

But Azzopardi had his own beef with Ritchie over money, and Azzopardi had resigned from his positions in Ritchie's organization because Ritchie had not paid him.[172] Then, on February 14, a €15,000 payment from Ritchie appeared in Azzopardi's bank account.[173] The bank halted the payment as suspicious and asked for documentation. After checking with Ritchie's team, Azzopardi sent the bank his old consulting agreement, even though it was no longer operative, and the bank released the payment.[174]

With the money issue addressed, Wolfe stepped in to get Azzopardi back on Ritchie's side. Ritchie and Wolfe's bad-cop/good-cop tactics worked. Azzopardi blamed

---

[170] Azzopardi Tr. 586.

[171] *Id.* at 582–83 (Q: "At the time that you're describing that you're in communication with Mr. Cicoski, did you have any reason to distrust what he was telling you?" A: "No, not at all. In fact, like I said, I considered him as a breath of fresh air.").

[172] *Id.* at 586–87, 614, 627.

[173] *Id.* at 634–35, 638; JX 282.

[174] Azzopardi Tr. 638; JX 282; JX 356.

himself for facilitating Brownell and Cicoski's supposedly insidious actions, writing Wolfe: "I'm in a deep dark hole. I'm afraid I might do something to harm myself."[175] After telling him not to do anything harmful, Wolfe offered a way out, writing: "Thane is remarkably forgiving where there is contrition . . . [a]nd willingness to help[.]"[176]

Ritchie and Wolfe convinced Azzopardi to support their conspiracy theories. Azzopardi agreed to do "everything [he] could to help establish a case" and handed over all of his communications with Cicoski and Brownell.[177] He never spoke with Cicoski, despite Cicoski's attempts to reach him. He simply "took Thane's word for it."[178]

**O. Cicoski Resigns.**

As the Family Office became more dysfunctional, Cicoski was preparing to resign.[179] Shortly after executing the Settlement Agreement, he learned about of

---

175 JX 357 at 3.

176 Ritchie and Wolfe played two other cards to bring Azzopardi over to their side. They stressed that Cicoski had received significantly more money than Azzopardi, which Azzopardi resented (even though Cicoski was performing full-time work, and Ritchie had not paid Cicoski in months). *See* Azzopardi Tr. 600–05; JX 36. They also capitalized on Azzopardi's faith by comparing Brownell to "Lucifer" and telling Azzopardi, "This is not just a legal battle[.] . . . It is at its heart a spiritual battle[.]" JX 357 at 4.

177 Azzopardi Tr. 634.

178 *Id.* at 619. At trial Azzopardi testified that "at the time [he] thought [Ritchie] was being told" about the Loan, but that he has now come to "understand" otherwise. *Id.* at 615, 619. His "understanding" came from Ritchie.

179 Cicoski Tr. 399; JX 101.

events at a Texas property held through an entity where Cicoski served as the sole manager:

> I got a note in February or March from the tenant there. I was the—like I had explained earlier, I'm the sole manager of this entity and it holds a house in Driftwood, Texas where Thane used to live. We were renting it out to a former NFL offensive lineman and his family. Apparently, they had not paid the rent. I think they missed maybe one rent payment. So someone sent four people to the house. They assaulted the tenant's daughter, they trespassed on the property. The police were called.
>
> And I got a call from the tenant and he said, "Did you send these people?" And I said, "No, but I'm the sole director." So this is a problem. And so he was pressing charges. I just had a feeling who it was who had done this.
>
> And then a few weeks later I got a notice that there was a raid by the ATF on the property and they pulled eight tons of ammo and 13 high-caliber weapons, something like that, and they were all seized from the property. And the search warrant was in Mr. Ritchie's name. I was already resigning at that point, and when I got notified that that had happened, it sort of sped up my resignation, shall we say.[180]

On February 27, 2024, Cicoski formally resigned from all positions in the Family Office.[181] Wolfe and Vail became the Borrower's directors.

## P. The Attempted Renovations

Meanwhile, the Lender planned to sell the Properties to recoup its losses and repay its investors. Springett decided to renovate the villa first and hired an architect.[182] Because the villa sits on environmentally sensitive land, securing a

---

[180] Cicoski. Tr. 255–56.

[181] JX 101.

[182] Springett Tr. 84–85.

building permit is difficult, but the Borrower had an existing permit from July 2020.[183]

In April 2024, Springett applied to transfer the building permit to the "Access Management S.A.S. Ltd."[184] That name corresponds neither to the old Island Subsidiary nor to its post-domestication incarnation as the Florida Subsidiary. Springett intended to transfer the property to the Florida Subsidiary, but he made a mistake.[185] The local authority granted the application.

But when the Lender and Florida Subsidiary tried to take possession of the Properties and start renovations, the Borrower filed suit in Guadeloupe claiming that the initial transfer of the Properties in 2022 was invalid (the "Guadeloupe Civil Action").[186] Next, the Borrower filed a criminal complaint with the Guadeloupe public prosecutor charging that the Loan resulted from fraud.[187] Vail filed a supporting affidavit in which he held himself out as a practicing lawyer (he had not practiced since 2013) and averred that the complaint's allegations resulted from a forensic

---

[183] JX 15; *see* Springett Tr. 101.

[184] JX 115.

[185] Springett Tr. 160–61; *see* Fornacciari Tr. 217 (Plaintiffs' French law expert: "For me, there was no doubt that the application was made by Mr. Springett for Access Management S.A.S., Inc. [i.e., the Florida Subsidiary]."). Alpha claims that the application transferred the permit to the Island Subsidiary, but the entity name on the application did not match its name either. Plus that entity no longer existed. It had domesticated in Florida as the Florida Subsidiary.

[186] JX 117; JX 116; Springett Tr. 92–93.

[187] JX 133; JX 132.

examination (he has no forensic qualifications).[188] Although the Guadeloupe prosecutor did not pursue the claims, the Borrower sent the complaint to the St. Barts local authorities and claimed to be "facing serious, malicious attempts by third parties to illegally appropriate its immovable properties."[189]

The Lender tried to move forward with the renovations, and construction began in July 2024. But in August 2024, the Borrower exercised self-help by changing the locks on the property entrance and sending the architect cease-and-desist letters.[190] Construction came to a halt.[191]

## Q. This Litigation

On August 22, 2024, the Lender and the Florida Subsidiary filed this lawsuit against the Borrower. They asserted claims for breach of contract, defamation, tortious interference with contract, and tortious interference with business expectancy. The Borrower moved to dismiss the plaintiffs' complaint in its entirety.

On September 12, 2024, the Borrower purported to change the name of the Island Subsidiary to Vue Mer Signature Holdings and to appoint Vail as its chairman.[192] The Borrower claimed that Island Subsidiary still existed as a distinct

---

[188] JX 130; *see* Vail Tr. 736–39.

[189] JX 136; *see* Springett Tr. 98–99.

[190] JX 157 at 3–5; Springett Tr. 90–91.

[191] Springett Tr. 90–91; JX 157; *see also* JX 148.

[192] JX 258.

entity and that the domestication to Florida was ineffective.[193] On December 11, the Borrower dismissed the Guadeloupe Civil Action on the theory that it had regained control of the Island Subsidiary, which supposedly owned the Properties.[194]

The Lender responded by filing an application in a St. Barts court for the equivalent of a *lis pendens*. The St. Barts court denied the application, citing a forum selection clause in the Loan selecting the courts of Delaware. The Lender then moved in this court for a status quo order and expedited proceedings.[195] The Lender was justifiably concerned that the Borrower was trying to deprive the Lender of its collateral and wanted to move quickly before the existing building permit expired. On February 6, 2025, the court granted the Borrower's motion to dismiss the defamation and tortious interference claims, denied the motion to dismiss the breach of contract claim, granted expedition, and issued a status quo order.[196] The court later entered a scheduling order contemplating a two-day trial starting June 9, 2025.[197]

On March 12, 2025, Alpha moved to intervene as a third-party plaintiff. The Borrower supported Alpha's intervention, claiming that "[t]here is no basis for Plaintiffs' assertion that Alpha Carta and Green Sapphire are affiliates with common

---

[193] *See id.*; Springett Tr. 99–100.

[194] JX 150 at 13.

[195] Dkt. 13; Dkt. 15.

[196] *See* Dkt. 27.

[197] Dkt. 32.

owners" and representing that "Thane Ritchie does not control the Petro Carta Trust (Green Sapphire's sole stockholder)."[198] Those statements were false. Not yet understanding the true relationship between Alpha and the Borrower, the court granted intervention.

Alpha then filed a third-party complaint asserting eight counts, including fraudulent transfer and breach of contract.[199] Vail verified the complaint on behalf of Alpha. Vail was simultaneously a director of the Borrower. One of the allegations in Alpha's verified complaint asserted that Alpha had demanded that the Borrower repay a loan. In fact, Alpha had never demanded repayment, so that averment was false.[200]

The Borrower and Alpha obstructed discovery and failed to meet deadlines. In response to a motion to compel, the court appointed a special discovery magistrate.[201] She reported that the Borrower's "conduct reflected an overall lack of transparency and inability to follow through on its commitments to the other parties, let alone meet discovery deadlines."[202]

---

[198] Dkt. 65 at 4.

[199] Dkt. 67.

[200] *See* Yuskus Tr. 660; Azzopardi Tr. 610.

[201] Dkt. 88; Dkt. 112.

[202] Dkt. 288 at 3.

The Borrower also stopped paying its counsel. The court allowed counsel to withdraw and required substitute counsel to appear by May 16, 2025, or the court would find the Borrower in default.[203] On May 14, rather than hire new Delaware counsel, the Borrower filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois, automatically staying this litigation. That was a tactical choice, because despite suing the Borrower, Alpha continued to advance hundreds of thousands of dollars of funds to the Borrower, and some of that money could have been used to pay counsel.[204]

Between May 23 and June 3, 2025, with Wolfe's authorization, Yuskus modified hundreds of entries in the Borrower's general ledger.[205] He changed entries related to Alpha's advances from "accounts payable" to "notes payable."[206] He also added new entries for "accrued interest payable to Alpha Carta" for 2018 to 2025.[207] Yuskus claimed to be unaware of any loan agreement with Alpha before early 2025 and asserted he was merely trying to document the loan relationship.[208]

---

[203] Dkt. 105.

[204] *See* JX 164 at 4; Yuskus Tr. 661, 663.

[205] *See* JX 169 at 24–25; Johnston Tr. 497–500; Wolfe Tr. 710–11.

[206] JX 169 at 24–25; Johnston Tr. 500; Yuskus Tr. 659.

[207] Yuskus Tr. 659; Johnston Tr. 500.

[208] Yuskus Tr. 658–59.

The Lender and the Florida Subsidiary sought relief from the automatic stay to pursue this action. The bankruptcy court granted their request.[209]

On July 1, 2025, the court entered a stipulated scheduling order providing for trial at the end of August.[210] The next day, the Borrower removed the case to the United States District Court for the District of Delaware, claiming this action was "related to" the bankruptcy proceeding.[211] The district court remanded the case a day later.[212]

The Borrower continued to resist discovery, leading to a second motion to compel.[213] The court set a deadline for any opposition.[214] Rather than responding, the Borrower filed a *second* notice of removal based on the same grounds as the first.[215] The district court promptly remanded the case again.[216]

On August 5, 2025, the plaintiffs moved to compel Ritchie's in-person deposition. The court granted the plaintiffs' motion and ordered Ritchie to appear

[209] Dkt. 118.

[210] Dkt. 134.

[211] Dkt. 139, Ex. at 5.

[212] Dkt. 154.

[213] *See* Dkt. 167; Dkt. 180.

[214] Dkt. 169.

[215] Dkt. 171.

[216] Dkt. 192.

within 48 hours. Ritchie's counsel represented that he was outside the United States and would not come to the United States for deposition or trial.[217] He gave his deposition by Zoom.

Trial took place on August 20–22, 2025. Ritchie did not attend.

In an earlier lawsuit, a judge in the Circuit Court of Cook County, Illinois, offered the following comment on Ritchie's litigation conduct: "My not-so-brief time overseeing this case tells me that Mr. Ritchie, through his various companies and through his counsel . . . attempted to do nothing short of sowing anarchy in the civil justice system."[218] The court's experience has been much the same.

## II. THE NON-MERITS DEFENSES

The Borrower seeks to achieve a non-merits victory by raising a series of pre-emptive defenses: lack of subject matter jurisdiction, failure to name an indispensable party, and lack of personal jurisdiction.

### A. The Lack Of Subject Matter Jurisdiction Defense

The Borrower's first non-merits defense contends that the court lacks subject matter jurisdiction. The Lender asserted a claim for breach of contract, with equitable jurisdiction grounded on its pleading-stage request for injunctive relief and current request for specific performance. The Borrower says those requests "came far too late

---

[217] *See* Dkt. 254 at 4, 6.

[218] *Ritchie Multi-Strategies Glob., LLC v. Huizenga Managers Fund, LLC*, Case. No. 18-CH-6001, at 57–58 (Ill. Cir. Ct. Cook Cty. Aug. 26, 2019) (TRANSCRIPT) (JX 7).

procedurally" and cannot support jurisdiction because a declaration of breach plus an award of money damages would provide complete relief.[219] Contrary to the Borrower's contention, the court can exercise subject matter jurisdiction over this dispute.

