**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>GREEN SAPPHIRE HOLDINGS, INC.,<br><br>Putative Debtor. | Case Number 26-33254-mvl7<br><br>Chapter No.: 11 |

**GLOBAL CAPITAL PARTNERS, LLC'S OBJECTION**
**<u>TO PETITIONERS' MOTION FOR ORDER TO SHOW CAUSE</u>**

Global Capital Partners, LLC ("Global Capital"), by and through its undersigned counsel, respectfully submits the following objection to Petitioners' *Motion for an Order to Show Cause Why Global Capital Partners, LLC Should Not Be Held in Civil Contempt for Violating the Automatic Stay Confirmed On September 1, 2026, and For Related Relief* (the "Motion") (ECF 61).

## <u>INTRODUCTION</u>

1. On July 17, 2026, the U.S. Bankruptcy Court for the Northern District of Illinois dismissed Green Sapphire Holdings, Inc.'s ("Green Sapphire") voluntary petition as filed in bad faith and barred Green Sapphire from refiling for one year. Two business days later, a patently collusive involuntary petition was filed against Green Sapphire in this Court. Thereafter, Global Capital moved to reopen the Illinois bankruptcy case. On September 1, 2026, the Illinois court ordered the case reopened and ordered Green Sapphire to show cause why it should not be held in contempt for violating the bar order. Now Petitioners claim Global Capital somehow violated the automatic stay in this case by proceeding to the September 1 hearing on its motion to reopen and show cause. Petitioners' Motion is unsupported by relevant law or facts and should be denied.

2. Reopening the Illinois bankruptcy case did not violate the stay in this case. This Court's instinct was right when it remarked at the September 21, 2026 hearing: "I'm not sure that the Motion to Reopen in and of itself violates the automatic stay."[1] The stay prohibits actions *against* Green Sapphire, its property, or property of its estate. Reopening a bankruptcy case initiated by Green Sapphire itself does not fit within any of those three categories.

3. On this Motion, the Court need not decide whether the stay applies to the upcoming show cause hearing in the Illinois bankruptcy case. Global Capital maintains that the government regulatory exception exempts the hearing from the scope of the stay. But as the Court remarked at the September 21 hearing: "the contempt motion is more what they did, and it really is an after-the-fact sort of approach."[2] Because the contempt hearing has yet to occur, the question of whether it is exempt from the stay is not ripe for adjudication.

**FACTUAL BACKGROUND**

4. On August 21, 2026, Global Capital moved to reopen Green Sapphire's first bankruptcy case in the Northern District of Illinois, and moved that court for an order to show cause why Green Sapphire should not be held in contempt for violating its order of dismissal.[3] The order had dismissed the case for cause and barred Green Sapphire from refiling for a year. Yet two business days later a new case naming Green Sapphire as debtor was filed in this Court.

5. On September 1, 2026, the Illinois court held a hearing on the motion to reopen. The court ruled that "The motion to reopen will be granted. The Code allows a case to be reopened to administer assets, to afford relief to the debtor or for other cause. I see that the situation satisfies

---

[1] Exhibit 1 at 61:9-11.

[2] *Id.* at 68:5-6.

[3] Exhibit 2.

the element of 'for other cause.'"[4] The court ordered the case reopened and ordered Green Sapphire to appear at a hearing through a representative in person and show cause why it should not be held in contempt.[5] The show cause hearing was set for September 30, 2026 at 1:30 p.m.

6. On September 9, 2026, Global Capital filed in this case a motion to transfer venue to the Illinois bankruptcy court. ECF 56. The motion to transfer is set to be heard on October 19, 2026, at 1:30 p.m.

7. On September 10, 2026, Petitioners filed their motion for an order to show. ECF 61.

8. On September 22, 2026, Green Sapphire filed a motion for a temporary restraining order. *Adversary Case*, 26-03096, ECF 2. Green Sapphire sought to enjoin Global Capital from proceeding to the show cause hearing in the Illinois bankruptcy case on September 30, 2026.

9. On September 24, 2026, Global Capital contacted Green Sapphire regarding the show cause hearing. Global Capital proposed that the parties continue the date of the hearing until after the motion to transfer venue is heard in this case. Green Sapphire refused to consent to any continuance of the show cause hearing. Global Capital then filed in the Illinois bankruptcy case an emergency motion to continue the show cause hearing until after the motion to transfer is heard.

10. On September 28, 2026, at 1:30 p.m., the Illinois bankruptcy court heard argument on the motion for continuance. Both Green Sapphire and Petitioners opposed the continuance. But under questioning, Green Sapphire could not reconcile its insistence that the show cause hearing should proceed with its TRO motion claiming that the same hearing violates the stay and

---

[4] Exhibit 3 at 19:7-11.

[5] Exhibit 4.

should not proceed.[6] The court ultimately continued the show cause hearing and set a status hearing for October 27, 2026. As Chief Judge Cox stepped down from the bench, Petitioner Michael McNutt shouted from the gallery: "Your Honor, I'll be filing an opposition. That's unacceptable."[7]

## ARGUMENT

### A. Reopening the Illinois Bankruptcy Case Did Not Violate the Automatic Stay.

11. Global Capital did not violate the automatic stay in this case by reopening the Illinois bankruptcy case on September 1, 2026. "Section 362(a) of the Bankruptcy Code defines the scope of the automatic stay which is implemented on commencement of a bankruptcy proceeding." *In re Wenstrom*, 649 B.R. 492, 506 (Bankr. N.D. Tex. 2023). Section 362(a) "operates as a stay of certain actions in three categories: against the debtor, the debtor's property, and property of the bankruptcy estate." *Rose v. Select Portfolio Servicing, Inc.*, 945 F.3d 226, 230 (5th Cir. 2019) (quoting *In re Smith*, 910 F.3d 576, 580 (1st Cir. 2018)). Reopening a voluntary bankruptcy case does not fall within any of the three categories of stayed actions.

12. The September 1 reopening is not an action against the debtor. Subsection 362(a)(1) enjoins any "proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." First, Global Capital did not commence an action against Green Sapphire. Global Capital reopened a bankruptcy case that Green Sapphire itself commenced in another district. Second, the reopening of the Illinois bankruptcy case is not a proceeding "to recover a claim against the debtor that arose before the

---

[6] Exhibit 5 at 15:9-16:12.

[7] *Id.* at 21:15-23:3.

commencement" of this case. In fact, the motion to reopen does not seek to recover on any debt Green Sapphire owes Global Capital.

13. The September 1 reopening also was not an action against the debtor's property or property of the bankruptcy estate. The September 1 hearing resulted in a court order that reopened the case and directed Green Sapphire to show cause why it should not be held in contempt. That is not "the enforcement … of a judgment" (362(a)(2)); an "act to obtain possession of … or to exercise control over property of the estate (362(a)(3)); an "act to create, perfect, or enforce any lien against property of the estate (362(a)(4)); an "act to create, perfect, or enforce against property of the debtor any lien…" (362(a)(5); nor an "act to collect, assess, or recover a claim against the debtor" that arose prior to the bankruptcy case (362(a)(6)). Reopening the Illinois bankruptcy case gives Global Capital no advantage over other creditors in recovering from Green Sapphire.

14. Petitioners have not cited any precedent for holding that the reopening of a first-filed bankruptcy case violates the automatic stay in a second case involving the same debtor. The Court should decline Petitioners' invitation to make new law.

15. In the alternative, the September 1 reopening was exempt from the automatic stay. Section 362(b)(4) exempts from the scope of the stay any "continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police or regulatory power [.]" 11 U.S.C. § 362(b)(4). In determining whether the exemption applies, courts apply a public policy test and a pecuniary purpose test. *In re Halo Wireless, Inc.*, 684 F.3d 581, 588 (5th Cir. 2012). The reopening satisfies both tests for the government regulatory exception to the automatic stay.

16. The reopening satisfies the public policy test, which asks whether the proceeding is "effectuating a public policy." *Id.* Here, the Illinois bankruptcy was reopened for the purpose of issuing an order to show cause why Green Sapphire should not be held in contempt for violating

the bar order. The reopening promotes the Illinois bankruptcy court's public policy interest in deterring bankruptcy misconduct and protecting the integrity of the bankruptcy court system.

17. The reopening also passes the pecuniary purpose test. The test asks whether the proceeding seeks to protect a government pecuniary interest in the debtor's property or to primarily adjudicate private rights, rather than effect a public policy. *Halo Wireless*, 684 F.3d at 588. The reopening did not protect pecuniary interests of the Illinois bankruptcy court in Green Sapphire's property. Nor did it seek to adjudicate Global Capital's rights in that property.

18. That the reopening was privately initiated does not change the analysis. As the Fifth Circuit observed in *Halo Wireless*, the government regulatory exception applies to "the commencement or *continuation* of an action or proceeding by a governmental unit." 684 F.3d at 589 (quoting 11 U.S.C. § 362(b)(4)). There, the court held that twenty suits that were initiated by telephone companies and continued before state public utility commissions against Halo while in bankruptcy were exempt from the stay. So too here.

**B. The Future Occurrence of the Show Cause Hearing in the Illinois Bankruptcy Is Not Ripe for Adjudication.**

19. Petitioners' Motion should also be denied to the extent it claims that the upcoming show cause hearing will violate the automatic stay. The government regulatory exception exempts the show cause hearing from the stay, as demonstrated in Global Capital's *Objection to Motion for Temporary Restraining Order and Preliminary Injunction*. *Adversary Case*, 26-03096, ECF 9. At present, however, any such challenge to the show cause hearing is not ripe for adjudication.

20. A claim is not ripe if it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citing *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580–581 (1985)). The show cause hearing is a contingent future event. It has not occurred and has yet to be scheduled.

21. In addition, the show cause hearing may not occur in the way Petitioners anticipate. The show cause hearing may not occur while this case is pending and the automatic stay in this case remains operative. On October 19, 2026, this Court will hear the motion to transfer and to consolidate this case with Green Sapphire's reopened case in the Northern District of Illinois. Should the two cases be consolidated, the automatic stay in this case would dissolve and cease to enjoin any proceedings in the first-filed case. In that circumstance, any claim that the show cause hearing violates the stay would be moot.

22. The uncertainty surrounding the show cause hearing in the Illinois bankruptcy case counsels against deciding now whether it is exempt from the scope of the stay in this case.

**CONCLUSION**

23. For these reasons, Global Capital respectfully requests the Court to deny Petitioners' Motion.

Dated October 9, 2026

**DENTONS US LLP**

*/s/ Spencer D. Hamilton*
Spencer D. Hamilton
Texas Bar No. 24087656
DENTONS US LLP
100 Crescent Court, Suite 900
Dallas, Texas 75201
Tel: (214) 259-0900
Email: spencer.hamilton@dentons.com

Kevin McCullough
ROCHELLE MCCULLOUGH
901 Main St #3200
Dallas, TX 75202
Tel: (214) 953-0182
Email: kdm@romclawyers.com

*Counsel to Global Capital Partners, LLC*

Kenneth J. Pfaehler (*pro hac vice*)
Nicholas W. Petts (*pro hac vice* )
DENTONS US LLP
1900 K Street N.W.
Washington, D.C. 20006
Tel: (202) 408-6468
Email: kenneth.pfaehler@dentons.com
nicholas.petts@dentons.com

Robert E. Richards (*pro hac vice*)
233 S. Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel: (312) 876-7396
Email: robert.richards@dentons.com

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that he served a copy of the foregoing on all counsel of record via the Court's CM/ECF System on October 9, 2026.

By: */s/ Spencer D. Hamilton*
Spencer D. Hamilton

# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 26-33254-mvl-7** |
| GREEN SAPPHIRE HOLDINGS, INC., | ) | Dallas, Texas<br>September 21, 2026<br>9:30 a.m. Docket |
| Alleged Debtor. | ) | PETITIONING CREDITORS' EMERGENCY OBJECTION TO GLOBAL CAPITAL PARTNERS, LLC'S NOTICE OF WITHDRAWAL [58] |
| . | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Alleged Debtor: | R. Adam Swick<br>AKERMAN, LLP<br>500 W. 5th Street, Suite 1210<br>Austin, TX 78701<br>(737) 999-7103 |
| For the Alleged Debtor: | David William Parham<br>AKERMAN, LLP<br>2001 Ross Avenue, Suite 3600<br>Dallas, TX 75201<br>(214) 720-4300 |
| For the Alleged Debtor: | Thomas B. Fullerton<br>AKERMAN, LLP<br>71 South Wacker Drive, 47th Floor<br>Chicago, IL 60606<br>(312) 634-5726 |
| For Legamaro Banipal, LLP, et al, Petitioning Creditors: | Brandon J. Tittle<br>TITTLE SANTIAGO, PLLC<br>1125 Legacy Drive, Suite 230<br>Frisco, TX 75034<br>(972) 213-2316 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For Global Capital Partners, LLC: | Kenneth J. Pfaehler<br>Nicholas W. Petts<br>DENTONS US, LLP<br>1900 K Street, NW, Suite 800<br>Washington, D.C. 20006-1102<br>(202) 408-6468 |
| For Global Capital Partners, LLC: | Robert E. Richards<br>DENTON US, LLP<br>233 S. Wacker Drive, Suite 5900<br>Chicago, IL 60606<br>(312) 876-8000 |
| For Global Capital Partners, LLC: | Kevin Dale McCullough<br>ROCHELLE MCCULLOUGH, LLP<br>901 Main Street, Suite 3200<br>Dallas, TX 75202<br>(214) 953-0183 |
| Recorded by: | Bryon A. Robinson<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street<br>Dallas, TX 75242<br>(214) 753-2011 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

DALLAS, TEXAS - SEPTEMBER 21, 2026 - 9:41 A.M.

THE COURT: Please be seated. All right. Good morning, everyone. We are here on our 9:30 docket. I've got one matter on the docket this morning, and that's Case No. 26-33254, Green Sapphire Holdings, Inc. I'll take appearances for the record, and I'll start with those folks in the courtroom.

Mr. Tittle?

MR. TITTLE: Good morning, Your Honor. Brandon Tittle on behalf of the Debtor. The Petitioning Creditors, sorry.

THE COURT: Thank you.

MR. TITTLE: So used to saying that.

THE COURT: Good morning.

MR. SWICK: Adam Swick with Akerman on behalf of Green Sapphire, the Alleged Debtor.

THE COURT: All right. Thank you.

MR. PARHAM: Good morning, Your Honor. David Parham, also on behalf of Green Sapphire.

THE COURT: Thank you both. Appreciate it.

Mr. McCullough?

MR. MCCULLOUGH: Good morning, Your Honor. Kevin McCullough of Rochelle McCullough, counsel for Global Capital Partners.

Also in the courtroom with me is Nicholas Petts, and by

video we have Ken Pfaeffler and Bob Richards.

THE COURT: Is it not Pfaehler anymore?

MR. MCCULLOUGH: Pfaehler, I mean.

MR. PFAEHLER: Thank you, Your Honor.

THE COURT: You're welcome. I was like, I just learned it.

MR. MCCULLOUGH: I think he might have changed his pronunciation in Berlin or wherever he is this morning.

THE COURT: Excellent. Thank you very much. Good morning, Mr. Pfaehler.

MR. PFAEHLER: Good morning, Your Honor.

THE COURT: Thank you.

Is there anyone else on WebEx who would like to make an appearance?

All right. Hearing --

MR. SWICK: Oh, Your Honor?

THE COURT: Oh.

MR. SWICK: Yes. We do have Tom Fullerton in from our Chicago office. He is on.

THE COURT: Okay. Tom Fullerton? Okay. Thank you.

MR. FULLERTON: Yes, good morning, Your Honor. Thank you.

THE COURT: Good morning.

All right. Anyone else?

All right. Hearing no other takers. All right. Mr.

Tittle, so we're here on both a scheduling conference and then obviously we'll want to address the Order for Relief, and then your motion opposing, I think, the withdrawal of the Motion to Dismiss without prejudice.

MR. TITTLE: Yes, Your Honor. After talking with Opposing Counsel before the hearing, they do intend to withdraw their opposition to the motion for leave to amend at Docket No. 36.

THE COURT: All right.

MR. TITTLE: And so I don't know if the Court would like me to put on --

MR. MCCULLOUGH: No, that's correct, Your Honor. We've clarified with Mr. Tittle it was just a clerical error. I would be the last person that would be able to say a typo would be cause for that much concern, as the Court is aware. So, --

MR. TITTLE: And listen, NextChapter just needs to have Involuntary as an option. When you -- because having to do it by PDF and manually trying to check the boxes and enter the text into the document is a nightmare. And so that was really all I was going to talk about on that one. But --

THE COURT: All right. And so with that, if there is no opposition to the Order for Relief, then the Court will enter the Order for Relief under Chapter 11.

MR. TITTLE: Thank you, Your Honor.

THE COURT: Okay. All right. And so I think that brings us to the Petitioning Creditors' objection to the Motion to Dismiss being withdrawn without prejudice, correct?

MR. TITTLE: That's correct.

THE COURT: All right. Ready when you are.

MR. TITTLE: Before we begin with argument, I would like to introduce all of my Exhibits 1 through 26 into evidence.

MR. PETTS: No objection, Your Honor.

THE COURT: All right. Anything from the Debtor?

MR. SWICK: No objection, Your Honor.

THE COURT: All right. Then Petitioning Creditors' 1 through 26 are hereby admitted. And they can be found at Docket 68. Is that correct?

MR. TITTLE: That's correct.

THE COURT: All right. Then 1 through 26 are hereby admitted.

(Petitioning Creditors' Exhibits 1 through 26 are admitted into evidence.)

THE COURT: All right.

MR. TITTLE: Your Honor, we're here today on Global's attempt to seek tactical advantages in another forum. It does not appear that they took heed of this Court's statements on the record at the September 1st hearing that if they continued to try to litigate sanctions in

Chicago, to fool around and find out. But unfortunately, the games continue.

After the August 18th status conference, we all agreed to a scheduling where the hearing on the Motion to Dismiss would take place on September 14th and that discovery would be due on September 4th.

On the day of the September 4th deadline, I emailed Opposing Counsel and requested a day extension to produce the responses to interrogatories. I accidentally omitted in my request that I was also going to be postponing discovery by 24 hours. The reason for doing that was because I have five different creditors, or, you know, Petitioning Creditors that I'm representing, it took tons of time to get all of stuff together, and so I just needed additional time.

After -- I guess it was the Saturday afterwards when I produced my documents, the Sunday after -- or the Sunday afterwards I realized I didn't have a link that worked. So I reached out and asked for a new link, and I finally got their documents. I don't think Green Sapphire got these documents from Global with respect to the fraudulent transfers until Monday.

On Monday, if you turn to Exhibit 23, I get an email from Opposing Counsel on the Monday, which is Labor Day, asking for depositions to take place that week.

Before this email, there was -- never been the discussion

of depositions from anyone at Global. We discussed at the 18th status conference that discovery would be due on the 4th and that the parties could have depositions that week if they wanted to schedule them. From August 19th until Labor Day, Global had ample time to serve us with a notice of deposition or to schedule a deposition that week. Instead, we get this on September 7th, on Labor Day, at 10:36.

Now, why would they want depositions spur of the moment, after not asking for them the entire time after the status conference? That's because the discovery that I had produced to them, which consisted of 1,616 pages of documents, with responses to the production and responses to the interrogatories were 20 pages single-spaced. And I'm going to walk through how complete our discovery package was. And I know, because I prepared it, and I put more than a hundred hours responding to this discovery.

I think it would be helpful to kind of let the Court see what I'm talking about. Your Honor, at Exhibit 17, these are the interrogatories that my clients -- lecocqassociate, Legamaro, and Charles-Hubert Vanoverberghe -- responded with. These are the responses to the interrogatories.