The Court of Chancery possesses limited subject matter jurisdiction. The court "can acquire subject matter jurisdiction in the first instance by three different means: (1) the invocation of an equitable right; (2) a request for an equitable remedy when there is no adequate remedy at law; or (3) a statutory delegation of subject matter jurisdiction."[220] "The party seeking the Court's intervention bears the burden of establishing jurisdiction."[221]

A party can challenge the court's subject matter jurisdiction at any point in the proceeding.[222] A court generally determines whether it has subject matter jurisdiction by looking at the face of the complaint and accepting the allegations as true.[223] But when evaluating whether subject matter jurisdiction exists based on a request for

---

[219] Dkt. 277 at 9.

[220] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 973 (Del. Ch. 2016) (internal quotation marks omitted).

[221] *Shore Invs., Inc. v. BHole, Inc.*, 2009 WL 2217744, at *2 (Del. Ch. July 14, 2009).

[222] *See Imbragulio v. Unemployment Ins. Appeals Bd.*, 223 A.3d 875, 878 (Del. 2019) ("A litigant may raise a court's lack of subject matter jurisdiction at any time in the same civil litigation, even initially at the highest appellate instance." (cleaned up)).

[223] *Diebold Comput. Leasing, Inc. v. Com. Credit Corp.*, 267 A.2d 586, 590 (Del. 1970).

equitable remedies, the court "must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim."[224] That means "a judge in equity will take a practical view of the complaint, and will not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists but where the plaintiff has prayed for some type of traditional equitable relief as a kind of formulaic 'open sesame' to the Court of Chancery."[225] This court will not exercise subject matter jurisdiction when a remedy at law "will afford the plaintiffs full, fair and complete relief,"[226] meaning it will be as "complete, practical and efficient" as equitable relief.[227]

Here, the Borrower maintains that the Lender only sought damages for its breach of contract claim, asserts that "[s]pecific performance is mentioned nowhere in the Complaint," and argues that equitable relief is unnecessary.[228] The Borrower reads the complaint too narrowly. Among other relief, plaintiffs' complaint sought a

---

[224] *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004).

[225] *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991); *see* 10 *Del. C.* § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."); *El Paso Nat. Gas Co. v. TransAmerican Nat. Gas Corp.*, 669 A.2d 36, 39 (Del. 1995) (same).

[226] *Hughes Tool Co. v. Fawcett Publ'ns, Inc.*, 315 A.2d 577, 579 (Del. 1974).

[227] *Int'l Bus. Machs.*, 602 A.2d at 85.

[228] Dkt. 277 at 4.

judgment "[p]reliminarily and permanently enjoining [the Borrower] from taking any action to interfere with [the Lender's] ownership of [the Florida Subsidiary] and the [Properties]."[229]

"A request for injunctive relief clearly constitutes equitable relief over which this Court has jurisdiction,"[230] as long as the request is "bona fide."[231] Here, the request was bona fide. The Borrower refused to recognize the Lender's rights to either the Properties or the Subsidiary Shares. The Borrower changed the locks on the Properties, sent cease-and-desist letters to the architect, filed legal proceedings in Guadeloupe, and created confusion over which manifestation of the Subsidiary—the Island Subsidiary or the Florida Subsidiary—continued to exist or whether they were distinct entities. The Lender legitimately requested equitable relief to stop the Borrower from evading its obligations and complicating the factual landscape. The Lender also legitimately sought equitable relief to force the Borrower to comply with its obligations and undo the mess it had created.

The Borrower objects to the Lender's reliance on its request for injunctive relief because the Borrower links that request to the Lender's claim for tortious interference, which the court dismissed. The Borrower seems to have fixated on the

---

[229] Dkt. 1 at 23.

[230] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *2 (Del. Ch. Nov. 5, 2004); *see Cont'l Auto. Sys., Inc. v. Nokia Corp.*, 2023 WL 1370523, at *21 (Del. Ch. Jan. 31, 2023).

[231] *DBMP LLC v. Del. Claims Processing Facility, LLC*, 2025 WL 3013006, at *8 (Del. Ch. Oct. 24, 2025).

request for an injunction against "interference" and assumed that linguistically, that word must relate to the claim for tortious interference. But the request for relief was not limited to that count. The Lender sued for breach of the Settlement Agreement and sought equitable relief to force the Borrower to comply with its terms. The Borrower had interfered with the Lender's rights in the colloquial sense, and the Lender wanted injunctive relief that would stop the Borrower from interfering and force the Borrower to comply.

The Borrower's fixation on the complaint's failure to use the explicit words "specific performance" is also misguided. Nothing in the Court of Chancery Rules requires that a party plead specific performance as a remedy, and the court determines the appropriate remedy after a party prevails, not at the pleading stage.[232] Just as pleading certain "magic words" like "injunction" or "specific performance" does not automatically open the door to the Court of Chancery,[233] the

---

[232] *See, e.g.*, *Delawareans for Educ. Opportunity v. Carney*, 199 A.3d 109, 178 (Del. Ch. 2018) (declining to rule on remedies at the pleading stage, writing that "[w]hether and what kind of remedy issues should be addressed at a future date"); *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *17 (Del. Ch. Jan. 12, 2015) ("At the pleadings stage, the court will not rule out the possibility of other remedies, such as rescissory damages.").

[233] *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987) (Allen, C.) ("Chancery jurisdiction is not conferred by the incantation of magic words. . . . If a realistic evaluation leads to the conclusion that an adequate remedy is available this court . . . will not accept jurisdiction over the matter."); *accord Cochran v. F.H. Smith Co.*, 174 A. 119, 121 (Del. Ch. 1934) (Wolcott, C.) ("It appears sometimes to be thought that if fraud be present in any situation the *open sesame* has been found upon the pronouncing of which the doors of equity are flung wide apart. That is a misconception.").

failure to use talismanic remedial phrases does not prevent the court from exercising jurisdiction when the complaint supports the potential need for an equitable remedy.[234] Here, in addition to specific items of relief, the complaint requests "such other and further relief as the Court deems just and proper."[235] To the extent a linguistic remedial hook is necessary (a dubious pleading proposition), that phrase "could encompass, in an appropriate case, an award of specific performance."[236] The complaint's allegations provide ample basis to believe a decree of specific performance could be warranted, making this "an appropriate case."

---

[234] *See Carpenter v. Liberty Mut. Ins. Co.*, 2023 WL 3454692, at *3 (Del. Ch. May 15, 2023) (noting that the complaint did not contain a request for specific performance, but dismissing complaint for lack of jurisdiction because the complaint failed to support an inference that specific performance would be needed, not because the complaint did not contain those words); *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *2 (Del. Ch. Mar. 21, 2018) (declining to exercise subject matter jurisdiction where the plaintiff both did not expressly seek specific performance and had not otherwise "attempted to demonstrate that the remedy is appropriate"), *aff'd*, 210 A.3d 705 (Del. 2019).

[235] Dkt. 1 at 23.

[236] *Ravenswood*, 2018 WL 1410860, at *24; *see, e.g.*, *Sheet Metal Workers' Int'l Ass'n Loc. 19 v. Herre Bros., Inc.*, 201 F.3d 231, 249 (3d Cir. 1999) ("In its amended complaint, the Union requested money damages representing lost wages and fringe benefits, a declaratory judgment, and such other relief as the Court deems just and reasonable. . . . As a result, we believe that the request for relief in the amended complaint is broad enough to encompass a request for specific performance, especially in light of the actual request made in a post-trial brief." (alteration and internal quotation marks omitted)); *Int'l Union of Elevator Constructors, AFL–CIO v. Reg'l Elevator Co.*, 847 F. Supp. 2d 691, 701 (D. Del. 2012) ("Because Plaintiffs' Complaint did request that the Court grant other such relief deemed just and proper, Plaintiffs' claim for specific performance is appropriately raised." (alteration and internal quotation marks omitted)).

If the Lender sprang the specific performance remedy on the Borrower at the last minute, then concern for due process could counsel against recognizing it as a basis for jurisdiction.[237] But this case does not involve the type of extreme facts that would warrant that outcome. Here, it has long been clear that specific performance was on the table.

Finally, this is not a case where a declaration of breach plus an award of money damages could provide an adequate remedy. Telling the Lender that it could only recover a money judgment would effectively deprive the Lender of the security it obtained and turn the Lender into an unsecured creditor. The Lender bargained for

[237] *See Ravenswood*, 2018 WL 1410860, at *25 (refusing to consider awarding specific performance in light of "[p]laintiff's basic failure meaningfully to address the remedy question at any stage of these proceedings," which "created a vacuum that the Court cannot fill, even in the spirit of equity, without offending fundamental notions of due process").

the ability to foreclose on real estate,[238] a unique asset,[239] or on the shares of an entity that owned unique real estate assets.[240]

**B. The Indispensable Party Argument**

The Borrower next argues that the court cannot grant relief involving the Properties because the Island Subsidiary is an indispensable party under Rule 19. It is not.

Rule 19 treats a party as indispensable if

> (A) in that person's absence, the Court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

---

[238] The Borrower provided two forms of security for the Loan: (1) a security interest in the shares of the Island Subsidiary (initially) and the Florida Subsidiary (subsequently) and (2) a commitment to provide mortgages on the Properties themselves. The Borrower provided the first type of security because of the difficulties in perfecting mortgages under French law in time for the Loan to close. The real security for the Loan is the Properties.

[239] *See Osborn v. Kemp*, 991 A.2d 1153, 1162 (Del. 2010) ("We recognize that real property is unique and often the law cannot adequately remedy a party's refusal to honor a real property contract."); *Szambelak v. Tsipouras*, 2007 WL 4179315, at *7 (Del. Ch. Nov. 19, 2007) ("Real property is unique; thus, specific performance of a real estate sale contract is often the only adequate remedy for a breach by the seller, except in rare circumstances.").

[240] *See True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 45 (Del. Ch. 1997) (explaining that opportunity to acquire entity was unique opportunity that rendered money damages inadequate); *accord ACE Ltd. v. Cap. Re Corp.*, 747 A.2d 95, 110 (Del. Ch. 1999) (noting that "the loss of a unique acquisition opportunity may constitute an irreparable injury" that renders monetary damage inadequate (internal quotation marks omitted)).

> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.[241]

If an indispensable party cannot be joined, then a court must determine how to proceed. The court need not undertake that inquiry, because the Island Subsidiary is not an indispensable party.

For starters, the Island Subsidiary no longer exists. Under Florida law, a domesticated foreign corporation is "[t]he same corporation, without interruption, as the domesticating corporation."[242] In addition, "[a]ll real property and other property owned by the domesticating corporation . . . are the property and contract rights of the domesticated corporation without transfer, reversion, or impairment."[243] In this case, the Borrower committed to "cause [the Island Subsidiary] to change its domicile to Florida, United States of America" before granting the mortgages that secured the Loan.[244] In compliance with that obligation, the Borrower redomiciled the Island Subsidiary in Florida, resulting in the Island Subsidiary becoming the Florida Subsidiary. There is no longer an Island Subsidiary that could be a party to the case. The only extant entity is the Florida Subsidiary, which is a plaintiff.

---

[241] Ct. Ch. R. 19(a).

[242] Fla. Stat. § 607.11924(1)(f)(1).

[243] *Id.* § 607.11924(1)(a).

[244] JX 248 § 5.3.

The Borrower contends that the Island Subsidiary continues to exist and that it has changed its name to Vue Mer Signature Holdings. The fact that the Borrower made a false filing on a foreign corporate registry that changed the name of an already domesticated corporation does not change the fact that the domestication took place. It reflects a clerical error.

Assuming for purposes of analysis that the domestication was not effective, then the present state of affairs results from the Borrower's failure to comply with its domestication obligation under the Loan and breach of the Settlement Agreement. "Equity regards as done what ought to have been done."[245] That principle creates an equity in favor of a party entitled to performance when the counterparty fails to perform and then invokes its own failure as a defense to its obligations.[246]

---

[245] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1030 (Del. Ch. 2020) (refusing to allow defendants to take advantage of their failure to take contractually mandated action as a way to avoid the contractual obligation).

[246] *See Freeman v. Fabiniak,* 1985 WL 11583, at *8 (Del. Ch. Aug. 15, 1985) ("Because equity regards as done that which ought to be done, a contract for sale of land, chattels, or choses in action acts as an equitable conversion. . . . Therefore, once Atlantic Financial exercised its option on March 8, 1985, the equitable ownership of the shares passed to it. The shares could not thereafter be voted hostile to the interests of Atlantic Financial."); *Eddington v. Turner*, 26 A.2d 80, 82 (Del. Ch. 1942) (explaining principle). The principle resembles the prevention doctrine, under which a party cannot avoid performing by relying on the failure of a condition that the party itself caused to fail. *Compare Phillips Petroleum Co. v. Arco Alaska, Inc.*, 1986 WL 7612, at *14 (Del. Ch. July 9, 1986) (relying on equitable maxim and holding that "[t]o permit SAE to circumvent a Data Cutoff Agreement that would otherwise be applicable by allowing it to rely upon the non-occurrence of a procedural formality that SAE itself deliberately chose to preclude, would be unconscionable"), *with Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) (explaining that under the prevention doctrine, "a party may not escape

Matters do not get better for the Borrower without the equitable maxim. The Island Subsidiary is not indispensable under Rule 19(a)(1)(A) because the court can "accord complete relief among existing parties."[247] The court can order the Borrower to transfer all of its shares in the Island Subsidiary to the Lender. If necessary, the court can appoint a receiver to take control over the Borrower and effectuate the transfer.

The Island Subsidiary is also not indispensable under Rule 19(a)(1)(B), because resolving this action without the Island Subsidiary as a party would neither "impair or impede [its] ability to protect the interest" nor "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of [the Island Subsidiary's] interest."[248] For purposes of the first issue, the Borrower can and has adequately represented any interests the Island Subsidiary might have. Both seek to escape from the Loan and the Settlement Agreement. The Borrower claims to control the Island Subsidiary. The latter cannot do anything without the former.