Interrogatory 1, Your Honor, took me two pages to respond to. At the bottom, it shows you the Bates stamp of all the pleadings that are connected to these interrogatories.

On the next page, on Page 8 of this document, Your Honor,

I have a chart showing where in this document does it talk about their claims and all the invoice information. I have a chart showing where all of it is in my production. You can flip through this, Your Honor, and see I went above and beyond getting this done, especially considering on a two-person firm, going up against Dentons, and my other attorney is completely full doing Subchapter V.

If you go to Docket or Exhibit 18, these are the responses to the interrogatories by Lazareff Le Bars SARL and Lazareff Le Bars Legal Advisory, Limited. The interrogatory responses are just as thorough as those done by the other three Petitioning Creditors. These are not two- or three-line responses, Your Honor. These are substantial responses, with charts, citing to where the documents are in our 1,1616-page production. My wife was literally angry at me for spending so much time on this.

Again, I did not get access to their documents until Sunday because the link provided did not work.

Now let's go to Exhibit 21, Your Honor. Global Capital had one set of interrogatories. I had five that I needed to sign verified statements for. Sorry. I had five. But yet if you turn to -- if you flip through their responses, Your Honor, you can see what I'm talking about. These are two-sentence, maybe three-sentence responses. They don't cite where any of this stuff is located in their production.

They cite to a protective order in the Chicago court for reasons why, a lot of this stuff, they don't have to respond to. We asked for the protective order in an email that I'm going to be presenting to you, but yet they never sent it to us.

This is grossly deficient discovery, Your Honor. Grossly deficient. This discovery is to shed light on the fraudulent transfers that they were trying to dismiss in the receivership action.

So the timeline is Monday, Green Sapphire's counsel still hasn't seen the discovery because the link didn't work for them, either. We get an email Monday morning on Labor Day, wanting to do depositions because the discovery was so thorough they knew they didn't have a chance. There wasn't a single email with Green Sapphire, with Thane Ritchie, or anyone else. And that was because when I was retained -- or when I was retained, I made it very abundantly clear that they needed to completely separate themselves from anyone with Green Sapphire if we were going to have a successful involuntary. And if you read through the responses to our interrogatories, Your Honor, which are now admitted into evidence, that's exactly what they say.

We attached engagement letters that showed that each one was representing me -- or, sorry, I was representing them for a set amount that was going to be paid by lecocqassociate.

It was going to be eighty grand.

Later on in the discovery, it shows that Lazareff Le Bars ADGM paid me fifty additionally, sent me seventy back, so that seventy would then go back to lecocqassociate. Mike McNutt, who's the owner of that entity, felt it was unfair to have lecocqassociate bear the cost of this litigation when their claim was disproportionately lower than the one for ADGM.

So we have emails proving that I was only corresponding with my Petitioning Creditors. We have WhatsApp text messages also included in the production that show I was talking to Charles-Hubert Vanoverberghe and Mike McNutt over WhatsApp. No other documents exist that showed collusion or bad faith or that anyone was involved in this other than me and the Petitioning Creditors.

In their -- in their -- so we send -- if we go to -- let me figure out where it is. If you go to Exhibit 24, Your Honor, --

A VOICE: Counsel, can I have an exhibit binder?

MR. TITTLE: -- Exhibit 24 is our response to the Labor Day email where they ask for a deposition the week that all my clients are trying to rearrange their schedule to fly in from overseas -- McNutt from Abu Dhabi, Benoit from France, and Dominique also from France.

To do a deposition requires substantial effort to prepare

your client. There were only four days left in that week. They gave us notice of depositions for the first time on Labor Day, without providing any notice before that time. There would be no way to interrupt their schedule, have them fly in before, and prepare them in the days following what was going to be a substantial daylong hearing on a Motion to Dismiss.

So we send them a response email that next morning, the day after Labor Day, at 1:49 p.m., after we analyzed what our obligations were to attend a deposition that they never noticed and never gave us advance notice of and were wanting to do it on less than three to four days' notice.

In this email, I even address governing case law, Your Honor, at the bottom of Page -- the first page of Exhibit 24, where I cite that at least ten days is normally required for the notice requirement under Rule 30(b). They were trying to do this deposition on less than four days.

We also circulated -- I'm seeing if I put it in here -- a notice of -- or, we sent an email regarding all of the discovery deficiencies, primarily their interrogatories, which failed to identify what transfers were actually adjudicated in Delaware. Their responses to that question, Your Honor, is just that the order speaks for itself, even though the main reason why they don't want us to pursue the fraudulent transfer actions is because they were already

adjudicated, but there's nine of them that are clearly not.

They also bring up this protective order in Chicago, like I talked about earlier, that our parties -- my clients were not a party to that. We asked for a copy of the protective order. They wouldn't even give us one. So they're citing this reason why we shouldn't get this stuff, but yet they're still not giving us the document. This is Tuesday after Labor Day.

And so we sent them an email, we're trying to get a meet-and-confer. We're trying to get the information so we can determine whether there's any validity to these fraudulent transfer claims.

Wednesday comes and I get a call from Kevin McCullough. He wants to know about why I checked the Chapter 7 box. And then we talked about the deposition issue, and he said, I'm good, we don't need depositions, I'd rather just take your clients cold on the stand on Monday. Because he was asking if we should do a continuance. And I said, my guys are flying in from out of the country, we can't push that off, it's now or never. We're bringing three live witnesses in. We can't push the hearing. Okay, I'll take the depositions cold, that's fine.

I then said to Kevin, we need to meet and confer on this discovery deficiency. Y'all still won't give us a time when we're doing this. Earlier that day, I got an email

discussing my deficiencies, to answer some more questions in the interrogatories, one of which is why Legamaro contacted me. I would have amended to show that Stephen Boulton, the Debtor's bankruptcy counsel in Chicago, was the one that reached out to Legamaro. But we never had a meet-and-confer for me to tell them and amend the interrogatory responses, which I would have if we would have just had a meet-and-confer.

It wasn't two hours after my call with Kevin McCullough that they withdrew their Motion to Dismiss and then filed their Emergency -- or, their Motion to Transfer Venue. It was not filed as an emergency when we did it, or when they filed it, but then they later wanted it as an emergency.

They're trying to have the Chicago bankruptcy judge rule at the hearing on September 30th. It's the Show Cause Hearing why Green Sapphire should not be sanctioned for having this bankruptcy filed here. If Your Honor will recall, that was the Motion to Reopen that they filed four days after our status conference hearing, --

THE COURT: Uh-huh.

MR. TITTLE: -- without giving me notice or any of my clients notice. And I know I'm going a little bit backwards. I apologize for that.

I think it's helpful to show why they're doing this. And the transcripts show that they wanted the 14th hearing. They

alerted Judge Cox of the interest in having that Motion to Show Cause heard after the 14th. But they were good with the 14th date.

Let me run you through it. So the -- or, Exhibit 15 is your transcript from the 1st, this Court's transcript. At the bottom of Page 20, counsel for Global admits, We are not in any way trying to put off the September 14th hearing. We want that very much. We want to have the Motion to Dismiss heard here.

On Page 22: There's no question that this was a collusive filing in our mind, and we hope to be able to show that to the Court on the 14th.

One second, Your Honor.

Exhibit 14 was an email to your chambers saying, The parties have agreed on a hearing date of September 14th for the pending Motion to Dismiss and Motion to Amend the Petition.

If you go to Exhibit 16, this is the transcript from the Chicago Bankruptcy Court, which was an hour after this Court rendered its ruling --

THE COURT: Uh-huh.

MR. TITTLE: -- that the stay did apply. And you were going to let them open the case, you were going to let them file the Motion to Reopen, --

THE COURT: Uh-huh.

MR. TITTLE: -- but if they proceeded with the Sanctions Hearing to try to get sanctions against the Debtor, would potentially be a violation of the stay because they didn't qualify as a governmental entity under 362(b)(4), I think. (b)(4) or (b)(2)?

In this transcript, Your Honor, they don't mention what this Court ruled at all. They don't say what you did in any part of this transcript. They don't let Judge Cox know what your ruling was.

On Page 3, starting at Line 14, Opposing Counsel states: Global Capital is simply requesting the Court to enter an order reopening this case and ordering Green Sapphire to show cause why it should not be held in contempt for the collusive bankruptcy filing that has occurred in Texas.

On Page 11, Line 11, Opposing Counsel states: Having said that, we are not opposed to having the return date on the Order to Show Cause come after the September 14th hearing in Texas. We pushed for the hearing on our Motion to Dismiss. We stand by that in Texas.

Your Honor, they want to proceed in another forum. For reasons unknown, they do not want this Court to rule on the Motion to Dismiss. If something doesn't happen in this case, they're going to a hearing on September 30th on the show cause issue to get sanctions against Green Sapphire for bad faith and collusion arguments that would have been tried on

the 14th, but yet when they got their discovery they realized they were going to lose.

Your Honor, we're here today on two different avenues to get what we want and to stop Global from the games. One is Rule 7041, and the other is the Court's inherent power. The Fifth Circuit decision, *Ben Keith Co. v. Dining Alliance* at 80 F.4th 695, in the Fifth Circuit in 2023, affirmed dismissal of claims with prejudice under its inherent authority. It is done to protect "the integrity of the judicial process." In order to succeed, under *Dining Alliance*, it must find that the litigant acted in bad faith or willfully abused the judicial process.

Your Honor, this entire case, Global has been trying to seek litigation advantages by trying to get the Chicago bankruptcy court to hear this matter, at all costs; by dodging discovery and withdrawing a motion on the eve of a hearing; in not attending a meet-and-confer based on discovery deficiencies that are significant, so that they can get sanctions in Chicago, use it as *res judicata* here, get the case dismissed so they can have a receiver, dismiss all litigation against Green Sapphire, and get a receiver appointed to liquidate the assets so that the judgment creditor can take everything.

Not to go off on a tangent, but they say there's $22 million of assets here, but they're illiquid. And everyone

knows, when you have someone that's trying to sell assets at an auction, a judgment creditor can bid it -- bid their debt and move on. Why, if they have $22 million in assets, does that mean that the receiver is going to actually get $22 million for them? They're not incentivized here if the judgment creditor is in charge of the process.

Their goal is to dismiss all the litigation and then take these assets over. Had we proceeded on the 14th, all of this would have come out. All of our -- all of the evidence that shows nothing nefarious happened here. We provided a 15-page privilege log of all of my emails to my clients. Fifty percent were redacted. The other fifty percent I withheld. But the documents that were produced clearly showed nothing bad happened here. But they know if we have a hearing here, they will lose. That's why they're trying to backdoor this Court to go to Chicago to have a ruling there that will affect my clients here. That's on all fours with *Dining Alliance*.

There's a more recent case called *NexPoint Real Estate Partners v. Highland Capital* the Fifth Circuit rendered on September 16th, 2026. In this case, it was a little bit different because they simply did a withdrawal with prejudice, but it did not work, and so they actually filed a Motion for Sanctions that led to $850,000 in claims based on their decision to withdraw a motion on the eve of

depositions.

Now, we didn't have a deposition scheduled, but we did have deficiencies to the discovery that we were seeking a meet-and-confer. And unlike *NexPoint*, we had a hearing that Monday. They withdrew their motion with the discovery deficiencies hanging over their head, with a hearing on Monday that was going to have three witnesses come from out of the country.

So under *NexPoint*, we could file a Motion for Sanctions for this conduct. But we haven't. We're trying to get -- we're trying to show some level of civility here. We could have filed a Motion to Compel because they left us with more questions than answers. But we're involuntary Petitioners. We are not the Debtor. My clients have incurred substantial costs and resources and time because of a Motion to Dismiss that had no grounds. And it was going to be their burden. And we touched on that briefly last time, but the burden changes in a show cause why Green Sapphire didn't collude. And if all the emails are between my clients that are attorney-client privileged, how is Green Sapphire going to be able to prove that negative? There's not going to be any text message or email between Green Sapphire, Thane, or my clients on this issue, but then how are they going to be able to prove a negative?

Your Honor, the second avenue for with-prejudice

dismissal is under Rule 7041. Now, they argue 1018 does not include Rule 7041, and they're right. But I'm going to get out the Bankruptcy Rules. And if you go to 1017(f): Proceedings to dismiss a case or to convert to another chapter, Rule 9014 governs.

This is not just an involuntary petition Order for Relief hearing. This is a Motion to Dismiss the case. This is a contested matter. 9014(c)(1) -- if you want to go over there, to close the loop on this -- 9014(c)(1) incorporates Rule 7041. And 7041 applies 41.

They argue that 1018 doesn't apply to an involuntary petition, but in *In re Blixseth*, a district -- a bankruptcy court out of Nevada on June 3rd, 2021 -- the Lexis cite is Bankr. LEXIS 1964 -- oh, sorry, 2021 Bankr. LEXIS 1964. The Court found that Rule 18 -- Rule 1018 applied to a Rule 41(b) for want of prosecution. So it applied 41(b), not 41(a), that it was in an involuntary case.

So it was a dismissal action, not for bad faith. The dismissal action in *In re Blixseth* was for want of prosecution.

THE COURT: Uh-huh.

MR. TITTLE: But they did the analysis to show why it applies.

So, with Rule 1017(f)(1), and with *Blixseth*, and with other cases like I quote in my reply, or, sorry, my response

to the -- actually, it was my motion -- that this applies to a contested matter, and a motion to dismiss is a contested matter.

The main case that I think shows a similar fact pattern and why it should be with prejudice is the *Fairchild* case, *Fairchild v. Internal Revenue Service*, 969 F.2d 866. This is a Tenth Circuit decision from 1992. In this one, the debtor had a claim objection based on the IRS proof of claim that was filed. He wanted to withdraw the claim objection right before the hearing on the claim objection so that he could pursue that objection to the IRS's claim in another forum. That Court affirms the refusal of an eve-of-hearing withdrawal of an answered contested matter where the movant sought to preserve the dispute for another forum.

That is exactly what's happening here, and it needs to stop. The only way to get them to stop is if this is with prejudice. And the Court has multiple options to use for that result, whether it's with Your Honor's inherent power under the *Dining Alliance* Fifth Circuit decision or whether you use 7041 and apply the reasoning in *Fairchild*.

With respect to the scheduling order, the Motion to Show Cause why they should not be held in contempt on violating the automatic stay is not going to be for another month or so. The hearing in Chicago is going to take place on September 30th. They refuse to stand down. This is the

exact reason why the Court's inherent power can be used in this situation to stop this from happening.

Thank you, Your Honor.

THE COURT: All right. Thank you very much, Mr. Tittle.

Mr. Petts?

MR. SWICK: Your Honor, would you like me to go first, or --

THE COURT: And then he can respond to both Petitioning Creditors and the Debtor?

MR. PETTS: That makes sense.

THE COURT: Okay. All right. Mr. Swick?

MR. SWICK: Good morning, Your Honor.

THE COURT: Good morning.

MR. SWICK: Once again, Adam Swick on behalf of the now-Debtor, Green Sapphire.

Yeah, Your Honor, I'll be brief. I'll echo what Mr. Tittle said. You know, I'm living in a world where the Petitioning Creditors filed this case, then the Debtor, while they're stayed, gets, you know, a filing for a contempt and to pay attorneys' fees, and that's still ongoing. I've got an associate briefing that response because that's due in just a few days, and there's a hearing in Chicago on September 30th now to decide why a debtor, while there's a stay pending, should pay a bunch of money to another party.

And the entire reasoning behind what's going on in Chicago is that the Debtor filed this case, which the Debtor didn't file this case, there's Petitioning Creditors who filed the case. It's all -- it's absurd. This has to stop.

And, you know, we use -- you know, we have such egregious facts, from the accelerated timeline, to the Motion to Dismiss, to wanting a hearing on the Motion to Dismiss almost immediately, to having witnesses come over and all the money being paid for witnesses by the Petitioning Creditors and with blatant forum shopping, lack of notice of what happened in Chicago.

You know, these words like bad faith and willful are -- they mean a lot, and especially in this Court and this district, but unfortunately that's where we are in this case. I mean, they filed the Motion to Reopen and for Sanctions. Didn't tell anybody about it. You know, they gave scant notice of what they did give. And then they didn't tell this Court. We tell the Court. The Court says, you need to watch out what you're doing. And they just go on right and do it. They knew what was going on. They did it. You know, once they -- everything was out in the open.

41, the argument and objection that 41 doesn't apply, it just applies. 7041 says -- or, 1018 says a court can use these rules or any other rules that the court wants to use. And then 1017 specifically says, in a dismissal, Rule 7041

applies.

And you look at the case law, and it's out there: In this type of scenario, courts have implied, just like the *Blixseth* case Mr. Tittle cited, that 41 applies.

Nonetheless, 41, this Court's inherent power is designed to help prevent exactly what's going on here, forum shopping, litigation advantage, and another case to come back to this case, when all of this was queued up on the 14th. People were in the air, flying here from Europe for this case, and then that's pulled so that it can go forward in Chicago, after representations to multiple courts that that was not going to happen.

So, Your Honor, the Debtor has work to do. It needs to focus on getting a Chapter 11 case going, DIP financing, all sorts of stuff. We need to be worried about that. And this motion -- the Motion to Dismiss should be with prejudice for raising the arguments that it raised: collusion and bad faith.

Now, this was withdrawn at the last second. Those arguments weren't raised. Objections to the Motion for Order for Relief weren't filed. That needs to be stopped, with prejudice, and without the ability to file the exact same argument in another case.

Thank you, Your Honor.

THE COURT: All right. Thank you.

All right. Mr. Petts? Mr. Petts, I want to hear your argument. I meant to ask Mr. Tittle and Mr. Swick: The motion for September 30, what is to be heard that day? Just correct me if I'm wrong. It's a Motion for Sanctions against the Debtor, essentially on a theory of collusion, correct, that the Debtor had colluded with the Petitioning Creditors to file here?

MR. PETTS: Generally, that's true.

THE COURT: Okay.

MR. PETTS: The motion is -- sorry. The hearing --

THE COURT: Hearing.

MR. PETTS: -- for September 30th is for Green Sapphire to show cause why it should not be held in contempt of court.

THE COURT: Okay. All right. Please proceed whenever you're ready.

MR. PETTS: Okay. Good morning, Your Honor. Nick Petts for Global Capital.

At the first status hearing in this case, Your Honor rightly emphasized the importance of due process. Global Capital has moved to dismiss the petition as filed in bad faith, but Petitioners are entitled to a hearing before any dismissal is ordered. And they certainly are. No doubt.

What I would add today is that the principles of due process protect both sides to a case. Due process is a two-

way street. Petitioners are entitled to a hearing and Global Capital is also entitled to discovery ahead of the hearing to support its motion.

But the fact is Petitioners denied Global Capital key discovery it sought ahead of the September 14th hearing date. On September 8th, significant discovery disputes arose between the parties. On September 9th, the very next day, Global Capital asked Petitioners to agree to continue the hearing. Global Capital's goal was simply to resolve the disputes and ensure that its motion was decided on a complete record.

But Petitioners said no to the continuance. So Global Capital had no choice but to withdraw its motion. And it did so immediately, without prejudice to refiling it.

Now Petitioners ask the Court to convert the withdrawal into a dismissal with prejudice. It should not be converted for two reasons. One, the withdrawal was entirely warranted; and two, it did not cause Petitioners plain legal prejudice.

The withdrawal was warranted because Petitioners refused to provide crucial discovery that Global Capital was entitled to and needed to present its motion. The motion alleges that they filed their petition in bad faith and in collusion with Green Sapphire and Thane Ritchie, but Petitioners objected to producing documents that would reveal connections between Petitioners and Ritchie.