For purposes of the second issue, the only parties with competing claims to the Borrower's Subsidiary Shares are the Lender, the Borrower, and Alpha. This decision

---

contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent").

[247] Ct. Ch. R. 19(a)(1)(A).

[248] Ct. Ch. R. 19(a)(1)(B).

adjudicates those claims. The Borrower has not identified any risk of inconsistent obligations that it or the Island Subsidiary might face.

The indispensable party argument fails.

### C. The No-Jurisdiction-Over-The-Properties Defense

In a variant of its indispensable-parties argument, the Borrower contends that the court cannot grant relief because it lacks jurisdiction over the Properties. The Borrower argues that a court applying French law with jurisdiction over the Properties must determine the validity of any effort to transfer an interest in the Properties and that this court must defer to the outcome of that as-yet-unfiled proceeding. That mashup of concepts fuses together arguments typically framed under the guise of choice of law, *forum non conveniens*, and general principles of comity.

Those preliminary issues do not limit a court's ability to address the merits once it has jurisdiction over the parties. A court can apply foreign law. A court can order a party before it to take action, including in a foreign jurisdiction. While a court can and should hesitate before awarding impractical or futile remedies, how to proceed is a discretionary determination.[249]

Here, the court has subject matter jurisdiction over the case and personal jurisdiction over the Borrower, which is a Delaware corporation. The court can order the Borrower to take action to remedy its breach, including actions relating to the

---

[249] *See 26 Cap. Acq. Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 465–74 (Del. Ch. 2023).

Properties. If those actions require that the Borrower act through a subsidiary, the court can decree that as well. The court can also appoint a receiver to carry out its orders. This is not the rare case like *26 Capital*, where unique concerns about illegality and influence led the court to decline to order specific performance concerning an asset halfway around the world. Even then, the court did not throw up its hands and dismiss the case, as the Borrower proposes. The court entertained alternative relief.[250]

The fact that the Properties are not within this court's jurisdiction does not defeat the Lender's claims.

## III. THE MERITS

The Lender sought at trial to prove its claim for breach of the Settlement Agreement. "The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[251] The Lender proved each element.

---

[250] *Id.* at 474 ("This ruling does not mean that 26 Capital will not be entitled to any remedy. To the extent 26 Capital has proven a breach of contract and Universal has not proven any of its affirmative defenses, then 26 Capital may be able to recover damages.").

[251] *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

### A. The Settlement Agreement Is A Valid And Enforceable Contract.

The first issue is whether the Settlement Agreement constitutes a valid and enforceable contract. A valid contract exists "when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[252] Here, a threshold issue looms: whether Cicoski had authority to bind the Borrower.

#### 1. Authority

The Borrower claims that Cicoski lacked authority to enter into the Settlement Agreement. The Borrower also argues that Cicoski lacked authority to enter into the Loan, which retroactively eliminates any basis for Cicoski to have entered into the Settlement Agreement.[253] Cicoski possessed actual authority to do both as the Borrower's duly empowered agent.[254]

"An individual corporate director may negotiate a settlement on behalf of the corporation—and bind the corporation to an agreed-upon settlement—provided the

---

[252] *Osborn*, 991 A.2d at 1158.

[253] This is a *Terminator* argument. Just as Skynet sought to negate John Connor's imminent victory by sending the Terminator back in time to assassinate his mother and prevent John's birth, so too the Borrower seeks to negate the Settlement Agreement by reaching back in time to invalidate the Loan. *See The Terminator* (Hemdale Film Corporation 1984).

[254] The plaintiffs rely in the alternative on the doctrine of apparent authority. The court does not reach that issue.

director has actual or apparent authority to do so."[255] "An agent possesses 'actual authority' when it has been expressly or implicitly granted authority by a principal."[256] "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."[257] An agent's actual authority goes beyond the principal's words to encompass the actions "designated or implied in the principal's manifestations to the agent and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act."[258] The principal's manifestations "may be made directly by the principal to the agent or may reach the agent through a more circuitous route."[259]

---

[255] *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *16 (Del. Ch. Dec. 8, 2017); *see Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 712 (Del. 2019) ("Under the common law of agency, there are two main forms of authority: actual authority and apparent authority.").

[256] *Caribbean Sun Airlines Inc. v. Halevi Enters. LLC*, 339 A.3d 24, 35 (Del. 2025).

[257] *Harmon v. Del. Harness Racing Comm'n*, 62 A.3d 1198, 1201 (Del. 2013) (quoting Restatement (Third) of Agency § 2.01 (2006)).

[258] Restatement (Third) of Agency § 2.02(1); *accord Sarissa*, 2017 WL 6209597, at *17.

[259] Restatement (Third) of Agency § 3.01 cmt. b.

In *Sarissa*, the Court of Chancery held that a director had actual authority to bind the corporation to a settlement agreement based on the board of directors' manifestations of authority and the director's reasonable understanding of those manifestations.[260] The board had appointed the director to act as the corporation's "lead negotiator" in settlement discussions with the counterparty, instructed the director "to see if a settlement agreement . . . could be reached," and told the director to convey key terms for a settlement.[261] Time was of the essence, because the other side was likely to lose its incentive to settle if the corporation delayed.[262] Under the circumstances, the director "reasonably understood the Board's (and thus [the corporation's]) manifestations" as empowering him to enter into an oral settlement agreement.[263]

**a. The Manifestations**

The manifestations regarding Ritchie's authority in this case gave him actual authority to enter into the Settlement Agreement. When Cicoski approved the Settlement Agreement, Cicoski was the general counsel of the Family Office. He was also the Borrower's sole director. In those capacities, he was an agent of the Family Office, which operated as the central nervous system for Ritchie's entities. He was

---

[260] *Sarissa*, 2017 WL 6209597, at *17.

[261] *Id.*

[262] *Id.* at *18.

[263] *Id.*

also an agent of Ritchie, the ultimate principal for each entity in the Family Office. Those roles gave Cicoski all the actual authority he needed.

The circumstances surrounding both the Loan and the Settlement Agreement further manifested Ritchie's authority. Facing a liquidity crisis, Ritchie instructed Cicoski to help Brownell secure the Loan. Ritchie and Wolfe, one of Ritchie's close associates, told Cicoski to get the Loan closed.[264] Ritchie was personally involved,[265] and the Loan was a regular topic of conversation as a short-term solution to the Family Office's cash flow problems.[266] Cicoski reasonably believed that Ritchie had empowered him to enter into the Loan.

Cicoski also reasonably believed that he had actual authority to execute the Loan because of the written consent that he and Azzopardi executed on January 29, 2023, as the only directors of the Family Trustee. The Family Trustee controlled the Family Trust, which was the Borrower's sole stockholder. The written consent expressly authorized Cicoski to execute the Loan Agreement.[267] A subsequent consent ratified the Loan and authorized the First Modification, the Second Modification, and

---

[264] Cicoski Tr. 237.

[265] *See id.* at 249.

[266] *See id.* at 238; McHugh Dep. 40.

[267] JX 34 at 1–2. Although the resolution could be read either to require both Cicoski and Azzopardi to sign the Loan or to authorize either Cicoski or Azzopardi to act, the record establishes that the latter was the intent. Cicoski Tr. 383–84. To clarify matters and confirm that interpretation, they executed a second written consent on February 15, 2023. Cicoski Tr. 272; JX 49.

the Settlement Agreement.[268] Ritchie knew about the Settlement Agreement and was happy with the result.[269]

Cicoski had actual authority to enter into both the Loan and the Settlement Agreement.

**b. The Board Majority Requirement**

Alpha and the Borrower argue that the Loan lacked proper authorization because under the Borrower's bylaws, only a majority of the Borrower's board of directors could approve the Loan. When the Borrower entered into the Loan, its board comprised both Wolfe and Cicoski. For several reasons, this argument does not prevent the Lender from enforcing the Settlement Agreement.

The Borrower relies on a provision in its bylaws which states that "without prior approval of a majority of the Board of Directors of the [Borrower], . . . the [Borrower] shall not . . . incur . . . any indebtedness, absolute or contingent of any nature whatsoever, if the [Borrower]'s aggregate indebtedness would exceed the indebtedness expressly provided for in the Approved Budget by $500,000" or "create any mortgage, lien, security interest or encumbrance on any asset of the [Borrower]

---

[268] JX 49 at 1–2.

[269] *See* Cicoski Tr. 308 ("I remember that Mr. Ritchie was happy [about the Settlement Agreement] because Mr. Brownell, to get this done, had to give up some of the fees—actually all of the fees, I believe—that he would otherwise have earned . . . ."). To the extent some of Ritchie's manifestations regarding the Loan and the Settlement Agreement came through Brownell, Cicoski still reasonably believed that Ritchie provided them. Ritchie communicated with Brownell constantly—far more frequently than with Cicoski—and commonly relied on Brownell to convey his wishes. *See id.* at 243–44, 307–08.

of any of its subsidiaries, other than in the ordinary course of business" (the "Board Majority Requirement").[270] The record contains no evidence as to the Borrower's "Approved Budget" or what sort of "mortgage, lien, security interest or encumbrance" would be outside the ordinary course of business. As the party invoking the bylaw as a defense, Alpha and the Borrower bore the burden of proving that the Loan exceeded the Approved Budget by $500,000 or was outside the ordinary course. They did not carry that burden.

Assuming without deciding that the Loan was outside the ordinary course of business or exceeded the Approved Budget in an amount sufficient to trigger the Board Majority Requirement, the record reflects that the Loan did not satisfy it. Under Delaware law, the board needed to act formally by unanimous written consent[271] or through action at a duly called and convened meeting at which a quorum was present.[272] The record does not contain persuasive evidence of either.

That failure, however, is not fatal. As Alpha and the Borrower correctly argue, a failure to comply with the bylaw would constitute a failure of authorization, not of

---

[270] JX 2 at 7–8.

[271] 8 *Del. C.* § 141(f).

[272] *Id.* § 141(b).

corporate power.[273] The Loan was therefore voidable, not void,[274] and majority stockholder ratification could validate it.[275] The Ratifying Consent delivered unanimous stockholder ratification, which could even validate waste.[276] The Ratifying Consent therefore authorized the Loan notwithstanding any failure to meet the Board Majority Requirement.

The authority defense based on the Board Majority Requirement also fails because of the equitable maxim that "[e]quity regards as done what ought to have been done."[277] When an act is voidable, rather than void, a court of equity can enforce it where the equities require. Here, the equites favor the Lender because Wolfe in fact

---

[273] *Moelis & Co. v. W. Palm Beach Firefighters' Pension Fund*, — A.3d —, —, 2026 WL 184868, at *6–7 (Del. Jan. 20, 2026) (holding that if corporation could achieve transactional outcome under some path provided by the DGCL, then the corporate power to act exists and the failure to follow that path renders the act voidable rather than void).

[274] *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 667 (Del. Ch. 2022) (collecting authorities), *aff'd in part, rev'd in part on other grounds and remanded*, 304 A.3d 896 (Del. 2023).

[275] *Michelson v. Duncan*, 407 A.2d 211, 219 (Del. 1979) ("Generally, any act of the board of directors or of any of the officers beyond the scope of their authority . . . may be ratified by the stockholders . . . ."); *Gerlach v. Gillam*, 139 A.2d 591, 593 (Del. Ch. 1958) ("It is contended and cannot be denied that where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail.").

[276] *Schreiber v. Bryan*, 396 A.2d 512, 518 (Del. Ch. 1978); *Kaplan v. Goldsamt*, 380 A.2d 556, 567–68 (Del. Ch. 1977).

[277] *Stream TV Networks*, 250 A.3d 1016, 1030 (Del. Ch. 2020) (refusing to allow defendants to take advantage of their failure to take contractually mandated action to avoid the contractual obligation).

knew about and approved the Loan, and Ritchie was both fully aware of what was going on and wanted the Loan closed. Any failure to comply with the Board Majority Requirement resulted from Ritchie's insistence on avoiding any semblance of corporate governance and his refusal to let his team properly document his decisions. Ritchie instructed his team not to keep written records, demanded that documentation be kept to a minimum, and provided approvals through informal means, such as a "thumbs-up" emoji in an ephemeral message.[278]

Under the standards followed by the Family Office, Wolfe approved the Loan. He told Cicoski to get the Loan done on any terms available.[279] He received regular reports on the Loan and never objected to it.[280] Although Wolfe later denied knowing about or authorizing the Loan, his testimony was not credible. He admitted knowing that money moved from Tailwind's counsel's account to Mack's IOLTA account.[281] He admitted knowing that Alpha received a portion of the proceeds.[282] He admitted knowing that the Borrower benefited by having its debt to Dominion Bank repaid.[283]

---

[278] *See* Cicoski Tr. 296.

[279] *Id.* at 236–37.

[280] *See id.* at 282.

[281] *See* Wolfe Tr. 697–98.

[282] *See id.* at 708–09.

[283] *See id.*

He knew where the money came from and was fine with it. The same is true for Ritchie.