RFP 3 sought communications between Petitioners and, among others, Thane Ritchie, in the last 18 months.

RFP 7 sought documents sufficient to show payments Petitioners received from, among others, Thane Ritchie and his family office.

Each of the responses states, "Thane Ritchie is excluded from its scope." Petitioner objected to producing, objected to searching for responsive documents. They asserted that Ritchie "cannot control Green Sapphire." But he can and he does.

The Delaware Court of Chancery found in its post-trial opinion that "Ritchie controls Green Sapphire Holdings, Inc." These were entirely appropriate discovery requests, and Petitioners have not produced any of the responsive documents.

Petitioners point to their interrogatory answers, Mr. Tittle was commenting on it earlier, saying that they were not influenced by Ritchie in their decision to file. But Global Capital is not required to take their word for it. We know what they will say at the hearing, but what do the documents say? We need the documents to test the veracity of their statements.

Petitioners also refused to answer key interrogatories. Interrogatory 1 sought disclosure of the circumstances leading to the filing of the petition, and Interrogatory 9

asked whether they had, quote, knowledge of the hearing in the Delaware action prior to the filing of the petition, and the source of that knowledge. Your Honor will recall that the petition was filed about an hour or so before a hearing in the Delaware Court of Chancery on a motion to appoint a receiver for Green Sapphire.

Their answers fail to provide crucial information. They say on the 30th of this year Tittle Santiago called lecocqassociate and Charles Vanoverberghe about a potential involuntary bankruptcy while the voluntary bankruptcy in Chicago was still pending. But Tittle Santiago did not just call these creditors out of the blue one day. There were circumstances that led to that June 30 call, and they haven't been disclosed.

Legamaro Banipal's answer is even more incomplete. They say that Michael Legamaro's involvement in this involuntary bankruptcy only began the day the petition was filed, July 21, 2026. The answer implies that Mr. Legamaro just woke up that day and decided that this was the day he was going to collect on that unpaid invoice for $8,000 from four years ago. So he calls Tittle Santiago, engages them and signs the petition, all within a couple of hours before the receiver hearing.

There is more to it than that. How did he know to call Tittle Santiago? How did he know to call on that day of all

days?

Well, Mr. Tittle has just told us in his opening statement how he knew to call Tittle Santiago on that day. Green Sapphire told him to. Green Sapphire's Debtor's counsel in Chicago called Legamaro and apparently directed him to call Tittle Santiago and join this petition.

I mean, to me, I can't see any clearer evidence of collusion than that, and which is all the more reason why we need to get the documents that they're refusing to produce. It just goes to show that there is backstory here to this petition that we've asked for in our interrogatories and they have refused to produce.

Finally, Petitioners refuse to make their witnesses available for depositions. Your Honor is familiar with the timeline. On September 7th, we asked for times to depose Petitioners and Green Sapphire's witnesses. As you know, they balked. They refused to even identify their witnesses. This should not have come as a surprise. The Court ruled at the August status hearing that if there were any depositions that needed to be had, they could be had the week beginning September 7th. All the parties were on notice that witnesses were going to have to be made available this week of September 7th. It should not have come as a surprise to Petitioners or Green Sapphire.

And the thing is, these depositions were not meant to be

a big production. They might have taken an hour or two per witness. Plus, we agreed to take them virtually, by Zoom, for the convenience of the witnesses. They could have easily been done that week.

The witnesses' identities were not disclosed. At the status hearing, ideas for witnesses were proposed, but none of it was firm. Green Sapphire said they might call Garrett Vail or maybe Paul Wolfe or maybe both. Regardless, it's hard to understand why they refused to provide the names when Global Capital asked for them that week. Global Capital sent multiple emails asking for the witnesses, and they wouldn't respond. Why not? It costs them nothing to just give us the names.

In sum, Petitioners denied Global Capital critical discovery and tried to force through a hearing on a one-sided record. Global Capital was not going to agree to that. Who would? So Global Capital rightly withdrew its motion and the hearing was canceled.

Now, Petitioners, in their motion, haven't cited any controlling authority for treating the withdrawal as a voluntary dismissal of a claim and converting it to a dismissal with prejudice. My colleague cited quite a few cases in his opening statement. I think I got some of the names down: *Dining Alliance*, *NexPoint*, *Blixseth*, *Fairchild*. I can't comment on those cases, Your Honor, because none of

those cases are cited in their motion.

What I can say is, even if Civil Rule 41 applies, and we don't agree that it does, it would not support Petitioners' request to treat this as a dismissal with prejudice. The presumption is that a voluntary dismissal should be without prejudice. To rebut that presumption, the other side must show plain legal prejudice. That's the standard. Petitioners have not carried their burden on that standard.

Refiling that Motion to Dismiss will not cause them to lose any legal defense. Refiling will not cause them to lose the benefit of their work in preparing for the September 14th hearing date. That work can be reused at the next hearing date. If they lost anything, it was the nominal cost to change their airline tickets. That is not plain legal prejudice.

Yes, refiling will mean they have to respond to the motion, but the Fifth Circuit has held that having to defend against a second suit is not prejudice.

If this withdrawal is deemed a voluntary dismissal, it was a first-time dismissal and one made without delay. The day it became clear a withdrawal would be necessary, Global Capital immediately filed its notice of withdrawal. The withdrawal should remain, as stated in the notice, without prejudice to refiling.

So unless Your Honor has any further questions, there's a

couple points I would respond to from my colleague's opening statement, a couple further points.

THE COURT: Okay. Please proceed.

MR. PETTS: One is that this is not gamesmanship, Your Honor. This was -- the motion was not withdrawn for any kind of tactical advantage. And the facts that show that are that we gave them the opportunity to continue the hearing. We did not immediately withdraw. We asked them, we've got these discovery disputes, we need the Court to rule on these discovery disputes so we can get the discovery we need for our motion. Would you agree to a continuance? And they slammed the door in our face. They boxed Global Capital into a corner and left Global Capital with no option but to withdraw its motion.

Global Capital is prepared to proceed on this motion, to file a renewed Motion to Dismiss and have it heard, just as soon as these discovery disputes are resolved. We think logically it makes sense for it to be heard after the Motion to Transfer, but we would look to Your Honor for direction on that.

So, with that, I'm happy to answer any questions you may have or rest there.

THE COURT: So if there was an issue on discovery, then why not ask for a continuance?

MR. PETTS: We --

THE COURT: Why not ask the Court for one, rather than the other side?

MR. PETTS: It didn't seem that there was sufficient time for us to -- clearly, the continuance was going to be opposed. We would have had to file a motion to continue. That would have been briefed. It's very unlikely -- I recall that chambers said you were busy that Friday and were not able to hear any --

THE COURT: Well, yes, an emergency motion on a Friday will very rarely, absent a fire or flood, be heard on a Friday.

MR. PETTS: Yeah. So there simply wasn't time to file a motion for a continuance.

THE COURT: Okay.

MR. PETTS: And one further point I'd like to address on the discovery disputes. These are genuine discovery disputes. We are very keen to get these resolved. My colleague said in his opening that we haven't met and conferred. What the timeline shows is that they offered us one date, one time to meet and confer, on that Wednesday at 1:00 o'clock, which we were not available to meet and confer then.

But in our response, Your Honor, we offered them anytime on Thursday, the very next day. We said anytime on Thursday, send us a calendar invite and a Zoom link, and we will get

together with you and meet and confer to work through these issues. And we didn't hear any response to that invite to meet and confer.

I have nothing further. Thank you, Your Honor.

THE COURT: Thank you very much.

Mr. Tittle?

MR. TITTLE: So, Your Honor, one of the most laughable events I've had in court was his statement that they didn't have time to file a Motion to Continue. But you know what they did have time to file? A massive Motion to Transfer Venue. At the same time, they filed their Notice of Withdrawal.

And you know what's also somewhat comical is, in his entire presentation, you know what he never said anything about? The September 30th in Chicago. Not a single -- he didn't say it a single time. And in fact, he wants to set the hearing in this matter after the transfer motion, two months from now, because by that point Judge Cox would have ruled.

Your Honor, if you turn to our responses to the interrogatories, or, sorry, the Requests for Production, after each request that they're talking about, like, if you can go to Page -- I'm at 20.

THE COURT: I'm in Exhibit 17.

MR. TITTLE: If you go to 20, Your Honor, this is

the Lazareff party interrogatories.

THE COURT: Uh-huh.

MR. TITTLE: If you go to Page 9 regarding Request for Production #3, it says, No responsive material is being withheld under any objection. I don't know if they read it or not, but it's there. Nothing else exists.

Now, we can lodge an objection, but we can also clarify that we're not holding anything on behalf of the objection.

Top of Page 10 for Request for Production #4. No responsive materials withheld under any objection stated in the response.

Same with 5. Same with 6. Every one of them say it. And if there is something there, we produce a Bates range of the production. I know, because I spent over a hundred hours doing it.

The only reason they're saying there's a deficiency is because they want -- they want to be able to use a substitute for live testimony. If they wanted to know what happened, call our guys to the stand. That's exactly what Kevin McCullough told me hours before they withdrew the motion -- or the notice -- or, sorry, withdrew the Motion to Dismiss and sought to transfer venue. My conversation with Kevin McCullough, he likes to take the witnesses cold. He doesn't want to do depositions.

MR. MCCULLOUGH: Objection, Your Honor. I'm not

sure I like to take witnesses cold. What I said was --

MR. TITTLE: On -- without the depositions here. He didn't need them.

MR. MCCULLOUGH: My inclination was maybe we just do it that way. I didn't have any authority. I didn't agree to that. I just said -- threw that out there.

MR. TITTLE: But what he can agree on is that I asked for a night -- a meet-and-confer that evening on that Wednesday when you filed your Notice of Withdrawal.

MR. MCCULLOUGH: And then when I found out all these discovery issues were way more extensive and problematic than I thought they were going to be, it made no sense to waste this Court's time on a hearing on a Motion to Dismiss. And we knew a continuance was going to be -- so just withdraw it without prejudice, let's get on with discovery issues, clear it up. We've already got a Motion to Transfer teed up. Let's see what happens between these two judges. Maybe we just have a status conference with both judges, and let's just get to the bottom of it.

MR. TITTLE: But that's not what happened.

MR. MCCULLOUGH: Are they offended that -- does she care whether you hear this case? We don't care. They already admit these cases need to be in bankruptcy. Their own lawyers think so. It's just a matter of where now.

MR. TITTLE: Your Honor, they never attended a meet-

and-confer after my repeated requests for a meet-and-confer. They withdrew it right before we could even have the meet-and-confer that Wednesday.

They could have continued this matter. That's a two, three-page motion. Citing discovery deficiencies. They could have filed a motion to compel. An emergency motion to compel. You know what we have? We have one on file -- on my folder, a motion to compel. We didn't file it, but we have one drafted.

They could have filed a notice of deposition at any point after the August 18th hearing. Depositions were never mentioned, not once, until the morning of Labor Day, that they want to depose all five of the Petitioning Creditors, who are all out of the country, and they're going to give us four days' notice to do deposition prep. The case law is clear. You get at least ten days. Depositions are serious. They were trying to sandbag us at the last minute to do depositions, to catch our guys flat-footed. And then when we give them discovery, we try to do a meet-and-confer, and they withdraw it so they can go back to Chicago. That's the only reason they're doing this.

It has to stop, Your Honor.

THE COURT: Mr. Swick?

MR. SWICK: Adam Swick on behalf of the Debtor. I will certainly be brief.

Yeah, I mean, that week was frantic. But, you know, we talked -- Opposing Counsel talked about due process. Due process is an opportunity. The opportunity was there. I've been in many of these circumstances where you have things going quickly in a bankruptcy case, but -- and I've got a case right now in Florida -- but, you know, deposition notices are sent. And you can talk about reserve days. You know, the words deposition between the parties just never came up. The only time it was mentioned was by Your Honor in that hearing, but no party, up until I think on Labor Day, was planning on doing a deposition.

And then it's also hard to say, well, there's discovery disputes, so the only option was to dismiss it to get better discovery, but there was no meet-and-confer. I think both parties at one time were trying to get a meet-and-confer going on a very quick schedule, these two guys talked about discovery disputes, from what I've just heard, but they didn't formally meet and confer.

So, you know, then, too, it goes back to the September 7th Labor Day. Well, if they're saying Monday was plenty of time before the following Monday, when people are flying over from Europe, what day would have been too late? Tuesday? Wednesday? Thursday? No. I mean, it was too late to do this.

And, you know, the most glaring thing, to actually

reiterate what Mr. Title just said, all these reasons of postponing it, want to do it after the Motion to Transfer Venue, but they didn't say anything about, once again, the September 30th hearing, which is the September 30th hearing are the fact issues that were queued up on September 14th that didn't happen. And they're not willing, they're not saying they're going to postpone that, they're not going to move -- they're going forward on that no matter what, because that's the entire purpose of this game.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Swick.

Mr. Petts, anything further?

MR. PETTS: Just one or two further points, Your Honor. I'd like to address the discovery responses that my colleague was talking about a second ago. He said that nothing was withheld in response to RFP #3 or RFP #7.

THE COURT: Okay.

MR. PETTS: And while it does say that at the very end of the discovery response, --

THE COURT: Right.

MR. PETTS: -- it says, earlier in the response, it makes clear that they did not search for any Thane Ritchie documents. They cannot say they, you know, rest on this statement that they're not withholding material when they haven't even searched for the responsive material.

In response to RFP #3, it says: Subject to and without waiving those limited objections, Responding Parties searched for communications with Green Sapphire, Garrett Vail, Paul Wolfe, or another authorized Green Sapphire representative. What name isn't mentioned there? Thane Ritchie.

Now let's look at the other RFP: The documents sufficient to show all monies you received from Thane Ritchie or Alpha Carta.

THE COURT: Which one are you--?

MR. PETTS: This one is RFP 7, Your Honor.

THE COURT: Thank you.

MR. PETTS: Again, they say Mr. Ritchie is excluded from the scope. And, again, it's -- they only searched for documents reflecting payments from Green Sapphire to Petitioners. They haven't searched for payments from Thane Ritchie or Alpha Carta to Petitioners. So there is potentially responsive documents out there that they have not searched for that may exist and probably do exist and should be produced.

Unless you have any other questions, --

THE COURT: I do not.

MR. PETTS: Okay.

THE COURT: Thank you.

Mr. Tittle?

MR. TITTLE: I think at the August 18th hearing, Mr.

Swick stated that this is a trust that's set up for Thane's wife and kids.

THE COURT: Uh-huh.

MR. TITTLE: Thane is not associated at all with Green Sapphire, but his kids are the beneficiaries of a trust.

THE COURT: You just said it's his wife and kids. And he's not associated at all?

MR. TITTLE: No, yeah, he's not -- he's not a beneficiary of the trust. He's not the trustee of the trust. He's not affiliated, --

THE COURT: But he's an insider?

MR. TITTLE: -- other than his kids and wife are the beneficiaries.

THE COURT: Okay.

MR. TITTLE: Regardless of that, if we would have had a meet-and-confer we could have revised or amended our interrogatories. They could have filed a Motion for Continuance and filed a Motion to Compel and had all of these issues come up. But I can tell you, there's nothing there. There's no discovery there that's going to show bad faith or collusion.

The truth is, they don't care about the discovery because they don't need the discovery to go to the Chicago bankruptcy court and argue bad faith and collusion, because it's on --

it's our burden, or, it's Green Sapphire's burden, Green Sapphire's burden to prove that there's no bad faith or collusion. So there doesn't need to be any evidence. They don't need discovery to go to the 30th and win.

THE COURT: That's not my hearing. I can't speak to what's needed.

MR. TITTLE: But this is your court.

THE COURT: I know this is my court. And number one, I am prone to stay in my lane; and number two, I intend to, because obviously folks have set up a dangerous game between two courts.

It is one thing to set up a game, to set up a situation between a bankruptcy court and a state court or a bankruptcy court and some sort of regulatory tribunal. But it's a whole other thing to set up between two essentially sister courts. And I understand very strongly both sides. That's all I'll say.

MR. TITTLE: Thank you, Your Honor.

THE COURT: Thank you.

All right. I'll take -- oh, Mr. McCullough?

MR. MCCULLOUGH: Your Honor, that's exactly the point. I don't want to get in the middle of it.

THE COURT: Sure.

MR. MCCULLOUGH: And I think the proposal -- and I know it's unusual -- but a joint status conference is with

both judges, so everything could be laid out on the table. There's no more games. This is where we're at. And if the Court in Chicago is not offended that a bankruptcy is down here and has no issues with it, then we hear it. If they have a problem with it, --

THE COURT: Well, there's an issue there, though, Mr. McCullough. Number one, a joint status conference, sure, I've read the transcript before Judge Cox. I think at some point the actual evidence needs to be decided. But I'll cite to you something that you're very familiar with, which is the *Mondara* --

MR. MCCULLOUGH: Yes. Exactly.

THE COURT: -- case that was before this Court. And there you had a state court that, for a great deal of time, was operating on her own. She was saying, notwithstanding a petition and notwithstanding an order for relief in the bankruptcy court, I'm going to go forward with the jury charges, I'm going to go forward and let the jury go to verdict, notwithstanding the bankruptcy petition.

I had the same face, Mr. Petts.

But as you will recall, factually what happened is after the -- like I said, the state court was acting and acting and acting. Eventually the plaintiff said, and you know what, Your Honor, we've got some case law authority that says that notwithstanding the petition and then notwithstanding the

removal, that the bankruptcy court can annul it after the fact. And what did I have to do? I had to basically say it was done in violation of the stay.

MR. MCCULLOUGH: Yeah.

THE COURT: I wouldn't annul it. And because of the removal, the state court was void of jurisdiction and they had to essentially retry -- I don't remember what the verdict was in that case, but I remember mine -- I had to retry an entire construction litigation case. I'm a stucco queen over here.

And so what I'm very concerned over is the fact that we don't have parallel proceedings, we've got a re-opened proceeding of a dismissed debtor there. We've got obviously an order for relief that has just been entered here, because of where we are in this case, being that it was an involuntary petition. But I'm very concerned that once we get to September 30th there, Global Capital will be participating in a hearing against the Debtor while a stay is happening here.

So, again, I think at the end of the day we would have been better off if everyone would have come to the Court in one way or the other, whether that is a motion to compel, whether that is a motion to continue, or whether that is an emergency status conference that says, hey, look, we're not prepared to go forward on Monday because of discovery

disputes, we want a continuance, they won't agree to one. And the answer is, could I have had a hearing Friday? But this obviously happened on Wednesday. It didn't happen on Friday. And I just think, I mean, emergency --

MR. MCCULLOUGH: Thursday is when I made the call.

THE COURT: Right.

MR. MCCULLOUGH: And it was my recommendation.

THE COURT: Right.

MR. MCCULLOUGH: Because I was like, this is not going forward in this posture.

THE COURT: Right.

MR. MCCULLOUGH: I don't want to waste the Court's time on this.

THE COURT: Right.

MR. MCCULLOUGH: Let's hold off. I'm just coming off of the *727 Lofts* case in front of Judge Jernigan, --

THE COURT: Right.

MR. MCCULLOUGH: -- where we had Delaware, Maryland, Oklahoma, and Texas.

THE COURT: Right.

MR. MCCULLOUGH: And we had a creditor --

THE COURT: I had a piece of that for a little bit, too.

MR. MCCULLOUGH: And we had a ton of moving parts in that one. The Delaware court took it upon themselves, I

think canvassed the other judges, --

THE COURT: Uh-huh.

MR. MCCULLOUGH: -- and everything got transferred to Oklahoma.

THE COURT: Right.