Finally, the Settlement Agreement separately ratified any defect in the Loan. Under the common law of agency, a principal may ratify an earlier contract voidable for lack of authority by entering into an agreement that affirms or promises to perform the antecedent contract.[284] A party may ratify a contract by any conduct indicating assent to the contract.[285] The principal himself may take the ratifying act or may do so through an agent. "Although ratification is often done by a party or parties distinct from the actor whose conduct is being ratified, that dichotomy is not

---

[284] *See* Restatement (Third) Of Agency § 4.01 ("Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."); 12 Williston on Contracts § 35:22 (4th ed.) ("Ratification may be defined generally as the adoption or confirmation of a prior act purportedly performed on the principal's behalf by an agent without the agent obtaining prior authority. . . . The subsequent affirmance by a principal of a contract made on its behalf by one who had at the time neither actual nor apparent authority constitutes a ratification, which relates back and supplies original authority to execute the contract."); *Lewis v. Vogelstein*, 699 A.2d 327, 334 (Del. Ch. 1997) ("Ratification is a concept deriving from the law of agency which contemplates the *ex post* conferring upon or confirming of the legal authority of an agent in circumstances in which the agent had no authority or arguably had no authority." (citing Restatement (Second) of Agency § 82 (1958)); *see also* Restatement (Second) of Contracts §§ 85, 93 (1981) ("[A] promise to perform all or part of an antecedent contract of the promisor, previously voidable by him, but not avoided prior to the making of the promise, is binding," as long as "the promisor knew or had reason to know the essential facts of the previous transaction to which the promise relates.").

[285] *See* 12 Williston on Contracts § 35:23 ("Ratification need not be express. Any conduct that indicates assent by the purported principal to become a party to the transaction, or by reason of which the principal is precluded from repudiating the transaction of the purported agent, such as the principal's receipt and acceptance of benefits, is sufficient." (footnotes omitted)).

required."[286] An agent with proper authority may act on the principal's behalf to ratify an earlier act of the agent whose authority is in dispute.[287]

The Settlement Agreement ratifies any defect in the Loan by recognizing and reaffirming the validity of the earlier contract. It states:

> A. Borrower and Lender are parties to a certain Loan and Security Agreement dated as of February 2, 2023 (the Original Loan & Security Agreement"), evidencing and governing a certain loan made by Lender to Borrower in the principal amount of $10,000,000 (the "Original Loan"), which is evidenced by that certain Promissory Note executed by Borrower to the order of Lender dated February 2, 2023 . . . .
>
> B. On February 16, 2023, the Lender and the Borrower entered into that certain First Amendment to Loan & Security Agreement to make certain revisions to the terms of the Original Loan & Security Agreement . . . .
>
> C. On June 16, 2023, Lender and the Borrower amended the Original Loan & Security Agreement by entering into that certain Second Loan Modification and Ratification Agreement by and among the Borrower, the Lender and the Principals . . . .[288]

---

[286] *Glass v. Baker*, 2024 WL 687755, at *16 (Del. Ch. Feb. 9, 2024) (footnote omitted), *adopted*, (Del. Ch. 2024), *aff'd*, 339 A.3d 745 (Del. 2025).

[287] *See, e.g.*, *id.* ("When an agent is validly appointed . . . , the principal authorizes the agent to execute the agent's certification and begin acting on the principal's behalf. If the agent fails to execute the certification, yet purports to act as agent for the principal, those actions are voidable. But, if those actions are not first voided by the principal, the agent is authorized (through the principal's initial and continued appointment) to ratify their post-appointment conduct after signing the agent's certification." (footnotes omitted)).

[288] JX 94 at 1–2.

Ordinarily, recitals are not binding and only provide context.[289] But parties can make them binding.[290] In the Settlement Agreement, the parties "acknowledge the accuracy of the recitals set forth above, which are incorporated herein as if set forth herein and form a part of this Agreement."[291] In effect, the parties stipulated that the recitals were true. The Settlement Agreement also contained an integration clause establishing that its terms embodied "the entire agreement and understanding between the Parties."[292]

Through the recitals, the parties to the Settlement Agreement ratified the validity of the prior documents, including the Loan Agreement. To the extent there were potential disputes over the prior documents, the integration clause resolved those disputes and merged the rights that existed under the prior agreements,

---

[289] *Llamas v. Titus*, 2019 WL 2505374, at *16 (Del. Ch. June 18, 2019) ("Generally, recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument. If the recitals are inconsistent with the operative or granting part, the latter controls.").

[290] *See* 17A C.J.S. Contracts § 420 ("Recitals in a contract, such as 'whereas' clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations, *unless the operative provisions of the contract refer to them*." (emphasis added)); D. Hull Youngblood, Jr., *7 Deadly Sins of Contract Drafting: Constructive Interpretation and Interpretative Construction*, 34 Corp. Counsel Rev. 155, 162 (2015) ("[I]f there is language in the agreement that leads the reader to believe the parties intended to be bound by the recitals, in essence the statements are no longer recitals, but have become covenants of the agreement, just as the other agreed-upon terms and covenants bind the parties.").

[291] JX 94 § 1.

[292] *Id.* § 11.

including any disputes about their existence and scope, into the single agreement embodied in the Settlement Agreement.

Thus, the Settlement Agreement cured any defect in the Loan Agreement. When the Lender and the Borrower entered into that agreement, Wolfe was no longer a member of the Borrower's board. Cicoski was the Borrower's sole director. His approval of the Settlement Agreement as the sole director satisfied the Board Majority Requirement.

### c. The Wyoming Trust Law Issue

Alpha and the Borrower further argue that the Loan and Settlement Agreement were not validly approved under Wyoming law. That argument is misguided.

The Family Trust is organized under Wyoming law, which mandates that a trustee "keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests."[293] Cicoski was a director of the Family Trustee, and Ritchie's wife and children were the beneficiaries of the Family Trust. Alpha and the Borrower contend that Cicoski had to inform Ritchie's wife and children about the Loan and the Settlement Agreement. Because he did not, they say that his actions violated Wyoming law, rendering the Loan and Settlement Agreement invalid.

---

[293] Wyo. Stat. § 4-10-813(a).

Assuming for purposes of analysis that Cicoski violated Wyoming trust law, that failure does not prevent the Lender from enforcing the Loan or Settlement Agreement against the Borrower, at least without some showing that the Lender knew about the violation and aided and abetted it.[294] Perhaps the Family Trust's beneficiaries might have a claim for damages against the Family Trust, but they cannot impair the Lender's contract rights.

On the merits, however, the argument under Wyoming law falls short. The limited case law interpreting or applying the Wyoming statute generally recognizes that a trustee is "obligated to report on a regular basis to . . . [the] Trust beneficiaries, concerning the status of the Trust, and to provide them all relevant information concerning the Trust."[295] Yet Wyoming law also provides that "[n]otice to a person who may represent and bind another person under this article has the same effect as if notice were given directly to the other person."[296] The Family Trustee's operating agreement expressly identified Ritchie as the "designated relative" and "Family

---

[294] *See C & J Energy Servs., Inc. v. City of Miami Gen. Emps.'*, 107 A.3d 1049, 1071 (Del. 2014) (reversing issuance of injunction impairing counterparty's contract rights where "[t]he Court of Chancery made no finding, even on a preliminary basis, that [the counterparty] aided and abetting the C & J board's alleged breach of fiduciary duties").

[295] *Redland v. Redland*, 2013 WL 9678730, at *15 (Wyo. Dist. Dec. 24, 2013); *see In re Phyllis V. McDill Revocable Trust*, 506 P.3d 753, 762 (Wyo. 2022) (describing statute as "impos[ing] . . . a duty to inform and report upon the trustee").

[296] Wyo. Stat. § 4-10-301(a).

Member" under Wyoming law.[297] Ritchie was the real party in interest who controlled the Family Trust, and Cicoski reasonably believed that by keeping Ritchie informed, he was keeping the ultimate beneficial owners of the trust informed.[298]

**2. Intent To Be Bound**

For a valid contract to exist, the parties must intend to be bound. "Under Delaware law, 'overt manifestation of assent—not subjective intent—controls the formation of a contract.'"[299] "Whether both of the parties manifested an intent to be bound 'is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent.'"[300]

"When presented with a facially valid contract, the court will defer to the parties' signed writing unless there is evidence to the contrary."[301] The Settlement Agreement is a facially valid contract. Springett signed for the Lender, and Cicoski

---

[297] *See* JX 247 at 1–2; Wyo. Stat. § 13-5-301 (defining "Family Member" and "Designated relative").

[298] *See* Cicoski Tr. 458 (testifying about having "limited" contact with Family Trust beneficiaries and that trust counsel named Ritchie the "designated relative" so communication could run through Ritchie).

[299] *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) (quoting *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971)).

[300] *Id.* (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986)).

[301] *Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at *18 (June 30, 2023) (citing *Malkani v. Cunningham*, 2023 WL 1383938, at *8 (Del. Ch. Jan. 31, 2023)).

signed for the Borrower.[302] That alone provides strong evidence of the parties' intent to agree.

When evaluating whether parties intend to be bound, a court can consider "a reneging party's post-signing conduct if it reflects an objective manifestation of the reneging party's intent to be bound by the agreement."[303] Here, the Borrower is the reneging party, so the court can consider its post-signing conduct to the extent it reflects an intent to be bound. In this case, the Borrower partially performed through its transfer of the Proton Green shares, providing an objective manifestation of its intent to be bound.[304] There is no credible evidence to the contrary.

**3. Sufficiently Definite Terms**

A valid contract also requires sufficiently definite terms. To meet this element, the terms must "provide a basis for determining the existence of a breach and for giving an appropriate remedy."[305] In other words, "[a] contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and

---

[302] JX 94 at 7; *see* Springett Tr. 76–77 (testifying about entering into Settlement Agreement); Cicoski Tr. 305 (same).

[303] *See Restanca*, 2023 WL 4306074, at *21.

[304] *See* Springett Tr. 77–79.

[305] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018) (quoting Restatement (Second) of Contracts § 33(2)).

applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do."[306]

Whether terms are sufficiently definite is a question of contract formation, not interpretation. The issue is not whether any terms are ambiguous.[307] When parties claim an agreement they signed was too indefinite, that argument "frequently is an afterthought excuse."[308] "If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left."[309]

Alpha claims that the Settlement Agreement lacks sufficiently definite terms but does not explain why. Later, when arguing against specific performance, Alpha

---

[306] *Id.*

[307] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233–34 (Del. 1997) ("The reality is that the contractual language defining rights and obligations of the parties is sometimes ambiguous. It is a court's duty to preserve to the extent feasible the expectations that form the basis of a contractual relationship. When, as in the instant case, the meaning and application of contract terms are uncertain, a court fulfills this duty by considering extrinsic evidence.").

[308] 1 Arthur L. Corbin et al., *Corbin on Contracts* § 4.1 (1993).

[309] *Id.*; *see Eagle Force*, 187 A.3d at 1232–38 (holding that contract terms were sufficiently definite); *cf. Black Horse*, 2014 WL 5025926, at *18 (holding at the pleadings stage that it was not reasonably conceivable that an agreement's terms were sufficiently definite where the complaint's allegations did not "support a reasonable inference that the parties reached an agreement as to the meaning of [the asset to be transferred]").

contends that the Settlement Agreement lacks the essential terms of a real estate sale contract.[310] That is because it was not a real estate sale contract. It was a settlement agreement that resolved a default under a loan. It did not need to have all the terms that a real estate contract would have.

The Settlement Agreement contains sufficient terms to determine breach and award a remedy. The agreement defines the underlying obligations and the collateral.[311] It contains accurate recitals.[312] It provides for a specific amount of settlement fees to be paid using the Proton Green shares.[313] It treats the Lender's ownership of the collateral as satisfying the Loan.[314] And it includes detailed mutual releases.[315] The parties may disagree over the content of those obligations, but the Settlement Agreement is sufficiently definite to constitute a valid contract.

**4. Consideration**

The final element is consideration. "To constitute consideration, a performance or a return promise must be bargained for."[316]

---

[310] Dkt. 276 at 30–31.

[311] JX 94 at 1–2.

[312] *Id.* § 1.

[313] *Id.* § 3.

[314] *Id.* § 4.

[315] *Id.* § 5.

[316] Restatement (Second) of Contracts § 71(1).

An exchange of consideration supported the Settlement Agreement. The Lender provided a release and accepted the collateral and the Proton Green shares in satisfaction of its claims.[317] The Borrower agreed that the Lender owned the collateral and agreed to transfer title to the Proton Green shares. That is enough.[318]

Alpha argues that the Settlement Agreement lacks consideration because the Loan was invalid in the first place. That argument depends on Cicoski's lack of authority, a position this decision has rejected.

**B. The Borrower Breached The Settlement Agreement.**

Because the Settlement Agreement is a valid and enforceable contract, the next question is whether the Borrower breached it. The Lender proved breach.

**1. The Obligation**

Whether a breach occurred turns on the content of the contract. When determining what a contract means, "the role of a court is to effectuate the parties' intent."[319] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[320] "When the contract is clear and

---

[317] *See* JX 94.

[318] *See Seiden v. Kaneko*, 2017 WL 1093937, at *5, 7 n.46 (Del. Ch. Mar. 22, 2017), *aff'd*, 177 A.3d 69 (Del. 2017) (noting that a "mutual release of all claims would itself be sufficient to constitute adequate consideration").

[319] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[320] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

unambiguous," the court "will give effect to the plain-meaning of the contract's terms and provisions."[321] Only when a court "may reasonably ascribe multiple and different interpretations to a contract" will the contract be found ambiguous.[322] If one of the two proffered interpretations "produces an absurd result or one that no reasonable person would have accepted when entering the contract," then that interpretation is unreasonable and does not create ambiguity.[323]

As discussed previously, the parties agreed to the accuracy of the recitals in the Settlement Agreement, thereby establishing a set of stipulated facts that served as a background against which the Settlement Agreement operated.[324] In the recitals, the parties agreed that:

> D. The indebtedness evidenced by the Note is secured by, *inter alia*, certain liens and security interests granted under (i) the [Loan Agreement] . . . , (ii) the Pledge and Security Agreement [covering the Subsidiary's shares, and] (iii) the mortgages granted by [the Florida Subsidiary], a Florida corporation and wholly-owned subsidiary of the Borrower . . . encumbering [the Properties] . . . .
>
> F. The [Loan Agreement], the Pledge, the Guaranties, and all other documents, instruments and agreements evidencing, securing or relating to the Original Loan, each as amended, restated and/or modified from time to time, are hereinafter collectively referred to as the "Loan Documents". All property pledged to the Lender to secure the obligations evidenced or governed by the Loan Documents, including without limitation, the shares of [the Florida Subsidiary] and the

---

[321] *Osborn*, 991 A.2d at 1159–60.