MR. MCCULLOUGH: That's all I was suggesting with a status conference, is: Is there some way that we don't run afoul of one Court or the other in proceeding? They're the ones that chose this venue.

THE COURT: I recognize that. I recognize that.

MR. MCCULLOUGH: Now we have to deal with it.

THE COURT: Right. But you also understand that, until I have an evidentiary hearing, I assume that the Petitioning Creditors filed an involuntary petition. That involuntary petition was not contested. At the end of the day, I've got an order for relief and now I have a Debtor.

MR. MCCULLOUGH: Understood.

THE COURT: So, yes. Thank you, Mr. McCullough.

MR. MCCULLOUGH: Thank you.

THE COURT: Mr. Swick?

MR. SWICK: Your Honor, I just, I want to state, the whole mess, they caused the entire mess. It was their Motion to Dismiss. It was they that wanted a hearing on very short notice, with discovery. And then they filed, just after this Court's status conference, the Chicago matter. Right? And

then didn't give notice.

And so here we are in this mess. This is not the world that Petitioning Creditors or the now-Debtor created. This is the world that this one lone creditor created. And they just shouldn't be allowed to benefit from it, when we were here to go right in front of this Court. If they wanted a continuance, we could have talked about a continuance. We didn't -- it was one sentence. I don't think I was asked for a continuance.

So, but, yeah, so Your Honor, it is what it is, but this is not -- like, we would like to get on with the Chapter 11 case. Like, there has been no motion to dismiss filed up to this point, and no objection. We should be allowed to just go and not have to worry about the collusion arguments in another court to where we're -- it's a blatant stay violation.

THE COURT: Okay.

MR. SWICK: So, that's all, Your Honor.

THE COURT: Thank you, Mr. Swick.

All right. Anything else?

MR. TITTLE: Nothing further.

THE COURT: Okay. All right. We'll take a brief recess.

THE CLERK: All rise.

(A recess ensued from 10:57 a.m. until 11:14 a.m.)

THE CLERK: All rise. The United States Bankruptcy Court for the Northern District of Texas is once again in session, with The Honorable Michelle Larson presiding.

THE COURT: Please be seated. All right. We're going to go back on the record in Case No. 26-33254.

All right. I've gone through this pretty thoroughly. Here's what I will say, is I do believe that Global Capital probably waited a little long to ask for those depositions when, I think, we had the hearing on or about -- I guess it was maybe August 18th, and I know there was one after that, perhaps. I'm not exactly sure, but maybe September 1st.

MR. TITTLE: September 1. Yeah.

THE COURT: And again, everything was, "We're going forward," We're going forward," "We're going forward." Obviously, discovery disputes arose. I think that the better state of play would have certainly been to ask for a continuance, ask for an emergency hearing when that issue arose, or for either a motion to compel or a motion for a continuance due to [Court edit] a discovery dispute. In other words, let's continue the hearing so that we can have the discovery dispute heard or so that we can further confer and work things out. I think that that certainly would have been the better position.

Likewise, I completely understand that proceeding on a Motion to Dismiss in this Court versus proceeding on an order

to show cause in another court are two completely different burdens and they're different hearings. And I flatly understand why Global Capital may want to be in Chicago versus Texas. I'm not an idiot, despite what my friends might say. I think I understand all that.

But I also recognize that a dismissal -- Mr. Tittle, I don't think you have a very straight line through the rules or the statutes for a dismissal with prejudice. 9014 does incorporate 7041. When I get to 7041, it is clearly in the context of an adversary proceeding. Likewise, it is clearly in the context of complaints, causes of action, and the like. I think that things could have been better handled, but that doesn't mean that the withdrawal of a motion is necessarily with prejudice.

So I'm not going to make it with prejudice, but I'm also not going to allow the refusal for it to be with prejudice to essentially hamstring the parties here. It's going to be a very, very hard row to hoe to get me to give res judicata to something that's going to happen in Chicago, because I have been as clear as I can be that if you want to deal with this bankruptcy and this Debtor, you need to do it in this Court. Whether that's the Motion to Transfer Venue or any other motion that you want to bring in the future, I will deal with it here.

Attempting to get res judicata on a very different record

with very different burdens in another court, especially after you chose [Court edit] to withdraw your Motion to Dismiss here, knowing what substantively would occur in both courts, I think that that would be giving Global Capital a bit of a litigation advantage.

And obviously, you've got a court in Chicago that has given a dismissal with a prejudicial bar. She's obviously got a lot of history with it. And so I have said before, I'm not going to enjoin my colleague by words, by actions, or frankly, by thoughts, but I'm also not going to allow Global Capital to get a leg up here just by withdrawing the motion and saying, well, I might bring it again in a different day, and at that time attempt to use res judicata.

And I know you haven't said that by any means, but obviously, your adversary believes that that is the chance. When we think about what has to happen on that order to show cause versus what would happen in a motion to dismiss, that is a judge's on-the-spot determination and evaluation as to the credibility of witnesses. And I'll say to you, Mr. Tittle, your discovery responses, you may have spent a long time on them, but they're less than clear of whether or not there exists an email or any other correspondence between Mr. Thane Ritchie and one of the Petitioning Creditors' principals as to this. And obviously, for lack of a better word, Global Capital believes that Mr. Ritchie is the

boogeyman, is the man behind the curtain or the Wizard of Oz, that he is the one that is putting this together. That is their assertion and their allegation.

And so I do believe that the discovery responses, as they stood, were incredibly unclear about whether or not any correspondence was being picked up that involved Mr. Ritchie. Maybe it is, and that's what you intended them to be, but I can see where there'd have been a meet-and-confer necessary, a dispute resolution of some measure that was necessary there.

So all that to say, my ruling is that I'm not going to give anyone a leg up by virtue of the withdrawal of the Motion to Dismiss. It will not be with prejudice today. However, if the attempt is let's go have a hearing in Chicago on the 30th on a different burden in a different hearing and try to use it in this case, the answer is very unlikely as well.

Again, I understand the dispute. I would have understood the request for a continuance based on kind of where we are. I understand that, Mr. Tittle, you thought that just a day's notice of a deposition was too quick. I think both parties could probably sit back in their own chairs and realize that, looking at it either way, there was a reasonable way to handle that. They should have been requested in advance. You should have expected that depositions were to occur.

It's as simple as that.

So all that to say the request for the Withdrawal of the Motion to Dismiss to be with prejudice is denied. It will be without prejudice, but you've got the rest of the Court's thoughts on what can come of that.

So, with that, I understand that we were going to have a scheduling conference on any other motions. I think there's a motion, you have a contempt and sanctions motion, I believe, that is on file, and then obviously Global Capital has a Motion to Transfer Venue.

MR. TITTLE: Yes, a Motion to Show Cause why they shouldn't be held in contempt for violating the stay.

THE COURT: Right.

MR. TITTLE: And want to proceed on September 30th.

THE COURT: Okay.

MR. TITTLE: I guess, I mean, we would like it heard before the 30th so that we have a ruling that it's a violation of the stay and it doesn't go forward. That doesn't give us a lot of time to have that hearing, but that would be our preference.

Now with this Court's ruling just now, I don't know if it's as important, but nothing is going to stop the September 30th from going forward.

THE COURT: Okay.

MR. SWICK: Yeah, I'd echo that, Your Honor. I

mean, we have an active stay violation ongoing that needs to be stopped before September 30th. And I don't think we're going to hear a voluntarily continuance on that or stop that from Opposing Counsel, even though everyone knows it's a stay violation.

THE COURT: Thank you, Mr. Swick.

Mr. Petts?

MR. PETTS: Yeah, --

THE COURT: So we've got --

MR. PETTS: -- Your Honor, we intend to move forward on the 30th. As Your Honor said, it's different burden, different relief being sought, and so we intend to go forward.

As to the scheduling of the Motion for Contempt that Petitioners have filed, we think, you know, a week in October -- this next week is too soon for us. We still have to have an opportunity to brief our response to that motion.

THE COURT: Okay.

MR. PETTS: So I don't know that it allows us enough time to squeeze it in this week.

THE COURT: Okay. All right. I don't think that I have a --

MR. PETTS: What I would --

THE COURT: We don't have a hearing time anyway.

MR. PETTS: What I would suggest is that the parties

meet and confer regarding dates --

THE COURT: Okay.

MR. PETTS: -- for those two motions.

THE COURT: Okay. Let's --

MR. TITTLE: Yes, the -- we filed the motion, but now it's, because the Debtor is Debtor-in-Possession, the Order for Relief is entered, it's not the Petitioning Creditors' stay, it's the Debtor's stay.

THE COURT: Uh-huh.

MR. TITTLE: So I don't know if they're going to join in on the motion or whether the Petitioning Creditors still need to proceed on that or whether that's a motion for the Debtor to take over, if the Court has any guidance as to that.

THE COURT: Why don't you get to the microphone, Mr. Tittle.

MR. TITTLE: Yeah, I don't know if the Court has any guidance on how to proceed on some of these issues, because the Petitioning Creditors really are now disbanded and they're now going to be proceeding individually. Maybe a Creditor Committee is appointed. But a lot of these motions that were contemplated were before the Order for Relief was entered, so I'm not sure how the Court wants to handle those.

THE COURT: All right. Well, what I'll do is I'll allow you and the Debtors -- obviously, we'll get the order

for relief entered, and I'll allow you and the Debtors to confer on how to proceed on the contempt motion at that time, and then we'll set it.

I can tell you that -- I'll have to look and see if I have a pocket availability, but I don't see one as I sit here until the week of October 5th, at best.

MR. TITTLE: Okay.

THE COURT: And I'm not even sure about that week. We'd have to get a time estimate and get Ms. Harden to look for times.

One of the issues is the Bankruptcy Court is closed on the 25th, and there is a full-day seminar on the 28th, and I'm speaking on at least two panels that day. And the rest of the week is, like I said, it's lighting up in colors that tell me that there's probably no availability.

Now, I can look. But, again, it'll depend greatly on the time estimate. And obviously, that was filed on --

Yes, Ms. Harden tells me that it would be probably the 5th or the 9th that I might have some time that week.

It was filed on the 9th, and it very well may be that that becomes the Debtor's motion rather than the Creditors' motion. You just have to look at it and see what you're asking for in terms of damages.

MR. PETTS: As to --

THE COURT: Unless -- wait, sorry, Mr. Petts.

Unless the initial motion is just for the contempt ruling, and then, of course, it could be held separately from any sort of damages hearing.

MR. SWICK: Yeah, that's the other thing, too. He's going to have -- there's different damages --

THE COURT: Right.

MR. SWICK: -- for both parties.

THE COURT: Sure. And so it very well may be, once you consider it, whether or not you want to file your own motion or -- and clearly, if there were to be contempt found and there were to be damages, it would be separate for each party.

MR. SWICK: Okay.

THE COURT: All right.

MR. SWICK: So there's no way to have that heard before September 30th, or if I were to do -- file for a TRO to stop the stay violation? Is there anything I can do to get that heard before September 30th?

THE COURT: If you file a TRO, it's like I said, I'm just talking about the amount of time I have to give to something. Let me look now. Let me see. In fact, there's no reason for me to look, let me have Ms. Harden look, --

MR. SWICK: Okay.

THE COURT: -- because I am horrible with the calendar. How much time?

MR. SWICK: The evidence is the evidence on this, so I don't necessarily know that a whole lot of time is necessary. I mean, every -- all the evidence that would be admitted is before this Court or the Chicago court.

THE COURT: Which day is the Arrow motion to dismiss? Is that on the 29th? (Pause.) I think I have an hour on September 29th. I mean, I am booked from 9:30 to 6:00 almost every single day.

MR. SWICK: I'll take it.

A VOICE: We really very much appreciate that, Your Honor.

MR. PETTS: I'm not sure that works for Global Capital. May I approach and address the Court --

THE COURT: Yes. Of course.

MR. PETTS: -- on timing matters?

THE COURT: Of course.

MR. PETTS: We have to be in Chicago the next morning. So, as a logistical matter, that would be very difficult for Global Capital. We would ask that the motion for contempt be heard on the 5th or the 9th, the two dates you proposed.

I also don't think that the Debtor can show any kind of irreparable harm to proceeding to the hearing on the 30th. I understand they may have a claim for damages, but Your Honor has made clear that any ruling in that hearing is not going

to have res judicata effect here.

MR. SWICK: She said unlikely.

MR. PETTS: Okay. Unlikely. But the standard is, you know, likelihood of irreparable harm, and I just don't think the showing is there to warrant --

MR. SWICK: It is there, because they're going to take it and use it in other proceedings worldwide, and use it, the findings, is what it is. There is going -- there is irreparable harm.

And look, this is their hearing. They can move their hearing on the 30th if they want to.

THE COURT: Mr. Petts, I just, I really do understand the history of this case. If you're not going to -- if you didn't oppose the Order for Relief, I mean, obviously, the stay was in place before. If there's a circumstance which a stay was doubly in place, it's doubly in place now. I just --

MR. PETTS: May I?

THE COURT: Yes, you may.

MR. PETTS: One further thought?

THE COURT: Of course you can.

MR. PETTS: They not only need to show irreparable harm, they also need to show --

THE COURT: That's for a TRO.

MR. PETTS: For -- right. We were talking about the

TRO.

THE COURT: Yes, exactly.

MR. PETTS: In order to --

THE COURT: I don't have the TRO motion.

MR. PETTS: Right.

THE COURT: But I hear what you're saying.

MR. PETTS: We're just talking conceptually.

THE COURT: Sure.

MR. PETTS: They also need to show likelihood of success on the merits, and we've already briefed this issue to Your Honor once before, and Your Honor reserved decision on that issue because you felt at the time that neither side had demonstrated that the law --

THE COURT: Sure.

MR. PETTS: -- was squarely in their favor. And so I would say, based on that prior ruling, it's going to be very difficult for them to show likelihood of success on the merits. They can't show that the law clearly favors them --

MR. SWICK: We have to show you're violating the stay.

MR. PETTS: Excuse me. Excuse me. They have to show that a contempt -- a civil contempt proceeding is not exempt from the automatic stay. In our briefing, we cited to five or six circuit courts that have unanimously held that civil contempt proceedings are exempt from the automatic stay

under the government regulatory exception. With that weight of authority in place, they simply cannot show a likelihood that they're going to show that all those courts were wrong and that --

MR. TITTLE: They were not published opinions.

THE COURT: Okay.

MR. TITTLE: This is absurd.

THE COURT: Well, but here's what I'll tell you, Mr. Petts. Again, I said then and I'll stand by it, with respect to the case law, there's one issue of a court proceeding on its own, but once the creditor is joining in, you have a -- and *Chesnut* applies in this district, from a Fifth Circuit perspective, and the question is whether or not you're arguably violating the automatic stay. And *Chesnut* says, come here and ask for permission. That's what *Chesnut* says. I don't have a "Mother, may I?" pleading. I have, your prerogative, I have we are going to forward. That's what I have.

And so it's just a very risky proposition. It seems -- it's like *Raiders of the Lost Ark*, you're walking across the river with alligators to get to the rolling ball down the mountain. I just, I'm not begging anyone one way or the other, and I understand where we're going, but I also understand that there's probably safer ways to proceed. And you already teed up your Motion to Transfer Venue. It's like

I said, a Motion to Dismiss here, Motion to Transfer Venue, Motion to Lift -- there's a ton of different ways to proceed. But I've read the case law relative to the governmental exception. And I'm not saying that it's absolutely inapplicable, I don't believe that, but I do believe it's a much finer line of things that were maybe already teed up before a petition date, of things where you do have a governmental actor, et cetera.

And so the Motion to Reopen is one thing. As I said, I'm not sure that the Motion to Reopen in and of itself violates the automatic stay. But now I have a debtor in bankruptcy, and it's just, in the Fifth Circuit, it's not that hard to violate the automatic stay because of *Chestnut*, and I don't desire to have to make hard rulings, is all I'll say there.

So, and I haven't seen the TRO motion. I think at the end of the day that I would be, again, loath to prohibit someone from proceeding in another forum. If they do and I find it violates the automatic stay, so be it. But, again, you've got a bankruptcy court in Chicago that full well knows what's going on over here as well. And so I'm very concerned about acting one way or the other. I think that after-the-fact acting may be what I have to do. So, again, I --

(Interruption.)

THE COURT: Is there a phone or anything? Is it a feedback from the --

THE CLERK: It's feedback from --

THE COURT: Oh, okay. No problem. I just wanted to make sure that there wasn't any recording device in the courtroom, obviously.

If you were to file a TRO motion, I can tell you that the only day that it could be heard -- and it would, given it's an emergency motion, it would be hybrid -- would be on the 29th. That's the only time that I see an hour of availability.

MR. SWICK: Okay.

THE COURT: And that's at 9:30.

MR. SWICK: Well, we could do the TRO or we could -- or it could be the Motion for Sanctions. Or is that what you're saying, do both of them of the 29th?

THE COURT: The Motion for Sanction, I don't have the motion. I denied the Motion to Expedite on the Motion for Sanctions.

MR. SWICK: Okay. Okay.

THE COURT: And again, that's not even the Debtor's; that's --

MR. SWICK: Correct.

THE COURT: -- the Creditor's pleading.

MR. SWICK: Yeah. Okay.

THE COURT: So.

MR. SWICK: Do you know what time? Or is it just --

THE COURT: On the 29th?
MR. SWICK: Yeah.
THE COURT: The only hour I have is at 9:30, and that's because someone just pulled the hearing.
MR. SWICK: Okay.
MR. PETTS: One other matter is, as to the Motion to Transfer, --
THE COURT: Yes.
MR. PETTS: -- scheduling a hearing on that.
THE COURT: Yes.
MR. PETTS: Global Capital would be willing to move -- have that heard on the 5th or the 9th, the two dates that you offered.
THE COURT: Okay. So you've got -- let me look. So you filed that on the 9th. All right.
MR. PFAEHLER: And Your Honor, sorry to pile on here, but Ken Pfaehler.
THE COURT: Yes, Mr. Pfaehler.
MR. PFAEHLER: The 5th would be very much optimal for me. Not saying we can't hear it on the 9th, but if you're available on the 5th, that would be much better --
THE COURT: Okay. Thank you.
MR. PFAEHLER: -- for Global Capital.
THE COURT: Appreciate it.
MR. PFAEHLER: Thank you.

THE COURT: I'll take a look.

MR. PFAEHLER: And I'm, yeah, sorry to jump in from across the ocean.

THE COURT: That's fine.

(Pause.)

THE COURT: All right. So I think, well, if I'm going to hear it on the 5th, that really doesn't give you guys any time to reply, because the response would be due on the 30th, and so that would be the 30th, and then I don't really think that would give you time to reply before the 5th.

MR. PFAEHLER: So why don't we say the 9th, and I will -- I'll move my other issue on that day.

THE COURT: Let me look at what I have on the 9th. (Pause.) No, other than the holiday on the 12th, I have a lot of time the next week as well.

MR. SWICK: I would, yeah, if we could do the following week, I would really appreciate it. I just, you know.

THE COURT: I have -- well, I said that. Let me see. Actually, well, I lied. I thought I did.

MR. SWICK: Yeah, 9/9 is a holiday with kids, yeah.

THE COURT: Yeah, the week of the 12th is a holiday, but I apparently am also having surgery that week that I forgot about.

Okay. So what is your time estimate for the Motion to Transfer?

MR. PETTS: Mr. Pfaehler?

MR. PFAEHLER: I think, Your Honor, yeah, I think we'd want probably half an hour, 45 minutes to argue on our side.

THE COURT: Okay.

MR. SWICK: Same.