[322] *Id.* at 1160.

[323] *Id.*

[324] JX 94 § 1 (agreeing to "the accuracy of the recitals set forth above, which are incorporated herein as if set forth herein and form a part of this Agreement").

> Properties . . . will be referred to herein collectively as the “Collateral”.
> . . .
>
> I. As the [the Borrower] failed to agree to the terms proposed in the Notice of Event of Default and Conditions for Standstill, (i) the Borrower remains in breach of its obligations under the Loan Documents; (ii) the Lender exercised its right under Section 7.2 of the [Loan Agreement], as amended; and (iii) the Collateral, including the Subsidiary Shares, is now held in the name of Lender. . . .[325]

Through these stipulations, the parties agreed that (1) the Borrower owned all of the Subsidiary Shares, (2) the Florida Subsidiary granted the mortgages on the Properties to secure the Loans, (3) the collateral for the Loan included both the Subsidiary Shares and the Properties, (4) the Borrower had breach the Loan and related documents, and (5) the Collateral—meaning the Subsidiary Shares and the Properties—was held in the name of the Lender.

In the Settlement Agreement, the Borrower agreed to pay two fees, both in the form of shares of Proton Green stock. One was a “Tailwind Fee” payable to Tailwind, and the other was a “Lender Settlement Fee” payable to the Lender (jointly, the “Settlement Fees”).[326]

The Settlement Agreement further provided that once the Settlement Agreement was executed, thereby memorializing the stipulations, and once the Settlement Fees were paid, then “the Loan is satisfied in full.”[327] Once that occurred,

[325] *Id.* at 1–2.

[326] *Id.* § 3.

[327] *Id.* § 4.

the Borrower "shall have no further liability to the Lender with respect to the Loan."[328]

Read as a whole, the Settlement Agreement contemplates a basic exchange: the Lender received the collateral and the Settlement Fees in return for giving the Borrower a release of all claims. The Borrower breached that agreement by insisting that it still owned the collateral.

To negate that breach, the Borrower and Alpha contend that the Settlement Agreement did not transfer ownership of the Properties or the Subsidiary Shares to the Lender. They say the Settlement Agreement merely required payment of the Settlement Fees and left the Lender's ownership of the collateral intact.

The plain meaning of the Settlement Agreement refutes that interpretation. The parties stipulated that the Lender already held the Properties and the Subsidiary Shares in its own name. There was no need for a transfer in light of that agreement. The Borrower gave up any rights to the Properties and the Subsidiary Shares by granting the Lender a release.[329]

The interpretation that the Borrower and Alpha advance, by contrast, "would lead to absurd and unfounded results" that "no reasonable person would have accepted when entering the contract."[330] The parties entered into the Settlement

---

[328] *Id.*

[329] *See id.* § 5.

[330] *Miramar Police Officers' Ret. Plan v. Murdoch*, 2015 WL 1593745, at *9 (Del. Ch. Apr. 7, 2015); *see Osborn*, 991 A.2d at 1160–61.

Agreement to "settle any and all claims under the Loan Documents."[331] Those claims included the Lender's right to recover $11 million in principal, plus interest. It would have been irrational for the Lender to release its claims in return for only the Proton Green shares, which were worth much less. That is not a reasonable reading of the Settlement Agreement.

To rescue its unreasonable interpretation, Alpha argues that the reference to the Lender having an ongoing "security interest" in the collateral is inconsistent with the Lender owning the collateral. As a matter of metaphysical curiosity, angels could dance on the head of that pin. But the Lender understandably feared a situation like it ultimately faced in which the Borrower reneged on its commitments. The Lender did not want to give up enforceable security interests and be left with only an executory contract. Alpha's interpretation remains unreasonable.

Assuming counterfactually that Alpha had advanced a reasonable interpretation, the extrinsic evidence defeats it. When interpreting an ambiguous contract, a court considers

> all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry.[332]

---

[331] JX 94 at 2.

[332] *Salamone v. Gorman*, 106 A.3d 354, 374–75 (Del. 2014).

Here, the extrinsic evidence shows that the Borrower gave up the Properties, the Subsidiary Shares, and the Proton Green shares in exchange for the Lender releasing all of its claims. That is how Springett described the deal contemporaneously to his investors.[333] That is how Springett and Cicoski described the deal at trial.[334]

Removing any doubt, that is what a subsequent amendment to the Settlement Agreement confirmed the deal to be. The amendment added a provision stating, "On the date of this Agreement, Borrower relinquishes any residual rights or claims it may have to the Subsidiary Shares to Lender."[335] In the amendment, the parties also agreed that the Lender was the sole owner of the Subsidiary Shares and that there were no other liens or claims to the Properties.[336] Alpha and the Borrower claim there was no consideration for the amendment because the Settlement Agreement had released all of the Lender's claims. The court need not reach that issue, because even if the amendment was not an enforceable contract, it provides persuasive extrinsic evidence confirming the nature of the deal memorialized in the Settlement Agreement.

---

[333] JX 486 at 7 ("We have received a signed settlement offer from the Borrower in the deal . . . . In short, the offer is to hand over the St. Barths [*sic*] properties to the Lender along with an allotment of shares in a private company they own.").

[334] *See* Springett Tr. 76–77; Cicoski Tr. 306–07.

[335] JX 95 at 2.

[336] *Id.*

**2. Breach**

The Borrower breached the Settlement Agreement by continuing to claim that it owned the Subsidiary Shares and the Properties when it gave up its rights to them in the Settlement Agreement. The Borrower claimed that the Island Subsidiary had not redomiciled to Florida as the Florida Subsidiary, that the Island Subsidiary still owned the Properties, and that the Borrower still owned the Subsidiary Shares. The Borrower also claimed that the mortgages encumbering the Properties were invalid. By taking those positions, the Borrower breached the Settlement Agreement.

The Borrower also breached the Settlement Agreement by filing the Guadeloupe Civil Action, filing the Guadeloupe criminal complaint, sending the Guadeloupe criminal complaint to civil authorities in St. Barts, changing the locks on the Properties, and sending cease-and-desist letters to the Lender's architect. The Borrower further breached the Settlement Agreement by purporting to change the name of the Island Subsidiary to Vue Mer and purporting to appoint Vail as its chairman, then filing documents reflecting those purported actions with a local commercial registry. Those actions interfered with the Lender's possession and ownership of the Properties and the Subsidiary Shares.

Alpha and the Borrower contend that they could not have breached the Settlement Agreement because the Borrower never had any obligation to transfer the Properties or the Subsidiary Shares to the Lender.[337] That position is absurd. The

[337] *See* Dkt. 276 at 27–28.

Borrower agreed in the Settlement Agreement that the Lender already owned those assets.

Alpha separately argues that the Borrower could file legal actions in the Caribbean courts to pursue its rights, and if the Borrower had a good-faith basis for its position, then it could have. Here, the Borrower lacked any good-faith basis for disputing the Settlement Agreement. Its bad-faith filings breached the Settlement Agreement.

**C. The Release Defense**

Alternatively, Alpha and the Borrower argue that even if the Borrower did breach the Settlement Agreement, the Lender released its claim for breach. That argument is specious.

The Settlement Agreement contains a release running from the Lender to the Borrower and its affiliates. It states:

> Upon the execution of this Agreement and payment of the Loan Settlement Fee and Tailwind Fee (which, for the avoidance of doubt, shall include the actual transfer of the Proton Green Shares to Lender and Tailwind in the books of the transfer agent), Lender and Tailwind, on behalf of themselves, and on behalf of their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, Affiliates and assigns, and its and their past, present and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns and successors in interest, and all persons acting by, through, under or in concert with them (collectively and each of them, the **"Affiliates"**) hereby release and discharge the Obligors and their Affiliates from any and all known or unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees and expenses (including offsets and attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown, which either Lender and/or Tailwind has, or may have had, against the other

> Party, whether or not apparent or yet to be discovered, or which may hereafter develop and for any acts or omissions related to or arising from the Loan (the **"Claims"**).[338]

Agreements containing broad releases like this one often include precautionary language saying that the release does not extend to claims to enforce the agreement in which it appears. Alpha argues that because the Settlement Agreement lacks that precautionary language, the Lender released any claim to enforce the Settlement Agreement, because that claim would constitute a claim for "acts or omissions related to or arising from the Loan."[339]

That interpretation makes no sense. The Settlement Agreement, by its terms, only released present or past claims—claims "which either Lender and/or Tailwind *has*, or *may have had*."[340] At the time of the Settlement Agreement, the Borrower's actions that led to the Lender's claim to enforce that agreement had not yet occurred. If the Settlement Agreement released the Lender's claims to enforce that very agreement, then the agreement itself would be a nullity. That would mean the Borrower could ignore its obligations under the Settlement Agreement, and the

---

[338] JX 94 § 5.

[339] The amendment to the Settlement Agreement may have inspired Alpha's argument. It added an express carveout for "any claims resulting from fraud or willful misconduct or any rights under [the Settlement Agreement]." JX 95 at 3. That was an obvious attempt at belt-and-suspenders drafting. At a minimum, it clarifies the parties' intent.

[340] JX 94 § 5 (emphasis added).

Lender would have no recourse. No party would agree to that result.[341] The court will not adopt an absurd interpretation.

Alpha's argument also fails as a matter of law because it would involve the release covering claims that had not yet arisen at the time of execution. A settlement agreement cannot release "claims arising from an event that ha[d] not yet happened."[342]

> A settlement can release claims that were not specifically asserted in an action, but can only release claims that are based on the "same identical factual predicate" or the "same set of operative facts" as the underlying action. Thus, it follows that a release is overly broad if it releases claims based on a set of operative facts that will occur in the future. If the facts have not yet occurred, then they cannot possibly be the basis for the underlying action.[343]

The Delaware Supreme Court has followed this holding in several cases, confirming that a settlement cannot release claims based on yet-to-occur operative facts.[344] Even if the parties had so intended, the Settlement Agreement could not release the

---

[341] *See Osborn*, 991 A.2d at 1159–61.

[342] *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 348 (Del. Ch. 2006).

[343] *Id.* at 347 (quoting *Nottingham P'rs v. Dana*, 564 A.2d 1089, 1106–07 (Del. 1989) (footnotes omitted).

[344] *See Griffith v. Stein*, 283 A.3d 1124, 1134–35 (Del. 2022); *In re Philadelphia Stock Exchange, Inc.*, 945 A.2d 1123, 1146–47 (Del. 2008); *see also In re AMC Entm't Hldgs., Inc. S'holder Litig.*, 299 A.3d 501, 526 (Del. Ch. 2023) (explaining that Delaware follows the "identical factual predicate test"). A covenant not to sue, by contrast, can address claims based on future acts. *See New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 536 (Del. Ch. 2023) ("A covenant not to sue can apply to future as well as to present claims. Unlike a release, where the cancellation of the claim and the discharge of the released party are complete upon execution, the covenant not to sue is an executory contract that contemplates ongoing performance." (cleaned up)).

Lender's claims to enforce it based on the Borrower's future acts reneging on the agreement.

### D. The Fraud Defenses

Alpha and the Borrower next raise a series of defenses based on the allegedly fraudulent nature of the Loan. None of those defenses succeed. Each is a fabrication resulting from Vail's conspiracy-theory-driven investigation.

First, Alpha and the Borrower argue that the Loan was a sham and that the Borrower never received any benefit from it. To the contrary, the Loan was real, and the Borrower benefited to the tune of $10 million. The Borrower's outside counsel received $9,749,910 (the remainder went to transaction fees). He transferred the proceeds as the Family Office directed—either to Alpha, directly to the Borrower's creditors, or to pay other fees.[345] The Borrower benefited from having its debts repaid, received at least $3.65 million in its bank account, and used those funds to pay Dominion Bank.[346] Wolfe admitted at trial that the complaint's allegation that the Lender "never intended to loan any money to Green Sapphire and never actually delivered any money to Green Sapphire" was not accurate.[347] Vail, by contrast,

[345] *See* JX 39; JX 54; JX 55.

[346] JX 60; Johnston Tr. 512–17.

[347] Wolfe Tr. 707.

persisted in insisting that the Lender "never actually delivered money to anybody."[348] That testimony was knowingly false.

Second, and more expansively, Alpha and the Borrower argue that Brownell orchestrated the Loan as part of his efforts to defraud Ritchie through a criminal loan-to-own scheme. They argue that Brownell paid off Cicoski to participate in the plot. But that is not what happened. As support, they point to Brownell's earlier criminal conviction and claim that Brownell sought to defraud Ritchie. But Ritchie and his associates knew about Brownell's criminal past; they never raised it as an issue until after Brownell and Ritchie had a falling out over other transactions.[349]

To bolster the fraud theory, Alpha and the Borrower argue that the Loan was too expensive to be legitimate, but that is historical revisionism. The Buyer was in the midst of a liquidity crisis and needed funds desperately and quickly. Its only security was real property located in a foreign jurisdiction. The initial efforts to find investors failed. If the Borrower had not received the funds, it would have defaulted on a series of obligations, lost valuable collateral, and suffered negative consequences in litigation.[350] The terms of the Loan reflected those realities. The closing prompted celebration in the Family Office.[351]

---

[348] Vail Tr. 731.