THE COURT: Okay. Well, if that is the case, well, then let me look at the actual week of the 5th. I think --

MR. SWICK: Well, we probably will have evidence, actually, because we might have a witness. So I guess I'm not sure, is the answer to that.

MR. PFAEHLER: Evidence on a Motion to Transfer Venue?

MR. SWICK: Yeah, there's facts on where venue should be. Well, the --

MR. PFAEHLER: I'm sorry. Did he -- I didn't --

THE COURT: Yes. He said that they would have evidence. I mean, obviously the burden is on the Movant. It would technically be an evidentiary hearing. But there's more than one way to tackle that.

MR. PFAEHLER: What evidence would we even be considering here?

MR. SWICK: I'm not sure, but I need to think about

that. But I think I probably would have to put on evidence.

THE COURT: Ms. Harden, can you tell me if we have time the afternoon of the 8th? (Pause.) I can start at 2:30 on the 8th.

MR. SWICK: Okay.

MR. PFAEHLER: That's fine with me.

THE COURT: Is that better than the 9th for you, Mr. Pfaehler? Because you said the 9th --

MR. PFAEHLER: Yes, the 8th is --

THE COURT: Okay.

MR. PFAEHLER: Yeah, it's -- actually, that's preferable to me, so thank you, Your Honor.

THE COURT: Okay. Does that --

MR. PFAEHLER: We appreciate that.

THE COURT: And does that work for the Debtor?

MR. SWICK: Yeah, I can -- I can make it work, yeah.

THE COURT: Okay. All right. So the Motion to Transfer Venue, we'll set that for 10/8 at 2:30. Mr. McCullough, Mr. Petts, I'll have you guys notice that up.

MR. PETTS: Will do.

THE COURT: Okay. So I think the response will due somewhere around the 30th. And then if you're going to file a reply and you want the Court to read it, let's try to get that on file by the 5th.

MR. PFAEHLER: Understood. We will certainly do

that, Your Honor.

THE COURT: And then I'll let you guys work towards, obviously, any witness or exhibit lists that you all have and stuff like that. But, yes, so I usually like to try to get the pleadings on file a couple days before the hearing at least, because that'll allow my clerks to prep me.

And then with respect to the contempt motion, again, if you want to file a TRO, we'll take a look at that whenever it is received, if you're going to get to that. Looking at my schedule, I think that, to have it heard before the 30th, it would be the 29th at 9:30.

MR. SWICK: Okay.

THE COURT: So you'll want to get that on file in time for that to be heard.

As I said, fire or flood won't even do it for the 25th. The bankruptcy court is closed. But the 28th, it's like I said, I'm speaking twice that day, locally, at a Chapter 13 seminar, but I am off the bench.

MR. TITTLE: My recommendation for the Petitioning Creditors' Motion to Show Cause, I guess maybe a status conference would be better to see what results from the TRO action. Whether they actually go forward on the 30th I think kind of impacts whether our motion is moot or not, other than what's been done from now until the 29th, but I think --

THE COURT: As I said, I think that with respect to

the contempt motion, I am loath to essentially enjoin prior behavior. But I'm not saying, I mean, a TRO might be the proper way to proceed to prohibit somebody from doing something in the future. But under a contempt motion, I think that the contempt motion is more what they did, and it really is an after-the-fact sort of approach.

MR. TITTLE: Okay. Thank you.

THE COURT: Thank you, Mr. Tittle.

Mr. Pfaehler, you were saying something?

MR. PFAEHLER: No.

THE COURT: Oh, okay.

MR. PFAEHLER: I was -- there were people entering the room and I was waving them off.

THE COURT: Oh, okay. Understood.

MR. PFAEHLER: It wasn't --

THE COURT: We've all had --

MR. PFAEHLER: I was trying to do it discreetly so that you would not see it, Your Honor. I was not successful.

THE COURT: That's fine. That's fine. That reminds me. I had an interview with an extern once, and it was blurred, and then all of a sudden you just kind of saw something kind of do this. I was like, is she flailing? What is this? And it was her cat and it was coming around. And the cat's name was Korben Dallas, and it's the most famous cat name I've ever heard. So I get it. Thank you,

Mr. Pfaehler, for explaining.

All right. So, obviously, if it's a TRO, we'll probably have to hit that on the 29th at 9:30. Other than that, I'll allow you guys to confer and see when to set the contempt motion and essentially who the players will be at that point.

MR. PETTS: All right. Thank you.

THE COURT: But we will, as I mentioned early on, we will enter the Order for Relief today, and other than that, I'll see you guys soon.

MR. SWICK: Thank you.

MR. TITTLE: Thank you, Your Honor.

THE COURT: Thank you very much.

MR. PFAEHLER: Thank you, Your Honor.

THE COURT: You're welcome, Mr. Pfaehler. If you're on vacation, have a great time. If not, you're overseas, have a great time anyway. Hope it's not as hot there.

You guys have a good one.

Court will stand in recess until 1:30.

(Conclusion of proceedings at 11:48 a.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **09/22/2026**

______________________________________ _____________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX


PROCEEDINGS 3

WITNESSES

-none-

EXHIBITS

Petitioning Creditors' Exhibits 1 through 26 Admitted 6

RULINGS 5/48

END OF PROCEEDINGS 69

INDEX 70

# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Green Sapphire Holdings, Inc., | Bankr. No. 25-07412 |
| Debtor. | Chief Judge Jacqueline Cox |
| | **Hearing Date: September 1, 2026**<br>**Hearing Time: 1:00 p.m.** |

**NOTICE OF MOTION FOR AN ORDER REOPENING THE CASE FOR THE PURPOSE OF ENFORCING THE ORDER BARRING REFILING AND FOR AN ORDER TO SHOW CAUSE WHY GREEN SAPPHIRE HOLDINGS, INC. SHOULD NOT BE HELD IN CONTEMPT OF COURT FILED BY GLOBAL CAPITAL PARTNERS, LLC**

**TO: See attached list.**

**PLEASE TAKE NOTICE** that on September 1, 2026 at 1:00 p.m. Central Time we will appear before the Honorable Chief Judge Jacqueline P. Cox, or any Judge sitting in her place, either in the United States Bankruptcy Court for the Northern District of Illinois, Dirksen United States Courthouse, 219 S. Dearborn Street, Chicago, Illinois, 60604 or electronically as described below, and present the *Motion for an Order Reopening the Case for the Purpose of Enforcing the Order Barring Refiling And for an Order to Show Cause Why Green Sapphire Holdings, Inc. Should Not Be Held in Contempt of Court* (the "Motion"), a copy of which is filed contemporaneously herewith.

**Important: Only parties and their counsel may appear for presentment of the Motion electronically using Zoom for Government. All others must appear in person.**

**To appear by Zoom using the internet**, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode.

**Meeting ID and passcode**. The meeting ID for this hearing is 161 273 2896, and the passcode is 778135. The meeting ID and password can also be found on the Judge's page on the Court's web site.

**PLEASE TAKE FURTHER NOTICE** that if you object to this Motion and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the Motion will be called on the presentment date. If no Notice of Objection is timely filed, the Court may grant the Motion in advance without a hearing.

Dated August 21, 2026
Chicago, Illinois

**DENTONS US LLP**

<u>*/s/ Robert E. Richards*</u>
Robert E. Richards
Samantha M. Siegien
233 S. Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel: (312) 876-7396
Email: robert.richards@dentons.com
samantha.siegien@dentons.com

Kenneth J. Pfaehler (admitted *pro hac vice*)
Nicholas W. Petts (admitted *pro hac vice*)
1900 K Street N.W.
Washington, D.C. 20006
Tel: (202) 408-6468
Email: kenneth.pfaehler@dentons.com
nicholas.petts@dentons.com

*Counsel to Global Capital Partners, LLC*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he served a copy of this Notice of Motion and Motion via the Court's CM/ECF System on August 21, 2026.

By: */s/ Robert Richards*
Robert Richards

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>Green Sapphire Holdings, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bankr. No. 25-07412<br><br>Chief Judge Jacqueline Cox<br><br>**Hearing Date: September 1, 2026**<br>**Hearing Time: 1:00 p.m.** |

**GLOBAL CAPITAL PARTNERS, LLC'S MOTION FOR AN ORDER REOPENING THE CASE FOR THE PURPOSE OF ENFORCING THE ORDER BARRING REFILING AND FOR AN ORDER TO SHOW CAUSE WHY GREEN SAPPHIRE HOLDINGS, INC. SHOULD NOT BE HELD IN CONTEMPT OF COURT**

**TABLE OF CONTENTS**

**Page**


INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 3

JURISDICTION AND VENUE .......... 7

ARGUMENT .......... 7

I. The Court Should Reopen this Case For the Limited Purpose of Enforcing Its Dismissal Order Barring Green Sapphire From Refiling for Bankruptcy Relief. .......... 7

II. The Court Should Find Green Sapphire In Contempt of Court Because It Violated the Dismissal Order by Refiling For Bankruptcy in the Northern District of Texas. .......... 9

A. Pre-Petition Evidence .......... 10

B. Petition Filing Evidence .......... 12

C. Post-Petition Evidence .......... 14

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Direct Media Power, Inc.*,
582 B.R. 739 (Bankr. N.D. Ill. 2018) ....................8, 9

*In re Nw. Bancorporation of Illinois, Inc.*,
2026 WL 1210375 (Bankr. N.D. Ill. May 4, 2026) ....................8

*In re Shondel*,
950 F.2d 1301 (7th Cir. 1991) ....................7

*Taggart v. Lorenzen*,
587 U.S. 554 (2019) ....................9

*Travelers Indem. Co. v. Bailey*,
557 U.S. 137 (2009) ....................8

*Matter of Winn*,
49 B.R. 237(Bankr. M.D. Fla. 1985) ....................12, 13

**Statutes**

11 United States Code
§ 105(a) ....................1, 7
§ 350(b) ....................1, 7
§ 1109(b) ....................8

28 United States Code
§ 157 ....................7
§ 1334 ....................7
§ 1408 ....................7
§ 1409 ....................7

**Other Authorities**

Federal Rules of Bankruptcy Procedure
Rule 5010 ....................1, 7

Case 25-10442 Doc 91 Filed 08/20/26 Entered 08/20/26 19:20:54 Desc Main
Document Page 7 of 22

Pursuant to Federal Rule of Bankruptcy Procedure 5010 and 11 U.S.C. §§ 105(a) and 350(b), Global Capital Partners, LLC ("Global Capital"), by and through its undersigned counsel, respectfully moves the Court to reopen this case for the limited purpose of enforcing its *Order Granting the Motion to Dismiss and Refiling Bar* (ECF 140) against Green Sapphire Holdings, Inc. (the "Debtor" or "Green Sapphire").

**INTRODUCTION**

1. Green Sapphire has directly disobeyed this Court and its order of dismissal. On July 17, 2026, the Court dismissed Green Sapphire's petition under chapter 11 as filed in bad faith and barred Green Sapphire from refiling for one year. Two business days later—while Green Sapphire counsel was before this Court to show cause why its adversary complaint should not also be dismissed—and one hour before appearing in the Delaware Court of Chancery on a hearing to appoint a receiver over it—Green Sapphire refiled in the U.S. Bankruptcy Court for the Northern District of Texas in the guise of a patently collusive "involuntary" petition. Needless to say, Green Sapphire did not breath a word to this Court or the Court of Chancery about the new filing. And the new petitioners in Dallas? Green Sapphire's own current counsel who have worked for the company for years.[1] Green Sapphire should be held in contempt of court.

2. Green Sapphire instigated the Texas bankruptcy in another attempt—perhaps the seventh or eighth such attempt—to thwart and collaterally attack the final judgment entered against it by the Court of Chancery. In fact, the law firm-petitioners *openly admit* they timed their petition filing to block the Chancery Court from appointing a receiver who would cause Green Sapphire, after months of defiance, to comply with the judgment. Green Sapphire supports the new filing

[1] Exhibit 1 (Involuntary Petition, 7/21/2026, *In re Green Sapphire Holdings, Inc.*, No. 26-33254-mv111 (N.D. Tex.) (the "N.D. Tex. Bankr.")); Exhibit 2 (Joinder by Lazareff Abu Dhabi, 8/15/26, N.D. Tex. Bankr.); Exhibit 3 (Joinder by Lazareff Paris, 8/15/26, N.D. Tex. Bankr.).

and on Tuesday of this week, in a hearing in Dallas, Green Sapphire's counsel asserted it would call witnesses (Garrett Vail and Paul Wolfe, who have both now been personally held in contempt by the Delaware Court of Chancery) to testify in opposition to dismissal of the involuntary petition.

3. The surrogates Green Sapphire employed for this wrongful purpose are lawyers who are presently working for Green Sapphire. They could not be less actually adverse. Michael Legamaro has worked and colluded with Thane Ritchie for decades and is even alleged to have been his agent in an illegal firearms scheme as recently as 2024. He claims to be owed $8,060 from two and a half years ago, has never made an effort to collect in court, and is believed to be funneling the money to pay counsel in the Dallas case. Another petitioner, who claims his debt arose three and a half years ago, was still working for Green Sapphire last year and submitted an "expert opinion" in opposition to Global Capital's motion to lift the automatic stay in this case. A third petitioner is actively representing Green Sapphire today, in contumacious satellite litigation against Global Capital in Paris. It made filings collaterally attacking the Court of Chancery's final judgment in Paris last month. None have taken action against to collect their alleged overdue bills in any court anywhere. None took action against Green Sapphire in this case or made any effort to intervene in motion practice or participate in the proceeding.

4. The petitioners admit they have filed the new proceeding to block the appointment of a receiver by the Delaware Court of Chancery to manage the affairs of Green Sapphire, a Delaware corporation. Their counsel told Judge Larson of the Dallas Bankruptcy Court that a receiver appointed by the Chancery Court would "loot" Green Sapphire for the benefit of Global Capital. They are using the automatic stay as a weapon, not a shield. And the receiver's mandate of course will not impair their claims. They can seek payment from the receiver. The receiver presumably will cause Green Sapphire to transfer control over the shares of Access Management, SAS and its

real property to Global Capital, the rightful owner under the final judgment. As this Court has repeatedly ruled, this is not property of the debtor, and Green Sapphire did not appeal the Court's orders. The receiver also presumably will cause Green Sapphire to pay Global Capital's money judgment of $8.6 million. But that won't harm these petitioners because, according to Green Sapphire's own filings in this Court, Green Sapphire's balance sheet reflects a surplus of $10 million, net of liabilities. Even after paying the judgment, Green Sapphire would have $13.4 million in assets—much more than it needs to pay its remaining debts of $3.52 million, including the $968,000 the Texas collusive petitioners collectively claim to be owed.

5. In truth, the petitioners blocked the appointment of a receiver because their clients, Green Sapphire and Thane Ritchie, directed them to do so. By directing the filing, Green Sapphire has circumvented and violated this Court's order of dismissal. Accordingly, Global Capital respectfully requests that the Court reopen this case, enforce its order of dismissal, and enter an order to show cause why Green Sapphire should not be held in contempt of court.

## FACTUAL BACKGROUND

6. On May 14, 2025, in a transparent attempt to thwart its main creditor Global Capital from recovering on a defaulted loan in the Delaware Court of Chancery, Green Sapphire filed a voluntary petition for bankruptcy protection in this Court. ECF 1. Global Capital promptly moved to lift the automatic stay (ECF 23), and to dismiss Green Sapphire's petition for cause (ECF 20).

7. On June 14, 2025, the Court granted the lift stay motion and allowed Global Capital to proceed to trial and final judgment against Green Sapphire in the Court of Chancery. ECF 55 at

3. On August 20, 2025, the parties proceeded to trial before Vice Chancellor Laster. On March 13, 2026, he entered his Post-Trial Opinion, ruling for Global Capital and against Green Sapphire.[2]

8. On April 13, 2026, the Chancery Court entered its Order and Final Judgment.[3] The judgment decreed that pursuant to a loan settlement agreement Global Capital was the "sole rightful owner" of the loan collateral, shares of Access Management, SAS and its real property. Ex. 5 at ¶ 1. The judgment ordered Green Sapphire to "transfer control" over the shares and properties to Global Capital. *Id.* at ¶ 3.b & ¶ 1.b. The judgment also "permanently enjoined" Green Sapphire from "asserting any rights to ownership or control over" them. *Id.* at ¶ 3.a.

9. The judgment directed Green Sapphire to pay Global Capital damages of $3,392,100, plus pre- and post-judgment interest. Ex. 5 at ¶ 1(d). Green Sapphire (with third-party plaintiff-intervenor Alpha Carta, Ltd.) was held liable for Global Capital's litigation-related expenses. *Id.* at 4. Subsequently, the Court of Chancery granted its application for fees and expenses in the amount of $5,204,916.37.[4] Green Sapphire owes Global Capital a judgment debt of $8.6 million.

10. On April 18, 2026, four days later, Green Sapphire raced back to this Court and began filing collateral attacks on the Chancery Court's rulings. It filed a motion to enjoin and void the Delaware judgment (ECF 100), and a motion to enjoin contempt proceedings in Delaware (ECF 108). The Court denied both. ECF 111 & 140. Green Sapphire also filed an adversary complaint against Global Capital, again seeking to void the Delaware judgment. ECF 123.

11. On July 17, 2026, this Court dismissed Green Sapphire's chapter 11 petition for cause ("Dismissal Order"). ECF 140. The Court held that the case "was filed in bad faith to interfere

---

[2] Exhibit 4 (Post-Trial Opinion, 3/13/26, *Global Capital Partners LLC et ano v. Green Sapphire Holdings, Inc.*, C.A. No. 2024-0877-JTL (Del. Ch.) ("Chancery Court Case").

[3] Exhibit 5 (Order and Final Judgment, 4/14/26, Chancery Court Case).

[4] Exhibit 6 (Order Granting Application for Fees and Expenses, 6/1/26, Chancery Court Case).

with the Chancery Court": "The Debtor's focus herein has not been to reorganize or to pursue other proper bankruptcy goals and objectives but to continue to litigate issues now resolved by the Delaware Court." ECF 140 at 9. The Court barred Green Sapphire from re-filing for one year. *Id.* at 10. The Court ordered that Green Sapphire show cause why its adversary complaint should not also be dismissed.

12. On July 20, 2026, Global Capital filed in the Court of Chancery a motion to appoint a receiver to cause Green Sapphire to comply with the final judgment.[5] The receiver would cause Green Sapphire—which has refused for months—to transfer control over the shares of Access Management and its real property to their rightful owner, Global Capital. The receiver would also cause Green Sapphire to dismiss actions in which it continues to claim ownership of Global Capital's assets and to pay Global Capital's money judgment. The court set a hearing for the next day at 3:15 p.m. and gave Green Sapphire until 12 p.m. to file a response.[6]

13. On July 21, 2026, two hearings and a filing occurred:

14. *At 1:00 p.m.*, this Court held its hearing to consider Green Sapphire's response to the Court's show cause order. Green Sapphire agreed to dismiss its complaint only without prejudice to refiling in another forum.

15. *At 2:15 p.m.*, the Chancery Court held its hearing to consider the motion for a receiver. The court ruled that Green Sapphire could stay the final judgment pending appeal upon posting a bond in the amount of $26 million.[7] The court denied the motion for a receiver without prejudice to refiling should Green Sapphire decline to post the bond.[8]

---

[5] Exhibit 7 (Motion to Appoint Limited-Purpose Receiver, 7/20/26, Chancery Court Case).

[6] Exhibit 8 (Order Setting Hearing, 7/20/26, Chancery Court Case).

[7] Exhibit 9 (Order Denying Motion to Stay Judgment Execution, 7/21/26, Chancery Court Case).

[8] Exhibit 10 (Order Denying Motion to Appoint Receiver, 7/21/26, Chancery Court Case).