[349] *See* Cicoski Tr. 257, 259, 376, 391.

[350] *Id.* at 231–36, 282.

[351] *Id.* at 282.

Alpha and the Borrower similarly argue that the extension of the Loan was too expensive to be legitimate, but that is more revisionist hindsight. When the Borrower could not repay the Loan by the deadline, the Loan became riskier for the Lender. The Lender agreed to extend the deadline in exchange for additional fees and interest, but the Borrower had no money to pay those fees. So the Lender also loaned an additional $1 million to the Borrower that largely covered the fees that the Borrower could not afford to pay. The Borrower never repaid the Loan and defaulted, leading to the Settlement Agreement.

When Brownell arranged the Loan, he was acting as Ritchie's agent and friend, not as his enemy.[352] Facing a liquidity crisis, Ritchie tasked Brownell with securing a short-term bridge loan on whatever terms were necessary.[353] Ritchie agreed to use the Properties as collateral.[354] Brownell set up the Loan so that investors would fund it, and his control over the Lender benefited Ritchie by ensuring that his longtime friend would have to sign off on any enforcement efforts. But after Brownell could not fund the loan from his network and had to pass the deal on to Tailwind, the Tailwind investors were not willing to fund a vehicle they did not control. Brownell transferred the Lender to Tailwind and stepped into a guarantor role. The Loan called for

---

[352] *See id.* at 243–44 (testifying to Brownell's status as Ritchie's "closest confidant" and longtime trusted advisor who would commonly set up transactions on Ritchie's behalf).

[353] *See id.* at 243, 249.

[354] *See id.* at 241; McHugh Dep. 40.

Brownell to receive fees that would pay him for his services and potentially repay him for other amounts due from the Family Office, but he never received any of those amounts.[355] A portion of the Loan proceeds went to repay one prior loan Brownell secured for the Family Office.[356] Otherwise, he did not receive any benefit from the Loan or Settlement Agreement. Brownell was helping Ritchie, not plotting against him.

But even if Alpha and the Borrower had succeeding in proving Brownell was a bad actor, that showing would not vitiate the Lender's rights. Tailwind and Springett had no involvement in any hypothetical loan-to-own scheme and no prior connection to Brownell. Alpha and the Borrower now fault Springett for not uncovering Brownell's criminal history, but Tailwind was striving to meet the Borrower's exigencies and prioritized ensuring that it had adequate security for a high-risk loan. Tailwind was making a hard money loan secured by collateral, not the creditworthiness of the person who seemed to be arranging the terms as the Borrower's agent. Springett engaged in a reasonable level of know-your-customer due diligence.

Springett also was not hoping to acquire the Properties. He testified credibly that he and his investors wanted their money, interest, and fees. They did not want to foreclose on the Properties and become real estate flippers. Springett and his

---

[355] *See* JX 397 at 2–3; Cicoski Tr. 308.

[356] *See* JX 55; Cicoski Tr. 281–82.

investors acted consistently. They extended the maturity date, attempted to negotiate a forbearance agreement for weeks after the Borrower defaulted, and ultimately negotiated and entered into the Settlement Agreement.[357]

Finally, Alpha and the Borrower have leveled false and unjustified charges at Cicoski. Ritchie and Wolfe told Cicoski to help with the Loan and made clear that they had authorized the transaction.[358] Cicoski did what they asked. But for Ritchie's decision to repurpose the funds earmarked to repay the Loan at the last minute, the Borrower would not have defaulted. Ritchie's decision created a renewed crisis, which Cicoski resolved through the Settlement Agreement. Cicoski was looking out for Ritchie's interests as the Family Office's general counsel.

To undermine Cicoski's integrity, Alpha and the Borrower have cited payments Cicoski received through Brownell's family office, claiming they were bribes. They were not. They were part of Brownell's ongoing financial help to his then-friend Ritchie: Brownell paid a portion of Cicoski's salary when Ritchie could not.[359]

The Loan and the Settlement Agreement were not products of fraud.

### E. The Unclean Hands Defense

In a last-ditch effort, the Borrower asserts an unclean hands defense, claiming that "certain persons associated with Plaintiffs engaged in a deliberate and

---

[357] *See* Springett Tr. 68–71.

[358] Cicoski Tr. 237.

[359] *See id.* at 317, 321–22, 374–75.

coordinated online defamation campaign through cyber smear website as part of their broader scheme of fraudulent asset extractions and financial misconduct."[360] The Borrower did not substantiate any connection between the alleged perpetrators of this supposed cyber campaign and the Lender. The allegations are unrelated to this case. They provide no basis for the Borrower to escape the Settlement Agreement.

## IV. ALPHA'S FRAUDULENT TRANSFER CLAIMS

After this case began moving forward, Alpha intervened, purportedly as a third party adverse to the Borrower. Alpha asserted fraudulent transfer claims against both the Lender and the Borrower: four for actual or intentional fraudulent transfer and four for constructive fraudulent transfer. All of Alpha's claims fail because Alpha is not a bona fide creditor and its claims were collusive.

### A. Bona Fide Creditor Status

All of the causes of action under the Delaware Uniform Fraudulent Transfer Act ("DUFTA") are available only to a bona fide creditor.[361] Alpha claims to be a creditor of the Borrower under an agreement titled "Loan Agreement" and dated February 14, 2019 (the "Alpha Agreement").[362] In substance, Alpha is an equity investor, not a creditor.

---

[360] Dkt. 28 at 26.

[361] *See Burkhart v. Genworth Fin., Inc.*, 275 A.3d 1259, 1269 (Del. Ch. 2022) ("By its terms, DUFTA is inapplicable to non-creditors or non-debtors.").

[362] JX 4.

When assessing a creditor's claim, a court must "look past the form of the instruments to the substance of the transactions to determine their economic reality."[363] "The court looks to the economic reality of the surrounding circumstances, considering the facts that confer context case-by-case, to arrive at whether instruments functioned as debt or equity."[364] Factors like the corporation's capitalization, the presence or absence of fixed maturity dates, and the enforcement of payment rights "may serve as indicia of that reality."[365] Here, those indicia show that Alpha was not a bona fide creditor of the Borrower.

First, Alpha's advances to the Borrower more closely resemble equity investments than loans. Under the Alpha Agreement, the Borrower has no obligation to pay Alpha any principal or interest on a regular schedule and no repayment obligation of any kind until a date twenty years after each advance.[366] Although Alpha could nominally demand repayment at any time, Alpha never did. Wolfe testified that Ritchie advanced money under the Alpha Agreement to fund the Borrower's investments in illiquid real estate, intending that his family would profit

---

[363] *Neem Int'l CV v. Shulman*, 2025 WL 3778917, at *27 (Del. Ch. Dec. 31, 2025).

[364] *Id.* (cleaned up).

[365] *Id.*

[366] JX 4 at 2.

"when gains were realized."[367] Amounts would be repaid with interest "upon the successful realization of investments."[368]

In that structure, Alpha's advances "functioned as risk capital."[369] Unlike a creditor with a right to periodic repayments of principal and interest, Alpha would only receive its money back if the Borrower's investments were successful.[370] That structure is a "hallmark of equity" and "contrasts with debt instruments, which typically feature fixed maturity dates and mandatory interest payments regardless of corporate performance."[371] To be sure, Alpha had the right, in its "absolute discretion," to "require the Borrower to repay some or all of the Indebtedness at any time and from time to time."[372] But Alpha never made any repayment demands.[373] And recall that Alpha controlled the Borrower. Alpha would thus determine when repayments happened whether Alpha demanded the repayment or not.

---

[367] Wolfe Tr. 712.

[368] *Id.* at 713.

[369] *See Neem*, 2025 WL 3778917, at *27.

[370] *See Harbinger Cap. P'rs Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 230 (Del. Ch. 2006) (holding that an instrument is equity where it provides "no guaranteed right of payment" and the holder's "fate . . . is tied directly to [the corporation's] business fortunes").

[371] *Neem*, 2025 WL 3778917, at *27.

[372] JX 4 § 2.03.

[373] *See* Azzopardi Tr. 610.

Second, all of Alpha's advances were unsecured. The Alpha Agreement authorized the Borrower to draw up to $50 million without the Borrower pledging any collateral to secure repayment.[374]

Third, the Borrower was inadequately capitalized. "When a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital."[375] The Borrower also did not generate any revenue, much less regular revenue, making the Borrower a poor credit risk for the type of long-term loan embodied in the Alpha Agreement. And Ritchie and Alpha were affiliates. Those facts all cut "against a finding of true debt" and suggest that the advances "were capital contributions and not loans."[376]

Fourth, Alpha operated outside the Alpha Agreement, including by transferring assets to the Borrower and loaning money in excess of the Alpha Agreement's nominal borrowing limit. The Borrower's accounting for the advances did not reflect bona fide loans either. The Borrower did not record Alpha's advances as debt or account for any interest until this litigation, when Ritchie's team retroactively altered the Borrower's books.[377] The lack of formalities operates in

---

[374] JX 8; JX 4; *see* JX 169 ¶ 35 ("Alpha Carta agreed to lend Green Sapphire approximately 1.7 times the total book value of its assets, without obtaining a security interest in those assets or a third-party guaranty.").

[375] *In re SubMicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006) (cleaned up).

[376] *Neem*, 2025 WL 3778917, at *27.

[377] *See* Johnston Tr. 497–504.

conjunction with the other factors to further undermine the characterization of the Alpha Agreement as a bona fide loan.

Taken together, the evidence shows that the Alpha Agreement was not a bona fide loan. It was a synthetic equity arrangement analogous to preferred stock. Preferred stock is a form of equity that often carries a liquidation preference equal to its initial purchase price, pays a cumulative dividend, and accrues unpaid dividends that increase the liquidation preference. When a liquidity event takes place, the issuer can redeem the preferred stock for its accumulated liquidation preference. The preferred stock may also have a redemption date or other time frame for achieving liquidity, often between five and ten years after the initial purchase.[378] The Alpha Agreement operates in the same way. The amounts of the advances equate to a liquidation preference, the interest adds to it, and when the Borrower achieves a liquidity event, it repays a portion of the loan with interest. The twenty-year term of the Alpha Agreement is even longer and therefore more equity-like than a typical preferred stock.

---

[378] *See* Shannon P. Pratt et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 619, 622–23 (6th ed. 2022) (discussing common features of preferred stock, including redemption provisions); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *3 (Del. Ch. Apr. 14, 2017) (addressing mandatory redemption right beginning five years after preferred stock investment); *SV Inv. P'rs, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 976–78 (Del. Ch. 2010) (addressing five-year preferred stock redemption right); *Shiftan v. Morgan Joseph Hldgs., Inc.*, 57 A.3d 928, 931, 938–39 (Del. Ch. 2012) (discussing ten-year preferred stock redemption provision); *Harbinger Cap.*, 906 A.2d at 224–32 (treating mandatory redeemable preferred stock as equity rather than debt).

Alpha argues that the facts do not matter because the Borrower admitted in its pleadings and in its bankruptcy filing that Alpha is a bona fide creditor. As discussed in the next section, that is simply additional evidence that Alpha's claims were collusive. A collusive admission does not bind the court.[379]

In substance, Alpha is an equity investor in the Borrower, not a bona fide creditor. As an equity investor, Alpha cannot assert fraudulent transfer claims.

**B. Collusive Litigation**

More broadly, Alpha's claims against the Borrower fail because they are collusive. "A fictitious or collusive action will not be entertained by the courts, since no actual and justiciable controversy is presented."[380]

Common law courts "require actual adverse parties."[381] A person, including a corporation, cannot sue itself.[382] A sufficient adversity of interests can exist between

---

[379] In reaching this conclusion, the court does not attribute misconduct to Alpha's or the Borrower's present or former Delaware counsel. The court suspects that at the outset of the case, they were unaware of Ritchie's control over both Alpha and the Borrower. Like the court when ruling on the motion to intervene, they credited the entities' separate status. As discovery generated information that might contradict that belief, the powerful effect of confirmation bias likely led them to discount evidence unfavorable to their clients and credit confirmatory evidence. Most notably, they may have evaluated witness credibility differently than the court. If one believes the defense witnesses and discredits Springett and Cicoski, then the facts look very different.

[380] 1A C.J.S. Actions § 70.

[381] Michael Herz, *United States v. United States: When Can the Federal Government Sue Itself?*, 32 Wm. & Mary L. Rev. 893, 901 (1991).

[382] *Id.* at 905–06.

entities in a corporate group,[383] but when it is lacking, a justiciable controversy does not exist.

As a practical matter, Alpha's claims against the Borrower involve Ritchie suing himself.

- Ritchie controls the Family Office, including the Personal Trust and the Family Trust. He also controls the Back Office.
- Through the Back Office and the Family Trust, Ritchie controls Alpha.
- Through the Back Office and the Personal Trust, Ritchie controls the Borrower.
- When Alpha filed its claims, Wolfe served simultaneously as a director of the Borrower, a director of the Back Office, a director of the Family Trustee, and a director of the Personal Trustee that controls the Personal Trust and Alpha.
- When Alpha filed its claims, Vail served as a director of the Borrower and as a director of Alpha. He verified Alpha's third-party complaint and then appeared at trial as the Borrower's client representative.
- Because of the positions Wolfe and Vail held when Alpha filed its claims, they embodied and could act contemporaneously on behalf of the entities on both sides of the purported dispute between the Alpha and the Borrower.
- The Borrower answered Alpha's complaint by admitting all of its allegations.
- Alpha and the Borrower collaborated throughout the action, coordinating on pre-trial briefing, witness presentations, post-trial briefing, and post-trial argument.
- Alpha paid the Borrower's litigation expenses.[384]

---

[383] *See, e.g.*, *Next Level Commc'ns, Inc. v. Motorola, Inc.*, 834 A.2d 828 (Del. Ch. 2003) (controlled subsidiary suing controlling-stockholder parent for breach of fiduciary duty).