16. *At 1:02 p.m.*—after this Court began its hearing and one hour before the Chancery Court began its hearing—an involuntary bankruptcy petition was filed against Green Sapphire in the U.S. Bankruptcy Court for the Northern District of Texas (Case No. 26-33254) (J. Larson). Ex. 1. Green Sapphire made no mention of the filing during the hearings.

17. The Texas Bankruptcy Case was filed by Legamaro Banipal LLP, Lecocqassociate, and Charles-Hubert Vanoverberghe (collectively, the "Green Sapphire Lawyers"). *See id.* at 3. They have asserted claims for unpaid legal fees totaling $174,784.66. Ex. 1 at 3-4.

18. On July 27, 2026, the Green Sapphire Lawyers filed in the Texas Bankruptcy Case an emergency motion to enforce the automatic stay against Global Capital in the Court of Chancery. The motion expressly sought to block appointment of a state-court receiver that would cause Green Sapphire to transfer control over the shares of Access Management and its real property.[9]

19. On July 29, 2026, Global Capital demanded that counsel for the Green Sapphire Lawyers withdraw the petition or face sanctions under Rule 9011.[10] Two days later, Global Capital moved to dismiss the petition as filed in bad faith and in collusion with Green Sapphire.

20. On August 3, 2026, counsel for the Green Sapphire Lawyers responded to Global Capital's Rule 11 letter. The letter response stated that the Green Sapphire Lawyers had "independently" decided to dismiss the case and would file an expedited motion to dismiss the next day, August 4, provided that the parties agreed to a release of claims for sanctions. On August 4, 2026, Global Capital returned the draft agreement, with modest edits, to counsel for the Green Sapphire Lawyers. Then their counsel claimed to be unable to reach his clients.

---

[9] Exhibit 11 (Emergency Motion to Enforce Stay, 7/27/26, N.D. Tex. Bankr.) at ¶¶ 26-29.

[10] Exhibit 12 (Motion for Expedited Hearing on Motion to Dismiss, 8/11/26, N.D. Tex. Bankr.).

21. On August 10, 2026, Global Capital moved for an expedited hearing on its motion to dismiss. Ex. 10. The Green Sapphire Lawyers *opposed* the motion and announced they had found two more parties to join their petition.[11] Four days later, the Paris and Abu Dhabi offices of the Lazareff law firm filed joinders, asserting claims for unpaid legal fees totaling $793,000.[12] The Abu Dhabi office claims to have done $628,000 of work on the case in the Northern District of Illinois—where it has never entered an appearance or appeared on any communication or filing.

22. On August 17, 2026, the Green Sapphire Lawyers and Green Sapphire filed a joint pre-hearing statement in the Texas Bankruptcy Case. The statement reported: "The Alleged Debtor does not oppose entry of an order for relief under Chapter 11."[13]

## JURISDICTION AND VENUE

23. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

24. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

25. The statutory bases for the relief requested are 11 U.S.C. §§ 105(a) and 350(b) and Federal Rule of Bankruptcy Procedure 5010.

## ARGUMENT

### I. The Court Should Reopen this Case For the Limited Purpose of Enforcing Its Dismissal Order Barring Green Sapphire From Refiling for Bankruptcy Relief.

26. Under Bankruptcy Code Section 350(b), the Court has broad discretion to reopen a case for cause. *In re Shondel*, 950 F.2d 1301, 1304 (7th Cir. 1991). Three factors courts consider when determining whether to reopen a case are: "(1) the length of time that the case has been closed; (2)

---

[11] Exhibit 13 (Opposition to Motion for Expedited Hearing, 8/12/26, N.D. Tex. Bankr.).

[12] Ex. 2 at ¶ 6; Ex. 3 at ¶ 6.

[13] Exhibit 14 (Joint Pre-Conference Statement, 8/17/26, N.D. Tex. Bankr.) at 3.

whether the debtor would be entitled to relief if the case were reopened; and (3) the availability of nonbankruptcy courts, such as state courts, to entertain the claims." *In re Nw. Bancorporation of Illinois, Inc.*, 2026 WL 1210375, at *7 (Bankr. N.D. Ill. May 4, 2026) (citing *Redmond v. Fifth Third Bank*, 624 F.3d 793, 798 (7th Cir. 2010) and *Imler v. Combs-Skinner*, 465 F. App'x 552, 554 (7th Cir. 2012)). All three factors are met here, and cause exists to reopen this case.

27. First, this case has been closed only a month. The Court entered its Dismissal Order on July 17, 2026. Global Capital has moved to reopen on August 21, 2026. This quite short period of time favors reopening the case.

28. Second, were the case reopened, Global Capital would be entitled to relief with respect to Green Sapphire's violation of the Dismissal Order. Global Capital is a judgment creditor of Green Sapphire. A creditor qualifies as a "party in interest," and parties in interest have standing to be heard on any issue in a bankruptcy. 11 U.S.C. § 1109(b). Global Capital moved to dismiss this case, and the Court granted the motion and entered its order of dismissal. Green Sapphire is now circumventing the Court's order and negating the relief Global Capital obtained. Based upon the evidence discussed in Section II, a finding of contempt is warranted.

29. Third, this Court is the appropriate court to interpret and enforce its own prior orders. Bankruptcy courts "plainly ha[ve] jurisdiction to interpret and enforce . . . prior orders." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Even following dismissal, bankruptcy courts retain jurisdiction to enforce prior orders and if necessary hold a debtor in contempt. *See, e.g., In re Direct Media Power, Inc.*, 582 B.R. 739, 742 (Bankr. N.D. Ill. 2018). The Debtor has violated the Dismissal Order entered by this Court, and the Court has jurisdiction to enforce its order.

30. Should the Court reopen the case, Global Capital requests that the automatic stay *not* go into effect. That would only reward Green Sapphire's contumacy. The case should be reopened to enforce the Dismissal Order, and the protections of the stay are unnecessary for that purpose.

## II. The Court Should Find Green Sapphire In Contempt of Court Because It Violated the Dismissal Order by Refiling For Bankruptcy in the Northern District of Texas.

31. The sanction of civil contempt is both coercive and remedial; it serves to coerce the defendant into compliance and to compensate the complainant for losses stemming from noncompliance. *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019). A finding of contempt is appropriate if (1) the court entered an order that set forth in specific detail an unequivocal command, and (2) the nonmovant violated that order. *In re Direct Media Power, Inc.*, 582 B.R. 739, 752 (Bankr. N.D. Ill. 2018). This Court entered its Dismissal Order, and Green Sapphire immediately violated that order. The company should be held in contempt of court.

32. The Court's Dismissal Order set forth in specific detail an unequivocal command. On July 17, 2026, the Court declared: "This case is dismissed and the Debtor is barred from refiling for bankruptcy relief under all chapters of the Bankruptcy Code, 11 U.S.C. §§ 1-1501 for one year, on or before July 17, 2027." ECF 140 at 10. The Court's command could not have been clearer.

33. Green Sapphire violated the Dismissal Order by refiling for bankruptcy relief only four days into the one-year bar period. On July 21, 2026, it caused its counsel to file an involuntary petition under chapter 11 against itself in the Texas Bankruptcy Case. Green Sapphire cannot do indirectly what it is forbidden from doing directly. By instigating the Texas Bankruptcy Case, Green Sapphire attempted to circumvent the Dismissal Order and violated the one-year bar period.

34. As shown below, the evidence is clear and convincing that Green Sapphire instigated the Texas Bankruptcy Case. The timing alone is proof. This case was dismissed over Green Sapphire's objection, and two business days later the Texas Bankruptcy Case is filed. If any further

proof were needed, all the evidence before, during, and after the filing of the petition confirms that Green Sapphire colluded with the Green Sapphire Lawyers in filing the Texas Bankruptcy Case.

**A. Pre-Petition Evidence**

35. The Green Sapphire Lawyers' pre-petition conduct demonstrates they have no separate interest in the collective process of a Green Sapphire bankruptcy and are merely carrying water for their long-time clients. All five of the law firms were absent from Green Sapphire's bankruptcy case in this Court during the full year it was pending, from May 14, 2025 to July 17, 2026.

36. None of the five filed a proof of claim in this case. This despite the fact that three firms asserted claims they could have asserted when this case began, in May 2025. Vanoverberghe's and Legamaro's arose in the spring of 2023 and 2024, respectively. Ex. 15 at 5:3-5. And Green Sapphire disclosed lecocqassociate and Vanoverberghe as creditors in its June 2025 schedules.

37. None of the five opposed dismissal of this case. Global Capital filed its motion to dismiss on May 29, 2025. ECF 20. The petitioners did not file a single objection to the motion before it was granted on July 17, 2026. Only once Green Sapphire's voluntary petition was dismissed did they leap into action and file their involuntary petition, plainly at Ritchie's direction.

38. None of the five have pursued state-court collection remedies against Green Sapphire. Legamaro, lecocqassociate and Vanoverberghe have asserted claims they could have sued on before this case was filed in May 2025 but chose not to.

39. None of the Green Sapphire Lawyers are actually adverse to Green Sapphire. Michael Legamaro has a documented history of carrying water, legal and non-legal, for Thane Ritchie. Legamaro has been sued for trespassing and "menacing" the family of a Ritchie lessee over past-

due rent, on February 23, 2024. [14] The lessee alleges that "Legamaro also stated that he was there to retrieve the gun safes and tonnage of ammunition left by Third Party-Defendant Ritchie on the Property." Ex. 15 at ¶ 27. On March 13, 2025, federal agents raided the residence and seized Ritchie's illegally held weapons and ammunition.[15]

40. Vanoverberghe continued to work for Green Sapphire long after his claim ripened, in April 2023. In June 2025, he signed a new French law opinion for Green Sapphire's opposition to the motion to lift the stay in this case. ECF 45. His retention was never approved by this Court.

41. The Lazareff law firm is actively engaged in representing Green Sapphire at this moment. On July 20, 2026, the day before the petition was filed, Lazareff filed a 30-page brief for Green Sapphire in contumacious litigation against Global Capital in the Judicial Tribunal of Paris, France.[16] This litigation is an open collateral attack on the Final Order and Judgment of the Court of Chancery. This Court never approved the retention of the Lazareff firm or the filing of the Paris action. Three weeks later, Lazareff joined the petition—while remaining counsel to Green Sapphire in the Paris action.

42. The collusion in the Texas Bankruptcy Case is no different from the collusion Green Sapphire and Thane Ritchie employed in the Court of Chancery. There, the court found that "Ritchie caused Alpha to intervene and assert fraudulent transfer claims against the Borrower [Green Sapphire], which Ritchie himself controlled." Ex. 4 at 3. Ritchie then had Green Sapphire

[14] Exhibit 15 (Counterclaims, July 9, 2024, *RECT, LLC v. Brian Thomas DeMarco et al.*, No. 24-1136 (Tex. District Ct. Hays Cty.)) at ¶ 28.

[15] Ex. 15 at Exs. A (search warrant) & B (ATF notice of weapons seized).

[16] Exhibit 16 (Green Sapphire Response Brief, 7/20/26, Judicial Tribunal of Paris).

file an Answer that admitted the claims against it.[17] The court found that the claims were "collusive"—"involv[ing] Ritchie suing himself." *Id.* at 99-100.

43. Here, Ritchie caused his law firm-allies to file an involuntary petition against Green Sapphire, which Ritchie himself controls. Ordinarily, an alleged debtor would oppose an involuntary petition. But Green Sapphire has *consented* to entry of an order for relief, and told the Dallas court that it will present Wolfe and Vail to assist the petitioners in their "unclean hands" defense. As with his collusive fraudulent transfer claims, the new petition involves Ritchie filing bankruptcy against himself.

**B. Petition Filing Evidence**

44. The involuntary petition on its face and the circumstances surrounding its filing further corroborate the collusive nature of the Texas Bankruptcy Case.

45. In their petition, the Green Sapphire Lawyers asserted claims for unpaid amounts so small they would not warrant a corporate bankruptcy under any circumstances. Legamaro claims to be owed a whopping $8,060. Vanoverberghe claims to be owed $69,676.80, and lecocqassociate $97,047.86. Green Sapphire could pay all three with the cash in its bank account.[18]

46. This scheme resembles *Matter of Winn*, 49 B.R. 237(Bankr. M.D. Fla. 1985). There, the court found that the debtor had filed for bankruptcy in bad faith to evade a judgment against it, and dismissed his petition. *Id.* at 238. Two months later, three creditors filed an involuntary petition against the debtor. The petitioners were the debtor's friends who held small-dollar claims that "ordinarily would not have warranted to institute an involuntary case against the Debtor." *Id.* at 240. The court dismissed the involuntary petition as collusive, finding it was "instigated by the

[17] Ex. 4 at 100 ("The Borrower answered Alpha's complaint by admitting all of its allegations").

[18] Green Sapphire most recently reported a cash balance of $296,908. ECF 136 at 2.

Debtor himself," "merely a second attempt by the Debtor to accomplish indirectly what he was not able to accomplish directly with his original voluntary petition." *Id.* at 239-40. So too here.

47. Moreover, the timing of the involuntary petition's filing exposes the same wrongful purpose behind Green Sapphire's filing of its voluntary petition—thwarting Global Capital in the Court of Chancery. The petition was filed and the automatic stay triggered minutes before a potentially adverse ruling against Green Sapphire, as set out in paragraphs 12-16 above. Indeed, petitioners' counsel in Dallas admitted in open court that he made a mistake in filing because "I was moving too quickly to try to get it [the petition] filed the morning before the receivership."[19]

48. The decisive question is, *cui bono*? Green Sapphire alone benefits from blocking appointment of a receiver. The petitioning creditors would not be harmed by a receiver causing Green Sapphire to transfer control over the shares of Access Management and its real property to Global Capital because this Court has found they are not estate assets. ECF 140 at 5. Blocking the transfer merely allows Green Sapphire to continue to unlawfully claim these assets for itself.

49. Nor would the petitioning creditors be harmed by the receiver causing Green Sapphire to pay its $8.6 million judgment debt to Global Capital. Green Sapphire has assets worth approximately $22 million.[20] Paying Global Capital's $8.6 million claim leaves $13.4 million in assets to pay the petitioners and all other creditors. In this case Green Sapphire disclosed $2.63 million in third-party debts.[21] The Green Sapphire Lawyers' asserted claims add an incremental

---

[19] Exhibit 17 (Transcript of Status Hearing, 8/18/26, N.D. Tex. Bankr.) at 6:24-25.

[20] Green Sapphire recently reported total assets of $39.2 million. ECF 136 at 2. It ascribes $17.5 million of that amount to the shares of Access Management and its real property. ECF 90 at 2. Because those assets belong to Global Capital, Green Sapphire's actual assets total $22 million.

[21] *See* ECF 58 at 10, 12-14 (Green Sapphire reporting that unsecured creditors hold claims with known amounts totaling $2,480,000 and that one secured creditor holds a claim of $150,000).

$894,980.[22] So Green Sapphire's third-party debts outside Global Capital total $3.52 million. With $13.4 million in available assets after paying Global Capital, Green Sapphire has the ability to pay all other creditors—including the Green Sapphire Lawyers—more than ***three times over***.

**C. Post-Petition Evidence**

50. Post-petition conduct in the Texas Bankruptcy Case shows further collusion between the Green Sapphire Lawyers and Green Sapphire.

51. First, the Green Sapphire Lawyers carried out a Rule 11 ruse. In response to its Rule 11 letter, their counsel emailed Global Capital: "lecocqassociate and Legamaro Banipal LLP have independently instructed Tittle Santiago that they no longer wish to prosecute the involuntary petition and authorize counsel to seek dismissal." Ten days later, without explanation, they reversed course. Rather than confirm their intent to dismiss, they instead told the Court "Two additional creditors have advised that they intend to join" the petition. Ex. 13. The head-fake bought Green Sapphire additional time to identify more law firms to join the involuntary petition.

52. And it *was* Green Sapphire that identified the "additional creditors"—in reality one law firm. Counsel for the Green Sapphire Lawyers could not have found them itself. Neither the Paris or Abu Dhabi offices of the Lazareff law firm filed a proof of claim in this case. Neither office was disclosed on Green Sapphire's lists of creditors. In fact, Lazareff continues to represent Green Sapphire in its litigation against Global Capital in France. Counsel could only have learned that Lazareff had claims against Green Sapphire from Green Sapphire itself.

53. Next, Green Sapphire and their counsel openly confirmed their collaboration during the status hearing in the Texas Bankruptcy Case. In advance, the Green Sapphire Lawyers and

[22] The petitioning creditors have asserted claims totaling $968,644.66. But $72,803 of the amount claimed by Lecocqassociate was previously disclosed in Green Sapphire's schedules.

Green Sapphire met and conferred about the case privately—without Global Capital. Ex. 13 at ¶ 2. They then filed a joint statement signaling their shared support for the Texas Bankruptcy Case. Green Sapphire further stated that it "does not intend to offer evidence *opposing* entry of that order" for relief under Chapter 11. Ex. 14 at ¶ 9 (emphasis added). But at the status hearing Green Sapphire told the Dallas court it will call its directors to testify at the hearing on Global Capital's motion to dismiss, and thus will offer evidence *supporting* an order for relief.[23]

54. Finally, Green Sapphire has enlisted the Green Sapphire Lawyers to prosecute much of the adversary complaint Green Sapphire dismissed here only weeks ago. The Green Sapphire Lawyers have served discovery on Global Capital, and virtually all the requests concern "alleged transfers identified in Green Sapphire's May 29, 2026 complaint in Adversary Proceeding No. 26099370 in the United States Bankruptcy Court of the Northern District of Illinois."[24]

55. The weight of the evidence proves that Green Sapphire colluded with the Green Sapphire Lawyers in filing the Texas Bankruptcy Case. Green Sapphire violated the Dismissal Order and its one-year bar on refiling. A finding of contempt and sanctions are warranted.

**CONCLUSION**

56. For these reasons, Global Capital respectfully requests the Court to enter an order, substantially in the form attached hereto, (i) reopening this case, (ii) ordering Green Sapphire to show cause why it should not be held in contempt, (iii) awarding fees and costs to Global Capital, and (iv) granting such other and further relief as is just and proper.

---

[23] Ex. 17 at 33:6-9.

[24] Exhibit 18 (Petitioning Creditors' First Discovery Requests, 8/19/26, N.D. Tex. Bankr.), at 2.

Dated August 21, 2026

Kenneth J. Pfaehler (admitted *pro hac vice*)
Nicholas W. Petts (admitted *pro hac vice*)
DENTONS US LLP
1900 K Street N.W.
Washington, D.C. 20006
Tel: (202) 408-6468
Email: kenneth.pfaehler@dentons.com
nicholas.petts@dentons.com

Respectfully submitted,

*/s/ Robert E. Richards*
Robert E. Richards
Samantha M. Siegien
DENTONS US LLP
233 S. Wacker Drive,
Suite 5900
Chicago, Illinois 60606
Tel: (312) 876-7396
Email: robert.richards@dentons.com
samantha.siegien@dentons.com

*Counsel to Global Capital Partners, LLC*

# EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREEN SAPPHIRE HOLDINGS, INC., ) No. 25 B 07412
)
) Chicago, Illinois
) September 1, 2026
) 1:00 p.m.
Debtor. )

TRANSCRIPT OF PROCEEDINGS BEFORE
THE HONORABLE JACQUELINE P. COX

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Mr. Saulius Modestas;<br>Mr. Thomas Fullerton;<br>Mr. Adam Swick; |
| For Global Capital Partners, LLC: | Mr. Kenneth J. Pfaehler;<br>Mr. Samantha Siegien; |
| For the U.S. Trustee: | Ms. Suhey Ramirez. |
| For Petitioning Creditor Lazareff LeBars: | Mr. Michael McNutt. |

Court Reporter: Mary C. Kelly, CSR
D & E Reporting
Dandereporting@gmail.com
(312) 986-1920

THE CLERK: Line 10 and 11, Green Sapphire Holdings, Inc.