[384] *See* JX 164 at 4; Yuskus Tr. 661, 663.

Alpha did not need to intervene for the Borrower to assert as a defense that Alpha's claims had priority over the Settlement Agreement. The Borrower could have made that argument itself. Instead, Ritchie caused Alpha to pretend to be adverse to the Borrower. Only the Lender's persistent efforts during discovery and at trial revealed the extent of Ritchie's control and the collusive nature of Alpha's positions.

The court will not turn a blind eye to Ritchie's effort to undo a transaction he no longer likes by causing his right hand to sue his left for something the left hand did with his knowledge and authorization. The collusive nature of Alpha's claims provides a separate and independent basis for dismissal.[385]

**C. Claim-Terminating Sanctions For Ritchie's Refusal To Appear**

The plaintiffs also seek claim-terminating sanctions based on Ritchie's refusal to appear to testify at trial. If the plaintiff had subpoenaed Ritchie to appear at trial, then that sanction would have been warranted. But they did not, so the sanction is unavailable.

Through its jurisdiction over an entity, the court "can compel the biological persons who serve as its directors, officers, and managing agents to appear as

---

[385] Alpha's breach of contract claim against the Borrower for nonpayment of loans under the Alpha Agreement likewise fails. Ritchie controls both Alpha and the Borrower. The same individuals served on the boards of Alpha and the Borrower or the entities that control them. They could cause the Borrower to repay Alpha at any time. But Alpha's allegation that it demanded repayment was false. *See* Yuskus Tr. 660; Azzopardi Tr. 610. Alpha's breach of contract claim was also collusive, just like its fraudulent transfer claims. In fact, when wearing his Alpha hat, Ritchie did not really want to recover money from the Borrower. He simply wanted to block the Lender from recovering. Unsurprisingly, Alpha and the Borrower ignored Alpha's breach of contract claim against the Borrower in their post-trial briefing.

witnesses at trial or for a deposition in a particular location."[386] Ritchie caused Alpha to intervene in this action. By doing so, he subjected Alpha to this court's jurisdiction. As the individual who controls Alpha, Ritchie is Alpha's managing agent. The court could therefore compel Alpha to produce Ritchie to appear at trial, with the consequences for Ritchie's failure to appear falling on Alpha rather than on Ritchie personally.[387]

The plaintiffs had ample grounds to invoke this court's jurisdiction to compel Alpha to produce Ritchie at trial. Alpha's fraudulent transfer claims and the Borrower's defenses rested on the assertion that Ritchie knew nothing about the Loan. Rather than appearing himself to testify on those topics, Ritchie, Alpha, and the Borrower relied on witnesses who lacked personal knowledge on key events and parroted made-for-litigation conspiracy theories.[388] The plaintiffs could have

---

[386] *In re Dole Food Co., Inc. S'holder Litig.*, 110 A.3d 1257, 1262 (Del. Ch. 2015); *see Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1215 (Del. Ch. 2010) ("The power to compel a corporate defendant to appear at trial would be a hollow one if it meant only that the certificate of incorporation would be placed in the witness box.").

[387] *See Summit Healthcare Operating P'ship, L.P., v. Best Years, LLC*, — A.3d —, —, 2026 WL 616183, at *2–6 (Del. Ch. Mar. 4, 2026) (holding that witness was a party's managing agent and exercising discretion to order witness to testify at trial).

[388] That tactical choice is arguably sufficient to undermine Alpha's claims. "It is a well established principle that the production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." *Smith v. Van Gorkom*, 488 A.2d 858, 878 (Del. 1985), *overruled on other grounds by Gantler v. Stephen*s, 965 A.2d 695 (Del. 2009); *accord Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1118 n.7 (Del. 1994).

subpoenaed Alpha to produce Ritchie as a managing agent with personal knowledge of the facts.

But the plaintiffs did not issue a trial subpoena to Alpha to compel Ritchie to appear. The court therefore will not impose a claim-dispositive sanction as another basis for entering judgment against Alpha.

### D. The Merits Of The Fraudulent Transfer Claims

The fraudulent transfer claims also fail on their own merits. Most notably, the Borrower did not engage in any transfers with actual intent to hinder, delay, or defraud Alpha, and the Borrower received reasonably equivalent value for the transfers. But because of the court's rulings on Alpha's creditor status and the collusive nature of its claims, the court need not reach those issues.

## V. REMEDIES

Because the Lender proved breach, and because none of Alpha's or the Borrower's defenses have merit, the Lender is entitled to a remedy. The resulting remedy is multifaceted.

### A. Specific Performance

The Lender is entitled to a decree of specific performance compelling the Borrower to comply with the Settlement Agreement. To comply with the Settlement Agreement, the Borrower must actually transfer control over the Subsidiary Shares and the Properties to the Lender.

"Specific performance is a specialized form of mandatory injunction that requires a party to fulfill its contractual obligations."[389] It is "an equitable remedy designed to protect a party's expectations under a contract."[390] Specific performance requires a showing, by clear and convincing evidence, that "(1) a valid, enforceable agreement exists between the parties; (2) the party seeking specific performance was ready, willing, and able to perform under the terms of the agreement; and (3) a balancing of the equities favors an order of specific performance."[391]

The Lender has proven each element. As discussed above, the Settlement Agreement is a valid and enforceable agreement. The Lender is not only ready, willing, and able to perform; it already has performed. That leaves only the balancing of the equities.

Balancing the equities requires considering whether "specific enforcement of a validly formed contract would cause even greater harm than it would prevent."[392] The equities generally weigh against the breaching party, which only need do what it agreed to do in the first place.[393] The equities fall particularly hard against a party

---

[389] *26 Cap.*, 309 A.3d at 464.

[390] *Sarissa*, 2017 WL 6209597, at *26.

[391] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009).

[392] *Hastings Funeral Home, Inc. v. Hastings*, 2022 WL 16921785, at *8 (Del. Ch. Nov. 14, 2022).

[393] See *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *30 (Del. Ch. Mar. 1, 2022) ("[A]s CorePower breached the APA . . . the balance of equities

that has engaged in "opportunistic maneuvers to escape its contractual obligations" that "offend basic notions of equity."[394]

Here, the Borrower could have complied with its obligations easily. Instead, the Borrower contended that the Settlement Agreement was a fraud and claimed it was unauthorized. The Borrower deliberately interfered with the Lender's rights. The equities therefore weigh against the Borrower.

The equities also weigh in favor the Lender. "[I]n the absence of specific performance, [the Lender] will lose the benefit of [its] bargain under the contract."[395] The Borrower agreed in the Settlement Agreement that the Lender held the Properties and the Subsidiary Shares. To allow the Borrower to retain the Properties and the Subsidiary Shares would deprive the Lender of its security and convert it into an unsecured creditor, contrary to its agreement.

Concerns about payment further justify specific performance. The Borrower owed over $16 million in principal, interest, and fees.[396] It agreed that the Lender could take ownership of the Subsidiary Shares and the Properties in exchange for forgiving that debt. Limiting the Lender to a monetary remedy would provide

---

decidedly favors Level 4."); *Hastings Funeral Home*, 2022 WL 16921785, at *8 ("I find that the equities tip in HFH's favor since it has not breached the Agreement . . . .").

[394] *Sarissa*, 2017 WL 6209597, at *27.

[395] *Schell Bros., LLC v. Pickard*, 2023 WL 7132358, at *3 (Del. Ch. Oct. 30, 2023).

[396] *See* Johnston Tr. 528.

incomplete relief. As Cicoski testified, the Borrower has faced "constant liquidity challenges,"[397] and Ritchie has a history of repurposing funds to prioritize other debts.[398] An order confirming that the Lender owns the Properties and the Subsidiary Shares is thus "more certain, prompt, complete, and efficient than a damages award."[399]

To invert the balancing of the equities, Alpha suggests that specific performance would harm the interests of "innocent third parties" (namely Ritchie's family members). That contention ignores the reality that Ritchie controls every entity in the Family Office, including the Family Trust. Ritchie cannot hide behind his wife and children to avoid a deal he authorized. Nor will holding the Borrower to its bargain cause meaningful hardship to Ritchie or anyone else. Alpha contends that Ritchie's wife has a special place in her heart for the Properties, and that may be so, but that merely reinforces the fact that the Properties are unique. The Lender is entitled to them.

The Borrower argues that specific performance is impracticable because the Properties are in St. Barts, relying on *26 Capital*. Unlike in that case, there is no risk that a decree of specific performance "would cause a citizen of a foreign country to

---

[397] Cicoski Tr. 317.

[398] *See id.* at 291.

[399] *United BioSource LLC v. Bracket Hldg. Corp.*, 2017 WL 2256618, at *4 (Del. Ch. May 23, 2017) (discussing prospect of "uncertainty" over whether the defendant could satisfy multi-million-dollar judgment and granting specific performance).

risk violating an order issued by that country's highest court" and "may cause a party to take action that could subject it to criminal contempt."[400]

Alpha last argues that specific performance is inappropriate because there is no performance left to compel. According to Alpha, because the Borrower agreed in the Settlement Agreement that the Lender owns the Subsidiary Shares and the Properties, everything that needed to be done has been done, so there is no need for a decree of specific performance.

Alpha confuses the legal effect of an agreement with the reality on the ground. The Lender indeed owns the Subsidiary Shares and the Properties as a result of the Settlement Agreement. But that does not mean the Borrower complied with its commitment by giving up actual control over those assets. Envision a residential real estate transaction in which the seller agreed that the buyer owned the house, but then never vacated the property, changed the locks to keep the buyer out, and kept living in the house. Nominal legal title would have passed, but a court still could issue a decree of specific performance to eject the seller from the property. That is the case here.

The decree of specific performance will require the Borrower to take all actions necessary to establish the Lender's ownership and control over the Subsidiary Shares and the Properties. The Borrower must take all actions necessary, in the reasonable judgment of the Lender, to:

---

[400] *26 Cap.*, 309 A.3d at 471.

- remove any uncertainty about the domestication of the Island Subsidiary as the Florida Subsidiary;
- remove any uncertainty about the Lender's title to the Subsidiary Shares;
- ensure that the Florida Subsidiary is the sole owner of the Properties, free of any liens and encumbrances; and
- ensure that the Lender can access the Properties.

## B. Injunctive Relief

The Lender is also entitled to permanent injunctive relief. That relief involves both negative and affirmative elements.

A permanent injunction is a form of final relief that prohibits a party from taking action or compels a party to take action. In its negative version, it is "a decree of the court whereby defendant is perpetually inhibited from the assertion of an assumed right, or perpetually restrained from the commission of an act which would be contrary to equity and good conscience."[401] In its affirmative or mandatory version, it is a decree that orders a party to take action on pain of contempt.[402]

"Because a permanent injunction is final relief, it does not require a showing of imminent irreparable harm."[403] A preliminary injunction requires that showing to justify the issuance of interim relief before the case can be adjudicated on the merits.

---

[401] James L. High, *A Treatise on the Law of Injunctions as Administered in the Courts of the United States and England* § 3, at 4 (1879), *quoted in In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1228 (Del. Ch. 2022).

[402] *See* 2 Monica E. McFadden, *Litigating Tort Cases* § 13:4, at n.11 (2024) (collecting authorities).

[403] *COVID-Related Restrictions*, 285 A.3d at 1228.

Once the case has been adjudicated, the need for interim relief is no longer a consideration, so that showing is no longer necessary. A permanent injunction instead requires a showing that other remedies are inadequate.[404] A showing of irreparable harm can satisfy that requirement, but other ways exist, including:

- Showing that the defendant acted "in such a way that the plaintiff may be required to bring more than one suit to effectuate his legal remedy . . . ."[405]

- Showing that although money could be an adequate remedy, "the defendant is insolvent and [the judgment] is not collectible."[406] In this setting, a permanent injunction may issue if "the defendant is still capable of rendering the performance to which the plaintiff is entitled as an alternative to the money . . . ."[407]

- Showing that the plaintiff is entitled to damages "if damages could be measured with any reasonable degree of accuracy, but under the facts damages are so speculative that any award is likely to be inadequate."[408]

This decision has explained twice why a legal remedy is inadequate, first when holding that this court can exercise subject matter jurisdiction and again when holding that specific performance is an appropriate remedy.

The final order will provide for a negative permanent injunction barring the Borrower, Alpha, their associates and affiliates, and anyone acting in concert with

---

[404] *Id.*

[405] Dan B. Dobbs, *Law of Remedies: Damages—Equity—Restitution*, § 2.5, at 57 (2d ed. 1993).

[406] *Id.*

[407] *Id.* at 57–58.

[408] *Id.* at 58.

them from (1) asserting any rights to ownership or control over the Subsidiary Shares and the Properties and (2) interfering with the Lender's ownership and control over the Subsidiary Shares and the Properties.

The final order will provide for a mandatory permanent injunction requiring the Borrower to take the actions described in the section addressing the decree of specific performance. If a reviewing court were to interpret the remedy of specific performance strictly as available only to enforce a contractual provision requiring action, then a mandatory injunction grounded in equity can provide equivalent relief. The arguably duplicative relief of specific performance and a mandatory injunction will hopefully avoid any remedial slipups that could leave the Lender without a means of enforcing its rights.