MR. MODESTAS: Good afternoon, Your Honor. Saul Modestas on behalf of the debtor.

MR. PFAEHLER: Good afternoon, Your Honor. Ken Pfaehler on behalf of Global Capital. And with me, in the courtroom is Samantha Siegien from Dentons, and also my colleague Nick Petts from Dentons.

MS. RAMIREZ: Good afternoon, Your Honor. Suhey Ramirez on behalf of the U.S. Trustee.

MR. MCNUTT: Good afternoon. My name is Michael McNutt on behalf of Lazareff LeBars, ADGM, petitioning creditor in Texas. Thank you.

MR. FULLERTON: Good afternoon, Your Honor. Tom Fullerton on behalf of the debtor Green Sapphire Holdings, Inc.

THE COURT: I'm sorry. Your name again?

MR. FULLERTON: Sure. Tom Fullerton, Your Honor.

I also have co-counsel on Zoom. There are a couple of different proceedings that implicate the parties before Your Honor.

And I have two colleagues who are

handling the involuntary proceeding down in Northern District of Texas Bankruptcy Court. Those colleagues are Adam Swick and Dave Parham.

And I also have a colleague Andy Dupre who is handling a parallel proceeding in the Delaware Chancery Court.

MS. SIEGIEN: And now I will defer to my colleague counsel Ken Pfaehler who is on the Zoom.

MR. PFAEHLER: May I present the motion?

THE COURT: Go ahead.

MR. PFAEHLER: It seems from the papers that there is some confusion about what we're moving for today.

Global Capital is simply requesting the Court to enter an order reopening this case and ordering Green Sapphire to show cause why it should not be held in contempt for the collusive bankruptcy filed that has occurred in Texas. We're not asking for any substantive decisions to be made today.

We believe our papers have made the prima facie case that is needed for issuance of the show cause order. As you know, contempt proceedings are two steps. We must show cause prima facie. We believe we've done that. After

that, an order would issue to Green Sapphire to show cause why it should not be held in contempt. At that point, it may present evidence of cause, attempt to discharge the order.

We are seeking to reopen the case. In seeking to have the show cause order -- and we're not -- I just want to be clear because we've heard to the contrary, and I don't think anything in our papers suggested that. We are not seeking any substantive relief today. Simply to reopen the case and have the Court consider contempt for the violation of its order of dismissal.

On July 17th, the Court dismissed Green Sapphire's petition under Chapter 11 as filed in bad faith, and it barred Green Sapphire from refiling for one year.

Two business days later, while Green Sapphire counsel was before this Court to show cause why its adversary complaint should not also be dismissed, and one hour before appearing in the Delaware Court of Chancery on a hearing to appoint a receiver there, Green Sapphire filed the case in the U.S. Bankruptcy Court for the Northern District of Texas using its own current counsel.

And it is -- there are three petitioning

creditors there. All of them are lawyers who are working for or have worked for Green Sapphire. We have a couple who have joined since, including Mr. McNutt and Lazareff LeBars who is on the call today.

But what they all have in common is none of these five counsel have filed a proof of claim or did file a proof of claim in this case. None of the five opposed dismissal of this case. Only two of them were even on the debtor's schedules that were filed in this case. None of the five had pursued state court collection remedies from Green Sapphire.

As Your Honor knows from the schedules in this case and the motion to dismiss, there is more than enough money in Green Sapphire to pay what they claim to be owed. The petitioning creditors claim to be owed a total of a little under a million dollars between them. Green Sapphire has assets worth approximately 22 million. We have Global Capital that has an $8.6 million judgment claim. That still leaves 13.4 million in assets to pay the petitioners and all other creditors.

In the case before Your Honor, Green

Sapphire disclosed 2.63 million in third-party debts, so even adding the additional claims we are now hearing about, we're talking about three times the coverage.

The question is why? What was the purpose for filing this action in Texas? And what we know is that the action was filed in anticipation of the appointment of the receiver; and the action was filed, and, in fact, counsel in Texas has said he made a mistake in filing the action because he was in a hurry to get it filed before the Delaware Chancery Court case.

We know that the creditors here, the initial-filing creditors, Mr. Legamaro, who Your Honor should know is the sole director of RECT, LLC, a Texas LLC owned by Thane Ritchie, but its immediate parent is Petro Carta who is also the parent of Green Sapphire, he claims to be owed eight thousand some odd dollars; and yet he never pursued that in court, never sought to have that paid, and he's filing this petition immediately before, immediately before, the receivership hearing in Delaware.

Your Honor, we think our papers more than make out a prima facie case. I mean, the

timing alone would show that, why this Court should be considering the question issuing an order to show cause as to why these -- Green Sapphire is not in, frankly, pretty open violation of the bar order that was filed here. And all we are seeking today is for the case to be reopened and for an order to show cause to issue for that to be heard.

Thank you, Your Honor.

THE COURT: Response to the motion to reopen?

MR. FULLERTON: Yes, Your Honor.

So there are two things that are up before Your Honor, the motion to reopen and then the motion to continue the hearing on the motion to reopen.

The key to sanction here is that Green Sapphire, the debtor, is being improperly lumped with its petitioning creditor attorneys.

There was an involuntary proceeding filed in the Northern District, Northern District of Texas, and Judge Larson handled a two-hour hearing this morning on the petitioning creditor's motion to enforce the automatic stay.

Judge Larson heard identical arguments from Global Capital that are being advanced before

Your Honor. The arguments being made there are in the form of a motion to dismiss the involuntary proceeding.

The involuntary proceeding is heading to an evidentiary hearing on September 14th on that motion to dismiss. So discovery is being exchanged.

All of the matters that are now before Your Honor are being directly confronted by Judge Larson in Dallas, Texas.

As I said, she hosted a two-hour hearing this morning. She made certain determinations, including that the automatic stay is absolutely in effect. She made statements that the -- that Global Capital is -- I'm sorry -- that she will not -- she will not prejudge the automatic stay violation but that she's happy to hear that before the Dallas, Texas Bankruptcy Court at a later date.

Judge Larson said that she is, of course, not in a position to enjoin Your Honor from making any rulings in your court, but she proclaimed unequivocally that the automatic stay is in place.

So just to take a step back in terms of where we sit on the two competing motions.

Notices of objection were filed. Preliminary objections were filed by both sides. And we are seeking an order from Your Honor that would allow for this Court to abstain from hearing the merits of these motions to allow for Judge Larson to confront them directly on September 14th. There won't be any prejudice to the moving creditor if this case simply moved to a day or two beyond September 14th so that we can come back before Your Honor and report back on that motion to dismiss.

In terms of the substance of the motion to reopen the case. First of all, they're seeking to reopen under Section 350 and Rule 5010. That's an improper mechanism to have this case reopened. The statutory provision and the Rule are designed to reopen cases that have been closed and have been fully administered. This case was dismissed. That's one.

The second, as I said, Your Honor would have to, in effect, make a decision on the preliminary papers that the debtor, Green Sapphire Holdings, Inc., and the petitioning creditors, who are five counsel, current and former counsel to Green Sapphire Holdings, are owed a million dollars, that they are one in the same or that they

have been colluding. It's our position that you cannot do that based upon the papers before Your Honor.

THE COURT: I wouldn't do anything based on papers. We do everything based on evidence, sir, not on papers.

MR. FULLERTON: I agree, Your Honor.

If Your Honor is inclined to host an evidentiary hearing, we would ask that it take place after the hearing before Judge Larson because we think that the record will have more fully developed by that point. As I said, the parties are engaged in discovery right now. And there will be findings coming out of that September 14th hearing that may assist the parties and the Court and make this a more efficient process before Your Honor.

THE COURT: Response to the motion to continue?

MR. PFAEHLER: Yes, Your Honor.

We think that -- you know, I think that the motion to continue is actually framed as a motion to continue the hearing today, and that seems to have pivoted that a little.

We don't think that this hearing should

be set off or that the issuance of an order to show cause should be pushed off in any way. We think we've more than established in our papers the fact that the petitioners are active attorneys right now of the debtor and that some of them are much more than that. Many of them have been doing active work, including Lazareff LeBars, are doing the work and started that work while the Chapter 11 was before Your Honor, and you never approved the retention.

Having said that, we are not opposed to having the return date on the order to show cause come after the September 14th hearing in Texas. We pushed for the hearing on our motion to dismiss. We stand by that in Texas. We do want a hearing on the motion to dismiss, and we're not opposed to the suggestion I believe Mr. Fullerton may have been making that the return date at least and the evidentiary hearing occur second to what happens in Texas.

THE COURT: All right. Anything further?

MR. MCNUTT: Yes, Your Honor, please, if I may.

You've heard this term Lazareff LeBars.

Lazareff LeBars is, in fact, two firms. There's two different petitioning creditors. I am calling in from Dubai United Emirates, which my good learned friend Mr. Pfaehler this morning in Texas referred to as Saudi Arabia. I'm not in Saudi Arabia. I'm in the UAE. I am not an attorney in any state in the United States. And we have -- we are -- let's say the allegation that we colluded with Green Sapphire is simply preposterous.

If the timing of an application is somehow related to whatever concerns Mr. Pfaehler and his client have, the fact of the matter is we've had no time to retain counsel. The interrogatories and requests for production issued against the petitioning creditors I'm preparing those now. The other firm Lazareff LeBars, Paris, France, is a different firm. Same name because we use the same trademark, but a different managing director, a different claim. That law firm is presently against Dentons in a proceeding in France.

It is true that we were not aware that we had to somehow register a claim in your court. We would have done so had we known to do so. However, that matter is now the subject of

discovery that they've sought before the Texas Bankruptcy Court. And so I mentioned they filed their motion to dismiss prior to us joining -- or me joining as a petitioning creditor as Lazareff LeBars UAE.

They have not amended that motion to dismiss; yet, they're making serious allegations before you of collusion, and as a law firm, we don't take that lightly frankly. I can appreciate that they may not like the timing; but if we were truly colluding, why would we have joined later?

The fact of the matter is we became aware of the Texas involuntary bankruptcy procedure after that procedure started, and I found out about it because of an ancillary procedure. It had nothing to do --

THE COURT: When did you become aware of this bankruptcy case, sir? When did you become aware of this bankruptcy case?

MR. MCNUTT: I was aware from the Delaware court proceedings that I assisted in December that these proceedings were ongoing. But the reason I became aware is that Green Sapphire also is involved in a Cayman Islands proceeding, and I assist in the Cayman Islands proceeding. And

in that proceeding, Green Sapphire had guaranteed a loan provided by Mr. Holdman (phonetic) and Mr. Matthews. And although I was aware of the proceeding, I'm not a U.S. attorney. I don't practice in the U.S. We don't -- we don't know the rules in the U.S. procedure. That's why I need to retain counsel.

So even -- my understanding is that with the automatic stay, that the purpose of the automatic stay is to allow me as a petitioning creditor to make the claims of collusion, which they did in their motion to dismiss. And I just see they're taking two bites out of the apple because that judge this morning said she's going to deal with it on the evidence, and we're presenting that evidence.

So I would like the time to retain counsel should this proceed here and be continued; but altogether I'm not sure what you frame it in the United States, but we would frame it as a motion to stay or an application to stay in our jurisdictions to stay the proceedings pending the outcome of the motion to dismiss because if they prevail on their motion to dismiss, which is founded on their claim of collusion, they

effectively would have a fact finding to bring before you to say that Green Sapphire was in contempt.

But for you to find in parallel some collusion seems contradictory to what exactly the Texas court is doing based on my understanding.

THE COURT: That's what happens when you proceed on the same issues in four or five cases. You have got something in the District Court, something in Delaware, something in France, a --

MR. MCNUTT: Well, I haven't done that. Forgive me, but I haven't done that.

THE COURT: -- bankruptcy -- may I finish? Can I finish?

-- an adversary proceeding here, an involuntary in Texas. That's what happens when you throw all these things out there. You can't say there is so much out there so you sit still.

MR. MCNUTT: I'm not -- Your Honor, I am not --

THE COURT: You don't want to be involved with several different matters, don't open several different cases.

MR. MCNUTT: Well, forgive me. Forgive me, Your Honor, but that's not fair.

THE COURT: Do you have anything else to say?
Of course it's not fair.
MR. MCNUTT: I'm a petitioning creditor not involved in any U.S. Court.
THE COURT: Just finish up, sir.
Finish up, please.
MR. MCNUTT: I'm not in any U.S. court.
THE COURT: You are telling me there are so many things going on, there might be a conflict? Of course there is going to be a conflict.
MR. MCNUTT: I'm not --
THE COURT: Maybe that's why things are being done the way they're done.
But go ahead.
MR. MCNUTT: Quite possibly. Maybe Green Sapphire's has Green Sapphire's agenda, but that agenda is wholly different from me being a petitioning creditor with a valid claim in Texas. And all I'm suggesting is that the Texas proceeding allows the argument that they are making.
THE COURT: Thank you for the suggestion.
MR. MCNUTT: It's just an observation.
I would ask that if this is continued,

to be provided time for sufficient counsel to be engaged because I need to be able to participate on the briefing and be able to affect this motion because it affects the relief I'm seeking in Texas.

Thank you.

THE COURT: All right. Anything further from anyone else?

MR. PFAEHLER: Yes, Your Honor.

I think most of what Mr. McNutt was saying is not relevant. But the idea that he's entitled to notice, to have counsel here, to participate in proceedings, he never filed a claim in the bankruptcy, Your Honor, that we're seeking to reopen. I don't believe he has standing to seek a stay or to participate here.

We're not seeking here a finding of contempt against his firm. We are seeking here a finding of contempt against Green Sapphire.

Thank you, Your Honor.

THE COURT: Anything further on the motion to reopen?

MR. FULLERTON: Your Honor, the last thing I would say is if Your Honor is inclined to host a further hearing, my request would be that the bankruptcy case not be reopened in its entirety

because the -- that's at issue before Judge Larson.

As we procedurally sit here today, we have a dismissed bankruptcy case, and we have an active involuntary case in the Northern District of Texas that is subject to further hearing on a motion to dismiss by Global Capital.

My concern is that if the case is out and out reopened here before Your Honor, then we have two active Chapter 11 cases.

THE COURT: You filed another bankruptcy case in another state.

MR. FULLERTON: Your Honor, that's the misnomer is that Green Sapphire, the debtor, did not file that proceeding --

THE COURT: And neither did I, sir. I didn't cause the potential for conflicting judgments. It's what happens when everybody is running around the world doing things and doing different things involving the same dispute.

MR. FULLERTON: And, Your Honor, I appreciate that. But my point is that Green Sapphire does not have any control over the petitioning creditors and vice versa.

THE COURT: And neither do I.

I'm going to hear the matters before me,

and I'll let the chips fall where they may.

Anything further?

MR. PFAEHLER: Nothing further here, Your Honor.

THE COURT: All right.

The motion to continue is denied.

The motion to reopen will be granted. The Code allows a case to be reopened to administer assets, to afford relief to the debtor or for other cause. I see that the situation satisfies the element of "for other cause."

Anything further on the proposed order?

MR. PFAEHLER: Nothing further from Global Capital, Your Honor.

THE COURT: Now, your Paragraph 3 says Green Sapphire has to appear on or before September 8th?

MR. PFAEHLER: Yes. I'm sorry, Your Honor.

THE COURT: It should have to appear on a certain date and time.

MR. PFAEHLER: Yeah. Let's -- why don't we give a date and time that sets the order to appear and show cause after September 14th.

THE COURT: What date do you suggest?

MR. PFAEHLER: We would suggest September -- well, we would suggest September 16th, Your Honor.

THE COURT: That's a bad day for me. That's a very bad day for me.

MR. SWICK: Your Honor, this is Adam Swick. I am Texas counsel. To the extent I may have to make an appearance and appear, I'm speaking at a conference that week, and I would appreciate if we can move past that week, and I do think I'll need to appear.

THE COURT: The best date for me would be September 23 or 24.

MR. PFAEHLER: Your Honor, unfortunately, I am unavailable on the 23rd or the 24th. I could be available on the 28th or 29th if those happen to be available to you.

THE COURT: How about -- because those are my heavy motion days, how about the 30th that Wednesday?

MR. PFAEHLER: That will be wonderful for us.

THE COURT: Let me check to make sure I'm available. I think I just scheduled something for the 30th.

We'll take the 30th. If I'm not available, I'll switch it to October 1.

All right. Hold on. Let me just change the order. Hold on.

MR. SWICK: At 1:00, Your Honor?

THE COURT: Hold on.

The order is going to say on -- see if it's a fillable order, the order on the motion to reopen. I'm not sure.

It should say on. It should say on September 30th at 1:30.

Well, September 30th we can do it in the morning at 10:00 a.m.

MR. PFAEHLER: That would be very good for us, Your Honor. Thank you.

MR. FULLERTON: Your Honor, for the debtor Green Sapphire Holdings, do we have the ability to on a more fulsome basis respond to the pending motion prior to that date?

THE COURT: Sure. Not a problem.

Hold on a second. I'm trying to get the order together.

MR. FULLERTON: Thank you, Your Honor.

THE COURT: I'll prepare the order. It will get done before the end of the day.

We'll have a paragraph allowing the written response. I'll prepare the order for a written response to be filed on or before September 24th. That order will get done before the day is over.

Thank you all very much.

MR. FULLERTON: Thank you, Your Honor.

MR. PFAEHLER: Thank you, Your Honor.

(Which were all the proceedings had in the above-entitled cause, September 1, 2026, 1:00 p.m.)

I, MARY C. KELLY, CSR, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE./S/ (f)

# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | | |
|---|---|---|
| In Re: | ) | BK No.: 25-07412 |
| Green Sapphire Holdings, Inc. | ) | |
| | ) | Chapter: 11 |
| | ) | Honorable Jacqueline P Cox |
| | ) | |
| | ) | |
| Debtor(s) | ) | |

**ORDER GRANTING MOTION FOR AN ORDER REOPENING THE CASE FOR THE PURPOSE OF ENFORCING THE ORDER BARRING REFILING AND FOR AN ORDER TO SHOW CAUSE WHY GREEN SAPPHIRE HOLDINGS, INC. SHOULD NOT BE HELD IN CONTEMPT OF COURT FILED BY GLOBAL CAPITAL PARTNERS, LLC**

Upon the motion of Global Capital Partners, LLC pursuant to Sections 105(a) and 350(b) of the Bankruptcy Code and Bankruptcy Rule 5010 for entry of an order reopening the chapter 11 case of Green Sapphire Holdings, Inc. (Case No. 25-07412) (JC) (the "Bankruptcy Case") for the purpose of permitting Global Capital to prosecute the Motion for an Order Reopening the Case for the Purpose of Enforcing the Order Barring Refiling And for an Order to Show Cause Why Green Sapphire Holdings, Inc. Should Not Be Held in Contempt of Court (the "Motion"); and it appearing that notice of the Motion was appropriate under the circumstances, and that no other or further notice is required; and the Court having determined that the legal and factual grounds set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. The Motion is GRANTED as set forth herein.

2. The Bankruptcy Case is REOPENED for the limited purpose of enforcing the July 17, 2026 Order Granting Motion to Dismiss and Refiling Bar (ECF 140) ("Dismissal Order") and granting related relief.