The final order also will provide for a mandatory injunction compelling Alpha to transfer any Subsidiary Shares to the Lender. In the Loan Agreement and again in the Settlement Agreement, the Borrower represented that it owned 100% of the Subsidiary's equity. During this case, the Borrower and Alpha claimed that a third party owned 1% of the equity, rendering those representations false. Alpha has subsequently acquired that share. Alpha must convey that share to the Lender so that the Lender receives 100% of the equity in the Subsidiary.

**C. Damages For Loss Of The Building Permit**

The Lender is also entitled to an award of damages for harm the Borrower caused by breaching the Settlement Agreement.

When the Borrower breached the Settlement Agreement by preventing the Lender from accessing the Properties, the Borrower harmed the Lender by delaying

construction. During the delay, the Lender's building permit expired. The Lender had made enough progress on construction to secure an extension until July 28, 2025, but the Lender need to continue construction to keep the permit in force. The Borrower prevented that from happening by changing the locks, sending cease-and-desist letters to the Lender's architect, and sending its frivolous criminal complaint to the local authority in St. Barts. The Lender promptly sought relief from this court, but the Borrower managed to derail this litigation by obstructing discovery, filing for bankruptcy, and removing the case to federal court twice. Those actions prevented the Lender from obtaining interim relief before the building permit expired. The environmental sensitivity of the Properties makes it unlikely that the Lender can obtain a comparable permit.[409]

Because the Borrower's breach of the Settlement Agreement resulted in the Lender's loss of a unique and valuable building permit, restoring the Lender's ownership and possession of the Properties alone will not make the Lender whole. The Lender is also entitled to damages.

"Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."[410] But "[w]here the injured party has proven the *fact* of damages—meaning that there would have been some profits from the contract—less certainty is required of the proof establishing the

---

[409] *See* Springett Tr. 101.

[410] Restatement (Second) of Contracts § 352.

*amount* of damages.[411] "Courts in Delaware and other jurisdictions have frequently applied the 'wrongdoer rule' where the wrongdoer's breach contributed to uncertainty over the amount of damages."[412] When uncertainty as to damages results from a defendant's conduct, "fundamental justice requires that . . . the perils of such uncertainty should be laid at defendant's door."[413]

The Lender proved the fact of damages. Quantifying those damages requires determining the difference between (1) the value of the Properties with the improvements, less their cost of completion, and (2) the value of the Properties without improvements. The Lender provided a real estate appraiser's report valuing the Properties at €12 million in December 2023 without improvements and in a range of €15–€16 with improvements.[414] The lower end of the latter range points to damages of €3 million. The Borrower decries these figures as speculative, but the Lender responds that more exacting figures are not available because the Borrower interfered with the renovations early in the process.

The Lender's appraisal is sufficient to support a damages remedy. The Borrower caused the uncertainty about damages by breaching the Settlement

---

[411] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015).

[412] *Id.* at 1131 n.132 (collecting cases).

[413] *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992) (internal quotation marks omitted).

[414] JX 242 at 8–9; *see* JX 243 at 8–9.

Agreement, so the Borrower cannot be heard to complain about the absence of a more specific estimate.

The final order will award €3 million in damages. The plaintiffs are also entitled to pre-judgment and post-judgment interest at the legal rate, compounded quarterly, from July 29, 2025, through the date of payment. If the legal rate changes during a compounding interval, then the new rate becomes effective at the beginning of the next compounding interval.

**D. Fee Shifting For Bad Faith Litigation Conduct**

Another element of the remedy is an award of expenses, including attorneys' fees. Delaware follows the American Rule, under which "litigants are normally responsible for paying their own litigation costs."[415] But the Supreme Court "has recognized limited equitable exceptions to that rule, including the exception for 'bad faith' conduct during the litigation."[416] The court applies this exception both to mitigate the harm the affected party has suffered and "to deter abusive litigation and to protect the integrity of the judicial process."[417] An award is warranted here.

Delaware courts have shifted fees under the bad faith exception where defendants "forced the plaintiff to engage in litigation that would not have been

---

[415] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[416] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).

[417] *Id.*; *see Martin v. Harbor Diversified, Inc.*, 2020 WL 568971, at *1 (Del. Ch. Feb. 5, 2020) ("[I]t is a method for reducing and appropriately allocating the costs of vexatious behavior sufficiently serious that justice requires such mitigation."), *aff'd*, 244 A.3d 682 (Del. 2020).

necessary if the defendants had acted with even minimal responsibility."[418] Delaware courts have also awarded expenses (including attorneys' fees) where parties "defended the action despite their knowledge that they had no valid defense," "delayed the litigation and asserted frivolous motions," "falsified evidence," or "changed their testimony to suit their needs."[419]

Ritchie, his associates, and his affiliates—including both the Borrower and Alpha—engaged in egregious litigation misconduct that warrants an award of expenses.

First, Ritchie caused Alpha to intervene in this litigation and assert collusive claims. Through that effort, Ritchie sought again to sow anarchy in the civil justice system.[420]

Second, Alpha and the Borrower made allegations that were recklessly misleading or knowingly false. They claimed falsely that the Loan was a sham. The Borrower asserted in its affirmative defenses to the plaintiffs' complaint that it "did not receive any funds that were allegedly wired."[421] And Alpha alleged in its third-party intervenor complaint that the Lender "never intended to loan any money to [the

---

[418] *Montgomery Cellular*, 880 A.2d at 228.

[419] *Id*; *see Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998).

[420] *See* JX 7 at 57–58.

[421] Dkt. 28 at 26.

Borrower] and never actually delivered any money to [the Borrower]."[422] Alpha and Vail doubled down on these assertions at trial.[423] In fact, the Borrower both benefited from the Loan and received a portion of the proceeds in its bank account.[424]

Alpha and the Borrower also claimed that they were unaffiliated, independent entities. When supporting Alpha's motion to intervene, the Borrower claimed that "[t]here is no basis for Plaintiffs' assertion that Alpha Carta and Green Sapphire are affiliates with common owners," and represented that "Thane Ritchie does not control the Petro Carta Trust (Green Sapphire's sole stockholder)."[425] In fact, Ritchie controls both entities, which are part of his Family Office.[426]

In addition to those big falsehoods, Alpha claimed it had demanded payment from the Borrower of all amounts under the Alpha Agreement.[427] In reality, Alpha never made a demand before filing its third-party complaint.[428]

Third, Alpha and the Borrower sought to delay and derail this litigation. When the litigation began to move forward on an expedited basis, the Borrower tactically

---

[422] Dkt. 67 ¶ 48.

[423] *See* Vail Tr. 729–30; Dkt. 276 at 50.

[424] *See* JX 60; JX 164 at 7; Johnston Tr. 512–17; Cicoski Tr. 281–82; Wolfe Tr. 708–09.

[425] Dkt. 65 at 4.

[426] *See* Cicoski Tr. 226–27, 295; JX 169 ¶ 37.

[427] Dkt. 67 ¶ 169.

[428] *See* Yuskus Tr. 660; Azzopardi Tr. 610.

filed for bankruptcy. Then, when it appeared the Lender would secure relief from the stay, the Borrower modified hundreds of entries in its general ledger to support Alpha's claims.[429] After the bankruptcy court lifted the stay, the Borrower removed the lawsuit twice on the same grounds. Each time the district court promptly remanded the case, noting on the second occasion that the Borrower had acted improperly and was obstructing the bankruptcy court's order.[430] During discovery, the Borrower repeatedly missed deadlines and exhibited "an overall lack of transparency and inability to follow through on its commitments to the other parties."[431] Ritchie sought to avoid giving a deposition, requiring the Lender to seek relief from the court twice.[432]

Shifting expenses (including attorneys' fees) is warranted under the bad faith exception to the American Rule. The plaintiffs are entitled to recover all of the litigation-related expenses, including attorneys' fees and costs. The Borrower and Alpha are jointly and severally liable for the amount.

---

[429] *See* JX 169 at 24–25; Johnston Tr. 497–500; Wolfe Tr. 710–11; Yuskus Tr. 658–59.

[430] Dkt. 192. *See* 14C C. Wright & A. Miller, *Federal Practice & Procedure* § 3739 (Rev. 4th ed. 2025) ("After a case has been remanded to state court, a second notice of removal on the very same ground that led to the initial removal is likely to be rejected by the district court and may be considered to have been interposed in bad faith."). A party may have a legitimate, good-faith basis to file for bankruptcy or remove a case to federal court. Here, the Borrower did not.

[431] Dkt. 288 at 3.

[432] *See* Dkt. 193; Dkt. 217; Dkt. 224; Dkt. 236.

### E. Equitable Subordination

The last issue is equitable subordination. This decision has awarded relief to the Lender, including awards of damages. To ensure that Alpha cannot use the Alpha Agreement to interfere with the Lender's ability to pursue the Borrower for those amounts, any claims Alpha has against the Borrower under the Alpha Agreement are subordinated to the judgment.

"Equitable subordination is a doctrine that, based on a creditor's inequitable conduct and its effect on other creditors, allows that creditor's debt to be subordinated to other claims in bankruptcy or allows the creditor's liens to be transferred to the bankruptcy estate."[433] The court has applied the doctrine to ensure that a wrongdoer could not use the fruits of its wrongdoing to interfere with the collection of a judgment.[434]

As discussed previously, the Alpha Agreement is, in substance, an equity investment. It therefore should be junior to the Lender's recovery. In light of Alpha's

---

[433] *Nelson v. Emerson*, 2008 WL 1961150, at *4 (Del. Ch. May 6, 2008).

[434] *In re Dura Medic Hldgs., Inc. Consol. Litig.*, 331 A.3d 796, 830 (Del. Ch. 2025) ("The Comvest Parties engaged in the Challenged Financings at the Company level. That gave those financings structural priority over the Seller Note, which Holdings issued. As a remedy for the Comvest Parties' legal and equitable violations, the Challenged Financings are equitably subordinated to be junior to the Seller Note."); *GB-SP Hldgs., LLC v. Walker*, 2024 WL 4799490, at *1 (Del. Ch. Nov. 15, 2024) ("And, as a remedy for the creditor's aiding and abetting that breach, its debt is equitably subordinated as to any amounts collected or received by or on behalf of the Company from the directors as a result of that disgorgement."); *Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *9 (Del. Ch. Oct. 10, 2014) ("Klee's loan to the Partnership in the amount of $136,200, together with any interest, is equitably subordinated to the claims of all other creditors.").

bad-faith conduct, equitable subordination is warranted. The amounts due under the judgment have priority over any amounts that Alpha has advanced to the Borrower.

## VI. POST-TRIAL MOTIONS

On the eve of post-trial argument, Alpha and the Borrower filed two post-trial motions. Both are denied.

### A. Alpha's Motion To Reopen And Supplement The Record

During this litigation, Cicoski testified about receiving multiple threats, including that a "man with a gun arrived at my home after nightfall" to deliver a "vitriolic" letter from out-of-state litigation counsel for the Family Office.[435] Cicoski's counsel filed a letter informing the court of several additional threatening text messages he received after trial.[436] McHugh also testified that she received threatening messages before her deposition.[437] After trial, Alpha moved to reopen and supplement the trial record to respond to those allegations and introduce evidence about threats to Wolfe.[438] Alpha seeks to introduce its own evidence to rebut the inference that Ritchie, Alpha, or the Borrower were behind the threats to Cicoski and McHugh.

---

[435] Cicoski Tr. 311–12.

[436] Dkt. 281.

[437] McHugh Dep. 10–16.

[438] Dkt. 287.

The court has not made any factual findings about the alleged threats, has not drawn any inferences based on the threats, and has not taken the representations about threats into account when evaluating credibility or weighing the evidence. Reopening and supplementing the trial record is unwarranted. Alpha's motion is denied.

### B. The Borrower's Motion To Dismiss The Florida Subsidiary For Lack Of Standing

On the morning of post-trial argument, the Borrower moved to dismiss the Florida Subsidiary on the theory that it is not a party to the Settlement Agreement.[439] That argument comes too late. The Lender caused the Florida Subsidiary to sue because the Lender believed it controlled the Florida Subsidiary and the Florida Subsidiary should have held title to the Properties. The Borrower created uncertainty by claiming that the Island Subsidiary was never properly redomiciled in Florida and continues to exist as a separate entity under a different name. The Florida Subsidiary is a proper party for purposes of that relief. The Borrower's motion is denied.

## VII. CONCLUSION

Judgment will be entered for the plaintiffs and against the Borrower. The judgment will include a declaration that the Lender is the rightful owner of the Subsidiary Shares and the Properties. The Borrower must take all actions necessary to remove any doubt about the domestication of the Island Subsidiary in Florida as the Florida Subsidiary, the transfer of the Subsidiary Shares to the Lender, and the

---

[439] Dkt. 289.

transfer of title to the Properties to the Lender. The Lender is entitled to damages of €3 million, plus pre-judgment and post-judgment interest through the date of payment.

The court will enter judgment against Alpha on all of its claims.

The court awards the Lender its expenses, including attorneys' fees. If the parties cannot agree on an amount, then the Lender may move to quantify the award.

Alpha's loans to the Borrower are equitably subordinated to the Lender's recovery.

Within thirty days, the parties must submit proposed final order that is agreed as to form. If there are issues that need to be addressed before a final order can be entered, then the parties must submit a joint letter identifying those issues and proposing a path forward. Any remaining items must be existing issues that need to be addressed to resolve this proceeding. This instruction is not an invitation to raise new issues or seek a do-over.