3. On September 30, 2026, Debtor Green Sapphire Holdings, Inc. shall appear through a representative in person and SHOW CAUSE why it should not be held in contempt of court for violation of the Dismissal Order by having involuntary bankruptcy case 26-33254 filed in the Bankruptcy Court for the Northern District of Texas. The September 30, 2026 2:00 p.m. hearing will proceed in person at the Dirksen Federal Courthouse at 219 S. Dearborn Street, Courtroom 680, Chicago, Illinois 60604.

4. This Order is without prejudice to Global Capital's rights to seek further related relief, including, under Section 105(a) of the Bankruptcy Code and otherwise, related attorneys' fees, costs and expenses.

5. The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

6. No automatic stay under Section 362 of the Bankruptcy Code is currently in effect in this Illinois Bankruptcy Case.

7. Any party may file a written response to this Show Cause Order by September 20, 2026.

8. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the Motion and the implementation, interpretation, and enforcement of this Order, to award further sanctions against the Debtor for any failure to comply with the terms and provisions of this Order.

Prepared by:
DENTONS US LLP
Robert E. Richards
Samantha M. Siegien
233 S. Wacker Drive, Suite 5900 Chicago, Illinois 60606
Tel: (312) 876-7396
Email: robert.richards@dentons.com
samantha.siegien@dentons.com

-and-

Kenneth J. Pfaehler (pro hac vice)
Nicholas W. Petts (pro hac vice)
1900 K Street N.W.
Washington, D.C. 20006
Tel: (202) 408-6468
Email: kenneth.pfaehler@dentons.com
nicholas.petts@dentons.com
Counsel to Global Capital Partners, LLC

Enter: Jacqueline P. Cox

Honorable Jacqueline Cox
United States Bankruptcy Judge

Dated: September 01, 2026

# EXHIBIT 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREEN SAPPHIRE HOLDINGS, INC., | ) | No. 25 B 07412 |
| | ) | Chicago, Illinois |
| | ) | 1:30 p.m. |
| Debtor. | ) | September 28, 2026 |

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE JACQUELINE P. COX

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Mr. Thomas Fullerton;<br>Mr. Saul Modestas;<br>Mr. Adam Swick; |
| For Global Capital Partners: | Mr. Kenneth Pfaehler;<br>Mr. Nicholas Petts; |
| Also Present: | Mr. Michael McNutt; |

Court Reporter: Amy Doolin, CSR, RPR
D&E Reporting
Official Court Reporter
d.and.e.reporting@gmail.com.
312/986-1920

THE CLERK: Court is reconvened. Please be seated and come to order.

We are taking up the 1:30 hearing of Green Sapphire Holdings, Inc.

THE COURT: Good afternoon.

MR. FULLERTON: Good afternoon, Your Honor. Tom Fullerton for the debtor, Green Sapphire Holdings, Inc.

MR. PFAEHLER: And, Your Honor, Ken Pfaehler for Global Capital Partners.

And with me today on Zoom are Nick Petts and Samantha Siegien, also from the Dentons firm.

MR. FULLERTON: Your Honor, I --

THE COURT: Let's proceed.

MR. MODESTAS: Saul Modestas for the debtor as well. Thank you.

MR. FULLERTON: I should have mentioned, Your Honor, too, that my colleague, Adam Swick, down in Dallas, Texas, is also on for the debtor, Green Sapphire Holdings, Inc.

Thank you.

THE COURT: All right. Let's proceed.

MR. PETTS: Your Honor, we're here

today on a motion to simply continue the contempt hearing, the hearing on the order to show cause that we requested --

(Brief Interruption.)

MR. PETTS: Sorry, Your Honor. I'm getting a message, sorry, on the Zoom.

-- that we requested after the openly collusive initially a Chapter 7 filing was made down in Dallas.

Their lawyer, by the way, in a court hearing last Monday, admitted that he had reached out to one of the petitioning creditors -- frankly, the key one -- after being contacted by Green Sapphire's counsel.

Now, we made a motion to dismiss down there in Texas. They said they wanted to have witnesses. They then wouldn't tell us who the witnesses would be.

They didn't allow depositions before the hearing. They wouldn't provide discovery, and we withdrew the motion.

They then opposed the withdrawal. We withdrew the motion without prejudice so that we could file it later at the appropriate time after we actually got discovery.

We moved to transfer venue, Your Honor, to this court where this case plainly belongs -- where the Dallas case plainly belongs. And that motion will be heard on the 8th.

I would also like to advise the court that the case down in Dallas has been converted to a Chapter 11, with the full-throated support and instigation of Green Sapphire, in open violation of the bar order that your court has entered.

Now, last week, last Monday, we were in court in Dallas. The Akerman firm, representing Green Sapphire, stood in front of the court, in front of Judge Larson, and they told the court that they considered it a violation of the automatic stay in Dallas if we proceeded with a contempt hearing on this Wednesday. They told the court that they would seek a TRO in Texas if we proceeded there.

Judge Larson heard argument. They told the court, by the way, among other things, that we were playing games.

And you will see this reflected again in their opposition here, that somehow we're playing games in this matter, despite the fact that anyone who wasn't playing games would have filed in your court, Your Honor, not down in Dallas, and despite

the fact that we have observed them and their gamesmanship for the last two years.

Mr. Fullerton's colleague stood in front of the court in Texas and said, Your Honor, I mean, we have an active stay violation ongoing that needs to be stopped before September 30th. And I don't think we're going to hear a voluntary continuance on that or stop that from opposing counsel, even though everyone knows it's a stay violation.

We made our arguments to the judge. We told the judge at the time that we intended to go forward on the 30th, but we -- because we did.

But here's what Judge Larson had to say, and we considered this very carefully, Your Honor.

First, she said -- they were discussing the stay motion and characterizing what we would do there and what our evidence would be. And she said -- and this is on page 42 of the transcript last Monday, Your Honor:

(As read)

That's not my hearing. I can't speak to what's knowing -- to what's needed.

I know this is my court. And, number

one, I am prone to stay in my lane; and, number two, I intend to, because, obviously, folks have set up a very dangerous game between two courts.

It is one thing to set up a game, to set up a situation between a bankruptcy court and a state court or a bankruptcy court and some sort of regulatory tribunal, but it's a whole other thing to set up between two essentially sister courts, and I understand very strongly both sides.

Now, we know who set up this situation. We know that if there was anything legitimate about the petitioning creditors and what they did, they would have filed in this court, which has been hearing this matter for years.

Eventually, Judge Larson took a break. And after she came back and the discussion renewed, here's what she had to say, Your Honor:

(As read)

Again, I said then, and I'll stand by it, with respect to the case law, there's one issue of the court proceeding on its own -- that is a court proceeding with a contempt hearing, Your Honor.

But once the creditor is joining in -- there she's referring to Global Capital -- you have a -- and Chestnut applies in this district from a

Fifth Circuit perspective.

And the question is whether or not you're arguably violating the automatic stay. And Chestnut says come here and ask for permission. That's what Chestnut says.

I don't have from you a mother-may-I pleading. I have -- your prerogative. I have it. You're going forward. That's what I have.

She then continued a few sentences later:

(As read)

I'm just -- I'm not begging anyone one way or the other, and I understand where we're going, but I also understand that there's probably safer ways to proceed.

And you have already teed up your motion to transfer venue. It's like I said, a motion to dismiss here, motion to transfer venue, motion to lift, there's a ton of different ways to proceed.

But I've read the case law relative to the governmental exception, and I'm not saying that it's absolutely inapplicable. I don't believe that.

But I do believe it's a much finer line of things that there -- that we're -- or maybe

you already teed up before the petition date of things where you do have a governmental actor, et cetera.

And so the motion to reopen in this court, Your Honor, is one thing. As I said, I'm not sure that the motion to reopen in and of itself violates the automatic stay.

But now I have a debtor in bankruptcy, and it's just in the Fifth Circuit, it's not that hard to violate the automatic stay because of Chestnut. And I don't desire to have to make hard rulings, so that's all I'll say here.

Your Honor, we thought very hard after hearing the court. We thought very hard about what is in the best interest of both courts here, and what the best way to proceed was. And a couple of days later --

THE COURT: Just a second.

Take the white screen down.

(Brief pause.)

THE COURT: Go ahead, sir.

MR. PETTS: Yes. I'm sorry, Your Honor.

And during the hearing, Your Honor, we certainly didn't say we're going to ask for a

continuance here before Your Honor. We said we're proceeding. That's where we were on that date.

But this was last Monday. And we went back and we thought about what was in the best interests of both courts. And we then called opposing counsel. Last Thursday. We reached out.

We said to what Judge Larson -- to avoid what Judge Larson referred to as the dangerous game between the two sister courts, we would be willing to continue, and we propose continuing the motion for contempt -- I'm sorry, the motion for contempt, correct, the order to show cause on contempt, until after the motion to transfer venue in Dallas could be heard. That's a pending motion. It will be heard on October 8.

We would have expected, given that, for example, Mr. Fullerton's partner was actually telling the court that we were not going to back off and that, therefore, they would have to make a TRO, we would have expected they would have simply accepted that continuance.

But true to the Thane Ritchie playbook, they oppose. They are still going forward with a temporary restraining order they filed, Your Honor -- there's a hearing on it tomorrow morning --

to hold us in contempt of the automatic stay, to find we have violated the automatic stay, because we are in to prevent a proceeding from occurring in this court on the 30th.

At the same time that they say they have to be in court in Dallas tomorrow with their TRO to prevent us from proceeding on the 30th, they're standing in front of you today to say we have to go forward on the 30th.

They tell the court in Dallas, if we proceed on the 30th, we're violating the stay.

They tell this court they must proceed on the 30th because, I don't know, you know, Mr. McNutt was in -- you know, was supposedly on a flight, even though he couldn't be deposed for the entire week before the motion-to-dismiss hearing in Texas.

Now suddenly he's here the week before. They say they have some extra costs. It doesn't make any sense, Your Honor.

If the stay is not -- if the -- our hearing is not continued Wednesday, we'll be in court tomorrow morning in Dallas, after they have refused to withdraw. And they will argue that -- after they have refused to agree to the continuance of the

hearing here.

And they will argue that a temporary restraining order is necessary to stop us from breaking the stay by conducting the very hearing they're seeking to preserve here. Are you kidding me?

We've seen one cynical, implausible argument after another for the last two years from Mr. Ritchie and Green Sapphire. This may take the cake, Your Honor. This may take the cake.

And this is weapons-grade gaslighting when they say we're playing games. We know very well what's going on here.

Your Honor, we respectfully submit we offered on the 24th to continue this -- the hearing that is set for Wednesday until after the venue transfer motion to be heard on October 8th can be decided. Green Sapphire refused.

While it's Green Sapphire's position that the contempt hearing is exempt from the -- I'm sorry, while it is Global Capital's position that the contempt hearing is exempt from the scope of the stay, out of an abundance of caution, threatened with a TRO, being told by the court in Dallas that she's not sure, and that we have -- we may well have

an automatic stay violation in Chestnut, we respectfully request that the very important contempt motion, order-to-show-cause hearing that we've asked for, and that we very much want to proceed with, particularly if this venue is transferred and perhaps either way, but that that be continued until the Dallas court can decide the motion to transfer.

Thank you, Your Honor.

THE COURT: Response?

MR. FULLERTON: Yes, Your Honor. Thank you. Again, Tom Fullerton for the debtor.

Your Honor, we, obviously, have very different views of the world on many different points. But as it relates to this hearing, we -- the debtor is unwilling to agree to what we view as --

THE COURT: I don't think he needed your agreement to file a motion. He filed a motion. I ruled on it. You don't need the other side's agreement to do something.

MR. FULLERTON: I agree with Your Honor. I --

THE COURT: Please present your -- what's your response?

MR. FULLERTON: We are --

THE COURT: I just don't think your agreement, I don't think it's necessary.

MR. FULLERTON: Your Honor, it's not. And they filed the motion.

THE COURT: Please present your response.

MR. FULLERTON: Yes, Your Honor.

We view this as an ongoing stay violation. If anything should occur --

THE COURT: You're entitled to your opinion.

MR. FULLERTON: And, Your Honor, we filed our response, and I'm here to argue it.

We believe that this matter, this reopened matter, should be dismissed. This --

THE COURT: Did you file a motion to dismiss it?

MR. FULLERTON: Your Honor, we filed a motion --

THE COURT: Did you file it, yes or no?

MR. FULLERTON: A motion to dismiss?

THE COURT: Is there a motion to dismiss it before me?

MR. FULLERTON: No, there is not.

THE COURT: Thank you.

MR. FULLERTON: Your Honor --

THE COURT: Go ahead.

MR. FULLERTON: We have a motion to reconsider the order that reopened this matter.

THE COURT: Today we're talking about whether the Wednesday hearing should be continued.

MR. FULLERTON: Yes, Your Honor. Our motion --

THE COURT: You should address that issue.

MR. FULLERTON: Okay. Your Honor, this matter needs to be dismissed for a few different reasons.

Global Capital has been aware for quite --

THE COURT: If you continue to talk about other issues, I'm going to find that you are not responding to today's motion.

MR. FULLERTON: Your Honor --

THE COURT: Today's motion is a motion to continue. Please respond to it.

MR. FULLERTON: And, Your Honor, my apologies. I'm trying to do so.

We believe that Global Capital was aware as of September 1st that there was an automatic stay in place. The record is clear on that.

If you review the transcripts from Judge Larson, Judge Larson said unequivocally that there's an automatic stay in place on September 1st.

Judge Larson, again --

THE COURT: You're saying that the most -- that the hearing on Wednesday should proceed so that there would be more than an attempt to violate the stay; there'd be a concrete violation?

You seem to be inconsistent.

MR. FULLERTON: Your Honor --

THE COURT: You seem to be approaching estoppel.

MR. FULLERTON: -- we want this matter dismissed so that there cannot be any further violation stay --

THE COURT: Should it be continued from Wednesday, sir? That's the motion before me. Yes or no?

MR. FULLERTON: Your Honor, I don't believe that it should be. I --

THE COURT: Yes or no?

MR. FULLERTON: No. No, Your Honor.

THE COURT: Go ahead.

MR. FULLERTON: Your Honor, the matter should either be dismissed or it should be stayed, as would be the case in any other bankruptcy --

THE COURT: It's a motion to continue, sir. We're not here on the merits.

Continue Wednesday or not? You said no. Why?

MR. FULLERTON: Because --

THE COURT: Because you want a violation of the automatic stay.

MR. FULLERTON: Your Honor, that's what we believe this to be. If it's continued until Wednesday, things are not -- they're not going to change.

They've asked that it be continued actually until a date after the motion to transfer venue. If that motion is denied --

THE COURT: The motion for venue is on the 8th. They asked that it be continued to the 20th.

MR. FULLERTON: To the 20th of October.

THE COURT: I thought the motion to

transfer venue was going to be heard on --

MR. PETTS: That's correct, Your Honor. It will be heard on the 8th. And we have moved to continue until the 20th.

MR. FULLERTON: Yes, Your Honor, but what's going to take place in between now and then? We're going to have to potentially respond to discovery leading up to that hearing that would take place in the --

THE COURT: You want the hearing to proceed on Wednesday. You oppose its continuance.

MR. FULLERTON: Yes, Your Honor. We have --

THE COURT: You're an officer of the court. You should come in here with a straight argument. Either you want it continued or not.

You say no, and all this other stuff is inconsistent.

MR. FULLERTON: Your Honor, I don't think I'm being unequivocal. We want it dismissed. That's what we --

THE COURT: There's no motion to dismiss before me today.

MR. SWICK: Your Honor, this is Adam Swick for the debtor.

May I interject?

THE COURT: I'm sorry. Who is talking?

MR. SWICK: This is Adam Swick, also with Akerman on behalf of the debtor.

May I please respond to your question?

THE COURT: No.

Go ahead, Mr. Fullerton. One is enough.

Go ahead.

MR. FULLERTON: Thank you, Your Honor.

Your Honor, we have a motion for reconsideration of the order --

THE COURT: It's not before me today.

MR. FULLERTON: But, Your Honor, this was set -- this is an emergency hearing that was manufactured by Global Capital to potentially avoid --

THE COURT: If I thought it was manufactured, I'd sanction under Rule 11.

Go ahead, Mr. Fullerton. Address the motion to continue.

MR. FULLERTON: And, Your Honor, I

apologize. That's what I thought I was doing here.

We view -- I'm not trying to be inefficient or obstructionist. I think, Your Honor, perhaps you haven't heard the whole story about what has transpired in the Texas court.

And Mr. Pfaehler has improperly lumped the debtor and the petitioning creditors as though they're the same -- they're the same entity or individuals.

THE COURT: This gentleman in the back is raising his hand. I don't know whether he's raising his hand for me or you.

But go ahead, Mr. Fullerton. One at a time.

Go ahead, Mr. Fullerton.

MR. FULLERTON: From our perspective, you know, Judge Larson recently entered an order for relief that --

THE COURT: And you're basically telling -- you're arguing that should be disrespected; I can go on with the motion on Wednesday.

But go ahead.

MR. FULLERTON: You know, my apologies, Your Honor.

Your Honor, I think if the court is willing to stay the proceeding until the 20th, which is the relief that has been requested, meaning we would not be -- we would not be in a position where we would have to further litigate between now and then, then I believe that we would -- we would allow for that. We would not oppose that relief.

THE COURT: Anything further, Mr. Fullerton?

MR. FULLERTON: Not from the debtor.

Michael McNutt is in the courtroom. He's one of the --

THE COURT: He can speak to you, that's fine, but I'm going to hear only one lawyer today on the emergency motion.

MR. FULLERTON: Your Honor --

THE COURT: Go ahead and talk to him, if you want.

MR. FULLERTON: Your Honor, I do not represent Mr. McNutt. He is here on behalf of one of the intervening creditors.

THE COURT: All right.

MR. FULLERTON: And he may want to --

MR. PETTS: And they are not a party to this motion.

THE COURT: Anything further on the motion, Mr. Fullerton?

MR. FULLERTON: Not from the debtor, Your Honor.

THE COURT: Reply, Mr. Pfaehler?

MR. PETTS: Yeah, the only thing I would say is I didn't hear a single reason why this should not be continued.

And we, obviously, do not agree to a stay. They're trying to back-door an attempt to avoid discovery that's under way in Dallas.

Thank you, Your Honor.

THE COURT: Anything further, sir?

MR. FULLERTON: No, Your Honor.

THE COURT: Why do you keep raising your hand? Have you filed an appearance in this matter?

MR. McNUTT: Your Honor, I'm Michael McNutt.

THE COURT: What's your name, sir?

MR. McNUTT: Michael McNutt.

THE COURT: Have you filed an appearance in this matter?

MR. McNUTT: I have not.

THE COURT: Then I won't hear you.

MR. McNUTT: Ma'am, excuse me. You did hear me on the --

THE COURT: I said I won't hear you, sir --

MR. McNUTT: I'm a foreign litigant --

THE COURT: Have a seat.

MR. McNUTT: -- I'm a foreign litigant.

THE COURT: You do not have an appearance in this matter.

MR. McNUTT: No, I cannot have an appearance because this was an expedited hearing --

THE COURT: The motion --

MR. McNUTT: I flew here from Dubai and --

THE COURT: The motion --

MR. McNUTT: -- I expect my appeal rights to be --

THE COURT: The motion is taken under advisement. I'll get an order out as soon as possible.

MR. McNUTT: Your Honor, I have --

THE COURT: Have a nice day.

MR. McNUTT: Your Honor, that's not acceptable --

THE CLERK: Court is adjourned.

MR. McNUTT: Your Honor, I'll be filing an opposition. That's unacceptable.

(Which were all the proceedings had in the above-entitled cause, September 28, 2026, 1:30 p.m.)

I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE. /S/